# EXHIBIT 1



March 10, 2014

Stuart McNicol
6633 E. Greenway Parkway # 1135
Scottsdale, AZ 85254

Dear Stuart,

Village Health Club and Spas is pleased to extend this employment offer to you for the position of Head
Tennis Professional at our DC Ranch Village location. We would like you to begin as of March 17, 2014.
You will report directly to Nicholas Heron, Tennis Director of DC Ranch Village Health Club & Spa.

Your beginning biweekly base salary will be $553.85, which is equivalent to $14,400.00 in one full year of
employment.

In addition to your salary and performance incentive and management commission bonus, you will receive
the following:

- A rate of $40.00 per hour for tennis instruction you provide in the Junior Development
  Program and lessons
- 60% commission for private or group tennis clinics that you provide with 6 participants
  or less
- 40% commission on 60% of the clinic rate for group tennis clinics that you co-facilitate
  with the Tennis Director with 7 or more participants.
    - For example: 1.5 hour clinic rate for 8 members is $180.00, of which the Tennis
      Director receives 60% ($108.00). Of the $108.00, you would receive 40%
      ($43.20).

Please keep in mind that compensation plans are subject to change at any time to align with business
objectives. Village Health Clubs & Spas is an at will employer. Nothing in this offer changes the fact that
employment is at will for an indefinite period, and that employment may be terminated by you or Village
Clubs any time and for any reason or no reason at all. This offer of employment is contingent upon
successful completion of a criminal background check.

Village Health Clubs & Spas expects its employees to comply with any legal or contractual obligations to
their previous employers. This includes restrictive covenants not to compete, not to solicit, and not to
disclose. It is your obligation to determine which restrictive covenants may apply to you and you are
expected to comply with any such covenants in accordance with applicable law.

On the first of the month following one month of full time employment, you will be eligible to participate in
the Village Health Clubs & Spas comprehensive benefit programs. Separate detailed information will be
provided to you with regard to the benefit plans.

DMB000018

Our health and wellness plans include medical, dental and vision. For 2014, the company and employee portions per bi-weekly pay period is shown below.

Aetna EE Only: Employer cost: $168.41,          Employee cost: $54.60
Aetna EE + Spouse: Employer cost: $256.95       Employee cost: $211.38
Aetna EE + Children: Employer cost: $248.70     Employee cost: $197.33
Aetna EE +Family: Employer cost: $ 361.08       Employee cost: $352.54

Delta Dental EE Only Employer cost: $35.76      Employee cost: $0.00
Delta Dental EE+ Family                         Employee cost: $29.12

We also offer Short Term and Long Term disability at no cost to you as well as Company paid life insurance as well as Supplemental Life, a generous Paid Time off allotment, 401(k) with an annual discretionary company match.

Congratulations Stuart! We look forward to having you join the Village team! We believe that you can make a significant contribution to the future growth and success of Village Health Clubs & Spas.

Please acknowledge your intention to accept the position by signing below and returning to my attention. Should you have any questions about any aspect of this offer, please feel free to discuss them with Jim or myself.


Sincerely,



Laura Frederickson, PHR
Director, Human Resources



_____              _____
          Stuart McNicol                    03/12/2014
                                                   Date

   Cc: Rick Erdenberger
       Nicholas Heron

DMB000019

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

|  |  |  |
|---|---|---|
| | ) | |
| Stuart McNicol, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | 2:19-cv-00750-PHX-SMB |
| | ) | |
| DMB Sports Clubs Limited | ) | |
| Partnership, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DEPOSITION OF STUART MCNICOL

September 17, 2019

9:38 a.m.

2415 East Camelback Road, Suite 800

Phoenix, Arizona 85016

Shelley E.D. Pearce, RPR, CR No. 50301

**STUART MCNICOL**                                   **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      Q.   Mr. McNicol, I've handed you what's been marked
2  Exhibit 1 to your deposition.  Go ahead and take as much
3  time as you need to review it, and just let me know when
4  you're ready for my next question.
5      **A.   Okay.**
6      Q.   Do you recognize Exhibit 1 as the offer letter
7  you received from the Village -- the DC Ranch Village
8  Health Club & Spa?
9      **A.   Yes.**
10     Q.   And Exhibit 1 sets forth the pay structure for
11 your position, correct?
12     **A.   Correct.**
13     Q.   You received a biweekly based salary equivalent
14 to 14 hundred and 400 [sic] per year, correct?
15     **A.   14,400.**
16     Q.   I'm sorry.  $14,400 per year?
17     **A.   Yes.**
18     Q.   Okay.  And then you also received hourly rates
19 for providing certain types of tennis instruction,
20 correct?
21     **A.   Yes.**
22     Q.   And that's set forth in Exhibit 1, correct?
23     **A.   Yes.**
24     Q.   Did those -- did your rates of pay change at any
25 time during your employment with DC Ranch Village?

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      **A.    It was a form of instruction specific for**

2      **juniors.**

3      Q.    Okay.  And what age was considered a junior?

4      **A.    Three or four years old to 18.**

5      Q.    And during the time you worked at the Village,

6      was the junior academy held during a specific time period?

7      **A.    Yes.**

8      Q.    Okay.  When was that?

9      **A.    I believe during the school year.  It was**

10     **between 4:00 and 6:00 in the afternoon.**

11     Q.    And these were group lessons provided to

12     individuals under the age of 18?

13     **A.    Yes.**

14     Q.    Did you know Nick Heron from prior to becoming

15     employed at DMB?

16     **A.    No.**

17     Q.    You indicated that it was your understanding

18     that he had heard you were a successful tennis

19     professional?

20     **A.    Correct.**

21     Q.    And do you know how he heard about you?

22     **A.    I don't know.**

23     Q.    I'd like to ask you to describe for me your job

24     duties as the head tennis professional at DC Ranch.

25     **A.    I was to help plan or help organize periodic**

 1   special events.  I was to assist in scheduling of courts

 2   and POS system, the booking of lessons, teaching lessons

 3   to juniors as well as adults, providing programs that

 4   would -- that would accompany the whole membership.

 5       Q.   Would you agree with me that one of your primary

 6   responsibilities was to help grow the tennis program?

 7       A.   Yes.

 8       Q.   And to retain the members that were already part

 9   of the tennis program?

10       A.   Yes.

11       Q.   When you indicated that part of your

12   responsibility was to help plan and organize periodic

13   special events, what did you mean by "special events"?

14       A.   Events that were -- events that were taking

15   place.

16       Q.   Would those be some of the events we just talked

17   about in terms of tournaments --

18       A.   Yes.

19       Q.   -- and social events?

20       A.   Yes.

21       Q.   And other events where members would get

22   together and play tennis?

23       A.   Yes.

24       Q.   Okay.  Am I missing any other big categories of

25   things?  I'm not trying to be...

```
 1      A.   No.
 2      Q.   That was what you understood about "special
 3   events"?
 4      A.   Yes.
 5           MS. FREED:  I'm going to mark Exhibit 2.
 6           (Exhibit 2 marked.)
 7   BY MS. FREED:
 8      Q.   Mr. McNicol, I've handed you what's been marked
 9   Exhibit 2.  Let me know when you've had an opportunity to
10   review it.
11      A.   Okay.
12      Q.   Do you recognize Exhibit 2?
13      A.   Yes.
14      Q.   This was a job description for your role as the
15   head tennis professional?
16      A.   Yes.
17      Q.   Okay.  Do you agree with the job functions
18   listed in Exhibit 2, that those were within the scope of
19   your position?
20      A.   Yes.
21      Q.   Did you ever -- were you ever notified that your
22   job description had changed?
23      A.   No.
24      Q.   Is it your testimony your job duties remained
25   the same throughout your employment?
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1        A.    Yes.

 2        Q.    And you understood that the Village would derive

 3   revenue from the lessons you provided, correct?

 4        A.    Yes.

 5        Q.    You weren't given the entire lesson fee in your

 6   compensation, correct?

 7        A.    Say the first question again.

 8        Q.    Sure.  Let me take a step back.

 9              So you understood that DMB was a for-profit

10   business, correct?

11        A.    Yes.

12        Q.    It was not a nonprofit, correct?

13        A.    Correct.

14        Q.    You understood that part of your role within the

15   tennis department was to help DMB generate revenues,

16   correct?

17        A.    Yes.

18        Q.    Through things like lessons --

19        A.    Yes.

20        Q.    -- correct?

21              And continuing to get members to join the

22   program --

23        A.    Yes.

24        Q.    -- correct?

25              And the prior question I was asking you was
```

```
 1        A.   No.

 2        Q.   That was what you understood about "special

 3   events"?

 4        A.   Yes.

 5             MS. FREED:  I'm going to mark Exhibit 2.

 6             (Exhibit 2 marked.)

 7   BY MS. FREED:

 8        Q.   Mr. McNicol, I've handed you what's been marked

 9   Exhibit 2.  Let me know when you've had an opportunity to

10   review it.

11        A.   Okay.

12        Q.   Do you recognize Exhibit 2?

13        A.   Yes.

14        Q.   This was a job description for your role as the

15   head tennis professional?

16        A.   Yes.

17        Q.   Okay.  Do you agree with the job functions

18   listed in Exhibit 2, that those were within the scope of

19   your position?

20        A.   Yes.

21        Q.   Did you ever -- were you ever notified that your

22   job description had changed?

23        A.   No.

24        Q.   Is it your testimony your job duties remained

25   the same throughout your employment?
```

1      **A.    Yes.**

2      Q.    And you understood that the Village would derive

3  revenue from the lessons you provided, correct?

4      **A.    Yes.**

5      Q.    You weren't given the entire lesson fee in your

6  compensation, correct?

7      **A.    Say the first question again.**

8      Q.    Sure.  Let me take a step back.

9            So you understood that DMB was a for-profit

10 business, correct?

11     **A.    Yes.**

12     Q.    It was not a nonprofit, correct?

13     **A.    Correct.**

14     Q.    You understood that part of your role within the

15 tennis department was to help DMB generate revenues,

16 correct?

17     **A.    Yes.**

18     Q.    Through things like lessons --

19     **A.    Yes.**

20     Q.    -- correct?

21            And continuing to get members to join the

22 program --

23     **A.    Yes.**

24     Q.    -- correct?

25            And the prior question I was asking you was

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1   whether you understood that the lessons you provided
 2   generated some income for DMB, correct?
 3       A.   Yes.
 4       Q.   In other words, you didn't get to keep the
 5   entire lesson fee that DMB charged for your time, correct?
 6       A.   You'll have to rephrase that question.
 7       Q.   Okay.  Well, we can go back to Exhibit 1, which
 8   sets for forth your compensation, but you received a
 9   commission off the lessons you provided, correct?
10       A.   Correct.
11       Q.   Some percentage was fee that was charged?
12       A.   Correct.
13       Q.   Did you have any responsibility as the head
14   tennis professional for any financial reporting of the
15   tennis department?
16       A.   No.
17       Q.   You weren't ever responsible for creating a
18   budget for the department, correct?
19       A.   Correct.
20       Q.   Okay.  You didn't prepare -- strike that.
21            You were not responsible for tracking revenues
22   and losses of the tennis department, correct?
23       A.   Correct.
24       Q.   And you didn't have any direct subordinates in
25   your position as the head tennis professional, correct?
```

**STUART MCNICOL**                                        **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1        A.    I don't understand "subordinate."

 2        Q.    Did you have any employees that reported to you

 3   as their supervisor?

 4        A.    No.

 5        Q.    You did not supervise directly any employees,

 6   correct?

 7        A.    No, correct.

 8        Q.    Did you have any hiring authority during the

 9   time you worked at DMB?

10        A.    No.

11        Q.    Any authority to discipline other employees?

12        A.    No.

13        Q.    You weren't responsible for reviewing employee

14   time sheets, correct?

15        A.    I assisted.

16        Q.    Okay.  When did you assist with reviewing time

17   sheets?

18        A.    No, sorry, I retract that.

19        Q.    Okay.

20        A.    Sorry.  No, I did not review anybody's time

21   sheets.

22        Q.    Okay.  Did you have any payroll-related

23   responsibility?

24        A.    No.

25        Q.    Did you have a set schedule during the time you
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1    Q.    Okay.  When would be the -- the busy -- busiest
2    time period for the tennis department?
3    **A.    Generally, during the school season.**
4    Q.    And here in Arizona, it varies a bit, but it's
5    usually what September through May?
6    **A.    I believe so.**
7    Q.    Would you agree with me that was the busiest
8    time for the tennis program?
9    **A.    Yes.**
10   Q.    And that, in addition to school being out of
11   session, that Arizona summers are pretty hot and that
12   would affect the amount of people taking lessons?
13   **A.    It could.**
14   Q.    Okay.  Do you find that people often book
15   afternoon tennis lessons during the summer --
16   **A.    No.**
17   Q.    -- heat in Arizona?
18         At the time you moved -- strike that.
19         At the time that you began employment at DC
20   Ranch, did you bring clients with you?
21   **A.    Yes.**
22   Q.    Do you recall how many?
23   **A.    I don't recall.**
24   Q.    No idea?
25   **A.    I'd be guessing.**

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1      Q.   Do you have any records that would reflect the
 2   clients that you brought with you?
 3      A.   Do I?  No.
 4      Q.   I believe you testified earlier that you -- one
 5   of your responsibilities was to increase the number of
 6   members who were taking lessons, correct?
 7      A.   Correct.
 8      Q.   What did you do to try and generate additional
 9   lessons at DC Ranch?
10      A.   I tried to promote myself.
11      Q.   And how would you do that?
12      A.   Word of mouth.
13      Q.   Can you explain what you mean by that?
14      A.   I would -- if anyone I was interested in taking
15   lessons, I would hopefully try and set one up.
16      Q.   Did you do anything else to try to generate
17   lessons at DC Ranch?
18      A.   No.
19      Q.   You mentioned earlier that one of the activities
20   that you performed at DC Ranch was stringing, correct?
21      A.   Correct.
22      Q.   When you were initially hired at DC Ranch, was
23   anyone performing stringing at that time?
24      A.   Yes.
25      Q.   Who?
```

```
 1      A.   No.

 2      Q.   Do you know how much income you derived for

 3   stringing in 2014?

 4      A.   I don't know.

 5      Q.   Do you know in 2015?

 6      A.   No.

 7      Q.   But those numbers would be reflected in your

 8   taxes?

 9      A.   Correct.

10      Q.   Now, at some point, the stringing -- there was a

11   formal stringing program implemented, correct?

12      A.   Correct.

13      Q.   Tell me about that.

14      A.   A stringer was bought and stringing was done

15   through the POS system.

16      Q.   Do you recall when the stringing machine was

17   purchased?

18      A.   End of 2016 or -- I would be guessing, but

19   sometime between August and December.

20      Q.   Okay.  So, to the best of your recollection,

21   there was a stringing machine purchased at the end of

22   2016, correct?

23      A.   Yes.

24      Q.   But you don't know the exact date?

25      A.   No.
```

```
 1       Q.   Do you know why DMB formalized the stringing
 2   program?
 3       A.   No.
 4       Q.   Do you know who made the decision to do that?
 5       A.   I believe it was the general manager, Jim
 6   Krimbill.
 7       Q.   And what's the basis for your belief that it was
 8   Mr. Krimbrill who made the decision to implement a formal
 9   stringing program?
10       A.   I believe he was the one that purchased the
11   machine.
12       Q.   I'm just asking you why you believe that.
13       A.   Nick Heron told me that Jim Krimbrill purchased
14   the machine.
15       Q.   And once the machine was implemented, was there
16   a difference in the way that the stringing was handled?
17       A.   Yes.
18       Q.   Okay.  Tell me about that.
19       A.   It was done at the club and ran through the POS
20   system.
21       Q.   Okay.  And when you say run through the POS
22   system, meaning, DMB charged a fee to the member itself,
23   correct?
24       A.   Correct.
25       Q.   Okay.  And do you -- were the individuals who
```

1   BY MS. FREED:

2       Q.    Mr. McNicol, before we took our break, we spoke

3   a little bit about the stringing program at DMB.  How did

4   your pay for stringing differ between when you were doing

5   it at home and when DMB formalized a stringing program?

6       **A.    I got paid a hundred percent.**

7       Q.    When you were stringing at home, you got paid a

8   hundred percent of the amount that was charged for the

9   stringing to the customer --

10      **A.    Correct.**

11      Q.    -- or to the member?

12      **A.    Correct.**

13      Q.    Okay.  And when DMB formalized the stringing

14  program, you got a flat rate?

15      **A.    Correct.**

16      Q.    Okay.  And it's your testimony you don't know if

17  DMB took some of the amount charged to the customer for

18  the stringing?

19      **A.    I don't know.**

20      Q.    You don't know if DMB derived any revenue from

21  the stringing program?

22      **A.    I don't know.**

23      Q.    Okay.  Do you believe that they did?

24      **A.    I believe it changed, yes.**

25      Q.    You believe that --

1       **A.    It changed.**

2       Q.    That what changed?

3       **A.    It changed during the course from when it was**

4    **first brought into place and changed.**

5       Q.    Okay.  Meaning, the stringing program itself

6    changed from when it was first initiated through what it

7    was when you left employment?

8       **A.    The commission changed.**

9       Q.    The amount that you or others received for

10    performing the stringing?

11       **A.    Correct.**

12       Q.    And do you believe that change was so that DMB

13    could generate additional revenues from the stringing

14    program?

15       **A.    Yes.**

16       Q.    Okay.  And did you think that was reasonable for

17    DMB to derive revenue from the stringing program?

18       **A.    I don't know.**

19       Q.    You didn't have an opinion?

20       **A.    Well, it changed.  Meaning it affected my**

21    **commission.**

22       Q.    Okay.  You received a lower commission as --

23       **A.    Correct.**

24       Q.    -- the program changed?

25       **A.    Correct.**

```
 1    stringing activities?
 2        A.   Yes.
 3            MS. FREED:  All right.  I'm going to mark
 4    Exhibit 3.
 5            (Exhibit 3 marked.)
 6    BY MS. FREED:
 7        Q.   Mr. McNicol, I've handed you what's been marked
 8    as Exhibit 3.  Do you recognize Exhibit 3?
 9        A.   Yes.
10        Q.   And can you tell me what it is?
11        A.   It is an expectations for success.
12        Q.   It's a memo to you from Nick Heron, correct?
13        A.   Correct.
14        Q.   And it's dated July 5th of 2016?
15        A.   Correct.
16        Q.   And it appears to be -- it was signed by you on
17    August 1st of 2016?
18        A.   Correct.
19        Q.   Do you recall receiving this document from
20    Mr. Heron?
21        A.   Yes.
22        Q.   Okay.  Did you discuss the document with him?
23        A.   Yes.
24        Q.   Okay.  Do you recall when you discussed it with
25    him?
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1    being paid outside of DMB systems, correct?

2        **A.    Correct.**

3        Q.    Okay.  Was Art Levy the only member who was

4    paying you under the table?

5        **A.    Yes.**

6        Q.    What about Zino Zacchino, Z-a-c-c-h-i-n-o, did

7    he ever pay you under the table?

8        **A.    No.**

9        Q.    Did you ever receive trade for lessons --

10       **A.    No.**

11       Q.    -- in lieu of pay?

12       **A.    No.**

13       Q.    Okay.  After you received this memo, did

14   Mr. Levy continue to pay you under the table?

15       **A.    No.**

16       Q.    Did he pay through DMB systems at that time?

17       **A.    Yes.**

18       Q.    He continued to take lessons?

19       **A.    Yes.**

20       Q.    Did you understand, after receiving Exhibit 3,

21   that these were the expectations that Mr. Heron and

22   Mr. Krimbrill had of you?

23       **A.    Yes.**

24       Q.    That these were the expectations for you to be

25   successful in your role as the head tennis professional?

```
 1      A.   I didn't believe this was specifically to me.  I
 2 believe it was something that was presented to all of us.
 3      Q.   Okay.  And what made you believe that?
 4      A.   Well, my name wasn't written on the page, and it
 5 says in order for our group to succeed, the following is
 6 expected of each of us.
 7      Q.   So you believe that Exhibit 3 was the
 8 expectations for everyone in the tennis department?
 9      A.   Correct.
10      Q.   And that these were the standards by which
11 everyone in the tennis department would be held to?
12      A.   Correct.
13      Q.   Okay.  And were you ever told that these
14 expectations no longer applied to you in your employment
15 at DMB?
16      A.   No.
17      Q.   Now, in August of 2016, you reported that you
18 had not been compensated for overtime pay, correct?
19      A.   Correct.
20      Q.   How did you -- I guess, what caused you to
21 report that to DMB?
22      A.   Laura Frederickson brought it to my attention.
23      Q.   Okay.
24      A.   That I was illegible [sic] for overtime.  I
25 wasn't aware that I was illegible [sic] for overtime.
```

```
 1      Q.    What do you mean?
 2      A.    I wasn't -- I wasn't aware that I was able to
 3  get paid for overtime.
 4      Q.    Okay.  And how did she bring that to your
 5  attention?
 6      A.    In a meeting.
 7      Q.    Do you recall when the meeting took place?
 8      A.    August of 2016.
 9      Q.    Okay.  Was anyone else present at the meeting?
10      A.    Yes.
11      Q.    Who else?
12      A.    Jim Krimbrill, and I cannot remember if Nick
13  Heron was there or not.
14      Q.    Tell me what -- to the best of your
15  recollection, what you can recall about the meeting.
16      A.    I believe we were discussing ways for me to be
17  compensated, compensated in a way to increase my income.
18      Q.    Okay.
19      A.    And so Laura Frederickson mentioned I was able
20  to -- you know, can't I work overtime?  And I replied I
21  didn't know that I was able to work overtime.
22      Q.    And how did this meeting come about?
23      A.    I don't remember.
24      Q.    Okay.  Do you recall who initiated the meeting?
25      A.    Could have been Nick Heron and myself, but
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1    **I'm -- I would be assuming.  So...**

2       Q.   You don't recall?

3       **A.   I don't recall specifically.**

4       Q.   Was the purpose of the meeting to talk about

5    your compensation?

6       **A.   Yes.**

7       Q.   Okay.  And at that time, were you dissatisfied

8    with your compensation at the Village?

9       **A.   No.**

10      Q.   Okay.  So what prompted the meeting to discuss

11   your compensation.  Do you know?

12      **A.   I was looking for a better way to --**

13      Q.   You were looking to increase --

14      **A.   -- compensate.**

15      Q.   -- you were looking to increase your

16   compensation?

17      **A.   Yes.**

18      Q.   Okay.  And during the context of that

19   discussion, Ms. Frederickson asked about your ability to

20   work overtime?

21      **A.   Correct.**

22      Q.   Okay.  And you indicated at that time you didn't

23   realize you were eligible for overtime pay?

24      **A.   Correct.**

25      Q.   Okay.  And did, during that discussion, you

1    indicate that you had already been working overtime?

2         A.    Correct.

3         Q.    Okay.  And what was Ms. Frederickson's response?

4         A.    I can't remember.

5         Q.    And you indicated prior to that meeting you

6    weren't aware that you could be compensated for working

7    overtime, correct?

8         A.    Correct.

9         Q.    And you weren't reporting overtime hours in the

10   payroll system?

11        A.    Correct.

12        Q.    And was that because you didn't believe you were

13   eligible to be paid for it?

14        A.    I didn't fill out a time sheet until -- I forget

15   the date.

16        Q.    Until after this meeting, sometime after this

17   meeting?

18        A.    No, I started filling out a time sheet before

19   the meeting.

20        Q.    Okay.  And did you ever report overtime pay on

21   the time sheet?

22        A.    Yes.

23        Q.    Starting when?

24        A.    I don't recall.  I believe it was the end of

25   September, maybe October 2015.

**STUART MCNICOL**                              **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1              MS. FREED:  Mark Exhibit 4.
 2              (Exhibit 4 marked.)
 3    BY MS. FREED:
 4       Q.    Mr. McNicol, do you recognize Exhibit 4?
 5       A.    Yes.
 6       Q.    This was a memo that was sent to you in
 7    September of 2016 related to overtime pay, correct?
 8       A.    Correct.
 9       Q.    And subsequent to your conversation with Laura
10    Frederickson and Jim Krimbrill, the Village went back and
11    attempted to calculate the overtime that you had not been
12    paid for, correct?
13       A.    Correct.
14       Q.    And you'll agree with me that Exhibit 4 sets
15    forth the method that the Village used to try to calculate
16    the overtime that you were due?
17       A.    Correct.
18       Q.    Okay.  And they, ultimately, calculated a total
19    sum due to you of $5,964.33 gross, correct?
20       A.    Correct.
21       Q.    Did you think that that amount was a fair
22    allocation or assessment of the overtime that you were
23    owed?
24       A.    Yes.
25       Q.    You didn't dispute the amount?
```

1    A.   No.

2    Q.   And you'll agree with me that you were

3  instructed about the importance of tracking all the hours

4  worked after -- or in this memo?

5    A.   Correct.

6    Q.   Okay.  And you were continued to pay overtime if

7  you reported it on your paycheck after this memo?

8    A.   Correct.

9    Q.   Did you have any issues in terms of being paid

10  proper overtime after September of 2016?

11    A.   No.

12    Q.   Now, Mr. Heron left employment with the Village

13  in September of 2016, correct?

14    A.   Yes.

15    Q.   Do you know why he left DMB's employment?

16    A.   No.

17    Q.   Did you keep in contact with him after his

18  resignation?

19    A.   Maybe for one month.

20    Q.   Do you recall what you kept in contact with him

21  about over that month?

22    A.   His end-of-year party for his resignation.

23    Q.   His resignation party?

24    A.   Yes.

25    Q.   I mean, just to clarify, did DMB throw a going

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1        A.    Correct.
 2        Q.    And it was just the three of you present for
 3   that meeting?
 4        A.    I believe so.
 5        Q.    Okay.  And do you know whether or not
 6   Mr. Krimbrill and Mr. Heron discussed the memo prior to it
 7   being issued to you?
 8        A.    I don't know.
 9        Q.    Okay.  And do you know -- do you have personal
10   knowledge that anyone else in the tennis department
11   received that memo?
12        A.    I don't know.
13        Q.    Okay.  How did you learn that Mr. Critchley
14   was -- had been hired as the director of tennis?
15        A.    I don't recall exactly.
16        Q.    Did you meet with Mr. Critchley after he was
17   hired?
18        A.    Yes.
19        Q.    Okay.  Did you discuss what his expectations
20   were of you as the head tennis pro --
21        A.    No.
22        Q.    -- at any time?
23        A.    During my employment?
24        Q.    Yes.
25        A.    Yes.
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      Q.    When was the first time?

2      **A.    I believe, April 2018.**

3      Q.    It's your testimony that the first time you and

4    Dave Critchley ever discussed his expectations of your

5    responsibilities as the head tennis pro was April of 2018?

6      **A.    To the best of my knowledge, yes.**

7      Q.    And prior to that, no discussions about your job

8    duties had taken place?

9      **A.    Correct.**

10      Q.    You recorded conversations with Dave Critchley

11    during your employment with DMB, correct?

12      **A.    Yes.**

13      Q.    When was the first time you recorded a

14    conversation with him?

15      **A.    April 4th, 2018.**

16      Q.    And did you record conversations with anyone

17    other than yourself and Dave Critchley?

18      **A.    No.**

19      Q.    How did you record those conversations?

20      **A.    On my phone.**

21      Q.    And what type of phone?

22      **A.    iPhone.**

23      Q.    And do you still have that phone?

24      **A.    Yes -- I don't know.**

25      Q.    How many conversations did you record?

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1    your iPhone?

2         **A.   Yes.**

3         Q.   Do you still have audio copies of the recording

4    on your iPhone today?

5         **A.   Yes.**

6         Q.   And how are those -- are those just saved as a

7    file on your iPhone?

8         **A.   Yes.**

9         Q.   In your recording --

10        **A.   Yes, correct.**

11        Q.   -- app?

12        **A.   Yes.**

13        Q.   You mentioned you were informed by Lisa Owens

14   that certain non-members that you were giving lessons to

15   at the Village could no longer take lessons at the

16   Village, correct?

17        **A.   Correct.**

18        Q.   Okay.  And you've testified you received that

19   email sometime in early 2018?

20        **A.   Yes.**

21        Q.   And Lisa Owens is the director of membership?

22        **A.   Correct.**

23        Q.   And do you know why Ms. Owens sent that email to

24   you?

25        **A.   I don't know.**

```
 1      Q.   Do you know if she gave a similar directive to
 2   any other individuals at DMB?
 3      A.   I don't know.
 4      Q.   And who were the non-members that you were not
 5   allowed to teach or give instructions to at DMB?
 6      A.   One was Marie Discerni.
 7      Q.   Marie?
 8      A.   Discerni.
 9      Q.   How do you spell her last name?
10      A.   D-i-s-c-e-r-n-i.
11      Q.   Was she the only non-member that you were giving
12   lessons to at the Village?
13      A.   No.
14      Q.   I thought you said there were nine.  Did I
15   misunderstand you earlier?
16      A.   Yeah, I didn't say nine.
17      Q.   How many non-members were you giving lessons to
18   at the Village at the time Lisa Owens gave you the
19   directive that they could no longer take lessons at the
20   Village?
21      A.   I believe it was two.
22      Q.   Marie was one?
23      A.   Yes.
24      Q.   And who was the other?
25      A.   Lisa Joseph.
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1       Q.    And how often were Marie and Lisa taking lessons
2   with you at that time?
3       **A.    It was periodically.**
4       Q.    Not on any regular basis?
5       **A.    No.**
6       Q.    Did you, in fact, stop teaching non-members at
7   the Village after receiving that instruction from
8   Ms. Owens?
9       **A.    Yes.**
10      Q.    And do you know whether any other members of the
11   tennis department had non-members taking lessons at the
12   Village?
13      **A.    You mean tennis pros?**
14      Q.    Yes.
15      **A.    I don't know.  I believe Dave Critchley was.**
16      Q.    Okay.  And what's the basis for your belief that
17   Dave was providing lessons to non-members at DMB?
18      **A.    Because I witnessed it.**
19      Q.    Okay.  Who did you witness?
20      **A.    Varesh -- I forget Varesh's last name; his --**
21   **his girlfriend at the time, Alex; Julian Rasmussen, Max**
22   **Geiger.  That's all I can remember.**
23      Q.    Okay.  And you indicate you witnessed Dave
24   providing lessons to Varesh and his girlfriend Alex?
25      **A.    Uh-huh.**

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1       Q.   Do you know how old Julian is?

2       **A.   Eighteen.**

3       Q.   And what about Max Geiger?  Was he in the junior

4    academy as well?

5       **A.   Yes.**

6       Q.   And do you know how old he is?

7       **A.   Right now or at the time?**

8       Q.   At the time.

9       **A.   Sixteen.**

10      Q.   Was Julian 18 at the time?

11      **A.   I believe so.**

12      Q.   Okay.  Do you know how often Max Geiger took

13   lessons from Dave Critchley?

14      **A.   No.**

15      Q.   Do you recall any specific dates when you

16   observed Dave giving Max Geiger --

17      **A.   During the course of his employment.**

18      Q.   Now, you obtained employment at Desert Highlands

19   while you were employed with DMB, correct?

20      **A.   Correct.**

21      Q.   And you were hired by Desert Highlands in

22   February 2018, correct?

23      **A.   Correct.**

24      Q.   You were hired as an assistance tennis

25   professional?

**STUART MCNICOL**                                      **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      **A.    Correct.**

2      Q.    At a rate of $15 per hour?

3      **A.    I believe so.**

4      Q.    Were you -- were there any other aspects to your

5      pay arrangement with Desert Highlands other than $15 per

6      hour?

7      **A.    I received commission for teaching lessons.**

8      Q.    What was your commission?

9      **A.    65 percent.**

10     Q.    Do you know what you charged for lessons the

11     time you started?

12     **A.    Either 80 -- 80 or $85 an hour.**

13     Q.    For all individual lessons?

14     **A.    Yes.**

15     Q.    How did you come to apply at Desert Highlands?

16     **A.    Mr. Anderson was looking for somebody to help on**

17     **Sundays.**

18     Q.    And when were you approached by Mr. Anderson?

19     **A.    Yes.**

20     Q.    That's Eric Anderson?

21     **A.    Yes.**

22     Q.    He's a tennis instructor?

23     **A.    Yes.**

24     Q.    Tennis instructor for Desert Highlands?

25     **A.    Yes, correct.**

**STUART MCNICOL**                                  **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1    that you had worked with at DMB that also began taking

2    lessons with you at Desert Highlands?

3        **A.    I believe I taught one lesson.**

4        Q.    Okay.  Who was that?

5        **A.    Shelly Harding.**

6        Q.    And just so I'm understanding, she was a member

7    of which club?

8        **A.    Both.**

9        Q.    Both DC Ranch and Desert Highlands?

10       **A.    Correct.**

11       Q.    Okay.  And what about Marie?  Did Marie Discerni

12   begin taking lessons with you at Desert Highlands?

13       **A.    Yes.**

14       Q.    Did Desert Highlands provide some of their

15   members or referrals of their members for you to give

16   instruction to?

17       **A.    Yes.**

18       Q.    Do you recall what the volume of that -- those

19   referrals were was?

20       **A.    No, I don't recall the volume.**

21       Q.    When you first began working at Desert

22   Highlands, did you have any duties other than providing

23   lessons?

24       **A.    Stringing rackets.**

25       Q.    And when you -- you said you made your own

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1        A.    I don't know.

 2        Q.    You don't see how it could be interpreted that

 3   way?

 4        A.    No.

 5        Q.    Okay.  Did you have any discussion with

 6   Mr. Krimbill about this email?

 7        A.    No.

 8              (Exhibit 6 marked.)

 9   BY MS. FREED:

10        Q.    Mr. McNicol, I've handed you what's been marked

11   as Exhibit 6.  Do you want an opportunity to review it?

12        A.    I've reviewed it.

13        Q.    Okay.  Is this one of the documents you reviewed

14   in preparation for your deposition?

15        A.    No.

16        Q.    Okay.  Do you recall the last time you reviewed

17   it?

18        A.    December 8, 2016.

19        Q.    Okay.  Is it your testimony that you have not

20   reviewed this document since December 2016?

21        A.    I have not reviewed it, no.

22        Q.    Okay.  Well, why don't you go ahead and take an

23   opportunity to review it.  I'm going to ask you some

24   questions about it.

25              Okay.  Mr. Krimbill [sic], you received this
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1   evaluation in December of 2016, correct?

2       **A.   You said Mr. Krimbill.**

3       Q.   I'm sorry.  See, I need lunch.

4            Mr. McNicol, you received this evaluation in

5   December of 2016, correct?

6       **A.   Yes.**

7       Q.   Okay.  Do you have any personal knowledge of who

8   prepared your 2016 evaluation?

9       **A.   No.**

10      Q.   Okay.  Do you have personal knowledge of who

11  provided input into your evaluation?

12      **A.   No.**

13      Q.   Okay.  Fair to say you don't know if

14  Mr. Krimbill provided input?

15      **A.   He gave the deposition -- he gave the**

16  **performance review.**

17      Q.   Okay.  So when you sat down to get the

18  performance evaluation, who was present?

19      **A.   Dave Critchley and Jim Krimbill.**

20      Q.   Okay.  Is it fair to say that neither of you --

21  neither of them informed you of exactly who prepared the

22  evaluation?

23      **A.   Yes.**

24      Q.   But it was your perception that they both had

25  input into the evaluation because they met with you to

**STUART MCNICOL**                        **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
1       Q.   Do you have any recollection of anything you
2   disagreed with?
3       A.   Not to my knowledge right now, no.
4       Q.   Okay.  And you agree with me you had the
5   opportunity to comment on the evaluation, correct?
6       A.   Correct.
7       Q.   But you did not, correct?
8       A.   I was told it didn't matter.
9       Q.   By whom?
10      A.   Mr. Krimbill.
11      Q.   What do you recall him saying in that regard?
12      A.   There was something that I didn't agree to, and
13  he said it didn't matter.
14      Q.   Do you remember what that was?
15      A.   No.
16      Q.   Did you discuss the comment section with
17  Mr. Krimbill specifically?
18      A.   No.
19      Q.   Okay.  In your lawsuit, you allege that you
20  became aware that DMB hired two minors, correct?
21      A.   Correct.
22      Q.   And by "minors," you do mean someone under the
23  age of 18?
24      A.   Yes.
25      Q.   Tell me what you became aware of.
```

```
 1        A.    I became aware that Cole and Max were providing
 2   lessons.
 3        Q.    And by "Cole," you mean Cole Stofflett?
 4        A.    Yes.
 5        Q.    And "Max," Max Geiger?
 6        A.    Yes.
 7        Q.    Did you know them prior to -- "them," Max or
 8   Cole -- prior to their being hired or providing lessons at
 9   DMB?
10        A.    No.
11        Q.    Do you know if either of these individuals were
12   members or children of members of DMB?
13        A.    I don't believe they were.
14        Q.    Okay.  Do you know if either of them had taken
15   lessons at DMB?
16        A.    I don't believe Cole did.  Max did, yes.
17        Q.    And you had indicated previously that he took
18   lessons with Dave Critchley?
19        A.    Yes.
20        Q.    Do you know if either Max or Cole knew Dave
21   Critchley before he became employed with DMB?
22        A.    I would assume they did, but I don't know for
23   sure.
24        Q.    Okay.  Do you know how -- do you know for a fact
25   Cole and Max were formally hired by DMB?
```

**STUART MCNICOL**                                      **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1       **A.    No.**

2       Q.    Okay.  And when did you first learn or come to

3    believe that Cole was providing lessons at DMB?

4       **A.    In May 2017.**

5       Q.    Do you remember when?

6       **A.    The exact date, no.**

7       Q.    And did you have concerns about Cole being hired

8    by DMB?

9       **A.    Cole?  No.**

10      Q.    Okay.  So does anything in your lawsuit relate

11   to Cole's employment with DMB?

12      **A.    No.**

13      Q.    Okay.  Let's talk about Max.  You've indicated

14   you weren't aware of whether Max was formally hired with

15   DMB, correct?

16      **A.    Correct.**

17      Q.    But your understanding is that he was providing

18   lessons --

19      **A.    Correct.**

20      Q.    -- at DMB?

21      **A.    Correct.**

22      Q.    And tell me what you learned about Max.

23      **A.    He was teaching in the junior academy.**

24      Q.    Do you know when he taught in the junior

25   academy?

**STUART MCNICOL**                                           **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1        A.    From May or periodically throughout --
 2   throughout 2017.
 3        Q.    2017 or 2018?
 4        A.    I can't recall if he taught in 2018 or not.
 5        Q.    Let's go back to how you first became aware that
 6   Max was teaching in the junior academy.
 7        A.    Okay.
 8        Q.    How did you learn that he was teaching?  You
 9   just saw it or did you --
10        A.    I saw -- no, I saw him teaching.
11        Q.    Okay.  And that was when?  When was the first
12   time you became aware that he was teaching in the junior
13   academy?
14        A.    Around May of 2017.
15        Q.    May of 2017.
16              Okay.  And did you have any concerns with him
17   teaching in May of 2017?
18        A.    Yes.
19        Q.    Okay.  What were your concerns?
20        A.    That it was illegal activity going on.
21        Q.    Why did you think it was illegal for Max to be
22   teaching at the junior academy?
23        A.    'Cause he wasn't employed.  He was getting
24   paid -- he was getting paid under the table.
25        Q.    And how did you learn that he was being paid
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1   under the table?
 2       A.   Dave Critchley asked him for his hours.
 3       Q.   And when -- when did that happen?
 4       A.   May 2017.
 5       Q.   You heard Dave ask Max for his hours?
 6       A.   Correct.
 7       Q.   Okay.  Do you recall when you heard that
 8   conversation?
 9       A.   No.  I don't know what date specifically.
10       Q.   Okay.  And other than hearing Dave ask Max for
11   his hours, was there anything else that led you to believe
12   he was being paid under the table?
13       A.   Yes.
14       Q.   What else?
15       A.   Warren Race mentioned that his hours were
16   increased in order to pay Max.
17       Q.   And when did Warren tell you that?
18       A.   April 2018.
19       Q.   Was it your understanding from Warren that he
20   was paying Max?
21       A.   I only knew that after he mentioned that to me.
22       Q.   Okay.  So starting in May of 2017, you learned
23   that Max was teaching at the junior academy, correct?
24       A.   Correct.
25       Q.   Was it around that time that you learned that or
```

**STUART MCNICOL**                               **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1  believed that Dave was paying Max under the table?
 2      A.   Correct.
 3      Q.   Meaning, he was giving him cash or otherwise
 4  paying him outside of DMB --
 5      A.   Yes.
 6      Q.   -- payroll?
 7      A.   Yes.
 8      Q.   Did you ever discuss that with Dave?
 9      A.   Yes.
10      Q.   When was that?
11      A.   April 4th, 2018.
12      Q.   Prior to April 4th of 2018, did you ever discuss
13  Max Geiger with Dave Critchley?
14      A.   No.
15      Q.   Did you ever express concerns to anyone about
16  Max Geiger providing lessons at DMB?
17      A.   Max Geiger or concerns about what was going on?
18      Q.   Max.  Let's talk about Max Geiger, specifically.
19      A.   No.
20      Q.   And, I guess, prior to April 4th of 2018, did
21  you ever report to anyone that you believed Max Geiger was
22  being paid under the table for providing lessons at DMB?
23      A.   No.
24      Q.   Okay.  And you just clarified my last question
25  saying -- about Max specifically or about other things
```

**STUART MCNICOL**                              **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1    that were going on.  Can you -- can you help me understand

2    what you were trying to clarify there?

3        **A.   Yes, there was a British citizen that was**

4    **teaching as well.**

5        Q.   That's Harry Busby?

6        **A.   Correct.**

7        Q.   Before we turn to Harry, I just want to talk

8    about your conversation with Warren Race.  You said that

9    was in April of 2018?

10       **A.   Correct.**

11       Q.   Was that prior to your discussion with Dave on

12   April 4th of 2018?

13       **A.   No.**

14       Q.   Okay.  It was after?

15       **A.   Yes.**

16       Q.   Okay.  And do you recall what specific date you

17   spoke with Warren?

18       **A.   I don't recall.**

19       Q.   Okay.  And do you recall specifically what

20   Warren told you about his pay and Max's pay?

21       **A.   He told me that his pay was increased to**

22   **full-time so that he could receive company benefits**

23   **because he was sick and he needed them and, in return, he**

24   **would pay Max out of his own pocket and that Igor Perasic**

25   **and Cole Stofflett knew about it.**

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1        Q.    And did Mr. Race tell you what Igor and Cole
 2   knew about the arrangement?
 3        A.    No.
 4        Q.    He just said they were aware of it?
 5        A.    Correct.
 6        Q.    Did he indicate whether anyone else was aware of
 7   it?
 8        A.    He didn't.
 9        Q.    Did you ever learn that anyone else was aware of
10   this arrangement that you just described?
11        A.    No.
12        Q.    And you indicated -- we talked about Harry Busby
13   is a British citizen?
14        A.    I believe so.
15        Q.    And what did you learn about Harry?
16        A.    That Harry was -- that Harry was teaching a
17   specific lesson.  A lesson request came in through the
18   front desk by Susan Cabano, and Dave Critchley and myself
19   were sitting there, and the lesson request was asked if
20   either of us wanted it, and Dave Critchley said he had it
21   covered.
22        Q.    When did this happen?
23        A.    In the summer of 2017.
24        Q.    And fair to say you don't recall what month?
25        A.    I believe we have it.  Right now, I don't
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1   recall.
 2       Q.   Was Harry an employee of DMB; do you know?
 3       A.   No.
 4       Q.   Did you know him --
 5       A.   Did I know if he was?
 6       Q.   Yes.
 7       A.   He was not.
 8       Q.   And how did you know that?
 9       A.   Because his name was not on the Spectrum.
10       Q.   Any other reason?
11       A.   He didn't have a work visa.
12       Q.   And how do you know that?
13       A.   Warren Race asked Dave Critchley about Harry
14   Busby, and Dave Critchley mentioned he was volunteering
15   and that he cannot be employed.
16       Q.   Because he didn't have -- he mentioned he didn't
17   have a work visa?
18       A.   Mr. Critchley mentioned that, yes.
19       Q.   Have you ever worked without a work visa?
20       A.   Yes.
21       Q.   During what period of time?
22            MR. GARDNER:  Object to the form on that
23   whole -- this whole area, but go ahead and answer.
24            THE WITNESS:  '99 to 2005.
25   BY MS. FREED:
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1       **A.    I raised concerns with someone in management**

2   **about the illegal activity that was going on at DC Ranch.**

3       Q.    And was that with Mr. Critchley?

4       **A.    No -- well, yes.**

5       Q.    Okay.  When was -- when did you raise your

6   concerns with Mr. Critchley?

7       **A.    About Mr. Busby?**

8       Q.    Yes.

9       **A.    April 4th.**

10      Q.    Okay.  Did you discuss your concerns about

11  illegal activity at DMB with anyone other than

12  Mr. Critchley?

13      **A.    Yes.**

14      Q.    Who was that?

15      **A.    Paul Apana.**

16      Q.    What's Paul's last name?  How do you spell it?

17      **A.    A-p-a-n-a.**

18      Q.    What's Paul's position?

19      **A.    He's the general manager at Camelback.**

20      Q.    Does Mr. Apana have any responsibilities at the

21  Village DC Ranch?

22      **A.    I don't know.**

23      Q.    When did you have a conversation with Mr. Apana?

24      **A.    April 14th.**

25      Q.    Of what year?

1      A.    2018.

2      Q.    Tell me about that discussion.

3      A.    Told him I was concerned about the illegal

4   activity that was going on at DC Ranch and that I felt

5   they were trying to get rid of me because I had an

6   overtime claim that I felt was being retaliated against.

7      Q.    Okay.  And did you know Mr. Apana before

8   speaking with him on April 14th?

9      A.    Yes.

10     Q.    How did you know him?

11     A.    We would hit -- we would play tournaments

12  together.  I would have dinner at his restaurant.

13     Q.    What was his restaurant?

14     A.    Oh, gosh.  I forget the name.  In Gainey Ranch.

15     Q.    Did you describe to Mr. Apana the illegal

16  activity you believed was occurring?

17     A.    No.

18     Q.    Did you use the phrase "illegal activity"?

19     A.    Yes.

20     Q.    But you didn't describe what that was?

21     A.    (No oral response.)

22     Q.    No?

23     A.    I just told him there was people working there

24  that weren't employed.

25     Q.    Did Mr. Apana ask you any questions?

1       A.    He told me that I sounded like I was working in

2    a toxic environment.

3       Q.    Did he give you any advice?

4       A.    Yes.

5       Q.    What did he say?

6       A.    Told me to write a letter or an email to the

7    president of the company.

8       Q.    Did you know who the president of the company

9    was?

10       A.    Yes.

11       Q.    Who was that?

12       A.    Carol Nalevanko.

13       Q.    Did you follow Mr. Apana's advice?

14       A.    Yes.

15       Q.    When did you do that?

16       A.    Mr. Marshall sent an email to Carol Nalevanko on

17    May 16th.

18       Q.    Between April 14th of 2018 and May 16th of 2018,

19    did you do anything to follow Mr. Apana's advice?

20       A.    I had a meeting with Mr. Critchley on the 3rd of

21    May 2018.

22       Q.    Did you do anything else?

23       A.    No.

24       Q.    Did Mr. Apana tell you why he suggested that you

25    reach out to the president?

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      **A.    No.**

2      Q.    Do you know whether Mr. Apana discussed your

3   concerns with anyone at DC Ranch?

4      **A.    I don't know.**

5      Q.    Do you know whether he discussed your concerns

6   with anyone?

7      **A.    I don't know.**

8      Q.    Or any of the content of your conversation?

9      **A.    I don't know.**

10     Q.    And you indicated you were represented by

11  Mr. Marshall beginning May 16th of 2018, correct?

12     **A.    Yes.**

13     Q.    So on the very day you retained Mr. Marshall, he

14  sent a communication to Ms. Nalevanko?

15     **A.    Correct.**

16     Q.    And you continued to be represented by

17  Mr. Marshall throughout your employment with DMB, correct?

18     **A.    From May 16th onwards --**

19     Q.    Correct.

20     **A.    -- yes.**

21     Q.    Okay.  So he was available to you for advice and

22  counsel during that time period?

23     **A.    Correct.**

24     Q.    And you'll agree with me you did seek his advice

25  and counsel during that time period, correct?

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      **A.   Correct.**

2      Q.   And that Mr. Marshall sent communications to DMB

3  and its counsel on your behalf, correct?

4      **A.   Correct.**

5      Q.   You were privy to those communications?

6      **A.   Excuse me?**

7      Q.   You were able to review the communications

8  between your attorney and DMB and its counsel?

9      **A.   As far as I know.  I wouldn't know if it was**

10  **everything.**

11      Q.   You're not aware that Mr. Marshall kept any of

12  that communication from you, correct?

13      **A.   Correct.**

14      Q.   It's your belief he provided anything of

15  substance between DMB and its counsel and him to you,

16  correct?

17      **A.   Correct.**

18      Q.   Okay.  Other than Mr. Apana, did you discuss --

19  and Mr. Critchley, did you discuss your concerns of

20  illegal activity at DMB with anyone else?

21      **A.   No, except for the day I spoke with Kathryn**

22  **Brassfield the day Harry Busby was teaching a lesson with**

23  **Rich Bruno.**

24      Q.   Going back to your employment at Desert

25  Highlands, you said you started in February of 2018,

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
1    to you to provide that information to us?
2         A.    Yes.
3         Q.    And would your written discovery responses be
4    the most accurate summary of your efforts to locate other
5    employment?
6         A.    Yes.
7         Q.    You'll agree with me that those written
8    responses are more accurate or more detailed than what you
9    can recall, as you sit here today?
10        A.    Yes.
11        Q.    Now, you made the decision to remove yourself
12   from participating in the junior academy, correct?
13        A.    Correct.
14        Q.    And when did you make that decision?
15        A.    May of 2017.
16        Q.    Okay.  And what was the reason?
17        A.    There was illegal activity taking place in the
18   junior academy.
19        Q.    Okay.  And what illegal activity are you
20   referring to?
21        A.    People teaching that weren't employed, as well
22   as getting paid under the table.
23        Q.    Is that Max that you're referring to?
24        A.    As well as Harry Busby.
25        Q.    Is it your testimony that Mr. Busby was
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1    participating in the junior academy?

2         **A.    Yes.**

3         Q.    Okay.  When?

4         **A.    Summer of 2017.**

5         Q.    Did you make the decision to stop participating

6    in the junior academy before you learned about Mr. Busby's

7    activities?

8         **A.    Yes.**

9         Q.    Did you tell anyone the reason you were not

10   participating in the junior academy?

11        **A.    No.**

12        Q.    Okay.  You'll agree with me that you informed

13   Mr. Critchley that the reason you weren't participating in

14   the junior academy was because of the pay, correct?

15        **A.    Correct.**

16        Q.    You indicated to him that you weren't paid a

17   high enough hourly rate to compensate you for

18   participating in the junior academy, correct?

19        **A.    I viewed my -- I viewed my concern that the**

20   **other pros were getting paid a higher rate than I was.**

21        Q.    And that's what you informed Mr. Critchley was

22   the reason you weren't participating in the junior

23   academy, correct?

24        **A.    That's what I recall.**

25        Q.    When was the first time you had that discussion

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1   have any personal discussions with her about the alleged
 2   illegal activity?
 3        A.    No.
 4        Q.    And what about anybody in HR?
 5        A.    No.
 6        Q.    Okay.  So turning to Exhibit 7, do you recognize
 7   this as the performance review that you received for your
 8   performance in 2017?
 9        A.    Correct.
10        Q.    And it's signed by you on August 6th -- I'm
11   sorry -- December 6th of 2017.
12        A.    Yes.
13        Q.    Okay.  And do you have any personal knowledge of
14   who prepared Exhibit 7?
15        A.    No.
16        Q.    Okay.  Do you have any personal knowledge of who
17   had input into your 2017 evaluation?
18        A.    No.
19        Q.    Okay.  Would you agree with me that your 2017
20   performance evaluation was generally positive?
21        A.    Yes.
22        Q.    Do you believe that the feedback in Exhibit 7
23   and the comments are accurate?
24        A.    I believe so, yes.
25        Q.    Do you know whether or not Mr. Krimbill reviewed
```

1    your evaluation before it was issued to you?

2         **A.   I don't know.**

3         Q.   Okay.  So let's go through some of the comments

4    on the first page of Exhibit 7.  The last sentence of the

5    first paragraph [as read]:  You have really stepped up in

6    planning and execution of all of our monthly socials,

7    volunteering to man the grill when needed, calling out the

8    pairings of play in the socials.

9              MR. GARDNER:  Where are you reading from?  You

10   lost me on that.

11             MS. FREED:  I'm right here, first paragraph

12   under section 2.

13             MR. GARDNER:  Got it.  Okay.  Sorry.

14             MS. FREED:  No problem.

15   BY MS. FREED:

16        Q.   So do you know what Mr. Critchley is referring

17   to in that statement?

18        **A.   Correct.**

19        Q.   Do you know what he's referring to?

20        **A.   Yes.**

21        Q.   What had you done to step up in planning and

22   execution of the monthly socials?

23        **A.   I would -- I would grill.  I would do the**

24   **cooking for the socials.**

25        Q.   Okay.  Anything else?  What did you step up in

**STUART MCNICOL**                                      **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1    in terms of planning and execution?
 2         A.   I don't know.
 3         Q.   You don't remember?
 4         A.   No.
 5         Q.   Is it your belief that Mr. Critchley prepared
 6    this exhibit, this evaluation?
 7         A.   (No oral response.)
 8         Q.   You don't know?
 9         A.   I don't know who prepared it.
10         Q.   Okay.  Let's turn to the next page.  Under
11    Section 3, it says [as read]:  Your attitude is now
12    positive and you bring a great energy to your lessons and
13    the club in general.
14              Accurate statement?
15         A.   Yes.
16         Q.   Did you have a generally positive attitude in
17    2017?
18         A.   I always had a generally positive attitude.
19         Q.   So is it your testimony there wasn't any change
20    in your attitude?
21         A.   Correct.
22         Q.   Did Mr. Critchley indicate to you what that
23    statement was based upon?
24         A.   No.
25         Q.   Okay.  And when we reviewed your 2016
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1  evaluation, your testimony was that you didn't recall any

2  discussion independent of what was included in the

3  comments that were included in the evaluation, right?

4      **A.   Say that again.**

5      Q.   Let me just ask.

6           With respect to your 2017 evaluation, did you

7  meet with Mr. Critchley to go over the evaluation?

8      **A.   Yes.**

9      Q.   Was anyone else present?

10     **A.   No.**

11     Q.   Okay.  Did you and Mr. Critchley discuss the

12  comments in the evaluation?

13     **A.   Yes.**

14     Q.   As you sit here today, do you recall anything

15  specific that was discussed?

16     **A.   No, other than what's on -- other than what's on**

17  **this.**

18     Q.   Would it be fair to say you reviewed the

19  comments that are included in your evaluation, but you

20  don't have an independent recollection of anything other

21  than what's set forth in the evaluation?

22     **A.   Correct.**

23     Q.   Okay.  And you don't similarly recall anything

24  you said to Mr. Critchley during that meeting?

25     **A.   No.**

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      Q.   You'll agree with me you were given praise for
2   stepping up in planning and executing the monthly socials?
3      **A.   Yes.**
4      Q.   And you were praised for having a positive
5   attitude and bringing great energy to your lesson?
6      **A.   Yes.**
7      Q.   Similarly, you were praised for making
8   suggestions on how to improve processes at the club,
9   providing ideas for new programs and formats for socials?
10      **A.   Yes.**
11      Q.   Okay.  Similarly, in the next -- I'm under
12   section 4 now.  Mr. Critchley praises you for following
13   through on the suggestion to create new and exciting
14   programs.
15         MR. GARDNER:  This section, I'm going to object
16   to the characterization.  Object to form, but go ahead and
17   answer.
18         MS. FREED:  Let me rephrase.
19         MR. GARDNER:  You keep referring to "praising,"
20   and I object to that characterization, but go ahead.  I'm
21   sorry.
22         MS. FREED:  That's fine.
23   BY MS. FREED:
24      Q.   You'll agree with me, Mr. McNicol, that your
25   evaluation states that [as read]:  It was great to see you

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      **A.    I don't know.**

2      Q.   Okay.  Did you do anything else, other than

3   create new programs, to become more involved in the larger

4   junior and/or adult program?

5      **A.    Excuse me?  Did I create new programs?**

6      Q.   Well, you just indicated you're not sure if you

7   created new programs in 2018, correct?

8      **A.    Correct.**

9      Q.   And I'm asking whether or not you can identify

10   anything specifically you did to get more involved in the

11   larger junior adult programs?

12      **A.    Well, I wasn't going to be involved in the**

13   **junior programs because there was illegal activity --**

14      Q.   So the answer is no?

15      **A.    No.**

16      Q.   And on paragraph 6, your evaluation states [as

17   read]:  You were very open to the several new

18   responsibilities given to you by the director.

19          Who was the director at that time?

20   Mr. Critchley?

21      **A.    Yes.**

22      Q.   Okay.  And the evaluation lists the following

23   responsibilities:  Scheduling and communicating with new

24   members, tracking stringing inventory, taking more of a

25   coaching leadership role at the front desk, taking on a

**STUART MCNICOL**                                    **September 17, 2019**
**McNicol vs DMB Sports Clubs Limited Partnership**

```
 1   larger role during socials and assisting and planning
 2   events and the tennis programs at the club.
 3           You'll agree with me you did those things in
 4   2017?
 5       A.   Yes.
 6       Q.   And you were very open to those
 7   responsibilities?
 8       A.   Yes.
 9       Q.   Okay.  Would you agree with me those were new
10   responsibilities that were given to you by the director in
11   2017?
12       A.   No.
13       Q.   Okay.  But you'll agree with me you didn't
14   comment on that in the evaluation?
15       A.   Yes.
16       Q.   Okay.  Were those responsibilities that
17   previously existed prior to 2017?
18       A.   Yes.
19       Q.   Okay.  It had always existed in your position?
20       A.   Yes.
21       Q.   Now, you and Mr. Critchley had repeated
22   conversations about your role at DC Ranch, correct?
23       A.   Yes.
24       Q.   Discussed your off-duty off-the-court duties, so
25   to speak?
```

**STUART MCNICOL**                                              **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1        A.    Yes.

 2        Q.    And you also had conversations with Mr. Krimbill

 3   at least via email about the same topic, correct?

 4        A.    Not about the same topic, no.

 5        Q.    How would you define off-the-court duties?  What

 6   was your understanding of what that phrase meant?

 7        A.    Help organizing periodic special events,

 8   assisting the front desk with point of sales, with

 9   scheduling of courts, help with the maintenance of the

10   club.

11        Q.    And for that, you were paid a base salary,

12   correct?

13        A.    Correct.

14        Q.    Okay.  And would you agree with me that you did

15   not believe that the base salary was sufficient to cover

16   the amount of off-the-court duties that Mr. Critchley was

17   expecting of you?

18        A.    No.

19        Q.    Okay.  You never had a conversation with him

20   about that?

21        A.    About the fact that I wasn't getting paid

22   enough?

23        Q.    Yes.

24        A.    I don't remember.

25        Q.    Okay.  Well, let's go back to your email with
```

```
 1      A.    No, I was not.

 2      Q.    Okay.  Why not?

 3      A.    I didn't know how.

 4      Q.    Any other reason?

 5      A.    Nobody had informed me that that was part of my

 6   duty.

 7      Q.    Okay.  And what about purchasing racket

 8   stringing equipment?

 9      A.    Same thing.  Nobody informed me that that was...

10      Q.    And that was the reason you weren't responsible

11   for performing it?

12      A.    Correct.

13      Q.    And is it your testimony that you have never

14   taken the position that you are not sufficiently

15   compensated with your base salary by DMB?

16      A.    That I'm not sufficiently compensated?  I don't

17   know.

18      Q.    Have you listened to the recordings of the

19   conversations between yourself and Mr. Critchley?

20      A.    Yes.

21      Q.    When was the last time you listened to that?

22      A.    When -- when it was -- actually, I don't know.

23   It's been a long time.

24      Q.    Was it -- has it been more than a year?

25      A.    Yes.
```

**STUART MCNICOL**                          **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      Q.    Have you reviewed the transcripts within the
2  last year?
3      **A.    No.**
4      Q.    Would you agree with me that Mr. Critchley
5  indicated to you he was frustrated, that he felt like he
6  was doing all of the off-the-court administrative duties
7  in the tennis department?
8      **A.    Yes.**
9      Q.    And that you were not supporting him in
10  performing some of those duties?
11     **A.    That's what he said, yes.**
12     Q.    Okay.  And do you recall that you responded
13  repeatedly to Mr. Critchley that you didn't get paid
14  enough to do all the things he was asking you to do?
15     **A.    I believed it wasn't in my job description.  I**
16  **questioned things because I did not know how to do them.**
17     Q.    And what things Mr. Critchley asking you to do
18  that you didn't think were in your job description?
19     **A.    Create a stringing poster and contact directors**
20  **of tennis within part of the United States to find out how**
21  **their pros were being paid, as well as themselves.**
22     Q.    Okay.  Anything else?
23     **A.    No, I don't remember.**
24     Q.    You indicated that one of the reasons -- I
25  guess, strike that.

**STUART MCNICOL**                                        **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
1              You indicated that you informed Mr. Critchley
2     that you were not participating in the junior academy
3     because other pros were being paid at a higher hourly rate
4     to perform that work, correct?
5          A.   Correct.
6          Q.   That was the only reason you gave Mr. Critchley
7     for your non-involvement in the junior academy, correct?
8          A.   If I told him that, I -- I believed -- I
9     believed I was going to get fired.
10         Q.   You told him what?
11         A.   If I told him that there was illegal activity
12    going on.
13         Q.   You believed that you if you told Mr. Critchley
14    that there was illegal activity going on, that you would
15    be terminated?
16         A.   That was my thought.
17         Q.   But you did it in April of 2018, anyway,
18    correct?
19         A.   Correct.
20         Q.   Okay.  And why did you believe Mr. Critchley
21    would fire you if you reported that activity?
22         A.   Because that was Mr. Krimbill's director.
23         Q.   That you learned through Mr. Critchley?
24         A.   Correct.
25         Q.   Never heard Mr. Krimbill say that to you
```

1   per hour?

2       A.   $50.

3       Q.   Do you know what he -- what types of activities

4   he was paid $50 per hour?

5       A.   **Teaching the academy.**

6       Q.   Do you know if he had any other rates or

7   commissions with DMB?

8       A.   **Yes.**

9       Q.   What else?

10      A.   **Hourly -- his hourly -- his hourly rate for**

11   **teaching was a hundred dollars an hour.**

12      Q.   Anything else?

13      A.   **That's all.**

14      Q.   And where did you get that information?  What's

15   the basis for your belief that that was his pay structure?

16      A.   **Well, Mr. Critchley told me $50 was his pay for**

17   **teaching the academy, and it's in Spectrum what his hourly**

18   **rate was to teach lessons.**

19      Q.   When did Mr. Critchley inform you of

20   Mr. Borani's pay rate at the academy?

21      A.   **I don't remember.**

22      Q.   What was the context of the discussion?

23      A.   **I don't know.**

24      Q.   Okay.  Did Mr. Critchley ever indicate to you

25   that he was advocating for a different pay structure for

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1   you?
 2      A.   Yes.
 3      Q.   That he agreed that he felt the pay structure
 4   could be improved for you?
 5      A.   He said it would not happen.
 6      Q.   Okay.  And when was the first time you and
 7   Mr. Critchley discussed him advocating for an improved pay
 8   system for you or pay structure?
 9      A.   I believe May 3rd.
10      Q.   It's your testimony that was never discussed
11   prior to May 3rd --
12      A.   I don't remember.
13      Q.   -- of 2018?
14      A.   I don't remember.
15      Q.   Okay.  It's possible?
16      A.   It's possible it could have, but I don't
17   remember.
18      Q.   You indicated that -- I'm sorry.  You don't
19   recall when the discussion took place with Mr. Critchley
20   about how much Mr. Borani was paid?
21      A.   Correct, I don't.
22      Q.   And did Mr. Borani, to your knowledge, receive a
23   base salary?
24      A.   I don't know.
25      Q.   Okay.  You indicated that the Spectrum system
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      Q.    It's in the recording, correct?

2      **A.    Yes.**

3      Q.    So we can trust the recording's accurate,

4      correct?

5      **A.    Yes.**

6      Q.    Your memory may not be as accurate as the

7      recording?

8      **A.    At this moment in time, no.**

9      Q.    You mentioned earlier that one of the things

10     that Mr. Critchley asked you to do is create a stringing

11     poster.

12     **A.    Yes.**

13     Q.    And you didn't do that, correct?

14     **A.    No.**

15     Q.    And Mr. Critchley also asked you to help in

16     planning, as well as attending, all of the social events

17     that the tennis department put on, correct?

18     **A.    Planning.  I don't know about attending.**

19     Q.    Okay.  Well, so is it your testimony he asked

20     for you to assist in the planning of social events at the

21     club?

22     **A.    Yes.**

23     Q.    Okay.  And that he expected you to do that?

24     **A.    Yes.**

25     Q.    And that he was frustrated that he felt like he

**STUART MCNICOL**                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1        A.   Yes.

 2        Q.   Okay.  Did you attend any socials in 2018?

 3        A.   Yes.

 4        Q.   Which ones?

 5        A.   I don't recall the name of it, but it was in

 6   February 2018.

 7        Q.   Okay.  Other than attending a social in

 8   February 2018, did you attend any other socials in 2018?

 9        A.   I attempted to.

10        Q.   Tell me about that.

11        A.   I attempted to attend the TGen social.  It was a

12   clinic.

13        Q.   And what happened?

14        A.   I arrived on the 24th of April, and there was no

15   clinic.

16        Q.   Okay.  And did you subsequently find out why you

17   missed it?

18        A.   I didn't -- I didn't miss it.  It was on the

19   next day --

20        Q.   Okay.

21        A.   -- that I was not notified about.

22        Q.   Did you go back the next day?

23        A.   No.

24        Q.   Why not?

25        A.   I didn't know it was on the next day.
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      Q.   When you went to try to attend the TGen clinic

2    and found there was no social, what did you do?

3      **A.   I believed I was being -- I believed I was being**

4    **excluded from it.**

5      Q.   Did you email Dave and say, hey, what happened

6    to the TGen Clinic?

7      **A.   No, I did not.**

8      Q.   Did you do anything?

9      **A.   No.**

10     Q.   Did you go to the website?

11     **A.   No.**

12     Q.   And you missed the St. Patty's Day Social,

13   correct?

14     **A.   I believe I let Dave know that I wasn't going to**

15   **be there.**

16     Q.   And you missed the Club Mixed Doubles Champ

17   Social correct?

18     **A.   Missed that one, yes.**

19     Q.   And you just said you missed the TGen

20   Fundraising Clinic.

21     **A.   Because it was on the incorrect day.**

22     Q.   And you missed the Cinco de Mayo Social?

23     **A.   Yes.**

24     Q.   Do you know if anyone showed up for the TGen

25   Clinic?

1       Q.    And where outside of DMB would you socialize

2    with Ms. Cabano?

3       **A.    Well, when I say -- you didn't let me finish.**

4    **Susan Cabano and Liz, they had a -- they had -- we had a**

5    **get together.**

6       Q.    On one occasion?

7       **A.    I believe so.**

8       Q.    And what kind of get together?

9       **A.    It was just a team get together.**

10      Q.    Like a happy hour?  A dinner?

11      **A.    Like a happy hour.**

12      Q.    And was this while you were employed?

13      **A.    Yes.**

14      Q.    Do you recall the date?

15      **A.    No.**

16      Q.    Was it just the three of you?

17      **A.    I believe Susan Spatz was there.  Kaoru Boynton**

18   **was another front desk employee.**

19           **(Exhibit 8 marked.)**

20   BY MS. FREED:

21      Q.    Mr. McNicol, do you recognize Exhibit 8?

22      **A.    Yes.**

23      Q.    These are an exchange of emails between you and

24   David Critchley on March 16, 2018, correct?

25      **A.    Correct.**

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      Q.    And in his email to you, Mr. Critchley is asking

2   if you've done your LinkedIn Learning, correct?

3      **A.    Correct.**

4      Q.    And he also states [as read]:  I am sensing the

5   attitude sliding more negative again.  I asked for your

6   help with promoting stringing, never got anything, asked

7   for some research on comparative tennis professionals, not

8   telling me until I asked you if -- could cover, you were

9   out of town for the social...

10         Goes on to say [as read]:  Let me know, trying

11   to make this work!  Need some help from you, as we are the

12   only salaried staff up here, please!

13         Does this email refresh your recollection of

14   when you and Mr. Critchley began discussing his need for

15   you to perform more of the off-the-court duties?

16      **A.    I'm not sure what you're talking about.**

17      Q.    Okay.  Well, do you agree that Mr. Critchley had

18   asked for your help with promoting stringing?

19      **A.    Yes.**

20      Q.    Okay.  And you -- that would have been before

21   March 16th of 2018, correct?

22      **A.    Correct.**

23      Q.    Okay.  Do you recall when he asked for your help

24   with that?

25      **A.    No.**

1       Q.    Okay.  And you'll agree with me you didn't

2   provide him anything for stringing promotion?

3       **A.    Correct.**

4       Q.    And he also asked you to do some research on

5   comparative tennis professionals, correct?

6       **A.    Correct.**

7       Q.    That's what you spoke about earlier?

8       **A.    Correct.**

9       Q.    Okay.  And do you recall when he asked you to do

10  that?

11      **A.    I believe it was the same time as the racket**

12  **stringing.**

13      Q.    But you don't recall exactly when that occurred?

14      **A.    No.**

15      Q.    Okay.  And then he indicates you didn't tell him

16  that you were out of -- going to be out of town for a

17  social, correct?

18      **A.    Well, I did.**

19      Q.    Which social was that?  Do you recall?

20      **A.    St. Patrick's Day.**

21      Q.    Okay.  And you'll agree with me that

22  Mr. Critchley is saying, I need some help from you,

23  correct, at the very bottom?

24      **A.    Yes.**

25      Q.    And he specifically identifies the fact that you

**STUART MCNICOL**                                        **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1   were the only two administrative or salaried staff in the

2   tennis department, correct?

3        A.   Correct.

4        Q.   Okay.  And you'll agree with me that you respond

5   to him that you haven't done your LinkedIn Learning,

6   correct?

7        A.   Yes.

8        Q.   And that he's correct that your attitude was

9   sliding more negative?

10       **A.   Well, can I -- can I carry on with the question**

11   **before?  Because at the bottom, it says I will get the**

12   **LinkedIn done.**

13       Q.   Okay.  I'm just -- my question was, you hadn't

14   done it at the time he emailed you, correct?

15       A.   Correct.

16       Q.   Okay.  And is it your testimony you got it

17   done -- you were anticipating getting it done at that

18   time?

19       A.   Absolutely.

20       Q.   Okay.  But you acknowledge that your attitude

21   was sliding more negative, correct?

22       A.   Yes.

23       Q.   And you go on to explain why that was, correct?

24       A.   Correct.

25       Q.   You felt like the club was taking clients away

1    from you?

2         A.    Correct.

3         Q.    And was that because you weren't allowed to

4    teach non-members?

5         A.    Correct.

6         Q.    Okay.

7         A.    As well as Mr. Critchley setting up lessons

8    during the same day as lessons that were currently being

9    provided by me.

10        Q.    Explain that to me.

11        A.    I had a Tuesday clinic designed for a specific

12   level, and Mr. Critchley set up a lesson within an hour of

13   the lesson that I had provided already, and so all my

14   clients -- most of my clients left and started taking the

15   clinics with him, and that happened on two different

16   dates.

17        Q.    And do you know why Mr. Critchley set up lessons

18   around the same time as yours?

19        A.    He told me that's what the members wanted.

20        Q.    Okay.  And do you have any reason to dispute

21   that?

22        A.    Well, it could have been discussed with me and

23   maybe have my lessons -- the lessons that were currently

24   in place promoted first before you just -- before you

25   changed it.

1   in four years, correct?

2       A.   Yes.

3       Q.   And you were upset that the new employees, you

4   felt like, were being paid better than you were?

5       A.   Yes.

6       Q.   Okay.  You'll agree with me you don't mention

7   any other gripes in this email, correct?

8       A.   No.

9       Q.   You don't mention retaliation?

10      A.   **This whole email doesn't explain everything.  I**

11  **had questioned where I was supposed to do the LinkedIn**

12  **training.  There was no computer in the tennis center that**

13  **enabled me to do this training.**

14      Q.   Did you ever ask Mr. Critchley where you could

15  do the training?

16      A.   **I didn't ask Mr. Critchley.  I asked Diana**

17  **Gaveloff [phonetic]?**

18      Q.   And what did she tell you?

19      A.   **She told me to use Mr. Critchley's office.**

20      Q.   Did you ever ask Mr. Critchley to use his

21  office?

22      A.   **It didn't have a tower in his office.**

23      Q.   Did you ever ask him if you could use his

24  computer to do the LinkedIn?

25      A.   **No.**

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1          **A.    I did -- I did -- I did the duties, yes.**

2          Q.    Which socials did you plan yourself,

3    Mr. McNicol?

4          **A.    Well, I provided -- I planned the Tutti Santi**

5    **Social.**

6          Q.    And what year was that?

7          **A.    2016.**

8          Q.    Any other socials you planned?

9          **A.    I don't know if I planned them, but I was**

10    **involved in them.**

11          Q.    You didn't plan a single social in 2018,

12    correct?

13          **A.    No.**

14          Q.    And you attended only one social in 2018,

15    correct?

16          **A.    Correct, to the best of my knowledge.**

17               MS. FREED:  Let's go off record.

18               (Recess taken from 2:15 to 2:26 p.m.)

19    BY MS. FREED:

20          Q.    Mr. McNicol, you testified earlier today that

21    you recorded two conversations with Mr. Critchley,

22    correct?

23          **A.    Correct.**

24          Q.    Two and only two?

25          **A.    Correct.**

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1     Q.   Okay.  The first was on April 4th of 2018, and
2   the second was on May 3rd of 2018, correct?
3     **A.   Correct.**
4     Q.   Okay.  Were those conversations, did they take
5   place in person with Mr. Critchley?
6     **A.   Yes.**
7     Q.   Did you practice using your recording device
8   before those conversations took place?
9     **A.   Briefly.**
10    Q.   Okay.  How did you do that?
11    **A.   Spoke into my phone to see if it recorded.**
12    Q.   Did you have your phone visible during your
13   conversation with Mr. Critchley?
14    **A.   No.**
15    Q.   Okay.  Where was it?
16    **A.   In my pocket.**
17    Q.   Okay.  And had you recorded conversations with
18   other individuals prior to recording your conversation
19   with Mr. Critchley?
20    **A.   No.**
21    Q.   This was the first time you had ever
22   surreptitiously recorded someone?
23    **A.   Yes.**
24    Q.   And why did you record those particular
25   conversations?

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      **A.   Because I believed that, firstly, the company**
2   **wanted me -- or Jim Krimbill wanted me fired, and certain**
3   **policies were only being applied to me, and I felt the**
4   **need to record the conversations.**
5      Q.   Well, how did you know that on April 4th you
6   were going to have a conversation with Mr. Critchley that
7   related to this topic?
8      **A.   I didn't.**
9      Q.   So you just were recording that conversation in
10   the hopes that something would come up?
11      **A.   I wouldn't say in the hopes.**
12      Q.   Okay.  But on both occasions, you just happened
13   to have conversations with Mr. Critchley about the alleged
14   illegal activity at DMB?
15      **A.   Well, it seemed like the communication between**
16   **Mr. Critchley and myself diminished, and I felt that they**
17   **were trying to get rid of me.**
18      Q.   So you went into those conversations intending
19   to bring up the topic of DMB's alleged illegal activity,
20   correct?
21           MR. GARDNER:  Object to the form.
22           Go ahead.
23           THE WITNESS:  I didn't do it intentionally, no.
24   BY MS. FREED:
25      Q.   Okay.  So why did you only record conversations

1    on April 4th and May 3rd?  Was that the only time you

2    talked to Mr. Critchley during that time period?

3        **A.    It's the only time I had a meeting with**

4    **Mr. Critchley other than --**

5        Q.    It's the only time --

6        **A.    -- the beginning of my employment.**

7        Q.    Those are only two times you spoke with him in

8    person?

9        **A.    Beginning of his employment, yes.**

10       Q.    From 2016 to 2018, those were the only two

11   conversations you had with him in person?

12       **A.    Correct.**

13       Q.    Did you schedule those meetings with him in

14   advance?

15       **A.    I believe he scheduled them with me.**

16       Q.    What was the purpose of those meetings?

17       **A.    Told me my attitude was changing.**

18       Q.    And Mr. Critchley set a meeting with you

19   April 4th to talk about your role, correct?

20       **A.    Correct.**

21       Q.    And to talk about his concerns with your

22   performance, correct?

23       **A.    Correct.**

24       Q.    And that you were not meeting the expectations

25   of what he expected the head tennis professional to do,

```
 1   correct?

 2       A.   Correct.

 3       Q.   And, specifically, about your lack of support

 4   with respect to the administrative duties, correct?

 5       A.   Correct.

 6       Q.   The off-the-court duties, correct?

 7       A.   Yes.

 8       Q.   So it was Mr. Critchley who was established the

 9   meeting with you to talk about those things?

10       A.   Correct.

11       Q.   And that was before you shared with him any of

12   your beliefs that there had been any illegal activity at

13   DMB?

14       A.   Say that again.

15       Q.   Well, you didn't share that you believed there

16   was illegal activity at DMB with Mr. Critchley until

17   April 4th, correct?

18       A.   Correct.

19       Q.   Did you ever have any conversations with

20   Mr. Critchley about your belief there was illegal activity

21   at DMB other than those two conversations?

22       A.   No.

23       Q.   And you recorded those conversations in their

24   entirety?

25       A.   Correct.
```

1      Q.   Okay.  And you indicated that you and

2   Mr. Critchley discussed the potential for you to take on a

3   different role at the club if you did not want to perform

4   the duties of the head tennis professional, correct?

5      **A.   Correct.**

6      Q.   When did those discussions take place?

7      **A.   May 3rd.**

8      Q.   And that was discussed on the recording?

9      **A.   Correct.**

10     Q.   Any other discussions about that?

11     **A.   I can't remember if he discussed it in the**

12  **April 4th meeting or not.**

13     Q.   But other than April 4th, 2018, or May 3rd,

14  2018, and in those recorded discussions, there was no

15  other time where you and Mr. Critchley discussed a

16  potential different role for you at DC Ranch?

17     **A.   No.**

18     Q.   So if he didn't offer you -- strike that.

19          MS. FREED:  Let me go ahead and mark Exhibit 9.

20          (Exhibit 9 marked.)

21  BY MS. FREED:

22     Q.   Mr. McNicol, do you recognize Exhibit 9?

23     **A.   Yes.**

24     Q.   This is an email to you from Mr. Critchley dated

25  May 14th of 2018 --

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      **A.    Yes.**

2      Q.    -- regarding the head pro duties?

3      **A.    Correct.**

4      Q.    And you'll agree with me that Mr. Critchley

5  indicates in his email this is an outline of what he

6  envisioned from the head pro role moving forward?

7      **A.    Correct.**

8      Q.    And he indicated that you had discussed it a

9  couple of times?

10     **A.    Correct.**

11     Q.    Did you respond to Mr. Critchley's email?

12     **A.    No, I told him I would take look at it.**

13     Q.    And how did you do that?

14     **A.    Email.**

15     Q.    You responded that you would take a look at it?

16     **A.    Correct.**

17     Q.    Other than emailing him that you would take a

18 look at Exhibit 9, did you otherwise communicate with

19 Mr. Critchley about Exhibit 9?

20     **A.    No.**

21     Q.    Did you ever indicate to him that you wished to

22 move forward in the head pro role?

23     **A.    Say that again.**

24     Q.    Did you ever confirm to Mr. Critchley that you

25 intended to stay in the head pro role?

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1        A.   I didn't -- I didn't communicate with him about
 2   it.
 3        Q.   One way or the other?
 4        A.   No.
 5        Q.   Okay.  You didn't indicate to him that you no
 6   longer wanted to perform the head pro role either?
 7        A.   Correct.
 8        Q.   Okay.  So the only communication regarding
 9   Exhibit 9 is this email and your response that you would
10   take a look at it?
11        A.   Yes.
12        Q.   And you'll agree with me this isn't the first
13   time that you and Mr. Critchley discussed the potential
14   changes to the head pro role?
15        A.   I believe it was in the recording.
16        Q.   Okay.  On which date?
17        A.   I believe it was May 3rd.
18        Q.   Okay.  And did you know, prior to May 3rd, that
19   Mr. Critchley wanted to talk to you about some changes to
20   the role?
21        A.   No.
22        Q.   You never --
23        A.   I don't remember.
24        Q.   You don't recall?
25        A.   I don't.
```

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      Q.    Okay.  And what pros were those?

2      **A.    I believe I would add -- no, I can't -- I don't**

3      **know anybody in specific.**

4      Q.    Well, I'm asking after your access was changed,

5      did you ever have a need to add any pros to any program?

6      **A.    No.**

7      Q.    Okay.  Do you know if any of the other pros in

8      the golf -- I'm sorry -- in the tennis department had

9      access -- managerial access to Spectrum?

10     **A.    I don't know.**

11     Q.    After your managerial access to Spectrum was

12     changed, was your ability to email affected?

13     **A.    No.**

14     Q.    Was your ability to text affected?

15     **A.    No.**

16     Q.    Was your ability to go on the DMB property

17     affected?

18     **A.    No.**

19     Q.    Was your ability to visit the front desk

20     affected?

21     **A.    No.**

22     Q.    Was your ability to interact with the front desk

23     personnel affected?

24     **A.    No.**

25     Q.    Was your other access to Spectrum impacted in

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
 1    terms of ability to review the lessons that had been

 2    booked?

 3         A.    No.

 4         Q.    You could still review lessons that were booked?

 5         A.    Yes.

 6         Q.    You could still review courts that were booked?

 7         A.    Yes.

 8         Q.    Did you ever use the Spectrum system to look up

 9    pay of other employees?

10         A.    No.

11         Q.    And you mentioned that you were being forced

12    back to the junior academy.  Tell me about that.

13         A.    That it was -- well, it was going to become my

14    job description, the main part of my job description as

15    head pro was to be teaching in the junior academy.

16         Q.    And so other than discussions with Mr. Critchley

17    where he indicated that the head pro would be involved

18    with the junior academy, was there any other basis for

19    your belief you were being forced back to the academy?

20         A.    No.

21         Q.    Was one of your concerns with the fact that

22    there were individuals being paid under the table in the

23    junior academy, that it might affect your citizenship?

24         A.    Yes.

25         Q.    Tell me about that.
```

1    Q.   You agree you didn't get approval to skip that

2  fundraiser?

3    **A.   It was on the wrong day.  It was never**

4  **communicated with me that it was on a different day.**

5    Q.   And when you showed up on the wrong day and no

6  one was there, you didn't do anything about that, did you,

7  Mr. McNicol?

8    **A.   I believed Mr. Critchley didn't want me**

9  **involved.**

10    Q.   And the Cinco de Mayo Social, didn't attend

11  that?

12    **A.   I did not attend the Cinco de Mayo.**

13    Q.   You didn't have approval to miss it either,

14  correct?

15    **A.   Correct.**

16    Q.   Okay.  You weren't ultimately given a write-up,

17  correct?

18    **A.   Correct.**

19    Q.   You weren't placed on any corrective action,

20  correct?

21    **A.   Correct.**

22    Q.   You weren't forced to sign a new employment

23  description or job description, correct?

24    **A.   Correct.**

25    Q.   Instead, you had your lawyer communicating with

1       **A.    I believed it was part of the Village to promote**
2  **the pros.**
3       Q.    Well, you were the first -- you had the right of
4  first refusal for lessons, correct?  You were on the text
5  chain with the other pros when lessons were sought,
6  correct?
7       **A.    There weren't any.  From May 16th?**
8       Q.    Do you know that anyone requested lessons during
9  that time period?
10      **A.    Don't know.**
11      Q.    You have no idea, do you?
12      **A.    I don't know.**
13      Q.    And you would agree with me that you repeatedly
14 turned down opportunities to teach lessons in 2018,
15 correct?
16      **A.    I wouldn't say repeatedly.**
17      Q.    Okay.  Well, on January 5th of 2018, you said
18 [as read]:  It's all you, Warren, to take on a lesson for
19 Blake Buller, correct?
20      **A.    You would have to refresh my memory of the**
21 **names, because that information is not correct.**
22      Q.    So do you know that you accepted a lesson on
23 January 5th of 2018?
24      **A.    I don't know.**
25      Q.    Did you keep records of the text messages that

1   you received offering you opportunities to teach lessons?

2       **A.    Yes.**

3       Q.    Okay.  Do you have all those?

4       **A.    Yes.**

5       Q.    And you produced those to your lawyer?

6       **A.    Yes.**

7       Q.    And do you know why he hadn't produced those to

8   us?

9           MR. GARDNER:  Object to the form.  You have

10  everything we have.

11          THE WITNESS:  You do have them.

12  BY MS. FREED:

13      Q.    So do you know if you have a text message on

14  January 5th of 2018?

15      **A.    Possibly.**

16      Q.    Okay.  If you don't, then you don't have any way

17  to dispute DMB's records, correct?

18      **A.    If I don't have the copy?**

19      Q.    If you haven't produced the text, it doesn't

20  exist, correct, on your -- you don't have it?

21          MR. GARDNER:  Object to the form.

22          THE WITNESS:  If I don't have it, yes.

23  BY MS. FREED:

24      Q.    January 30th of 2018, did you respond to an

25  invitation to give a listen to Damian Kallis?

1        **A.    I don't remember.**

2        Q.    Okay.  On February 5th of 2018, did you respond

3    to an opportunity to give a lesson to Kathryn and Richard

4    Brooks?

5        **A.    I don't remember.**

6        Q.    Okay.  On February 21st of 2018, do you recall

7    responding to an offer to give a lesson to Beth Rusy?

8        **A.    I don't know.**

9        Q.    Okay.  Any reason to -- do you have any

10   recollection of indicating [as read]:  No, I'm done at

11   10:30.  Warren, it's all yours?

12       **A.    Possibly, yes.**

13       Q.    February 24th of 2018, do you recall declining a

14   lesson for Diane Long?

15       **A.    Possibly, yes.**

16       Q.    On March 5th, do you recall declining a lesson

17   for Barb May indicating [as read]:  I'm already on the

18   court?

19       **A.    Possibly.**

20       Q.    Okay.  On March 5th of 2018, do you recall

21   indicating you could not perform a lesson for Dave Crumb?

22       **A.    I don't know.**

23       Q.    On March 23rd of 2018, do you recall that you

24   didn't respond to text opportunities to give lessons to

25   Jeff and Doris Holtz and Blake Abraham?

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1      A.   I don't know.

2      Q.   Okay.  On March 27th of 2018, do you recall

3  responding [as read]:  Warren, if you want it, it's all

4  yours, in response to a lesson request for Sara Hambell?

5      **A.   I -- I believe I did respond saying I could do**

6  **it, and he responded saying he could do it as well, and I**

7  **told him it was his, and there was some communication back**

8  **and forth about whether he -- he didn't want to do some --**

9  **one of them and the time didn't work out.  There was -- I**

10 **believe that might have been the one that there was some**

11 **communication with, but I did say that I could do it.**

12     Q.   Okay.  And what about on March 27th of 2018,

13 Scott Cathsent and Roy Keough?  Do you recall responding

14 [as read]:  You take both?

15     **A.   I don't know.**

16     Q.   Okay.  On March 29th of 2018, a lesson request

17 for Roy Keough, do you recall responding [as read]:  I

18 cannot either?

19     **A.   Possibly, yes.**

20     Q.   Okay.  On March 31, 2018, do you recall

21 responding "can't" in response to a lesson request for

22 Katie Biem?

23     **A.   I don't know.**

24     Q.   Okay.  On March -- I'm sorry.  On April 11,

25 2018, do you recall responding to a lesson request for

**STUART MCNICOL**                                **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1    Jared Parker with [as read]:  I can't do either?

2        A.    I don't remember.  Possibly.

3        Q.    On April 13th of 2018, do you recall responding

4    to a lesson request for Debbie Hogan [as read]:  I can't?

5        A.    I don't remember.

6        Q.    Okay.  On April 26, 2018, responding to a

7    request for a lesson for Reggie Opera [as read]:  I can't?

8        A.    I don't remember.

9        Q.    Did you ever dine at the restaurant where you

10   planned the social in 2016?  I believe you said it was

11   Tutti Santi?

12       A.    Did I ever dine there?  Yes.

13       Q.    Yes.

14             Do you know who owns that restaurant?

15       A.    Yes.

16       Q.    Who?

17       A.    Leonardo Zacchino.

18       Q.    And Leonardo is the father to Zino?

19       A.    Yeah, correct.

20       Q.    And you provided lessons to Zino?

21       A.    Yes.

22       Q.    Okay.  And it's your testimony you never

23   received free meals at Tutti Santi from Leonardo?

24       A.    Correct.

25       Q.    And you were promoted to the head tennis

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

```
1    professional at Desert Highlands in on August 29th of

2    2018?

3         A.    Correct.

4         Q.    And you went to full-time at that time?

5         A.    Yes.

6         Q.    Not prior to August 29th of 2018?

7         A.    Correct.

8         Q.    You received a pay increase from -- to $17 per

9    hour?

10        A.    Correct.

11        Q.    And a promise that that would increase to 17.60

12   after 90 days at full-time?

13        A.    Correct.

14        Q.    And what's your current hourly rate?

15        A.    17.60.

16        Q.    And have any other aspects of your pay with

17   Desert Highlands changed?

18        A.    Yes.

19        Q.    Tell me about that.

20        A.    My commissions changed.  It has been increased

21   by half a cent from my director of tennis.

22        Q.    Okay.  Any other changes?

23        A.    I was supposed to get an increase on my hourly

24   rate but, for some reason, I did not because Desert

25   Highlands -- I believe Desert Highlands has raised
```

1      Q.    The tennis department reserved six of the eight

2    courts for the junior academy, correct?

3      **A.    Eight.**

4      Q.    Eight of the ten?

5      **A.    Yes.**

6      Q.    Okay.  And the other two were available for

7    members to use?

8      **A.    Correct.**

9      Q.    Okay.  And it's your -- did you ever ask to be

10   able to teach lessons during the junior academy on the

11   other courts?

12     **A.    Yes.**

13     Q.    Okay.  Was that ever granted?

14     **A.    It was, but I couldn't do it on a regular basis**

15   **because it was against policy.**

16     Q.    Okay.  And who granted you an exception to teach

17   during the junior academy?

18     **A.    Dave.**

19     Q.    How many times?

20     **A.    I don't know.**

21     Q.    Can't recall?

22     **A.    No.**

23     Q.    Did he ever decline your request to teach during

24   the junior academy?

25     **A.    He -- he -- he said I could do it one-off, but I**

**STUART MCNICOL**                                    **September 17, 2019**
McNicol vs DMB Sports Clubs Limited Partnership

1    could not do it on a regular basis.  So I couldn't have a

2    regular client taking a lesson every week.

3         Q.   But did you ever ask him for a one-off time to

4    do lessons during the junior academy and have him tell you

5    no?

6         A.   I don't remember.

7         Q.   You don't know if --

8         A.   I believe it depended if there was a court

9    available or not.

10        Q.   Okay.  Is there anyone that you recall that you

11   turned down for a lesson because it was during the junior

12   academy --

13        A.   Yes.

14        Q.   -- time?

15             Who?

16        A.   Sophia Kleingardner [phonetic].

17        Q.   Anyone else?

18        A.   Well, did I decline or did I stop teaching?

19   Can't remember names.

20        Q.   Can you recall the names of anyone you stopped

21   teaching because of the junior academy hours?

22        A.   No.  If I saw it, I would tell you, but I can't

23   remember off the top of my head, no.

24        Q.   And how many times did Sophia request lessons

25   during the hours of the junior academy?

```
 1                    C E R T I F I C A T I O N
 2
               I, SHELLEY E.D. PEARCE, RPR, a Certified
 3      Reporter within and for the State of Arizona, do hereby
        certify:
 4
               That the foregoing deposition was taken before
 5      me; that an oath or affirmation was duly administered to
        STUART MCNICOL pursuant to A.R.S. 41-324(B); that the
 6      questions propounded to the witness and the answers of the
        witness thereto were taken down by me in shorthand and
 7      thereafter reduced to typewriting; that the transcript is
        a full, true, and accurate record of the proceedings, all
 8      done to the best of my skill and ability; and that the
        preparation, production, and distribution of the
 9      transcript and copies of the transcript comply with the
        Arizona Revised Statutes and ACJA 7-206(J)(1)(g)(1) and
10      (2).
11           The witness has requested transcript review and
        signature.
12
             I FURTHER CERTIFY that I am not related to any of
13      the parties, nor am I in any way interested in the outcome
        hereof.
14
             IN WITNESS WHEREOF, I have hereunto set my hand this
15      27th day of September, 2019.
16
17
18                           _____
                                   Shelley E.D. Pearce, RPR
19                                 Arizona CR No. 50301
20
21
                       /S/
22      _____
        For Esquire Deposition Solutions
23      Registered Reporting Firm No. R1048
24      Assignment No. J4445557
25
```

# EXHIBIT 3



# Job Description

| | | | |
|---|---|---|---|
| **Position Title:** | **Head  Tennis Professional** | **EEO Job Class:** | **Professional** |
| **Reports To:** | **Tennis Director** | **Dept/Dept #:** | **Tennis/5** |
| **FLSA Status:** | **Non-Exempt** | **Last Revision Date:** | **February 18, 2014** |

<u>Head Tennis Professional</u>

### Summary of Essential Job Functions:
To assist and oversee in all areas of tennis club operations. Including: pro shop, maintenance, instruction and programming.

- Help organize periodic special events at the club in an effort to attract and retain members' tennis interests.
- Assist in all tennis related activities.
- Assist in charging and booking of court reservations, lessons and clinics.
- Perform promotional lessons as required.
- Enforce all the club's rules and regulations governing the use of the facility, its equipment and other property.
- Foster and maintain close relationships with the other club professionals (fitness, swimming, etc.).
- Ensure programs are in place at the club/facility to service the entire membership (juniors, adults, seniors, *etc.*).
- Help organize periodic special events at the club in an effort to attract and retain members' tennis interests.
- Provide beginner through advanced instruction to enhance broad-based member participation.
- Provide educational opportunities for all members so they can understand, enjoy tennis, and grow their game.
- Assist Tennis Director in the promotion of tennis activities for the club.
- Assist in organizing and conducting league play.
- Inspect the courts/facilities on a daily basis prior to the start of play and ascertain that all necessary maintenance has been performed.
- Ascertain that all areas of the tennis club/facility are neat and clean at all times
- Conduct daily ball sweeps of the facility and its immediate exterior area.
- Complete transactions with members for lessons, drills, clinics and tournaments through the Club POS system.
- Control all guest and outside play to ensure all guest fees are collected.
- Oversee tennis operations in Director of Tennis absence
- Attend weekly Tennis staff meeting.

### Knowledge/Skills Required:
- Professional game knowledge and experience  with rules and techniques
- Customer service focused attitude
- Obtain CPR certification within 30 days of hire through Company training
- Must have excellent oral and written communication skills
- Must have excellent organizational skills
- Must be punctual and self-motivated

DMB000061

**Knowledge/Skills Preferred:**
- USPTA certification

DMB000062

# EXHIBIT 4

McNicol v. DMB Sports Clubs                    David Critchley

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Stuart McNicol,                    )
                                   )
        Plaintiff,                 )
                                   )
vs.                                ) Case No.:
                                   ) 2:19-cv-00750-SMB
DMB Sports Club Limited            )
partnership, a Delaware            )
limited partnership,               )
                                   )
        Defendant.                 )
                                   )

DEPOSITION OF DAVID CRITCHLEY

Mesa, Arizona

October 14, 2019

Reported by:  Cathy A. Miccolis, RPR/CRR

Certified Reporter, No. 50068

McNicol v. DMB Sports Clubs                          David Critchley

Page 23

1      Q.    And what did it go up to?  Do you recall?

2      A.    50, $50 an hour.

3      Q.    Do you recall any other increases in your

4  compensation package?

5      A.    I don't.

6      Q.    Tell me how it was that you were able to secure

7  an increase or increases in your compensation package.

8      A.    I believe my salary was raised because the

9  tennis department performed much better than it ever had

10  in the company's existence.

11      Q.    And what time frame would that have been?

12      A.    From when I started in 2016 until end of 2017.

13      Q.    And maybe I should give you a better question.

14  I'm interested in knowing whether or not you had to go and

15  ask for an increase or if someone just went up to you and

16  said, "Hey, you're doing a great job; we're going to give

17  you an increase."

18      A.    Specific to the raise in salary?

19      Q.    Right.  I'm just trying to get an idea of, how

20  does one go about getting an increase in their

21  compensation package?

22      A.    I don't remember the specifics of that raise.

23      Q.    Can you remember generally?

24      A.    I don't remember.

25      Q.    Now, do you remember the general time frame

McNicol v. DMB Sports Clubs                        David Critchley

Page 24

1    when you were actually hired as the tennis director?

2          A.   Yes.

3          Q.   What was the time frame?

4          A.   September -- you mean my start date?

5          Q.   Yes.

6          A.   First week in November 2016.

7          Q.   And since you started in September 2016 --

8          A.   November.

9          Q.   November.  Excuse me.  Have your duties changed

10   at all as tennis director?

11         A.   Can you be more specific?

12         Q.   Well, when you received the job offer, I think

13   you indicated you received an offer letter; correct?

14         A.   Yes.

15         Q.   Did that offer letter actually outline your

16   terms and conditions of your employment, what your

17   expectations were as the tennis director?

18         A.   I don't recall.

19         Q.   Well, did your hours increase at all over time?

20         A.   Yes.

21         Q.   And when did the hours increase as time passed?

22         A.   From -- from the beginning until probably

23   mid-2018.

24         Q.   And then November 2018 they leveled off?

25              MS. FREED:  Objection.

McNicol v. DMB Sports Clubs                          David Critchley

Page 41

1    Mr. Krimbill in which he indicated that he wanted to fire

2    my client because of an overtime claim he made in 2016?

3         A.   No.

4         Q.   Do you have any knowledge of any overtime claim

5    my client made in 2016?

6         A.   Yes.

7         Q.   How did you become aware of that?

8         A.   I don't remember.

9         Q.   Did Mr. Krimbill discuss that with you?

10        A.   Not that I recall.

11        Q.   Have you ever had any conversation with

12   Mr. Krimbill in which he indicated that he wanted to

13   terminate the employment of my client?

14        A.   Not that I remember.

15        Q.   Do you recall any conversations you had with

16   Mr. Krimbill in which he was critical of my client's work

17   performance?

18        A.   Yes.

19        Q.   And when did you have those first

20   conversations, if you recall?

21        A.   Throughout his employment.

22        Q.   And do you recall specifically what complaints

23   Mr. Krimbill had concerning his job performance?

24        A.   I do.

25        Q.   If you'd be good enough to outline each and

McNicol v. DMB Sports Clubs                          David Critchley

Page 42

1    every concern you can recall him making.

2          A.   Badmouthing in the Village, negative attitude.

3          Q.   Let's start from the beginning.  The first one

4    was what?

5          A.   Complaining to members about the Village

6    policies.  Complaining about Jim specifically to members.

7    Complaining about Carol specifically to members.

8    Complaining about Nick to members.  Complaining about

9    myself to members.  Not promoting programs.  Not wanting

10   to do anything other than teach lessons.  Not helping

11   mentor younger pros.  Not developing new programs.  Not

12   supporting director.  Not assisting when able, directors

13   specifically and other pros.

14         Q.   Anything else?

15         A.   Generally that's the...

16         Q.   And what time frame did he make these

17   complaints to you about my client's work performance?

18         A.   I don't remember when he brought them up.

19         Q.   Can you tell me if he brought them up at any

20   time during calendar year 2016?

21         A.   Yes.

22         Q.   Did he bring them up at any time during

23   calendar year 2017?

24         A.   Yes.

25         Q.   Did he bring them up at any time during

McNicol v. DMB Sports Clubs                          David Critchley

Page 44

1       Q.    How many more?  Any idea?

2       A.    Several.  Four or five.

3       Q.    And when you heard him complain, do you recall

4  exactly the words he used to complain about the

5  individual?

6       A.    No.

7       Q.    And which members -- excuse me, strike that.

8             Which individuals do you recall him complaining

9  about to the members?

10      A.    Jim, Carol and myself.

11      Q.    And specifically tell me what he said about

12  Jim, if you can recall.

13      A.    I don't remember specifics.

14      Q.    Can you tell me generally, what do you recall?

15      A.    He complained that he had not been given a

16  raise.  He complained that the club was trying to take

17  away his clients.

18      Q.    And that's when he complained about Jim?

19      A.    Yes.

20      Q.    Anything else about Jim that you recall?

21      A.    Not specifically.

22      Q.    You say he complained about Carol to members.

23  What did he complain about related to Carol?

24      A.    Compensation.

25      Q.    Anything else?

McNicol v. DMB Sports Clubs                        David Critchley

Page 45

1        A.   I don't recall the specifics.

2        Q.   And what did he complain about to members about

3    you?

4        A.   I don't remember the specifics.

5        Q.   Do you remember generally?

6        A.   Not the conversation.

7        Q.   And identify for me by name each and every

8    client or customer he complained to.

9        A.   I don't remember the specific people.

10        Q.   Was my client a good teacher?

11        A.   Yes.

12        Q.   Was he a personable individual with the clients

13    or customers?

14        A.   Sometimes.

15        Q.   When you claim that he spoke badly of Jim,

16    Carol and yourself to members, did you discipline my

17    client?

18        A.   No.

19        Q.   Now, you were his boss at that time, weren't

20    you?

21        A.   I was.

22        Q.   Did you say anything to him at that time?

23        A.   Yes.  We had several conversations.

24        Q.   And what did you say?

25        A.   I don't recall everything I said.

McNicol v. DMB Sports Clubs                                    David Critchley

Page 46

1        Q.    Well, do you recall generally what you said

2    during these conversations?

3        A.    Yes.

4        Q.    What did you say to him?

5        A.    That his attitude was negative, that it was

6    obvious that he was frustrated and upset, and that as long

7    as he worked here, he needed to find a way to make the

8    best of it.

9        Q.    At some point in time did my client's attitude

10   improve --

11       A.    Yes.

12       Q.    -- in your estimation?

13       A.    Yes.

14       Q.    What time frame was that?

15       A.    2017, probably from the spring through the

16   fall.

17       Q.    And when you say it improved, what were your

18   observations that led you to that conclusion?

19       A.    He was in a better mood.  He participated in

20   the club socials.  He volunteered to do things in the club

21   socials and generally had a more positive attitude towards

22   working at the club.

23       Q.    Do you recall him complaining at any time

24   during this change in attitude where he actually

25   complained about his compensation to members?

McNicol v. DMB Sports Clubs                           David Critchley

Page 50

1        A.    In its entirety?

2        Q.    Just that paragraph that I read to you, the

3    first bullet point paragraph.

4        A.    Yes, he was in violation sometimes.

5        Q.    And what specifically was he in violation of?

6        A.    The smile.

7        Q.    So sometimes he didn't always smile?

8        A.    (Witness nods head affirmatively.)

9        Q.    You're shaking your head.

10       A.    Yes.  Sorry.

11       Q.    Anything else?

12       A.    No.

13       Q.    The second point, bullet point, "Bring a

14   positive attitude to work each day," while you were

15   supervising my client's performance, did he bring a

16   positive attitude to work every day?

17       A.    No.

18       Q.    No one brings a positive attitude every single

19   day to their work, do they?

20       A.    I don't know.

21       Q.    Do you bring a positive attitude every day you

22   go to work?

23       A.    I do.

24       Q.    The third bullet point, "Conduct my work the

25   Village Way using our Core Values, Fun, Friendship

McNicol v. DMB Sports Clubs                      David Critchley

Page 51

1   Integrity, Involvement, Trust and Teamwork."  Do you see

2   that?

3         A.   I do.

4         Q.   While you were supervising my client's

5   performance, did he ever violate that particular

6   provision?

7         A.   Yes.

8         Q.   In what ways?

9         A.   He was not -- not involved with the other

10  tennis staff, so I would say he was -- did not demonstrate

11  great teamwork.

12        Q.   And you say he didn't interact with the staff.

13  What do you mean by that?  What was he supposed to do?

14        A.   He was supposed to mentor the younger kids,

15  younger tennis pros.

16        Q.   Anything else?

17        A.   Several times I asked him to cover shifts for

18  me, which he rarely was able to.

19        Q.   What do you mean cover shifts for you?  When

20  you were physically disabled?

21        A.   Not specifically to take my place always, but

22  just when we needed staff for a certain program.

23        Q.   When you say he couldn't cover for you, is that

24  because you were not able to attend?

25        A.   Mostly for other staff.

McNicol v. DMB Sports Clubs                      David Critchley

Page 54

1   you were his supervisor?

2           A.   (Pause.)

3                No.

4           Q.   How about the next one:  "Not engage in gossip

5   about a member or another Village employee"?  Did he ever

6   violate that provision while you were his supervisor?

7           A.   Yes.

8           Q.   How so?

9           A.   He often complained about the compensation and

10   the people that made those decisions.

11           Q.   That was just your prior testimony?

12           A.   Yes.

13           Q.   Next:  "Participate in member events,

14   networking functions and team functions unless prior

15   approval is received from the Tennis Director or General

16   Manager to be absent."  Do you see that?

17           A.   I do.

18           Q.   Did he ever violate that provision?

19           A.   He did.

20           Q.   In what ways?

21           A.   He stopped attending socials in 2018.

22           Q.   Do you know why he stopped attending?

23           A.   I do not.

24           Q.   Was it your job to find out?  You were his

25   supervisor, weren't you?

McNicol v. DMB Sports Clubs                          David Critchley

Page 55

1          A.    I was.

2          Q.    Why didn't you go to him and find out why he

3     was missing?

4          A.    I did.

5          Q.    And what did he say?

6          A.    Which event?

7          Q.    Any one that you can remember as you sit here.

8          A.    I don't remember the specific reasons he gave

9     for each event.  There were different excuses given.

10         Q.    Did you ever order him to appear?

11         A.    Yes.

12         Q.    And do you recall which events you ordered him

13    to appear at?

14         A.    In our conversations and per this document, he

15    was expected to be at all social events.

16         Q.    So your testimony is you ordered him to appear

17    at all social events and he didn't?

18         A.    Yes.

19         Q.    And each time you say he did have a reason for

20    not attending; correct?  You just can't recall what they

21    are?

22              MS. FREED:  Objection.

23              THE WITNESS:  I can't recall the specifics to

24    each one, no, I don't.

25    BY MR. GARDNER:

McNicol v. DMB Sports Clubs                                    David Critchley

Page 56

1       Q.   Can you recall generally?

2       A.   Not for each one, no.

3       Q.   Well, for any of them?

4       A.   Yes.

5       Q.   Okay.  Tell me what you can recall.

6       A.   He said he didn't -- was unaware or he said he

7  had family obligations.  One time he said he was out of

8  town.

9       Q.   When he gave you these reasons, did you believe

10 him or did you think he was making them up?

11      A.   I thought he was making them up.

12      Q.   And what's the basis for that belief?

13      A.   That he attended all of them in 2017 and he

14 missed four or five consecutively in 2018.

15      Q.   Do you know my client's wife?

16      A.   I do.

17      Q.   Do you know when they got married?

18      A.   I do not.

19      Q.   Next:  "Use my best judgment in all

20 situations."  It refers to handling things in the "Village

21 Way."

22           Did he ever violate that?

23      A.   Yes.

24      Q.   How so?

25      A.   One specific that comes to mind is he inserted

McNicol v. DMB Sports Clubs                          David Critchley

Page 57

1   himself into a conversation or meeting I was having with

2   other employees and began complaining that the club was

3   taking away his clients.

4        Q.   And who was present during that conversation?

5        A.   Tom Clark, the front desk manager; Susan Cabano

6   and Kathryn Brassfield.

7        Q.   And was that a true statement on his part, or

8   do you think he was lying to his coworkers?

9             MS. FREED:  Objection.

10            THE WITNESS:  Could you rephrase, please?

11            (Record read:  "And was that a true statement

12   on his part, or do you think he was lying to his

13   coworkers?")

14            THE WITNESS:  Could you rephrase the question?

15   I can't testify to what -- if he was lying or not.

16   BY MR. GARDNER:

17        Q.   Well, I'm just trying to get an idea.  Maybe I

18   can give you a better question.

19            Did my client ever go to you and indicate that

20   his compensation was being reduced while --

21        A.   Yes.

22        Q.   -- others were getting their compensation

23   increased?

24        A.   Can you make that two different questions?

25        Q.   Well, why don't you answer the first part first

McNicol v. DMB Sports Clubs                    David Critchley

Page 59

1   saying was true?

2        A.   I was aware of his complaints.  I didn't need

3   to investigate.

4        Q.   Well, did you do anything to try to get that

5   reversed in some fashion to increase his compensation?

6        A.   Yes.

7        Q.   And what did you do to try to get his

8   compensation increased?

9        A.   Tried to get the compensation percentage

10  increased for all tennis pros.

11       Q.   You kind of lost me there.  So because of the

12  complaint that he raised to you about losing money, you

13  decided to try to get the compensation in general

14  increased for all of the tennis pros.  That's your

15  testimony?

16       A.   Not specific to his complaint, but that was an

17  ongoing thing.

18       Q.   That's an ongoing thing.  So it had nothing to

19  do with my client's specific complaint about losing money?

20       A.   I wouldn't say it had nothing to do with that,

21  no.

22       Q.   Did you do anything else?

23            MS. FREED:  Objection.

24            THE WITNESS:  Yes.

25  BY MR. GARDNER:

McNicol v. DMB Sports Clubs                          David Critchley

Page 60

1        Q.    What else did you do?

2        A.    I encouraged him to teach more groups where he

3    made more money per hour.  I offered him more hours in set

4    programs.

5        Q.    Now, while my client was employed at DMG, did

6    you ever talk to Mr. Krimbill about my client's position

7    on this?

8        A.    At DMB?

9        Q.    Yeah.

10        A.    Yes.

11        Q.    And what was his response?

12        A.    I don't remember.  Several conversations.

13        Q.    Well, let me ask you this:  Do you have any

14    recollection of Mr. Krimbill doing anything to increase

15    the compensation for my client?

16        A.    No.

17        Q.    Did Mr. Krimbill ever indicate to you why he

18    was not going to increase my client's compensation?

19        A.    Can you rephrase that?

20        Q.    Yes.  Did Mr. Krimbill at any time --

21        A.    Krimbill?

22        Q.    -- Krimbill ever indicate to you why he was not

23    going to increase the compensation for my client?

24        A.    I don't know how to answer that because I don't

25    remember a specific conversation where he was -- where

McNicol v. DMB Sports Clubs                          David Critchley

Page 64

1              THE WITNESS:  Not that I recall.

2   BY MR. GARDNER:

3        Q.   And did you see the response that my client

4   sent?  It starts out "Good morning."

5        A.   I did.

6        Q.   Is there anything in that paragraph, which is,

7   I interpret, is a response by my client to Mr. Krimbill,

8   is there anything in that paragraph that you think is

9   inaccurate?

10             MS. FREED:  Objection.

11   BY MR. GARDNER:

12        Q.   Go ahead and answer.

13        A.   Yes.

14        Q.   Everything is accurate in there?

15        A.   No.  I think part of it is inaccurate.

16        Q.   What part of it is inaccurate?

17        A.   The $7.00.

18        Q.   What's inaccurate about that?

19        A.   I believe he's calculating that by spreading

20   out his salary over the number of hours he's at the club.

21   It's my understanding that your salary is given to you to

22   perform specific tasks and is not divided by the number of

23   hours you're at the club.

24        Q.   Did you agree that at least back in that time

25   frame he was promoting the club?

McNicol v. DMB Sports Clubs                          David Critchley

Page 65

1          MS. FREED:  Objection.

2          THE WITNESS:  I was not at the club then, so I

3    can't speak to that.

4    BY MR. GARDNER:

5          Q.   Fair enough.  And you don't render any opinion

6    as far as whether or not the money that he was generating

7    had been reduced by close to $100 a month?

8          A.   I have no knowledge of that.

9          Q.   If you would have had $100 a month taken from

10   your income from the business at DMB, do you think you

11   would have objected to that reduction?

12          MS. FREED:  Objection.

13          THE WITNESS:  Yes.

14   BY MR. GARDNER:

15          Q.   And who would you have objected to in

16   circumstances like that?

17          MS. FREED:  Objection.

18          THE WITNESS:  Jim Krimbill.

19   BY MR. GARDNER:

20          Q.   You recognize those two exhibits, do you not?

21          A.   I do.

22          Q.   The first is Exhibit No. 6 from my client's

23   deposition, and the second is Exhibit No. 7 from his prior

24   deposition.  Do you see that?

25          A.   I do.

McNicol v. DMB Sports Clubs                        David Critchley

1       Q.    What are the differences between those two

2   reviews?

3       A.    One is 2016 and one is 2017.

4       Q.    And would you agree with me that the review for

5   2017 is actually an improvement over my client's

6   performance in 2016?

7       A.    I would.

8       Q.    And to what do you -- strike that.

9             Specifically how did his performance improve in

10  2017?

11      A.    His attitude was more positive.  He took some

12  of my advice on creating new programs, focusing on larger

13  groups.

14      Q.    What new programs did he assist with?

15      A.    I don't remember the specifics, but we were

16  creating an adult tennis schedule, and in the past he

17  didn't have any open -- clinics open to members.  I

18  suggested that he have some clinics that were open, open

19  to anyone.

20      Q.    Anything else that would have improved?

21      A.    Hard to speak to it because I only worked with

22  him for a little over a month in 2016.

23      Q.    During 2017 was he still complaining about

24  money he felt was being taken away from him by DMB?

25      A.    Yes.

McNicol v. DMB Sports Clubs                          David Critchley

Page 67

1        Q.    Did my client ever indicate to you that he did

2    not think you were doing enough to try to assist with his

3    issues relating to his compensation?

4        A.    Yes.

5        Q.    How many times did he complain to you?

6        A.    Can you rephrase?

7        Q.    Sure.  How many times did he complain to you

8    that you weren't doing enough to look into his

9    compensation arrangement?

10       A.    Once or twice that specific complaint.

11       Q.    And how did you respond to him when he said

12   that?

13       A.    I -- my recollection is that I said we would

14   need to change the compensation structure for the entire

15   club would be our best avenue.

16       Q.    Your review, Exhibit No. 7 to the McNicol

17   deposition indicates that my client has been a great asset

18   to the club in 2017.

19       A.    Correct.

20       Q.    That was a true statement; correct?

21       A.    Correct.

22       Q.    Many of the members joined the club because of

23   him; correct?

24       A.    Correct.

25       Q.    "You," being my client, "are largely a face of

McNicol v. DMB Sports Clubs                    David Critchley

Page 71

1       Q.    Is it your position that the tennis pros at DMB

2   never get an increase in salaries or the compensation

3   package?

4       A.    No.

5       Q.    They do get increases sometimes; correct?

6       A.    Correct.

7       Q.    But my client in four years never got any;

8   correct?

9       A.    Not correct.

10      Q.    When did he get a raise?

11      A.    I believe when I first came on, we increased

12  the lesson prices, which had him make more money per hour.

13      Q.    And what was the increase of the lesson prices?

14      A.    I don't recall what.

15      Q.    I have just handed you what's been marked as

16  Exhibit No. 9 to the McNicol deposition.  Please take a

17  look at that.

18      A.    Yeah, I'm familiar with it.

19      Q.    Why was this sent to my client?

20      A.    It started with the conversation I had with our

21  head HR person, Laura Frederickson, that Stuart was not

22  fulfilling his duties as head pro.  She suggested that I

23  meet with him and discuss what my expectations were.  In

24  that conversation Stuart asked me to produce an outline of

25  what my vision for the head pro was.  This is what I

McNicol v. DMB Sports Clubs                              David Critchley

```
 1  produced and shared with Stuart.
 2        Q.   Do you recall how it is you came up with this
 3  form?  Did you copy it from some other document?
 4        A.   No.  I created it from --
 5        Q.   From scratch?
 6        A.   Yes, sir.
 7        Q.   Now, at the time you outlined these duties of
 8  the head pro, did you ever indicate either in writing or
 9  verbally to him that if he complied with all of this, he
10  would be entitled to an increase in his pay?
11        A.   Can you rephrase?  This was -- this was what I
12  envisioned for that pro.  That was not an official change
13  of the job duties.
14        Q.   But my question was:  Did you ever indicate to
15  him -- either you did or you didn't -- that if he complied
16  with your vision here, that he would be entitled to an
17  increase in his compensation?
18        A.   No, not that I recall.
19        Q.   Did you ever have any conversations with my
20  client which led you to believe that he considered this an
21  increase in his job duties from those originally assigned
22  to him?
23        A.   Yes.
24        Q.   And what did you discuss along those lines?
25        A.   That there were two salary positions at the
```

McNicol v. DMB Sports Clubs                          David Critchley

Page 84

```
 1   STATE OF ARIZONA          )
                               )  ss.
 2   COUNTY OF MARICOPA        )

 3              BE IT KNOWN that the foregoing deposition was

 4   taken before me, Cathy A. Miccolis, RPR, a Certified

 5   Reporter, Certificate #50068, for the State of Arizona,

 6   and by virtue thereof authorized to administer an oath;

 7   that the witness before testifying was duly sworn by me to

 8   testify to the whole truth; that the questions propounded

 9   to the witness and the answers of the witness thereto were

10   taken down by me in shorthand and thereafter reduced to

11   print by computer-aided transcription under my direction;

12   that pursuant to request, notification was provided that

13   the deposition is available for review and signature; that

14   the transcript consisting of 84 pages is a full, true and

15   accurate transcript of all proceedings and testimony had

16   and adduced upon the taking of said deposition, and

17   preparation, production and distribution of the transcript

18   and copies comply with law and code as required by ACJA

19   7-206(F)(3), all done to the best of my skill and ability.

20              I FURTHER CERTIFY that I am in no way related to

21   nor employed by any of the parties hereto, nor am I in any

22   way interested in the outcome hereof.

23   DATED at Phoenix, Arizona, October 20, 2019.

24   _____
     Cathy A. Miccolis, RPR/CRR, Certified Reporter #50068
25   Bamford Reporting Service, Inc.
```

# EXHIBIT 5

**Jim Krimbill**

| | |
|---|---|
| **From:** | Nicholas Heron |
| **Sent:** | Thursday, May 07, 2015 11:44 AM |
| **To:** | Stuart McNicol |
| **Subject:** | Fwd: Meeting! |

Sent from my iPhone

Begin forwarded message:

> **From:** Jim Krimbill <JKrimbill@dmbclubs.com>
> **Date:** May 7, 2015 at 6:08:36 AM MST
> **To:** Nicholas Heron <nheron@dmbclubs.com>
> **Subject:** Fwd: Meeting!
>
> I am out till May 14, please touch base with him. Show him our example of 100 rackets a month at $20 =$2,000 and 100 rackets at $15=$1,500,difference $500. If increasing tennis memberships and taping into current players we increase rackets to 150 month, he will more than make up revenue. Just teaching more groups verses privates can increase revenue. I really am not interested in talking about this any more. The focus of the club should not be about rackets.

  **Jim Krimbill** | General Manager |USPTA Master Professional
DC Ranch Village Health Clubs & Spas | P480.502.8844
🔲 🔲 🔲 🔲 🔲 | **Wwww.villageclubs.com**

Begin forwarded message:

> **From:** Stuart McNicol <SMcNicol@DMBClubs.com>
> **Date:** May 7, 2015 at 5:57:49 AM MST
> **To:** Jim Krimbill <JKrimbill@dmbclubs.com>
> **Subject: Meeting!**
>
> Good morning Jim,
> If you have some time I'd like to sit down with you and discuss a few things.
> Let me know if you can and when we can do that.
> Thanks.
>
> Stuart McNicol
> Head Tennis Professional
> DC Ranch Village Tennis Center

1

DMB000071

# EXHIBIT 6

To: Stuart McNicol

RE: Expectations for Success                                    Date: July 5th, 2016

From: Nick Heron

In order for our group to succeed, the following expectations of each of us must become effective immediately.

I understand that I am expected to:

- Arrive at work dressed professionally, and wearing my nametag and a smile.  I understand that I am held to the Attendance Policy as outlined in the Employee Handbook and that I am expected to report to work on time.
- Bring a positive attitude to work each day.
- Conduct my work the Village Way using our Core Values (FIT$^2$) Fun, Friendship, Integrity, Involvement, Trust and Teamwork.
- Take care of each member.  If a member and I have a disagreement, I will not be confrontational but understand that the member is our number one priority and try to take care of them to the best of my ability.  If I am not able to help them after making an attempt, I will make sure to get the Tennis Director involved and work towards a resolution together.
- Establish and maintain an atmosphere of trust in my team.  If I have a disagreement with another teammate I will try to work it out with that teammate quickly, privately and respectfully as possible.  I will give my teammates the benefit of the doubt and ask questions to resolve issues. If my attempts at resolution are not successful, I will get the Tennis Director involved and work towards a resolution together.
- Not engage in gossip about a member or another Village employee.  Discussing another employee or member in a negative manner is unacceptable.  This behavior leads to distrust and a negative vibe in our club.  It is imperative that we are the positive promoters within the club and establish good working relationships with all departments as well as within our department.
- Participate in member events, networking functions and team functions unless prior approval is received from the Tennis Director or General Manager to be absent.
- Use my best judgment in all situations.  If I and/or my manager feel that a situation was not handled the "Village Way" we will review what could have been done differently so that we know how to deal with it in future case.
- No clients will pay under the table effective immediately.

DMB000021

Expectations for Success

In order for our group to succeed, the following expectations of each of us must become effective immediately.

I understand that I am expected to:

- Arrive at work dressed professionally, and wearing my nametag and a smile. I understand that I am held to the Attendance Policy as outlined in the Employee Handbook and that I am expected to report to work on time.
- Bring a positive attitude to work each day.
- Conduct my work the Village Way using our Core Values (FIT$^2$) Fun, Friendship, Integrity, Involvement, Trust and Teamwork.
- Take care of each member. If a member and I have a disagreement, I will not be confrontational but understand that the member is our number one priority and try to take care of them to the best of my ability. If I am not able to help them after making an attempt, I will make sure to get the Tennis Director involved and work towards a resolution together.
- Establish and maintain an atmosphere of trust in my team. If I have a disagreement with another teammate I will try to work it out with that teammate quickly, privately and respectfully as possible. I will give my teammates the benefit of the doubt and ask questions to resolve issues. If my attempts at resolution are not successful, I will get the Tennis Director involved and work towards a resolution together.
- Not engage in gossip about a member or another Village employee. Discussing another employee or member in a negative manner is unacceptable. This behavior leads to distrust and a negative vibe in our club. It is imperative that we are the positive promoters within the club and establish good working relationships with all departments as well as within our department.
- Participate in member events, networking functions and team functions unless prior approval is received from the Tennis Director or General Manager to be absent.
- Use my best judgment in all situations. If I and/or my manager feel that a situation was not handled the "Village Way" we will review what could have been done differently so that we know how to deal with it in future case.
- No clients will pay under the table effective immediately.

Stuart McNicol

08/01/16.

08.01.16

# EXHIBIT 7



# Village Health Clubs and Spas
# Hourly and Commission
# Performance Review Form
# Year 2016_

| Employee Name:  Stuart McNicol |
| Employee Title:  Head Tennis Professional |
| Date of Hire: 03/24/2014 |
| Department:  Tennis 505 |
| Supervisor Name & Title: Dave Critchley Tennis Director/ Jim Krimbill General Manager |
| Date of Evaluation:      December 8th , 2016 |
| Date of Next Evaluation: 12/31/16 |

| Outstanding | Exceeds Standards | Meets Standards | Needs Improvement | Unsatisfactory |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |

## 1. Attendance and Punctuality
- Shows up on time dressed to play.  Regularly shows up for scheduled shifts on time and ready to work.

☐1- OUT        ☐ 2- ES        ☒ 3-MS        ☐ 4- NI        ☐ 5- UN

**Manager's Comments:**

Your attire is very professional and you have been punctual and on time with your private and group lessons.

## 2. Customer Service
- Greets members and employees in a friendly manner with a smile and pleasant attitude.
- Responds gracefully and promptly to member inquiries and attempts to resolve customer questions and concerns, which includes directing members to the proper person to help with the inquiry if further assistance is needed.
- Consistently takes care of member needs.  Finds a way to say "Yes" to members.

☐1- OUT        ☐ 2- ES        ☒ 3-MS        ☐ 4- NI        ☐ 5- UN

**Manager's Comments:**

You have demonstrated that you are a strong teaching professional with your teams and have serviced them very well. Your teams are enjoying the clinics with you and the league play. You assisted in adding players to all DC Village Interclub teams, and addressed those players that needed to move up or down.  This is not an easy task, as individuals have a hard time accepting the playing level that they are at in the league play.

In 2016 we discussed Andrew Mayer and onboarding new pro's to string tennis rackets, and on growing the stringing area financially.  The discussion was to partner with Camelback and purchase same string offerings (cost control based on volume purchase) and promote it to members-Monthly specials where members could receive free grip when having their racket strung, etc. You had an opportunity to demonstrate leadership and ownership in organizing, promoting, and developing the stringing business at the club, to financially benefit the organization, stringer, and onboarding new employees who were developing their lesson business.  Likewise the Demo rackets were not managed and many are not stenciled, grips are poor condition, and the presentation to members is not representative to the Village standard.

Page 1 of 5



In July Nick Heron, Tennis Director was very frustrated and wrote up an expectation sheet as a result. He specifically mentioned items such as "Not trusting Stuart", Stuart does not have my back". Nick and you met and resolved the concerns and expectations moving forward.

**3. Co-Worker Relations: Promotes Fun, Friendship, Integrity, Involvement, Teamwork, Trust**
- Helps to maintain a climate of trust and respect and promotes harmony among coworkers.
- Helps to maintain a professional environment by having a positive "can do" attitude.
- Offers assistance to fellow employees or managers when needed, including such tasks as covering shifts or helping with club events.

☐1- OUT     ☐ 2- ES     ☐ 3-MS     ☒ 4- NI     ☐ 5- UN

**Manager's Comments:**

The front desk staff and Eusebio seem to know that if you are asked to assist them that you will. As to a positive environment, there was a lot of negativity from you towards the Village policies and procedures. You complained having to attend paid training, stringing service, having to use company email to communicate with members, establishing office hours to handle members calls/emails, responding to Lisa Owens Membership Director request for new member with " I cannot go into overtime", resistant to hosting NMO set times, .

Recently in November Lisa Rice witness and discussed with you the conversation that you and Suzi were having at the main club front desk. Suzi was suggesting that the doubles play on Tuesday night did not go well and she was stating that people that Dave brought up already know the format but it left all the new people standing around not knowing the format. Instead of being supportive and positive about the changes at Tennis and thanking her for her feedback and her patience while we introduce new programming, you were agreeing with her and contributing to the negative conversation. When Suzi stepped away, Lisa Rice spoke to you about this conversation and she coached you stating that we need to be positive in explaining the growth and some inevitable opportunities for improvement.
As a teaching professional I am not aware of a time where you included other teammates to team teach with your clinics to service more team members that would be interested in practicing.

**4. Completion of Assignments and Projects**
- Follows through on tasks or projects when asked to complete them.
- Completes tasks or projects on time.

☐1- OUT     ☐ 2- ES     ☐ 3-MS     ☒ 4- NI     ☐ 5- UN

**Manager's Comments:**

As a Head Tennis Professional the focus should be on developing events, programs, staffing (Helping current staff by including them as second pro, coaching them to find a expertise, as well as finding assistance Pro's) to increase revenue or participation. Head Tennis Professionals should be self-starters that see opportunities and fill niches. The tennis lessons and programs have not grown in three years. You have managed your specific interclub teams and focused on stringing a few rackets a week. Even with stringing there has not been any management to grow- signage, promotion, grips, wraps, specials, or financial management. When you were asked to fill out the required fields on the timesheet as to the activities you were preforming off court, you push back.

Page 2 of 5



You should organize your time toward impactful activities and projects to grow the tennis department revenue. In addition we should be managing the stringing so that it would be profitable for the tennis budget. Attending Third Friday tennis mixer, four grand slam mixers (missed French Open), oversee drop-ins, and oversee teaching staff (adult Try Tennis Today or juniors)

Laura Frederickson Chief Human Resource Officer advised you in July during a meeting, to not run errands on the company's behalf. Yet in October we again had to remind you.

In October when we discussed your time management, you mentioned being on the phone for 5 hours with a member about one of your interclub teams. As communicated in the past, we want all employees to use company phones (designate office times) and club emails to communicate to members.

On October 31, Jim Krimbill asked you to mark off 8 courts from 4-6pm, and merge junior classes with Dave Critchley.  It took four days.

As a seasoned teaching professional, it was disappointing to see this past summer teaching hours in June, July, and August dip down below 10 hours teaching a week.  Tennis lessons revenue as a group dropped from $201k to $170k and junior lesson revenue dropped from $57k to $37k. There was not a concentrated effort to be creative to incentivize or attract lessons, drills, clinics, or programs for tennis. As a team you could have considered using the gym or racquetball courts during the hot months like Camelback Village did, and work with kids club.

## 5. Work Effort
- Demonstrates a high level of expertise in role and is confident in abilities.
- Maximizes personal strengths and uses abilities to the fullest.
- Puts forth full effort to complete the responsibilities of role with a high level of enthusiasm.

☐ 1- OUT      ☐ 2- ES      ☐ 3-MS      ☒ 4- NI      ☐ 5- UN

Nick Heron announced resignation September 14th effective September 23rd.  At this time I took a look at all areas of the tennis operation, and determine where we are spending our time.  We are responsible for the financial wellbeing of the tennis department. We are responsible to the membership to provide programs and activities.  In the short time that I have been involved since Nicks departure, I have had to up-date the front desk contact list ( last time it was up-dated was April), order balls, order Try Tennis Today rackets, up-date Adult programs, buy new court scorecards that were missing on three courts, Buy balls, buy Try Tennis Today rackets, Try Tennis today Program, Junior Program, handle 4.5 plus Interclub team, evaluate how to improve the Pro's time with Interclub teams, determine how we are going to add more teaching pro's to be available in evenings and weekends ( ten court facility after three years should have more than two pro's), establish a better system for new member orientation/ rating, review maintenance task, etc.  I have been hands off for the last year and a half, providing the tennis staff the flexibility to take the steps required to accomplish the main objective we need for tennis.  The junior program, adult program needs development as well as other areas of operations.  In 2016 we did not host singles or doubles championships, Spring Jr. Break Camp, Village interclub matches, did not host a French Open Mixer, No Holiday drills or events were scheduled, single ladder activity did not take place, the office printer was out of order for an extended period of time, We did not offer an event for November 8th for the Open House, there was no evidence that networking opportunities with Cooper Ridge School were taking place. These expectations are outline in your Head Professional Job Description.

Page 3 of 5



**6. Work Habits (Organizational Skills, Time Management)**
- Uses time productively
- Looks for things to do to help out during slow periods.
- Prioritizes responsibilities in order of importance

☐1- OUT        ☐ 2- ES        ☐ 3-MS        ☒ 4- NI        ☐ 5- UN

**Manager's Comments:**

When we had you specifically track your off court activity on the time sheet, we have opportunity to use your time more effectively to grow the tennis department.  As mentioned previously, we should be focus on operational needs to insure updated flyers, website, promotions, court appearance, etc.

**Overall Score:**  3.66

**7.  Future Expectations/Goals to Accomplish for Success:** *(To be discussed during meeting with employee).*

| Goal | Date to be completed by |
|---|---|
| 1.  Be a solution and positive influence to the Tennis Programs, events, and teammates. Promote member involvement in all activities at Tennis | |
| 2.  Build trust with all tennis staff with positive talk, and behavior that demonstrates the success of the team is more important than the success of one person. | |
| 3.  Work with Tennis Director to insure success as a team | |
| 4.  Work with Tennis Director on your 2017 role, expectations, and job requirements. | |
| 5. | |

**Employee Comments (use additional pages if necessary):**

_____

_____

DMB000055

**Village**
HEALTH CLUBS & SPAS

I have reviewed this Performance Evaluation and discussed the contents with my supervisor.  My signature indicates that I have been advised of and understand my performance evaluation.

Employee Signature                                   12/8/16
                                                      Date

Supervisor Signature                                 12/8/16
                                                      Date

General Manager Signature                            12/8/16
                                                      Date

Page 5 of 5

DMB000056

# EXHIBIT 8



**Life's Better at the Village**

**MEMORANDUM**

September 19, 2016

Stuart McNicol,

On August 1, 2016, you advised Nick Heron, Tennis Director, Jim Krimbill, General Manager and Laura Frederickson, Chief Human Resources Officer, that you had recently realized that you have not received compensation for overtime hours that you had worked beginning March 2014 to August 2015. You stated that you had not previously brought this matter to the attention of your manager or anyone else at Village Health Clubs & Spas.

You then stated that Laura Barnes, AP/Payroll Manager, advised you in August of 2015 that you needed to begin tracking your time on a timesheet that she provided you with via email as you had not previously done so. You stated during that meeting that you had no record of the hours worked before you began tracking your time on the timesheets beginning in September of 2015, but that you were certain that you had worked overtime from the first week you started with the clubs, the week of March 24, 2014, and in every week thereafter. You stated that your commissions and all other payments received each period was accurate and it was only the overtime hours that you had worked and did not receive compensation for.

An extensive and exhaustive search was performed in the payroll system as well as Spectrum to calculate commissions for lessons and stringing racquets and determine hours recorded. The Spectrum system was reconciled with the payroll records you did turn in for later dates. The method used to calculate overtime potential was done by calculating the average of hours worked including overtime that you had reported during the months of April-August of 2016, August-December of 2015, and January through August 2016 once again, for a total of 36 pay period. This was completed to emulate the period of March 2014 through August 2016, prior to your beginning to track your time. We also calculated your average commission earned for that same period of time. We then determined that the average overtime reported worked for each week was 8.3 hours. We calculated the 20 pay periods from April 11, 2014 -January 2, 2015 at your then salary rate, which was $553.85. We calculated the next 16 pay periods from January 16, 2015-August 14, 2015 at your salary rate which became effective January 1, 2016, of $570.47. We arrived at a total due to you of $5,964.33, minus applicable deductions and taxes as required by law.

Your position with The Village is designated as salaried nonexempt. As such, you must track and submit all hours worked for each workweek. Your base salary is paid to you on a fluctuating workweek basis. This means that you will be paid this salary amount ($570.47 per week) every two weeks, regardless of the number of hours worked, minus applicable taxes and deductions. In addition, you are eligible to receive overtime for working more than 40 hours in a workweek paid at ½ times your regular rate of pay. Overtime earnings are calculated based on your salary and commission earnings and bonus earned in that week ("regular rate").

All policies and procedures in the Employee Handbook were in place from the date of your hiring throughout your employment. Therefore, you understand that you are expected to record your time

*7477 E Doubletree Ranch Road*
*Scottsdale, Arizona 85258*
*Phone: 480-609-6979*
*Fax: 480-609-6976*
*www.villageclubs.com*

*Owned and operated by DMB Sports Clubs*

regularly on a timesheet or in an electronic timekeeping system, if applicable. Effective immediat, per the Overtime Approval policy in the Employee Handbook, "*Working overtime must be approved advance by your immediate manager. Employees who log in more than 10 minutes prior to scheduled shift or stay later than 10 minutes after a scheduled shift must have their manager's or another manager's approval. Failure to adhere to the scheduled shift and clock in and out in a timely manner will not be tolerated.*" In addition, per the Time Clock and Time Sheet policy in the Employee Handbook, "*Salaried non-exempt employees will be required to track their hours on a timesheet on a daily basis. This timesheet is to be turned in to the employee's manager for approval on every Monday following the end of a pay period. Managers are to approve their employees' time sheets and send these to Payroll no later than the following Tuesday morning after the payroll period has ended.*" If you have difficulty clocking in or have questions on the process, please contact your manager, Human Resources or Payroll right away for assistance.

Village Health Clubs & Spas is an at will employer. Nothing in this memo or any other document you receive changes the fact that employment is at-will for an indefinite period, and that employment may be terminated by you or Village Health Clubs and Spas at any time and for any reason or no reason at all.

If you have any additional questions regarding pay or other general questions, please contact your manager, General Manager, Payroll or Human Resources Department.

_____          09/21/2016
Stuart McNicol                                              Date

_____          09.21.2016
Nicholas Heron                                             Date
Tennis Director

Cc:     Jim Krimbill
         Laura Frederickson

DMB000026

# EXHIBIT 9



## Village Health Clubs and Spas
## Hourly and Commission
## Performance Review Form
## Year 2017

| Employee Name:  Stuart McNicol |
| --- |
| Employee Title:   Head Tennis Professional |
| Date of Hire: 03/24/2014 |
| Department:   Tennis 505 |
| Supervisor Name & Title: Dave Critchley Tennis Director |
| Date of Evaluation:       12/03/2017 |
| Date of Next Evaluation: 12/06/2018 |

| Outstanding | Exceeds Standards | Meets Standards | Needs Improvement | Unsatisfactory |
| --- | --- | --- | --- | --- |
| 1 | 2 | 3 | 4 | 5 |

### 1. Attendance and Punctuality
- Shows up on time dressed to play.  Regularly shows up for scheduled shifts on time and ready to work.

☐1- OUT    ☐ 2- ES    ☒ 3-MS    ☐ 4- NI    ☐ 5- UN

**Manager's Comments:**

You are always dressed professionally and are early to lessons and bring great energy to the club.

### 2. Customer Service
- Greets members and employees in a friendly manner with a smile and pleasant attitude.
- Responds gracefully and promptly to member inquiries and attempts to resolve customer questions and concerns, which includes directing members to the proper person to help with the inquiry if further assistance is needed.
- Consistently takes care of member needs.  Finds a way to say "Yes" to members.

☐1- OUT    ☐ 2- ES    ☒ 3-MS    ☐ 4- NI    ☐ 5- UN

**Manager's Comments:**

You have been a great asset to the club this past year. You have been here since the beginning and many of our members joined the club because of you.  You are largely a face of our tennis program as you are often at the club stringing when not on court and you have fostered many great friendships with members and staff.  You have really stepped up in planning and execution of all our monthly socials, volunteering to man the grill when needed, call out the pairings and play in the socials.

You have jumped in to play with men in the midafternoon, come in during off times to string a racket if needed and have gone above and beyond.  Recently you have been tasked with doing many of the new member initial orientations and have done a great job welcoming new members and communicating with the director and membership as new members are incorporated.

You are on several teams and use these opportunities to create meaningful relationships with members and show that you are an integral part of our tennis community and lead by example. Your attitude is always positive and you bring a great energy to your work and are always engaged and responsive when we

DMB000057



**3. Co-Worker Relations: Promotes Fun, Friendship, Integrity, Involvement, Teamwork, Trust**
- Helps to maintain a climate of trust and respect and promotes harmony among coworkers.
- Helps to maintain a professional environment by having a positive "can do" attitude.
- Offers assistance to fellow employees or managers when needed, including such tasks as covering shifts or helping with club events.

☐1- OUT   ☒ 2- ES   ☐ 3-MS   ☐ 4- NI   ☐ 5- UN

**Manager's Comments:**

You are well respected by all the staff.  You have been very willing to fill in when available for lessons, orientations, and programs to fill on teams when needed.

Your attitude is now positive and you bring a great energy to your lessons and the club in general.  You are quick to make suggestions on how to improve processes at the club, ideas for new programs and formats for socials.  You have been a huge asset to the director as you have a great knowledge of the members, their personalities and their tennis needs.

**4. Completion of Assignments and Projects**
- Follows through on tasks or projects when asked to complete them.
- Completes tasks or projects on time.

☐1- OUT   ☐ 2- ES   ☒ 3-MS   ☐ 4- NI   ☐ 5- UN

**Manager's Comments:**

As Head Professional it was to great to see you follow through on the suggestion to create new and exciting programming that is open to all members of the appropriate level.  You now have several classes on the monthly tennis calendar and as noted are an integral part of all our tennis socials.  This has grown your visibility and interacting with more club members and we are moving away from clicks of members at the club.

I would encourage you to expand some of your programs to include younger pros both to increase revenue and help mentor and teach our younger staff as well as get more involved in the larger junior and or adult programs at the club.

**5. Work Effort**
- Demonstrates a high level of expertise in role and is confident in abilities.
- Maximizes personal strengths and uses abilities to the fullest.
- Puts forth full effort to complete the responsibilities of role with a high level of enthusiasm.

☐1- OUT   ☐ 2- ES   ☒ 3-MS   ☐ 4- NI   ☐ 5- UN

You demonstrate great professionalism on court while teaching.  You are loud, engaged and clearly have a vested interest in your students learning and achieving their tennis goals.  Your student's often give positive feedback and referrals which is why you very successful.

Despite already being very experience and accomplished tennis professional you have tried to improve your skills by enrolling in the PTR's Master of Tennis a very in-depth program that shows your dedication to your craft.

Page 2 of 4



**6.  Work Habits (Organizational Skills, Time Management)**
- Uses time productively
- Looks for things to do to help out during slow periods.
- Prioritizes responsibilities in order of importance

☐ 1- OUT          ☐ 2- ES          ☒ 3-MS          ☐ 4- NI          ☐ 5- UN

**Manager's Comments:**

You were very open to the several new responsibilities given to you by the director.  Including scheduling and communicating with new members, tracking string inventory, taking more of a coaching leadership role with front desk, taking on a larger role during socials and assisting in planning events and the tennis programs at the club.

When at the club you are quick to help where needed whether answering a phone, answering questions about programs or coaching front desk staff on tennis programs or stringing.  You maximize your time at the club and are efficient when stringing and have often volunteered to help when needs arise.

You have been very proactive in making suggestions on new programs, scheduling, new teams and socials.

**Overall Score:  2.83**

**7.  Future Expectations/Goals to Accomplish for Success:** *(To be discussed during meeting with employee).*

| Goal | Date to be completed by |
|---|---|
| 1.   Be aware of all programs and socials and promote to members | Daily |
| 2.   Develop relationships with participants and use their first name | Daily |
| 3.   Be engaged, energetic, patient and positive at all times while coaching | Daily |
| 4.   Be patient at all times while coaching – the member is always correct | Daily |
| 5.   Communicate openly with Director on suggestions, feedback from members | Daily |

**Employee Comments (use additional pages if necessary):**



Page 3 of 4

DMB000059

**Village**
HEALTH CLUBS & SPAS

**I have reviewed this Performance Evaluation and discussed the contents with my supervisor.  My signature indicates that I have been advised of and understand my performance evaluation.**

_____          12/ 6/ 2017.
Employee Signature                                    Date

_____          12/06/2017
Supervisor Signature                                  Date

_____          _____
General Manager Signature                      Date

DMB000060

# EXHIBIT 10

## Jim Krimbill

| | |
|---|---|
| **From:** | David Critchley |
| **Sent:** | Friday, March 16, 2018 2:35 PM |
| **To:** | Stuart McNicol |
| **Subject:** | FW: LinkedIn Learning |

Have you done this?  If we need to chat let me know.  I am sensing the attitude sliding more negative again.  I asked for your help with promoting stringing, never got anything, ask for some research on comparative tennis professionals, not telling me til I asked you if could cover you were out of town for the social...

Let me know, trying to make this work!  Need some help from you as we are the only salaried staff up here please!

Dave

**From:** Jim Krimbill
**Sent:** Thursday, March 15, 2018 4:52 PM
**To:** David Critchley <DCritchley@dmbclubs.com>; Sabrina Bordeaux <SBordeaux@dmbclubs.com>
**Subject:** FW: LinkedIn Learning

**From:** Diana Gevelhoff
**Sent:** Thursday, March 15, 2018 4:49 PM
**To:** RJ Heyer <rheyer@dmbclubs.com>; William White <WWhite@DMBClubs.com>; Ryan Sawyer <RSawyer@dmbclubs.com>; Cyndi Van Voorhees <CVanVoorhees@dmbclubs.com>; Stuart McNicol <SMcNicol@DMBClubs.com>; Peter Fantich <PFantich@dmbclubs.com>
**Subject:** LinkedIn Learning

Cyndi, and Stuart,
You haven't signed up for LinkedIn Learning yet. We have made a significant investment to bring this new online learning program to all of our managers. The first mandatory course, Communication Foundations, is due March 31 and is a 2 hour online course. I have sent several emails to you and wonder if you having trouble signing up? If you need help, call me. The invite to sign up will come from Village Health Clubs & Spas via LinkedIn Learning messages-noreply@linkedin.com

Let me know if I can help. Thanks.

**Diana Gevelhoff | Executive Assistant**
Village Health Clubs & Spas |People|Places|Programs
P 480.609.6979  W www.villageclubs.com



1

DMB000083

# EXHIBIT 11

**David Critchley**

| | |
|---|---|
| **From:** | Stuart McNicol |
| **Sent:** | Friday, March 16, 2018 2:56 PM |
| **To:** | David Critchley |
| **Subject:** | Re: LinkedIn Learning |

I have not done it.
Yes you are correct about the attitude some what.
How am I supposed to be happy when the club is taking clients away from me and keep trying to do that.
I haven't gotten a raise in 4 years that's not okay.
It seems like all the new employees that are getting hired are getting paid better than I am.
I also have family to support as well!

As a Professional  to the clients and the members there isn't anything that I don't do. I get compliments on Yelp and nobody even says thank you.

So Dave, yes I'm a little down right now.

Sorry for venting!
I'll get the LinkedIn done!

Thanks.

Stuart McNicol
Head Tennis Professional
DC Ranch Village Health Club and Spa
W....480-515-4040
C....480-203-3564

On Mar 16, 2018, at 2:34 PM, David Critchley <DCritchley@dmbclubs.com> wrote:

> Have you done this?  If we need to chat let me know.  I am sensing the attitude sliding more negative
> again.  I asked for your help with promoting stringing, never got anything, ask for some research on
> comparative tennis professionals, not telling me til I asked you if could cover you were out of town for
> the social...
>
> Let me know, trying to make this work!  Need some help from you as we are the only salaried staff up
> here please!
>
> Dave
>
> **From:** Jim Krimbill
> **Sent:** Thursday, March 15, 2018 4:52 PM
> **To:** David Critchley <DCritchley@dmbclubs.com>; Sabrina Bordeaux <SBordeaux@dmbclubs.com>
> **Subject:** FW: LinkedIn Learning

1

DMB000084

# EXHIBIT 12

**Village**

WEEKLY TIME SHEET

*May 2018*

| Employee Name | STUART MCNICOL - 49988 |
| Club and Department | ZIO RANCH - 608 |

**Week Ending:** Month: 6   Day: 13   Year: 2018

| Day of Week | Time In | Time Out | Time In | Time Out | Reg Hrs | Exception Hrs (Classes/ Instruction) | Total Hrs Reg/ Exception | OT Hrs | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|---|
| Sunday | | | | | 0.00 | | | | | |
| Monday | | | | | 0.00 | | | | | |
| Tuesday | 7:00 AM | 1:00 PM | | | 6 | | | | | |
| Wednesday | | | | | 0.00 | | | | | |
| Thursday | 8:00 AM | 12:00 PM | | | 5 | | | | | |
| Friday | 8:00 AM | 12:00 PM | 4:00 PM | 5:00 PM | 5 | | | | | |
| Saturday | | | | | 4.00 | | | | | |
| | | | | Totals | 15 | 0.00 | 15 | 0 | 0 | 0 |

**Exceptions**

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

| Day of Week | Date of PTO | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

**Week Ending:** Month: 6   Day: 26   Year: 2018

| Day of Week | Time In | Time Out | Time In | Time Out | Reg Hrs | Exception Hrs (Classes/ Instruction) | Total Hrs Reg/ Exception | OT Hrs | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|---|
| Sunday | | | | | 0.00 | | | | | |
| Monday | 3:00 AM | 12:00 PM | | | 3 | | | | | |
| Tuesday | 7:00 AM | 12:00 PM | | | 5 | | | | | |
| Wednesday | 6:00 AM | 10:00 AM | | | 4 | | | | | |
| Thursday | 8:00 AM | 11:00 AM | | | 5 | | | | | |
| Friday | 8:00 AM | 11:30 AM | | | 4.5 | | | | | |
| Saturday | | | | | 0.00 | | | | | |
| | | | | Totals | 21.5 | 0.00 | 21.5 | 0 | 0 | 0 |

**Exceptions**

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

| Day of Week | Date of PTO | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

No Person Permitted to Work Overtime Without Authorization From Manager
Time Sheet Must be Completed and Signed by Employee and Reviewed by Employee's Department Manager

Employee Signature: _____
Manager Authorization: _____

*15*

*21.5*

**Village**

April   WEEKLY TIME SHEET   2018

| Employee | |
|---|---|
| Name | STUART MCNICOL - 45088 |
| Dept-888 | |
| Department | DC RANCH - 505 |

Week Ending: | Month: 4 | Day: 24 | Year: 2018 |

| Day of Week | Time In | Time Out | Time In | Time Out | Reg Hrs | Exception Hrs (Classes/ Instruction) | Total Hrs Reg/ Exception | OT Hrs | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|---|
| Sunday | | | | | 0:00 | | | | | |
| Monday | 8:00 AM | 12:00 PM | | | 5 | | | | | |
| Tuesday | 7:30 AM | 4:00 PM | | | 8.5 | | | | | |
| Wednesday | 7:00 AM | 12:00 PM | | | 6 | | | | | |
| Thursday | 5:00 PM | 7:00 PM | | | 2 | | | | | |
| Friday | 7:00 AM | 12:00 PM | 4:00 PM | 5:00 PM | 6 | | | | | |
| Saturday | 7:30 AM | 11:00 AM | | | 3.5 | | | | | |
| | | Totals: | | | 28 | 0.00 | 28 | 0 | 0 | 0 |

**Exceptions**

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| Totals | | | | 0:00 |

**Date of PTO**

| Day of Week | | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| Totals | | | | 0:00 |

Week Ending: | Month: 4 | Day: 28 | Year: 2018 |

| Day of Week | Time In | Time Out | Time In | Time Out | Reg Hrs | Exception Hrs (Classes/ Instruction) | Total Hrs Reg/ Exception | OT Hrs | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|---|
| Sunday | | | | | 0:00 | | | | | |
| Monday | 7:30 AM | 12:00 PM | | | 4.5 | | | | | |
| Tuesday | 7:30 AM | 3:00 PM | | | 7.5 | | | | | |
| Wednesday | 8:20 AM | 11:00 AM | | | 3 | | | | | |
| Thursday | 8:00 AM | 11:00 AM | 4:00 PM | 7:00 PM | 5 | | | | | |
| Friday | 7:00 AM | 11:00 AM | 4:00 PM | 5:00 PM | 5 | | | | | |
| Saturday | | | | | 0:00 | | | | | |
| | | Totals: | | | 25 | 0.00 | 25 | 0 | 0 | 0 |

**Exceptions**

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| Totals | | | | 0:00 |

**Date of PTO**

| Day of Week | | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| Totals | | | | 0:00 |

No Person Permitted to Work Overtime Without Authorization From Manager
Time Sheet Must be Completed and Signed by Employee and Reviewed by Employee's Department Manager

Employee Signature _____
Manager Authorization _____

28

25

DMB000028

**Village**

WEEKLY TIME SHEET

*March 2018*

**Employee Name:** STUART MCNICOL · 46888
**Club and Department:** DC RANCH - 505

**Week Ending:** Month: 3   Day: 24   Year: 2018

| Day of Week | Time In | Time Out | Time In | Time Out | Exception Hrs (Classes/ Instruction) | Total Hrs Reg/ Exception | OT Hrs | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Reg Hrs | | | | |
| Sunday | | | | | 0.00 | | | | |
| Monday | 7:30 AM | 5:00 PM | | | 4.5 | | | | |
| Tuesday | 7:30 AM | 2:30 PM | | | 7 | | | | |
| Wednesday | 8:30 AM | 11:00 AM | | | 2.5 | | | | |
| Thursday | 7:00 AM | 12:00 PM | 2:30 PM | 7:00 PM | 9.5 | | | | |
| Friday | 8:00 AM | 12:00 PM | 4:00 PM | 5:00 PM | 5 | | | | |
| Saturday | 7:30 AM | 12:30 PM | | | 5 | | | | |
| | | | Totals: | | 33.5 | 0.00 | 33.5 | 0 | 0 | 0 | 0 |

**Exceptions**

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

**Date of PTO**

| Day of Week | | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

No Person Permitted to Work Overtime Without Authorization From Manager
Time Sheet Must be Completed and Signed by Employee and Reviewed by Employee's Department Manager

Employee Signature _____
Manager Authorization _____

*33.5*

---

**Week Ending:** Month: 3   Day: 31   Year: 2018

| Day of Week | Time In | Time Out | Time In | Time Out | Exception Hrs (Classes/ Instruction) | Total Hrs Reg/ Exception | OT Hrs | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Reg Hrs | | | | |
| Sunday | | | | | 0.00 | | | | |
| Monday | 6:30 AM | 11:00 AM | | | 3 | | | | |
| Tuesday | 7:30 AM | 12:30 PM | | | 6 | | | | |
| Wednesday | 7:00 AM | 10:00 AM | 3:00 PM | 7:00 PM | 6 | | | | |
| Thursday | 7:00 AM | 11:00 AM | | | 4 | | | | |
| Friday | 5:30 AM | 11:00 AM | 3:00 PM | 5:00 PM | 4.5 | | | | |
| Saturday | 6:30 AM | 1:30 PM | | | 4.5 | | | | |
| | | | Totals: | | 29 | 0.00 | 29 | 0 | 0 | 0 | 0 |

**Exceptions**

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

**Date of PTO**

| Day of Week | | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

*29*

**Village**

WEEKLY TIME SHEET

Feb 2018

**Employee Name:** STUART MCNICOL - 45986
**Club and Department:** DC RANCH - 505

Week Ending: Month: 02 Day: 24 Year: 2018

| Day of Week | Time In | Time Out | Time In | Time Out | Reg Hrs | Exception Hrs (Classes/ Instruction) | Total Hrs Reg/ Exception | OT Hrs. | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|---|
| Sunday | 9:00 AM | 11:00 AM | | | 2 | | | | | |
| Monday | 10:00 AM | 3:00 PM | | | 5 | | | | | |
| Tuesday | 7:30 AM | 4:00 PM | | | 3.5 | | | | | |
| Wednesday | 8:00 AM | 4:30 PM | | | 8.5 | | | | | |
| Thursday | 9:00 AM | 11:00 AM | 5:00 PM | 7:00 PM | 4 | | | | | |
| Friday | 3:00 PM | 5:00 PM | | | 2 | | | | | |
| Saturday | 9:00 AM | 11:00 AM | | | 2 | | | | | |
| | | | Totals | | 33 | 0.00 | 33 | 0 | 0 | 0 |

**Exceptions**

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

| Day of Week | Date of PTO | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

Week Ending: Month: 03 Day: 03 Year: 2018

| Day of Week | Time In | Time Out | Time In | Time Out | Reg Hrs | Exception Hrs (Classes/ Instruction) | Total Hrs Reg/ Exception | OT Hrs | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|---|
| Sunday | | | | | 0.00 | | | | | |
| Monday | 9:00 AM | 11:30 AM | 2:00 PM | 4:00 PM | 5 | | | | | |
| Tuesday | 7:30 AM | 2:00 PM | | | 6.5 | | | | | |
| Wednesday | 10:00 AM | 3:00 PM | | | 5 | | | | | |
| Thursday | 8:00 AM | 11:00 AM | | | 3 | | | | | |
| Friday | 8:00 AM | 5:00 PM | | | 9 | | | | | |
| Saturday | 10:00 AM | 12:00 PM | | | 1 | | | | | |
| | | | Totals | | 29.5 | 0.00 | 29.5 | 0 | 0 | 0 |

**Exceptions**

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

| Day of Week | Date of PTO | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

No Person Permitted to Work Overtime Without Authorization From Manager
Time Sheet Must be Completed and Signed by Employee and Reviewed by Employee's Department Manager

Employee Signature_____

Manager Authorization_____

33

29.5

DMB000030

**Village**

WEEKLY TIME SHEET

Jan 2018

**Employee Name:** STUART MCNICOL - 43088
**Club and Department:** DC RANCH - 505

Week Ending:  Month: 01  Day: 27  Year: 2018

| Day of Week | Time In | Time Out | Time In | Time Out | Exception Hrs (Classes/Instruction) | | Total Hrs Reg/ Exception | OT Hrs | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Reg Hrs | | | | | |
| Sunday | 9:00 AM | 12:30 PM | | | 3.5 | | | | | |
| Monday | 9:00 AM | 11:00 AM | 2:00 PM | 3:30 PM | 4.5 | | | | | |
| Tuesday | 7:30 AM | 4:30 PM | | | 5.5 | | | | | |
| Wednesday | 8:00 AM | 4:30 PM | | | 8.5 | | | | | |
| Thursday | 9:00 AM | 3:30 PM | | | 6.5 | | | | | |
| Friday | 8:30 AM | 4:00 PM | | | 7.5 | | | | | |
| Saturday | 6:00 AM | 2:00 PM | | | 8 | | | | | |
| | | | Totals | | 45 | 0.00 | 45 | 5 | ######## | $VALUE! | ###### |

Week Ending:  Month: 02  Day: 03  2018

| Day of Week | Time In | Time Out | Time In | Time Out | Exception Hrs (Classes/Instruction) | | Total Hrs Reg/ Exception | OT Hrs | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Reg Hrs | | | | | |
| Sunday | 9:00 AM | 11:00 AM | | | 3 | | | | | |
| Monday | 9:00 AM | 12:00 PM | 2:00 PM | 4:30 PM | 5.5 | | | | | |
| Tuesday | 7:30 AM | 3:00 PM | | | 7.5 | | | | | |
| Wednesday | 8:00 AM | 11:00 AM | | | 3 | | | | | |
| Thursday | 5:00 AM | 12:30 PM | 5:00 PM | 7:00 PM | 5.5 | | | | | |
| Friday | 8:30 AM | 11:00 AM | | | 2.5 | | | | | |
| Saturday | 9:00 AM | 12:00 PM | | | | | | | | |
| | | | Totals | | 29 | 0.00 | 29 | 0 | 0 | 0 | 0 |

Exceptions

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| Totals | | | | 0:00 |

Exceptions

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| Totals | | | | 0:00 |

Date of PTO

| Day of Week | | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| Totals | | | | 0:00 |

Date of PTO

| Day of Week | | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| | | | | 0:00 |
| Totals | | | | 0:00 |

No Person Permitted to Work Overtime Without Authorization From Manager
Time Sheet Must be Completed and Signed by Employee and Reviewed by Employee's Department Manager

Employee Signature _____
Manager Authorization _____

45

29

**Village**

WEEKLY TIME SHEET

Dec 2017

**Employee**
Name: STUART MCNICOL - 45868
Club and Department: DC RANCH - 605

Week Ending:

| Day of Week | Time In | Time Out | Time In | Time Out | Reg Hrs | Exception Hrs (Classes/ Instruction) | Total Hrs Reg/ Exception | OT Hrs | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|---|
| Sunday | | | | | 0.00 | | | | | |
| Monday | | | | | 0.00 | | | | | |
| Tuesday | 9:00 AM | 1:00 PM | | | 4 | | | | | |
| Wednesday | 8:00 AM | 2:00 PM | | | 6 | | | | | |
| Thursday | 8:00 AM | 12:00 PM | | | 4 | | | | | |
| Friday | 8:00 AM | 2:00 PM | | | 6 | | | | | |
| Saturday | 7:00 AM | 1:00 PM | | | 6 | | | | | |
| | | | Totals | | 26 | 0.00 | 26 | 0 | 0 | 0 | 0 |

Week Ending:

| Day of Work | Time In | Time Out | Time In | Time Out | Reg Hrs | Exception Hrs (Classes/ Instructors) | Total Hrs Reg/ Exception | OT Hrs | OT Rate of Pay | OT Earnings |
|---|---|---|---|---|---|---|---|---|---|---|
| Sunday | | | | | 0.00 | | | | | |
| Monday | | | | | 0.00 | | | | | |
| Tuesday | 7:00 AM | 4:30 PM | | | 6 | | | | | |
| Wednesday | 9:00 AM | 4:30 PM | | | 7.5 | | | | | |
| Thursday | 7:00 AM | 3:00 PM | 5:00 PM | 7:00 PM | 10 | | | | | |
| Friday | 7:00 AM | 5:00 PM | | | 10 | | | | | |
| Saturday | 7:00 AM | 11:30 AM | | | 4.5 | | | | | |
| | | | Totals | | 41 | 0.00 | 41 | 1 | | | |

**Exceptions**

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

| Day of Week | Date of PTO | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

**Exceptions**

| Day of Week | Classes/Instruction/Activity performed outside of hours indicated above | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

| Day of Week | Date of PTO | Time In | Time Out | Totals |
|---|---|---|---|---|
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| | | | | 0.00 |
| Totals | | | | 0.00 |

No Person Permitted to Work Overtime Without Authorization From Manager
Time Sheet Must be Completed and Signed by Employee and Reviewed by Employee's Department Manager

Employee Signature_____
Manager Authorization_____

26

41

# EXHIBIT 13



**DESERT HIGHLANDS**
**PERSONNEL ACTION FORM**

For Payroll:
Process Date: 2/26/2018
Initials: BL
ADP ☑   Nova T&A ☑

27088

Change of Status ☐   Rehire ☐   New Hire ☒   Transfer ☐   Change of Address ☐

*Instructions: Complete only those items relevant to the change(s) being made. Please Print.*

Employee Name (First, M.I., Last): Stuart Mc Nicol

Effective Date: 2/22/18

Social Security #: 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   Date of Birth: 8/28/1976

Exemptions: M-1   State %: 1.8   EEO: White / Service workers   Wage Assignment: Y (N)

Home Telephone Number: ___   Cell Telephone Number: 480-203-3564

Address: 4303 E. Wildcat Drive   Apt No: X

City: Cave Creek   State: AZ   Zip: 85331

**Manager must provide data for pay changes:**   From   To

**Job Title: Asst. Tennis Professional   _____

**Department Name/Number: Tennis / 07   _____

**Pay Rate:
$ 15.60 per hour (non-exempt) OR   * ___ % change   _____

$ ___ per pay period = Annual Salary / 26 (salaried, exempt)   _____

Full-Time ☐   Part-Time ☑   ***   Regular ☑   Temporary/Seasonal ☐   On-Call ☐

**Next Review Date: 5/22/18

Comments: 90 day review
65% of tennis lessons

Manager / Director: _____   Date: 2-21-18   HR: Theresa Klingensmith   Date: 2/21/18

CFO: _____   Date 2/26/18   COO: _____   Date: 2/23/18

DHA000003

# EXHIBIT 14



# DESERT HIGHLANDS

## Attendance Time Sheet

| Employee: | **Stuart McNicol** | | Pay Period Beginning: | February 12, 2018 |
|---|---|---|---|---|
| Department: | **Tennis** | | Pay Period Ending: | February 25, 2018 |

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M | 2/12 | | | | | | | | | | | 0.00 | |
| T | 2/13 | | | | | | | | | | | 0.00 | |
| W | 2/14 | | | | | | | | | | | 0.00 | |
| Th | 2/15 | | | | | | | | | | | 0.00 | |
| F | 2/16 | | | | | | | | | | | 0.00 | |
| Sa | 2/17 | | | | | | | | | | | 0.00 | |
| Su | 2/18 | | | | | | | | | | | 0.00 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 0.00 | 0.00 |
| M | 2/19 | | | | | | | | | | | 0.00 | |
| T | 2/20 | | | | | | | | | | | 0.00 | |
| W | 2/21 | | | | | | | | | | | 0.00 | |
| Th | 2/22 | 11:30 AM | 12:30 PM | | | | | | | | | 1.00 | |
| F | 2/23 | | | | | | | | | | | 0.00 | |
| Sa | 2/24 | | | | | | | | | | | 0.00 | |
| Su | 2/25 | 8:00 AM | 4:00 PM | | | | | | | | | 8.00 | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 9.00 | 0.00 |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 9.00 | 0.00 |

Stuart McNicol

Eric Anderson

DHA000022



**DESERT HIGHLANDS**

## Attendance Time Sheet

Employee: **Stuart McNicol**
Department: **Tennis**

Pay Period Beginning: February 26, 2018
Pay Period Ending: March 11, 2018

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|-----|------|-------|-----|-------|-----|-------|-----|----------|----------|---------|---------|-----------|-----|
| M | 2/26 | | | | | | | | | | | 0.00 | |
| T | 2/27 | | | | | | | | | | | 0.00 | |
| W | 2/28 | | | | | | | | | | | 0.00 | |
| Th | 3/1 | 11:30 AM | 2:00 PM | | | | | | | | | 2.50 | |
| F | 3/2 | | | | | | | | | | | 0.00 | |
| Sa | 3/3 | 12:00 PM | 2:00 PM | | | | | | | | | 2.00 | |
| Su | 3/4 | 7:00 AM | 12:00 PM | | | | | | | | | 5.00 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 9.50 | 0.00 |
| M | 3/5 | | | | | | | | | | | 0.00 | |
| T | 3/6 | | | | | | | | | | | 0.00 | |
| W | 3/7 | | | | | | | | | | | 0.00 | |
| Th | 3/8 | 11:30 AM | 4:00 PM | | | | | | | | | 4.50 | |
| F | 3/9 | | | | | | | | | | | 0.00 | |
| Sa | 3/10 | | | | | | | | | | | 0.00 | |
| Su | 3/11 | | | | | | | | | | | 0.00 | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 4.50 | 0.00 |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 14.00 | 0.00 |

Stuart McNicol

Eric Anderson

DHA000023



## DESERT HIGHLANDS

## Attendance Time Sheet

Employee: **Stuart McNicol**
Department: **Tennis**

Pay Period Beginning: March 12, 2018
Pay Period Ending: March 25, 2018

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|-----|------|-------|-----|-------|-----|-------|-----|----------|----------|---------|---------|-----------|-----|
| M | 3/12 | 2:00 PM | 4:00 PM | | | | | | | | | 2.00 | |
| T | 3/13 | | | | | | | | | | | 0.00 | |
| W | 3/14 | 2:30 PM | 4:30 PM | | | | | | | | | 2.00 | |
| Th | 3/15 | | | | | | | | | | | 0.00 | |
| F | 3/16 | | | | | | | | | | | 0.00 | |
| Sa | 3/17 | 8:00 AM | 4:30 PM | | | | | | | | | 8.50 | |
| Su | 3/18 | | | | | | | | | | | 0.00 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 12.50 | 0.00 |
| M | 3/19 | 2:00 PM | 3:00 PM | | | | | | | | | 1.00 | |
| T | 3/20 | | | | | | | | | | | 0.00 | |
| W | 3/21 | | | | | | | | | | | 0.00 | |
| Th | 3/22 | | | | | | | | | | | 0.00 | |
| F | 3/23 | 1:30 PM | 3:30 PM | | | | | | | | | 2.00 | |
| Sa | 3/24 | | | | | | | | | | | 0.00 | |
| Su | 3/25 | | | | | | | | | | | 0.00 | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 3.00 | 0.00 |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 15.50 | 0.00 |

Stuart McNicol

Eric Anderson

DHA000024



# DESERT HIGHLANDS

## Attendance Time Sheet

Employee: **Stuart McNicol**
Department: **Tennis**

Pay Period Beginning: March 26, 2018
Pay Period Ending: April 8, 2018

### Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|-----|------|-------|-----|-------|-----|-------|-----|----------|----------|---------|---------|-----------|-----|
| M | 3/26 | 2:00 PM | 3:30 PM | | | | | | | | | 1.50 | |
| T | 3/27 | | | | | | | | | | | 0.00 | |
| W | 3/28 | | | | | | | | | | | 0.00 | |
| Th | 3/29 | 11:00 AM | 12:00 PM | | | | | | | | | 1.00 | |
| F | 3/30 | | | | | | | | | | | 0.00 | |
| Sa | 3/31 | | | | | | | | | | | 0.00 | |
| Su | 4/1 | | | | | | | | | | | 0.00 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 2.50 | 0.00 |
| M | 4/2 | 2:00 PM | 5:00 PM | | | | | | | | | 3.00 | |
| T | 4/3 | 3:00 PM | 4:00 PM | | | | | | | | | 1.00 | |
| W | 4/4 | 3:00 PM | 4:00 PM | | | | | | | | | 1.00 | |
| Th | 4/5 | 11:00 AM | 12:00 PM | | | | | | | | | 1.00 | |
| F | 4/6 | | | | | | | | | | | 0.00 | |
| Sa | 4/7 | | | | | | | | | | | 0.00 | |
| Su | 4/8 | 8:30 AM | 11:30 AM | | | | | | | | | 3.00 | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 9.00 | 0.00 |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | | 0.00 |

Stuart McNicol

Eric Anderson

DHA000025



## DESERT HIGHLANDS

### Attendance Time Sheet

Employee: **Stuart McNicol**
Department: **Tennis**

Pay Period Beginning: April, 9 2018
Pay Period Ending: April, 22 2018

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|-----|------|-------|-----|-------|-----|-------|-----|----------|----------|---------|---------|-----------|-----|
| M | | | | | | | | | | | | 0.00 | |
| T | | | | | | | | | | | | 0.00 | |
| W | 4/11 | 3:00 PM | 4:00 PM | | | | | | | | | 1.00 | |
| Th | 4/12 | 11:00 AM | 1:00 PM | | | | | | | | | 2.00 | |
| F | | | | | | | | | | | | 0.00 | |
| Sa | | | | | | | | | | | | 0.00 | |
| Su | | | | | | | | | | | | 0.00 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 3.00 | 0.00 |
| M | | | | | | | | | | | | 0.00 | |
| T | | | | | | | | | | | | 0.00 | |
| W | 4/18 | 3:00 PM | 5:00 PM | | | | | | | | | 2.00 | |
| Th | 4/19 | 10:30 AM | 12:00 PM | | | | | | | | | 1.50 | |
| F | | | | | | | | | | | | 0.00 | |
| Sa | | | | | | | | | | | | 0.00 | |
| Su | 4/22 | 9:00 AM | 11:00 AM | | | | | | | | | 2.00 | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 5.50 | 0.00 |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 8.50 | 0.00 |

Stuart McNicol

Eric Anderson

DHA000026



## DESERT HIGHLANDS

## Attendance Time Sheet

| Employee: | **Stuart McNicol** | Pay Period Beginning: | April, 23 2018 |
| Department: | **Tennis** | Pay Period Ending: | May, 7 2018 |

**Tennis**

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|-----|------|-------|-----|-------|-----|-------|-----|----------|----------|---------|---------|-----------|-----|
| M | 4/23 | | | | | | | | | | | 0.00 | |
| T | 4/24 | | | | | | | | | | | 0.00 | |
| W | 4/25 | 3:00 PM | 4:00 PM | | | | | | | | | 1.00 | |
| Th | 4/26 | | | | | | | | | | | 0.00 | |
| F | 4/27 | | | | | | | | | | | 0.00 | |
| Sa | 4/28 | 7:00 AM | 4:00 PM | | | | | | | | | 9.00 | |
| Su | 4/29 | | | | | | | | | | | 0.00 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 10.00 | 0.00 |
| M | 4/30 | | | | | | | | | | | 0.00 | |
| T | 5/1 | | | | | | | | | | | 0.00 | |
| W | 5/2 | | | | | | | | | | | 0.00 | |
| Th | 5/3 | | | | | | | | | | | 0.00 | |
| F | 5/4 | | | | | | | | | | | 0.00 | |
| Sa | 5/5 | | | | | | | | | | | 0.00 | |
| Su | 5/6 | 8:30 AM | 1:00 PM | | | | | | | | | 4.50 | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 4.50 | 0.00 |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 14.50 | 0.00 |

_____
**Stuart McNicol**

_____
**Eric Anderson**

DHA000027



**DESERT HIGHLANDS**

## Attendance Time Sheet

Employee: **Stuart McNicol**
Department: **Tennis**

Pay Period Beginning: 7, May 2018
Pay Period Ending: 20, May 2018

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|-----|------|-------|-----|-------|-----|-------|-----|----------|----------|---------|---------|-----------|-----|
| M | | | | | | | | | | | | 0.00 | |
| T | | | | | | | | | | | | 0.00 | |
| W | 5/9 | 7:00 AM | 8:00 AM | 10:30 AM | 11:30 AM | | | | | | | 2.00 | |
| Th | 5/10 | 11:00 AM | 4:30 PM | | | | | | | | | 5.50 | |
| F | 5/11 | 7:00 AM | 2:15 PM | | | | | | | | | 7.25 | |
| Sa | 5/12 | 7:30 AM | 2:15 PM | | | | | | | | | 6.75 | |
| Su | 5/13 | 7:30 AM | 12:15 PM | | | | | | | | | 4.75 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 26.25 | 0.00 |
| M | 5/14 | 7:00 AM | 3:30 PM | | | | | | | | | 8.50 | |
| T | | | | | | | | | | | | 0.00 | |
| W | 5/16 | 7:30 AM | 9:30 AM | | | | | | | | | 2.00 | |
| Th | 5/17 | 11:00 AM | 1:00 PM | | | | | | | | | 2.00 | |
| F | 5/18 | 7:00 AM | 8:00 AM | 11:30 AM | 12:30 PM | | | | | | | 2.00 | |
| Sa | 5/19 | 8:30 AM | 12:30 PM | | | | | | | | | 4.00 | |
| Su | 5/20 | 8:30 AM | 11:30 AM | | | | | | | | | 3.00 | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 21.50 | 0.00 |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 47.75 | 0.00 |

**Stuart McNicol**

**Eric Anderson**

DHA000028



**DESERT HIGHLANDS**

## Attendance Time Sheet

| Employee: | **Stuart McNicol** | | Pay Period Beginning: | 21-May, 2018 |
|---|---|---|---|---|
| Department: | **Tennis** | | Pay Period Ending: | 3-June, 2018 |

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M | 5/21 | 7:30 AM | 8:30 AM | | | | | | | | | 1.00 | |
| T | | | | | | | | | | | | 0.00 | |
| W | 5/23 | 9:00 AM | 2:00 PM | | | | | | | | | 5.00 | |
| Th | 5/24 | 12:00 PM | 1:00 PM | 1:30 PM | 2:30 PM | | | | | | | 2.00 | |
| F | 5/25 | 10:30 AM | 3:30 PM | | | | | | | | | 5.00 | |
| Sa | 5/26 | 7:00 AM | 4:30 PM | | | | | | | | | 9.50 | |
| Su | | | | | | | | | | | | 0.00 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 22.50 | 0.00 |
| M | | | | | | | | | | | | 0.00 | |
| T | 5/29 | 8:00 AM | 2:30 PM | | | | | | | | | 6.50 | |
| W | 5/30 | 10:00 AM | 7:00 PM | | | | | | | | | 9.00 | |
| Th | 5/31 | 12:00 PM | 6:30 AM | | | | | | | | | 6.50 | |
| F | 6/1 | 10:00 AM | 6:30 PM | | | | | | | | | 8.50 | |
| Sa | | | | | | | | | | | | 0.00 | |
| Su | 6/3 | 8:30 AM | 6:00 PM | | | | | | | | | 9.50 | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 40.00 | 0.00 |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 62.50 | 0.00 |

Stuart McNicol

Eric Anderson

DHA000029



**DESERT HIGHLANDS**

## Attendance Time Sheet

Employee: **Stuart McNicol**  
Department: **Tennis**

Pay Period Beginning: 4-June, 2018  
Pay Period Ending: 17-June, 2018

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|-----|------|-------|-----|-------|-----|-------|-----|----------|----------|---------|---------|-----------|-----|
| M | 6/4 | 6:30 AM | 1:30 PM | | | | | | | | | 7.00 | |
| T | | | | | | | | | | | | 0.00 | |
| W | 6/6 | 7:00 AM | 10:00 AM | 11:30 AM | 1:00 PM | | | | | | | 4.50 | |
| Th | 6/7 | 10:30 AM | 11:30 AM | | | | | | | | | 1.00 | |
| F | 6/8 | 7:00 AM | 1:00 PM | | | | | | | | | 6.00 | |
| Sa | | | | | | | | | | | | 0.00 | |
| Su | | | | | | | | | | | | 0.00 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 18.50 | 0.00 |
| M | | | | | | | | | | | | 0.00 | |
| T | | | | | | | | | | | | 0.00 | |
| W | | | | | | | | | | | | 0.00 | |
| Th | | | | | | | | | | | | 6.50 | |
| F | | | | | | | | | | | | 0.00 | |
| Sa | | | | | | | | | | | | 0.00 | |
| Su | | | | | | | | | | | | | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | | |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | | 0.00 |

Stuart McNicol

Eric Anderson

DHA000030



## DESERT HIGHLANDS

## Attendance Time Sheet

Employee: **Stuart McNicol**
Department: **Tennis**

Pay Period Beginning: June 18, 2018
Pay Period Ending: July 1, 2018

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|-----|------|-------|-----|-------|-----|-------|-----|----------|----------|---------|---------|-----------|-----|
| M | 6/18 | 7:00 AM | 8:00 AM | 11:00 AM | 12:00 PM | | | | | | | 2.00 | |
| T | 6/19 | 10:00 AM | 11:00 AM | | | | | | | | | 1.00 | |
| W | 6/20 | 6:30 AM | 7:30 AM | | | | | | | | | 1.00 | |
| Th | 6/21 | 7:00 AM | 10:00 AM | | | | | | | | | 3.00 | |
| F | 6/22 | 6:30 AM | 7:30 AM | | | | | | | | | 1.00 | |
| Sa | | | | | | | | | | | | 0.00 | |
| Su | 6/23 | 7:30 AM | 8:30 AM | | | | | | | | | 1.00 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 9.00 | 0.00 |
| M | 6/25 | 6:30 AM | 8:30 AM | | | | | | | | | 2.00 | |
| T | 6/26 | 7:30 AM | 8:30 AM | | | | | | | | | 1.00 | |
| W | 6/27 | 6:30 AM | 8:30 AM | 3:00 PM | 4:00 PM | | | | | | | 3.00 | |
| Th | 6/28 | 7:00 AM | 1:00 PM | | | | | | | | | 6.00 | |
| F | 6/29 | 9:00 AM | 1:00 PM | | | | | | | | | 4.00 | |
| Sa | 6/30 | 6:30 AM | 10:00 AM | | | | | | | | | 3.50 | |
| Su | | | | | | | | | | | | | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 19.50 | |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 28.50 | 0.00 |

Stuart McNicol

Eric Anderson

DHA000031



## DESERT HIGHLANDS

### Attendance Time Sheet

| Employee: | Stuart McNicol |
| Department: | Tennis |

Pay Period Beginning: July 1, 2018
Pay Period Ending: July 15, 2018

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|-----|------|-------|-----|-------|-----|-------|-----|----------|----------|---------|---------|-----------|-----|
| M | 7/2 | 6:30 AM | 7:30 AM | | | | | | | | | 1.00 | |
| T | 7/3 | 7:30 AM | 8:30 AM | | | | | | | | | 1.00 | |
| W | | | | | | | | | | | | 0.00 | |
| Th | 7/5 | 7:30 AM | 11:00 AM | | | | | | | | | 3.50 | |
| F | | | | | | | | | | | | 0.00 | |
| Sa | 7/7 | 7:00 AM | 8:00 AM | | | | | | | | | 1.00 | |
| Su | | | | | | | | | | | | 0.00 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 6.50 | 0.00 |
| M | 7/9 | 6:30 AM | 8:30 AM | | | | | | | | | 2.00 | |
| T | | | | | | | | | | | | 0.00 | |
| W | 7/11 | 6:30 AM | 8:30 AM | 9:30 AM | 12:30 PM | | | | | | | 5.00 | |
| Th | | | | | | | | | | | | | |
| F | 7/13 | 6:30 AM | 8:30 AM | | | | | | | | | 2.00 | |
| Sa | 7/14 | 7:00 AM | 8:00 AM | | | | | | | | | 1.00 | |
| Su | | | | | | | | | | | | | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 10.00 | |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 16.50 | 0.00 |

7/2
7/3

Stuart McNicol

Eric Anderson

DHA000032



# DESERT HIGHLANDS

## Attendance Time Sheet

Employee:   Stuart McNicol
Department:   Tennis

Pay Period Beginning:   July 16, 2018
Pay Period Ending:   July 29, 2018

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M | 7/16 | 7:30 AM | 8:30 AM | | | | | | | | | 1.00 | |
| T | | | | | | | | | | | | | |
| W | 7/18 | 6:30 AM | 7:30 AM | 10:00 AM | 2:00 PM | | | | | | | 5.00 | |
| Th | 7/19 | 7:30 AM | 10:00 AM | 1:00 PM | 2:00 PM | | | | | | | 3.50 | |
| F | 7/20 | 6:30 AM | 8:30 AM | | | | | | | | | 2.00 | |
| Sa | | | | | | | | | | | | | |
| Su | | | | | | | | | | | | | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 11.50 | 0.00 |
| M | 7/23 | 6:30 AM | 8:30 AM | | | | | | | | | 2.00 | |
| T | 7/24 | 6:00 AM | 8:30 AM | 9:00 AM | 10:30 AM | | | | | | | 4.00 | |
| W | 7/25 | 6:30 AM | 7:30 AM | | | | | | | | | 1.00 | |
| Th | 7/26 | 6:00 AM | 7:00 AM | 9:00 AM | 11:30 AM | | | | | | | 3.50 | |
| F | 7/27 | 6:30 AM | 7:30 AM | 9:00 AM | 10:00 AM | | | | | | | 2.00 | |
| Sa | 7/28 | 8:30 AM | 10:30 AM | | | | | | | | | 2.00 | |
| Su | | | | | | | | | | | | | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 14.50 | |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 26.00 | 0.00 |

Stuart McNicol

Eric Anderson

DHA000033

# EXHIBIT 15



# DESERT HIGHLANDS

## Attendance Time Sheet

Employee: **Stuart McNicol**  
Department: **Tennis**

Pay Period Beginning: 7, May 2018  
Pay Period Ending: 20, May 2018

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|-----|------|-------|-----|-------|-----|-------|-----|----------|----------|---------|---------|-----------|-----|
| M | | | | | | | | | | | | 0.00 | |
| T | | | | | | | | | | | | 0.00 | |
| W | 5/9 | 7:00 AM | 8:00 AM | 10:30 AM | 11:30 AM | | | | | | | 2.00 | |
| Th | 5/10 | 11:00 AM | 4:30 PM | | | | | | | | | 5.50 | |
| F | 5/11 | 7:00 AM | 2:15 PM | | | | | | | | | 7.25 | |
| Sa | 5/12 | 7:30 AM | 2:15 PM | | | | | | | | | 6.75 | |
| Su | 5/13 | 7:30 AM | 12:15 PM | | | | | | | | | 4.75 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 26.25 | 0.00 |
| M | 5/14 | 7:00 AM | 3:30 PM | | | | | | | | | 8.50 | |
| T | | | | | | | | | | | | 0.00 | |
| W | 5/16 | 7:30 AM | 9:30 AM | | | | | | | | | 2.00 | |
| Th | 5/17 | 11:00 AM | 1:00 PM | | | | | | | | | 2.00 | |
| F | 5/18 | 7:00 AM | 8:00 AM | 11:30 AM | 12:30 PM | | | | | | | 2.00 | |
| Sa | 5/19 | 8:30 AM | 12:30 PM | | | | | | | | | 4.00 | |
| Su | 5/20 | 8:30 AM | 11:30 AM | | | | | | | | | 3.00 | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 21.50 | 0.00 |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 47.75 | 0.00 |

Stuart McNicol

Eric Anderson

DHA000028



## DESERT HIGHLANDS

## Attendance Time Sheet

| Employee: | **Stuart McNicol** | | Pay Period Beginning: | 21-May, 2018 |
| Department: | **Tennis** | | Pay Period Ending: | 3-June, 2018 |

Tennis

| Day | Date | Start | End | Start | End | Start | End | Personal | Vacation | Medical | Holiday | Reg Hours | O/T |
|-----|------|-------|-----|-------|-----|-------|-----|----------|----------|---------|---------|-----------|-----|
| M | 5/21 | 7:30 AM | 8:30 AM | | | | | | | | | 1.00 | |
| T | | | | | | | | | | | | 0.00 | |
| W | 5/23 | 9:00 AM | 2:00 PM | | | | | | | | | 5.00 | |
| Th | 5/24 | 12:00 PM | 1:00 PM | 1:30 PM | 2:30 PM | | | | | | | 2.00 | |
| F | 5/25 | 10:30 AM | 3:30 PM | | | | | | | | | 5.00 | |
| Sa | 5/26 | 7:00 AM | 4:30 PM | | | | | | | | | 9.50 | |
| Su | | | | | | | | | | | | 0.00 | |
| Wk 1 | | | | | | | | 0 | 0 | 0 | 0 | 22.50 | 0.00 |
| M | | | | | | | | | | | | 0.00 | |
| T | 5/29 | 8:00 AM | 2:30 PM | | | | | | | | | 6.50 | |
| W | 5/30 | 10:00 AM | 7:00 PM | | | | | | | | | 9.00 | |
| Th | 5/31 | 12:00 PM | 6:30 AM | | | | | | | | | 6.50 | |
| F | 6/1 | 10:00 AM | 6:30 PM | | | | | | | | | 8.50 | |
| Sa | | | | | | | | | | | | 0.00 | |
| Su | 6/3 | 8:30 AM | 6:00 PM | | | | | | | | | 9.50 | |
| Wk 2 | | | | | | | | 0 | 0 | 0 | 0 | 40.00 | 0.00 |
| Total Hours | | | | | | | | 0 | 0 | 0 | 0 | 62.50 | 0.00 |

Stuart McNicol

Eric Anderson

DHA000029

# EXHIBIT 16

**David Critchley**

| | |
|---|---|
| **From:** | Stuart McNicol |
| **Sent:** | Monday, May 14, 2018 7:21 PM |
| **To:** | David Critchley |
| **Subject:** | Re: Head Pro duties |

Thank you for sending this to me.
I'll take a look and get back to you.

Stuart McNicol
Head Tennis Professional
DC Ranch Village Health Club and Spa
W....480-515-4040
C....480-203-3564

On May 14, 2018, at 12:37 AM, David Critchley <DCritchley@dmbclubs.com> wrote:

> Stuart,
>
> Here is a quick outline of what I envision from the Head Pro Role moving forward as we have discussed a couple times.
>
> The position will require 15-20 hours each week of off court work and I have outlined the main responsibilities below.  The Village views the salary as compensation for fulfilling the specific duties of job, it is not an hourly or base to offset the percentage of commission the club keeps of lessons as you believe was communicated to you when you were hired.  The longer weeks would be when we have a social or other event.  As we discussed it is also possible moving forward that these roles be divided among different individuals as they require different knowledge of members and skillsets.  The below specific roles would be in addition, not in place of the current duties listed in the Head Pro Job Description.  As the activity and programming has doubled in the past 18 months all our responsibilities have increased significantly.
>
> U10 help:
> - Answering all inquiries about all U10 programs at the club
> - Once per month do a review of each student's progress
> - Once per month have a phone or in persons conversation with one parent from each student
> - Create and maintain a data base of all participants
> - Follow up with any students that have left the program
> - Create a yearly development plan for each specific program
> - Create daily lesson plans for each class and provide to coach
> - Create and deliver a monthly newsletter specific for U10 participants highlighting what the students worked on that month, any standouts and instructional article
>
> Interclub teams
> - Respond to all inquiries about any team related items
> - Place new players who are wanting to be on a team get on a roster
> - Ensure all courts are booked for home matches
> - Conduct annual survey of all players to check satisfaction

1

DMB000111

- Create and host a yearly kickoff event
- Create and host a closing event
- Host a captain's luncheon at the beginning and end of each interclub season

Tennis Programs
- Create new programs
- Conduct quarterly surveys to see if there is demand for new specific programs and satisfaction level with programs
- Manage the member master sheet that tracks all member activity at the club
- Target specific members in an attempt to get them involved in new and different activities
- Promote all round-robins, clinics, socials to specific groups of members by level

Intraclub Leagues
- Promote and manage all in-house leagues
- Create session schedules
- Email participants at the beginning and end of each session
- Move players into appropriate level each session based on performance
- Host session playoff/social (organize food, be present for playoff)
- Obtain and present prizes

DMB000112

# EXHIBIT 17

From: <marshall@marshallmartinlaw.com>
marshall@marshallmartinlaw.com
Subject: Stuart McNicol
Date: May 16, 2018 at 4:40:16 PM
To: Cnalevanko@dmbclubs.com

Ms. Nalevanko,

This office represents Stuart McNicol in regards to his current employment situation at The Village. As you know he had previously made and resolved his own claim regarding proper payment under the Fair Labor Standards Act (FLSA). He had additional concerns when he learned in 2017 that the club was paying a teenage employee under the table as well as a foreign national without a work visa. Not wanting to be part of this illegal conduct, he discontinued his involvement with the coaches and the academy. He is now being forced to be involved in the academy as part of a new job description. Rather then do this he is accepting the other option given to him of giving up his salaried position as Head Pro and instead will remain as a commission only employee providing lessons. He feels this is a constructive discharge, since the option of being part of illegal conduct is not an option at all.

He has serious concerns about what has gone on, including retaliation against him for his earlier FLSA claim and the scheme by which the teenager has been paid under the table by forcing another employee to make the payments in return for being "full time" and thus receive benefits. These and other issue will be addressed with you or appropriate legal counsel in more detail. Please advise who I should communicate with going forward.

Sincerely,

Marshall A. Martin, Esq.
LAW OFFICE OF MARSHALL A. MARTIN
8585 E. Hartford Drive, Suite 800
Scottsdale, Arizona 85255
Telephone: (480) 444-9980



CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION
This e-mail and any file transmitted with it are confidential attorney-client communications or may otherwise be privileged or confidential. They are intended solely for the individual or entity to whom they are addressed. If you are not the intended recipient, please do not read, copy or retransmit this communication. Instead, please destroy it immediately. Any unauthorized dissemination, distribution or copying of this communication is strictly  SM 006

prohibited. Thank you for your cooperation. If you have any questions, please contact the author.

SM 007

# EXHIBIT 18

From: <marshall@marshallmartinlaw.com>
marshall@marshallmartinlaw.com
Subject: Stuart McNicol v. The Village
Date: Jul 20, 2018 at 12:20:29 PM
To: Leah Freed leah.freed@ogletree.com

Leah:

As I have mentioned to you before, Stuart McNicol has been completely frozen out of communications at The Village, his manager's online access has been revoked and he has been provided no lesson opportunities. I previously shared with you his substantial drop in lesson income in June. That trajectory continued and so far in July, he has only had a few hundred dollars of income. The Village has effectively terminated him. To be clear, with this email, he is providing notice to The Village of what is at a minimum his constructive discharge from employment. He will turn in his receipts for reimbursement today and consider himself no longer employed at The Village.

Obviously, the company's actions in discharging Mr. McNicol are directly in retaliation for the concerns he has raised and will be treated as a wrongful termination in violation of ARS Sec.23-1501, as well as the FLSA.

Sincerely,

Marshall A. Martin, Esq.
LAW OFFICE OF MARSHALL A. MARTIN
8585 E. Hartford Drive, Suite 800
Scottsdale, Arizona 85255
Telephone: (480) 444-9980



Marshall A. Martin

BEST LAW FIRMS
USNews
Best Lawyers

Best Lawyers
Lawyer of the Year
2015

Employment Law - Individual
- Phoenix, AZ

CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION
This e-mail and any file transmitted with it are confidential attorney-client communications or may otherwise be privileged or confidential. They are intended solely for the individual or entity to whom they are addressed. If you are not the intended recipient, please do not read, copy or retransmit this communication. Instead, please destroy it immediately. Any unauthorized dissemination, distribution or copying of this communication is strictly prohibited. Thank you for your cooperation. If you have any questions, please contact the author.

Smos3

# EXHIBIT 19

## 2017 W-2 and EARNINGS SUMMARY 

**W-2** Employee Reference Copy **2017**
Wage and Tax Statement
OMB No. 1545-0008

Copy C for employee's records.

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 045988 PHOE/JB3 | 505 | | A 669 |

c Employer's name, address, and ZIP code

**DMB SPORTS CLUBS LP**
**4444 EAST CAMELBACK ROAD**
**PHOENIX AZ 85018**

Batch #00610

e/f Employee's name, address and ZIP code

STUART MCNICOL

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 86-0661323 | |

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 66063.96 | 10634.60 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 70280.86 | 4357.41 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 70280.86 | 1019.07 |

| 7 Social security tips | 8 Allocated tips |
|---|---|

9 Verification Code
65a4-1728-631c-b047

| 10 Dependent care benefits |
|---|

| 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|
| | D 4216.90 |

| 14 Other | 12b |
|---|---|
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay |

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| AZ | 86-0661323 | 66063.96 |

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 1189.07 | |

| 19 Local income tax | 20 Locality name |
|---|---|

---

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

**1. The following information reflects your final 2017 pay stub plus any adjustments submitted by your employer.**

| | | | | |
|---|---|---|---|---|
| Gross Pay | 70280.86 | Social Security Tax Withheld | 4357.41 | AZ. State income Tax | 1189.07 |
| | | | | SUI/SDI | |
| | | | | Box 17 of W-2 | |
| Fed. Income Tax Withheld | 10634.60 | Medicare Tax Withheld | 1019.07 | Box 14 of W-2 | |
| Box 2 of W-2 | | Box 6 of W-2 | | | |

**2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.**

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | AZ. State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 70,280.86 | 70,280.86 | 70,280.86 | 70,280.86 |
| Less 401(k) (D-Box 12) | 4,216.90 | N/A | N/A | 4,216.90 |
| Reported W-2 Wages | 66,063.96 | 70,280.86 | 70,280.86 | 66,063.96 |

**3. Employee W-4 Profile.** To change your Employee W-4 Profile Information, file a new W-4 with your payroll dept.



STUART MCNICOL

Social Security Number
Taxable Marital Status:   SINGLE

Exemptions/Allowances:
FEDERAL:   1
STATE:   Tax is 1.8 %

© 2017  ADP, LLC

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 66063.96 | 10634.60 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 70280.86 | 4357.41 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 70280.86 | 1019.07 |

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 045988 PHOE/JB3 | 505 | | A 669 |

c Employer's name, address, and ZIP code

**DMB SPORTS CLUBS LP**
**4444 EAST CAMELBACK ROAD**
**PHOENIX AZ 85018**

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 86-0661323 | 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 |

| 7 Social security tips | 8 Allocated tips |
|---|---|

9 Verification Code
65a4-1728-631c-b047

| 10 Dependent care benefits |
|---|

| 11 Nonqualified plans | 12a |
|---|---|
| | D 4216.90 |

| 14 Other | 12b |
|---|---|
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

STUART MCNICOL

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| AZ | 86-0661323 | |

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 1189.07 | |

| 19 Local income tax | 20 Locality name |
|---|---|

**W-2** Federal Reference Copy **2017**
Wage and Tax Statement
OMB No. 1545-0008
Copy B to be filed with employee's Federal Income Tax Return.

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 66063.96 | 10634.60 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 70280.86 | 4357.41 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 70280.86 | 1019.07 |

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 045988 PHOE/JB3 | 505 | | A 669 |

c Employer's name, address, and ZIP code

**DMB SPORTS CLUBS LP**
**4444 EAST CAMELBACK ROAD**
**PHOENIX AZ 85018**

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 86-0661323 | 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 |

| 7 Social security tips | 8 Allocated tips |
|---|---|

9 Verification Code

| 10 Dependent care benefits |
|---|

| 11 Nonqualified plans | 12a |
|---|---|
| | D 4216.90 |

| 14 Other | 12b |
|---|---|
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

STUART MCNICOL

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| AZ | 86-0661323 | 66063.96 |

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 1189.07 | |

| 19 Local income tax | 20 Locality name |
|---|---|

**W-2** AZ State Filing Copy **2017**
Wage and Tax Statement
OMB No. 1545-0008
Copy 2 to be filed with employee's State Income Tax Return.

---

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| 66063.96 | 10634.60 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 70280.86 | 4357.41 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 70280.86 | 1019.07 |

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 045988 PHOE/JB3 | 505 | | A 669 |

c Employer's name, address, and ZIP code

**DMB SPORTS CLUBS LP**
**4444 EAST CAMELBACK ROAD**
**PHOENIX AZ 85018**

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 86-0661323 | 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 |

| 7 Social security tips | 8 Allocated tips |
|---|---|

9 Verification Code

| 10 Dependent care benefits |
|---|

| 11 Nonqualified plans | 12a |
|---|---|
| | D 4216.90 |

| 14 Other | 12b |
|---|---|
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay |

e/f Employee's name, address and ZIP code

STUART MCNICOL

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| AZ | 86-0661323 | 66063.96 |

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 1189.07 | |

| 19 Local income tax | 20 Locality name |
|---|---|

**W-2** AZ State Reference Copy **2017**
Wage and Tax Statement
OMB No. 1545-0008
Copy 2 to be filed with employee's State Income Tax Return.

DMB000497

Stuart Mcnicol - 045988 - DMB Sports Clubs, LP

## W-2

**Form W-2 Wage & Tax Statement 2018**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**
This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service                       OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| ▓▓▓▓▓ | 29009.08 | 3390.78 |
| **c** Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
| | 30860.74 | 1913.37 |
| DMB Sports Clubs, LP | 5 Medicare wages and tips | 6 Medicare tax withheld |
| 4444 E. Camelback Road | 30860.74 | 447.48 |
| Phoenix, AZ 85018 | 7 Social security tips | 8 Allocated tips |
| USA | 0.00 | 0.00 |
| **b** Employer identification number (EIN) | 9 Verification code | 10 Dependent care benefits |
| 86-0661323 | | 0.00 |
| **e** Employee's name, address, and ZIP code | 11 Nonqualified plans | 13 Statutory employee ☐  Retirement plan ☑  Third-party sick pay ☐ |
| Stuart Mcnicol | 0.00 | |
| ▓▓▓▓▓ | 12 See instructions for box 12 <br> D        1851.66 | 14 Other |

| 15 State | Employer's state ID No | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AZ | 86-0661323 | 29009.08 | 522.12 | | | |

DMB000498

# 2018 W-2 and EARNINGS SUMMARY



This blue Earnings Summary section is included with your W-2 to help describe portions in more detail.
The reverse side includes general information that you may also find helpful.

**1. The following  information reflects your final 2018 pay stub plus any adjustments submitted by your employer.**

| | | | | | | |
|---|---|---|---|---|---|---|
| Gross Pay | 41822.93 | Social Security Tax Withheld Box 4 of W-2 | 2593.02 | AZ. State Income Tax Box 17 of W-2 | 710.69 | |
| | | | | SUI/SDI/FLI Box 14 of W-2 | | |
| Fed. Income Tax Withheld Box 2 of W-2 | 2993.60 | Medicare Tax Withheld Box 6 of W-2 | 606.43 | | | |

**2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.**

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | AZ. State Wages, Tips, Etc. Box 16 of W-2 |
|---|---|---|---|---|
| Gross Pay | 41,822.93 | 41,822.93 | 41,822.93 | 41,822.93 |
| **Less** 401(k) (D-Box 12) | 2,340.46 | N/A | N/A | 2,340.46 |
| **Reported W-2  Wages** | **39,482.47** | **41,822.93** | **41,822.93** | **39,482.47** |

**3. Employee W-4 Profile.  To change your Employee W-4 Profile Information, file a new W-4 with your payroll dept.**



STUART   MCNICOL

Social Security Number:
Taxable Marital Status:  **MARRIED**

Exemptions/Allowances:
**FEDERAL: 1**
**STATE:**          **Tax is 1.8 %**

®© 2018  ADP,  LLC

---

## W-2 (Copy C)

| | |
|---|---|
| Employee | Reference Copy |
| **W-2** Wage and Tax Statement | **2018** OMB No. 1545-0008 |

Copy C for employee's records.

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 027038   PHOE/DQ6 | 076320 | A | 134 |

**c** Employer's name, address, and ZIP code
DESERT HIGHLANDS ASSOC
10040 E HAPPY VALLEY RD
SCOTTSDALE AZ 85255

Batch  #00542

**e/f** Employee's name, address, and ZIP code
STUART  MCNICOL

| b Employer's FED ID number | a Employee's SSA number |
|---|---|
| 86-0482550 | |

| 1 Wages, tips, other comp. 39482.47 | 2 Federal income tax withheld 2993.60 |
|---|---|
| 3 Social security wages 41822.93 | 4 Social security tax withheld 2593.02 |
| 5 Medicare wages and tips 41822.93 | 6 Medicare tax withheld 606.43 |
| 7 Social security tips | 8 Allocated tips |
| 9 Verification Code 1390-dbea-61f4-9a9e | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12  D   2340.46 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp  Ret. plan  X  3rd party sick pay |

| 15 State  Employer's state ID no. AZ  86-0482550 | 16 State wages, tips, etc. 39482.47 |
|---|---|
| 17 State income tax 710.69 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

---

## W-2 (Copy B - Federal)

| 1 Wages, tips, other comp. 39482.47 | 2 Federal income tax withheld 2993.60 |
|---|---|
| 3 Social security wages 41822.93 | 4 Social security tax withheld 2593.02 |
| 5 Medicare wages and tips 41822.93 | 6 Medicare tax withheld 606.43 |

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 027038   PHOE/DQ6 | 076320 | A | 134 |

**c** Employer's name, address, and ZIP code
DESERT HIGHLANDS ASSOC
10040 E HAPPY VALLEY RD
SCOTTSDALE AZ 85255

| b Employer's FED ID number 86-0482550 | a Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Verification Code 1390-dbea-61f4-9a9e | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12  D   2340.46 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp  Ret. plan  X  3rd party sick pay |

**e/f** Employee's name, address and ZIP code
STUART  MCNICOL

| 15 State  Employer's state ID no. AZ  86-0482550 | 16 State wages, tips, etc. 39482.47 |
|---|---|
| 17 State income tax 710.69 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

| | |
|---|---|
| Federal  Filing Copy | |
| **W-2** Wage and Tax Statement | **2018** OMB No. 1545-0008 |

Copy B to be filed with  employee's  Federal Income Tax Return.

---

## W-2 (AZ. State - Reference Copy)

| 1 Wages, tips, other comp. 39482.47 | 2 Federal income tax withheld 2993.60 |
|---|---|
| 3 Social security wages 41822.93 | 4 Social security tax withheld 2593.02 |
| 5 Medicare wages and tips 41822.93 | 6 Medicare tax withheld 606.43 |

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 027038   PHOE/DQ6 | 076320 | A | 134 |

**c** Employer's name, address, and ZIP code
DESERT HIGHLANDS ASSOC
10040 E HAPPY VALLEY RD
SCOTTSDALE AZ 85255

| b Employer's FED ID number 86-0482550 | a Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Verification Code | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a  D   2340.46 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp  Ret. plan  X  3rd party sick pay |

**e/f** Employee's name, address and ZIP code
STUART  MCNICOL

| 15 State  Employer's state ID no. AZ  86-0482550 | 16 State wages, tips, etc. 39482.47 |
|---|---|
| 17 State income tax 710.69 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

| | |
|---|---|
| AZ.State  Reference  Copy | |
| **W-2** Wage and Tax Statement | **2018** OMB No. 1545-0008 |

Copy 2 to be filed with  employee's State Income Tax  Return.

---

## W-2 (AZ. State - Filing Copy)

| 1 Wages, tips, other comp. 39482.47 | 2 Federal income tax withheld 2993.60 |
|---|---|
| 3 Social security wages 41822.93 | 4 Social security tax withheld 2593.02 |
| 5 Medicare wages and tips 41822.93 | 6 Medicare tax withheld 606.43 |

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 027038   PHOE/DQ6 | 076320 | A | 134 |

**c** Employer's name, address, and ZIP code
DESERT HIGHLANDS ASSOC
10040 E HAPPY VALLEY RD
SCOTTSDALE AZ 85255

| b Employer's FED ID number 86-0482550 | a Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Verification Code | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a  D   2340.46 |
| 14 Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp  Ret. plan  X  3rd party sick pay |

**e/f** Employee's name, address and ZIP code
STUART  MCNICOL

| 15 State  Employer's state ID no. AZ  86-0482550 | 16 State wages, tips, etc. 39482.47 |
|---|---|
| 17 State income tax 710.69 | 18 Local wages, tips, etc. |
| 19 Local income tax | 20 Locality name |

| | |
|---|---|
| AZ.State  Filing  Copy | |
| **W-2** Wage and Tax Statement | **2018** OMB No. 1545-0008 |

Copy 2 to be filed with  employee's State Income Tax  Return.

DMB000500

## Instructions for Employee

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See the Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is **not** included in box 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. On Form 4137 you will calculate the social security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be credited to your social security record (used to figure your benefits).

**Box 9.** If you are e-filing and if there is a code in this box, enter it when prompted by your software. The only valid characters are the letters A-F and the digits 0-9. This code assists the IRS in validating the W-2 data submitted with your return. The code is not entered on paper-filing returns.

**Box 10.** This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 also is included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan, or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box shouldn't be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $18,500 ($12,500 if you only have SIMPLE plans; $21,500 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $18,500. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2018, your employer may have allowed an additional deferral of up to $6,000 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the instructions for Form 1040.

**Note:** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**E**—Elective deferrals under a section 403(b) salary reduction agreement

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in box 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See the Form 1040 instructions.

**P**—Excludable moving expense reimbursements paid directly to a member of the U.S. Armed Forces (not included in box 1, 3, or 5)

**Q**—Nontaxable combat pay. See the instructions for Form 1040 for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525, Taxable and Nontaxable Income, for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan

**Z**—Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount also is included in box 1. It is subject to an additional 20% tax plus interest. See the Form 1040 instructions.

**AA**—Designated Roth contributions under a section 401(k) plan

**BB**—Designated Roth contributions under a section 403(b) plan

**DD**—Cost of employer-sponsored health coverage. **The amount reported with code DD is not taxable.**

**EE**—Designated Roth contributions under a governmental section 457(b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**FF**—Permitted benefits under a qualified small employer health reimbursement arrangement

**GG**—Income from qualified equity grants under section 83(i)

**HH**—Aggregate deferrals under section 83(i) elections as of the close of the calendar year

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590-A, Contributions to Individual Retirement Arrangements (IRAs).

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.

**Note:** Keep Copy C of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits,** keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

Department of the Treasury − Internal Revenue Service

---

**NOTE: THESE ARE SUBSTITUTE WAGE AND TAX STATEMENTS AND ARE ACCEPTABLE FOR FILING WITH YOUR FEDERAL, STATE AND LOCAL/CITY INCOME TAX RETURNS.**

---

**This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.**

**IMPORTANT NOTE:**

In order to insure efficient processing, attach this W-2 to your tax return like this (following agency instructions):



## Notice to Employee

**Do you have to file?** Refer to the Form 1040 instructions to determine if you are required to file a tax return. Even if you don't have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2018 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You can't take the EIC if your investment income is more than the specified amount for 2018 or if income is earned for services provided while you were an inmate at a penal institution. For 2018 income limits and more information, visit *www.irs.gov/EITC*. Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you aren't subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA)

to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but aren't the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 800-772-1213. You may also visit the SSA website at *www.SSA.gov.*

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2018 and more than $7,960.80 in social security and/or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $4,674.60 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 instructions and Pub. 505, Tax Withholding and Estimated Tax.

---

DMB000501

# EXHIBIT 20

Leah S. Freed, SBN 021332
Justin B. Caresia, SBN 034007
Ogletree, Deakins, Nash, Smoak & Stewart, P.C., SBN 00504800
2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
Telephone: (602) 778-3700
Fax: (602) 778-3750
leah.freed@ogletree.com
justin.caresia@ogletree.com

*Attorneys for Defendant DMB Sports Clubs Limited Partnership*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

|  |  |
|---|---|
| Stuart McNicol, | No. CV-19-00750-PHX-SMB |
| Plaintiff, | **DECLARATION OF LISA OWENS** |
| vs. | |
| DMB Sports Clubs Limited Partnership, | |
| Defendant. | |

I, Lisa Owens, declare as follows:

1.    I am over the age of 18, and am competent to make this declaration.

2.    I am making this declaration based on my own personal observations.

3.    I am the Director of Membership at DMB's DC Ranch Village Health Club & Spa ("DC Ranch").

4.    As the Director of Membership, I am responsible for selling, growing, and maintaining the membership of DC Ranch members as well as developing programs, initiatives, and policies designed to increase membership at DC Ranch.

5.    In early 2018, I informed all of DC Ranch's tennis department and Pilates department employees that, consistent with club policy, non-members who were taking

lessons at DC Ranch would no longer be able to take lessons at DC Ranch without becoming members.

      6.    The purpose of this policy is to increase the number of memberships and profit at DC Ranch.

DATED this ___2nd___ day of December 2019.

Lisa Owens

40897236.1

2

# EXHIBIT 21

# Audio Recordings