# McNicol v. DMB

## 2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT A

**McNicol Depo**

**In the Matter Of:**

McNicol vs DMB Sports Clubs Limited Partnership

2:19-cv-00750-PHX-SMB

---

**STUART MCNICOL**

*September 17, 2019*

---



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                 UNITED STATES DISTRICT COURT

 2                     DISTRICT OF ARIZONA

 3
                                   )
 4    Stuart McNicol,              )
                                   )
 5                    Plaintiff,   )
                                   )      Case No.
 6    v.                           )      2:19-cv-00750-PHX-SMB
                                   )
 7    DMB Sports Clubs Limited     )
      Partnership,                 )
 8                                 )
                      Defendant.   )
 9                                 )

10

11

12

13             DEPOSITION OF STUART MCNICOL

14

15

16
                    September 17, 2019
17
                         9:38 a.m.
18

19
             2415 East Camelback Road, Suite 800
20
                   Phoenix, Arizona 85016
21

22

23

24

25          Shelley E.D. Pearce, RPR, CR No. 50301
```



1                        APPEARANCES OF COUNSEL

2    On Behalf of the Plaintiff:

3              BRADLEY D. GARDNER, ESQ.
               UDALL SHUMWAY, PLC
4              1138 North Alma School Road
               Suite 101
5              Mesa, Arizona 85201
               480.461.5300
6              bdg@udallshumway.com

7    On Behalf of the Defendant:

8              LEAH S. FREED, ESQ.
               OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.
9              2415 East Camelback Road
               Suite 800
10             Phoenix, Arizona 85016
               602.778.3700
11             leah.freed@ogletree.com

12   Also Present:

13             Jim Krimbill

14

15

16

17

18

19

20

21

22

23

24

25



```
1                    INDEX OF EXAMINATION

2
     WITNESS:  STUART MCNICOL
3
     EXAMINATION                                   PAGE
4
     By Ms. Freed                                     5
5

6
                     INDEX TO EXHIBITS
7
     EXHIBIT              DESCRIPTION               PAGE
8
     Exhibit 1     Correspondence dated March 10, 2014    23
9                  (DMB000018 - 000019)

10   Exhibit 2     Village Health Clubs & Spas            41
                   Job Description:  Head Tennis Professional
11                 Last Revision Date:  February 18, 2014
                   (DMB000451 - 000452)
12
     Exhibit 3     Correspondence dated July 5, 2016      61
13                 Re:  Expectations for Success
                   (DMB000021 and 000024)
14
     Exhibit 4     Memorandum dated September 19, 2016    73
15                 (DMB000025 - 000026)

16   Exhibit 5     Email dated October 31, 2016          110
                   Subject:  Stuart include description
17                 of activity with payroll time sheet
                   (DMB000510)
18
     Exhibit 6     Village Health Clubs and Spas         118
19                 Hourly and Commission Performance
                   Review Form Year 2016 dated 12/08/2016
20                 (DMB000052 - 000056)

21   Exhibit 7     Village Health Clubs and Spas         147
                   Hourly and Commission Performance
22                 Review Form Year 2017 dated 12/06/2017
                   (DMB000057 - 000060)
23

24

25
```



```
 1                      INDEX TO EXHIBITS

 2   EXHIBIT                 DESCRIPTION                PAGE

 3   Exhibit 8        Email dated March 16, 2018         178
                      Subject:  LinkedIn Learning
 4                    (DMB000084)

 5   Exhibit 9        Email dated May 14, 2018           193
                      Subject:  Head Pro duties
 6                    (SM030 - 031)

 7

           (Exhibits 1 - 9 were attached to the original
 8
     transcript.)
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                DEPOSITION OF STUART MCNICOL

 2                      September 17, 2019

 3

 4                      STUART MCNICOL,

 5   having been first duly sworn, testified as follows:

 6

 7                      EXAMINATION

 8   BY MS. FREED:

 9       Q.   Good morning, Mr. McNicol.  My name is Leah

10   Freed.  I'm counsel for the defendant in this case.  I'll

11   be taking your deposition today.

12            I'd like to ask you to state and spell your full

13   name for the record.

14       A.   Stuart John McNicol, S-t-u-a-r-t, J-o-h-n,

15   M-c-N-i-c-o-l.

16       Q.   And, Mr. McNicol, you understand that you have

17   been placed under oath today?

18       A.   Yes.

19       Q.   You understand what that means?

20       A.   Yes.

21       Q.   Have you ever had your deposition taken before?

22       A.   No.

23       Q.   Have you ever participated in a deposition in

24   any context or observed one, sat in on one?

25       A.   No.
```



```
 1              C E R T I F I C A T I O N

 2

               I, SHELLEY E.D. PEARCE, RPR, a Certified
 3    Reporter within and for the State of Arizona, do hereby
      certify:
 4

               That the foregoing deposition was taken before
 5    me; that an oath or affirmation was duly administered to
      STUART MCNICOL pursuant to A.R.S. 41-324(B); that the
 6    questions propounded to the witness and the answers of the
      witness thereto were taken down by me in shorthand and
 7    thereafter reduced to typewriting; that the transcript is
      a full, true, and accurate record of the proceedings, all
 8    done to the best of my skill and ability; and that the
      preparation, production, and distribution of the
 9    transcript and copies of the transcript comply with the
      Arizona Revised Statutes and ACJA 7-206(J)(1)(g)(1) and
10    (2).

11         The witness has requested transcript review and
      signature.
12

13         I FURTHER CERTIFY that I am not related to any of
      the parties, nor am I in any way interested in the outcome
      hereof.
14

15         IN WITNESS WHEREOF, I have hereunto set my hand this
      27th day of September, 2019.

16

17

18         _____
                 Shelley E.D. Pearce, RPR
19                 Arizona CR No. 50301

20

21                /S/
      _____
22
      For Esquire Deposition Solutions
23    Registered Reporting Firm No. R1048

24    Assignment No. J4445557

25
```



1    A.    Yes.

2    Q.    Anything else?

3    A.    No.

4    Q.    I want to quickly go through your employment

5  history.  You were hired by DMB on March 24th of 2014,

6  correct?

7    A.    Yes.

8    Q.    And, just for the record, you know, I want to --

9  I may use DMB and DC Ranch and the Village sort of

10  interchangeably today.  Will you understand that I'm

11  referring to those things as the same entity?

12    A.    Yes.

13    Q.    Okay.  That I'm referring to your employment

14  with DMB at the DC Ranch Village?

15    A.    Yes.

16    Q.    Let's talk about the employment you had prior to

17  being hired by DMB.  What was the position you held

18  immediately prior to becoming employed by DMB?

19    A.    Self-employed.

20    Q.    Okay.  And what period of time were you

21  self-employed?

22    A.    2006 to 2014.

23    Q.    Okay.  And were you exclusively self-employed

24  during that period of time?

25    A.    Yes.



1       Q.   Okay.  So did you -- did you provide instruction

2   without receiving any pay for your services --

3       A.   Correct.

4       Q.   -- during that time?

5            Okay.  Do you know approximately what your

6   earnings were in the time period of 2006 to 2014 annually?

7       A.   Approximately, 40,000.

8       Q.   Again, that was annually?

9       A.   Yes.

10      Q.   Okay.  And did that -- was that relatively

11  consistent during that time period?

12      A.   I believe so.

13      Q.   Okay.  So we've established that you began work

14  for the DC Ranch Village Health Club & Spa in March of

15  2014, correct?

16      A.   Yes.

17      Q.   How was it that you came to be employed at DC

18  Ranch?

19      A.   I was approached by Nick Heron and Rick

20  Erdenberger.

21      Q.   Tell me about that.

22      A.   Nick knew that I was a successful pro in the

23  area and wanted to employ me to help promote and get the

24  Village started.

25      Q.   Okay.  And the Village is a health club and spa?



```
 1       A.   Yes --

 2       Q.   And it has --

 3       A.   -- at DC Ranch.

 4       Q.   -- it is within the DC Ranch community?

 5       A.   Yes.

 6       Q.   Has tennis amenities as well?

 7       A.   Yes.

 8       Q.   And it's a private club, correct?

 9       A.   Yes.

10       Q.   In other words, individuals sign memberships to

11  have access to the club, correct?

12       A.   Yes.

13       Q.   Do you know who made the decision to hire you at

14  DC Ranch?

15       A.   I believe it was Rick Erdenberger and Nick

16  Heron.

17       Q.   Do you have personal knowledge that those were

18  the only individuals involved in the decision?

19       A.   Yes.

20       Q.   How do you have that knowledge?

21       A.   Nick Heron sent me an application.

22       Q.   Okay.  And he ultimately also sent -- you also

23  received an offer letter, correct?

24       A.   Correct.

25       Q.   I'm just -- I'm trying distinguish between what
```



 1    Q.   Mr. McNicol, I've handed you what's been marked

 2  Exhibit 1 to your deposition.  Go ahead and take as much

 3  time as you need to review it, and just let me know when

 4  you're ready for my next question.

 5    A.   Okay.

 6    Q.   Do you recognize Exhibit 1 as the offer letter

 7  you received from the Village -- the DC Ranch Village

 8  Health Club & Spa?

 9    A.   Yes.

10    Q.   And Exhibit 1 sets forth the pay structure for

11  your position, correct?

12    A.   Correct.

13    Q.   You received a biweekly based salary equivalent

14  to 14 hundred and 400 [sic] per year, correct?

15    A.   14,400.

16    Q.   I'm sorry.  $14,400 per year?

17    A.   Yes.

18    Q.   Okay.  And then you also received hourly rates

19  for providing certain types of tennis instruction,

20  correct?

21    A.   Yes.

22    Q.   And that's set forth in Exhibit 1, correct?

23    A.   Yes.

24    Q.   Did those -- did your rates of pay change at any

25  time during your employment with DC Ranch Village?



1    A.    Yes.

2    Q.    Okay.  Tell me how they changed.

3    A.    My -- my biweekly based salary changed from

4  553.85 to 570.  I can't remember the cents.

5    Q.    Okay.  Do you recall when you received an

6  increase in your base salary?

7    A.    January 2016.

8    Q.    Is that the only time you received an increase

9  in your base salary?

10    A.    Yes.

11    Q.    Okay.  What about the hourly rates for tennis

12  instruction?  Did those -- either the hourly rates or the

13  commission structure change at any time?

14    A.    No.

15    Q.    Okay.  So within Exhibit 1 existed throughout

16  your employment with DC Ranch?

17    A.    Correct.

18    Q.    Okay.  And you, in your role, reported to the

19  director of tennis, correct?

20    A.    Yes.

21    Q.    And, at the time you were hired, the director of

22  tennis was Nick Heron, correct?

23    A.    Yes.

24    Q.    Okay.  Do you know what Mr. Heron's pay with DC

25  Ranch was?



1        A.    No.

2        Q.    Okay.  Did you ever -- do you know if there was

3   a job description for his position?

4        A.    I don't know.

5        Q.    Fair to say, then, you never saw a job

6   description for the director of tennis position?

7        A.    Correct.

8        Q.    Okay.  Tell me about how the tennis department

9   was structured during the time at the time you were hired.

10  And when I -- what I'm asking for is really just to

11  understand who was part of the tennis department at that

12  time.  We've identified there was a director of tennis,

13  correct?

14       A.    Yes.

15       Q.    And then you were hired in as the head tennis

16  professional, correct?

17       A.    Yes.

18       Q.    And you were the only one in that position,

19  correct?

20       A.    Yes.

21       Q.    Okay.  What other individuals were part of the

22  tennis department at DC Ranch at that time?  Tennis pros.

23  I mean, there were other folks that provided instruction,

24  right?

25       A.    There was an assistant tennis pro.



 1       Q.    Okay.  Anyone else?

 2       A.    Front desk employees.

 3       Q.    And who was the tennis pro at the Village at the

 4  time you were hired?

 5       A.    Eusebio Sirabia.

 6       Q.    And at any point did -- during your employment,

 7  were additional tennis pros hired?

 8       A.    Yes.

 9       Q.    Okay.  Who else?

10       A.    Throughout my employment?

11       Q.    Correct.

12       A.    Dave Critchley, Warren Race, Cole Stoffloe --

13  Stofflett, Desire Jackson, Mike McCay, Ken Fuller --

14  Feuer, I believe that's all I remember.

15       Q.    Okay.  And just quickly, I want to identify the

16  positions that those individuals held.  Dave Critchley was

17  ultimately hired in as the tennis instructor, correct --

18       A.    Yes.

19       Q.    -- after Mr. Heron resigned his employment?

20       A.    Yes.

21       Q.    And what was Warren Race's position?

22       A.    I don't know.

23       Q.    Okay.  What about Cole Stofflett?  Do you know

24  his official position?

25       A.    I don't know.



```
 1        Q.    Sure.

 2        A.    Other than Dave Critchley and Nick Heron.

 3        Q.    Okay.  So the person in the director of tennis

 4   position also has a salary, as you understand it --

 5        A.    Yes.

 6        Q.    -- or received a salary?

 7        A.    Yes.

 8        Q.    Okay.  And just to clarify your prior answer

 9   then, do you know whether anyone other than the director

10   of tennis and the head tennis professional received a

11   salary?

12        A.    I don't know.

13        Q.    Okay.  Did anyone ever tell you at any point

14   that only you and the director of tennis received a salary

15   within the tennis department?

16        A.    Yes.

17        Q.    Okay.  And who informed you of that?

18        A.    Dave Critchley.

19        Q.    Do you have any reason to dispute

20   Mr. Critchley's statement that only you and the director

21   of tennis received a salary in the tennis department?

22        A.    No, no.

23        Q.    Okay.  Did you ever learn who the director of

24   tennis reported to within the Village in terms of

25   hierarchy?  Do you know who supervised the director of
```



1  tennis?

2      A.   The general manager.

3      Q.   And was that your understanding throughout your

4  employment at the Village?

5      A.   Yes.

6      Q.   Okay.  Who was the general manager at the time

7  that you are hired?

8      A.   Rick Erdenberger.

9      Q.   And, at some point, Mr. Jim Kimbrill [sic]

10  became the general manager correct?

11      A.   Yes, Krimbrill.

12      Q.   Do you know when that change took place?

13      A.   I don't remember.

14      Q.   Any reason to dispute it was in October of 2014?

15      A.   (No oral response.)

16      Q.   You don't know?

17      A.   I don't know.

18      Q.   Okay.  Your head was sort of shaking.

19      A.   I don't know, yeah.

20      Q.   Okay.  Do you know who the general manager of

21  the DC Ranch Village reports to?

22      A.   I don't know.

23      Q.   Did you know during the time you were employed

24  there or have any understanding of that?

25      A.   No.



1      A.    Nick Heron.

2      Q.    And what was the -- was there a formal stringing

3  program?

4      A.    No.

5      Q.    Okay.  How was the stringing being performed?

6      A.    Both Nick Heron and myself had stringers at

7  home.

8      Q.    And do you require some equipment to do the

9  stringing?

10     A.    Yes.

11     Q.    And so you -- both you and Nick had stringing

12  equipment at your home?

13     A.    Correct.

14     Q.    And members would pay you to perform stringing

15  for them?

16     A.    Correct.

17     Q.    Okay.  And do you recall what the pay was to

18  string at that time?

19     A.    It varied.

20     Q.    And did the stringing services run through DMB

21  at all at that time?

22     A.    No.

23     Q.    Okay.  You were paid directly from the members?

24     A.    Correct.

25     Q.    And Nick was paid directly from the members?



1   A.   Correct.

2   Q.   Were you paid in cash or how were you --

3   A.   No --

4   Q.   -- paid?

5   A.   -- check.

6   Q.   And that was --

7   A.   I was.  I don't know for Nick.

8   Q.   You don't know how Nick was paid?

9   A.   No.

10  Q.   Okay.  And that wasn't reported through any DMB

11  system?

12  A.   Correct.

13  Q.   Did you report that on your taxes?

14  A.   Yes.

15  Q.   Okay.  Did you have any sort of business license

16  or business organization for the stringing?

17  A.   No.

18  Q.   Did you report it as income, personal income?

19  A.   As a business account.

20  Q.   Was there a name of the business account?

21  A.   Stuart McNicol.

22  Q.   But your testimony is there wasn't an L.L.C. or

23  other formal business?

24  A.   Correct.

25  Q.   Did you have a tax ID number for Stuart McNicol?



1      A.   No.

2      Q.   Do you know how much income you derived for

3   stringing in 2014?

4      A.   I don't know.

5      Q.   Do you know in 2015?

6      A.   No.

7      Q.   But those numbers would be reflected in your

8   taxes?

9      A.   Correct.

10      Q.   Now, at some point, the stringing -- there was a

11   formal stringing program implemented, correct?

12      A.   Correct.

13      Q.   Tell me about that.

14      A.   A stringer was bought and stringing was done

15   through the POS system.

16      Q.   Do you recall when the stringing machine was

17   purchased?

18      A.   End of 2016 or -- I would be guessing, but

19   sometime between August and December.

20      Q.   Okay.  So, to the best of your recollection,

21   there was a stringing machine purchased at the end of

22   2016, correct?

23      A.   Yes.

24      Q.   But you don't know the exact date?

25      A.   No.



1      Q.   Do you know why DMB formalized the stringing

2   program?

3      A.   No.

4      Q.   Do you know who made the decision to do that?

5      A.   I believe it was the general manager, Jim

6   Krimbill.

7      Q.   And what's the basis for your belief that it was

8   Mr. Krimbrill who made the decision to implement a formal

9   stringing program?

10      A.   I believe he was the one that purchased the

11   machine.

12      Q.   I'm just asking you why you believe that.

13      A.   Nick Heron told me that Jim Krimbrill purchased

14   the machine.

15      Q.   And once the machine was implemented, was there

16   a difference in the way that the stringing was handled?

17      A.   Yes.

18      Q.   Okay.  Tell me about that.

19      A.   It was done at the club and ran through the POS

20   system.

21      Q.   Okay.  And when you say run through the POS

22   system, meaning, DMB charged a fee to the member itself,

23   correct?

24      A.   Correct.

25      Q.   Okay.  And do you -- were the individuals who



1   performed the stringing paid by DMB?

2       A.   Yes.

3       Q.   And they were paid a flat rate?

4       A.   Yes.

5       Q.   Okay.  Do you recall what that flat rate was?

6       A.   It was $20.

7       Q.   Per racket?

8       A.   Yes.

9       Q.   And do you know what DMB charged the members for

10  stringing per racket?

11      A.   I don't know.

12      Q.   Okay.  Do you know whether DMB received part of

13  the fee that was charged to the member?

14      A.   Don't know.

15      Q.   You don't know?

16      A.   I don't remember.

17      Q.   How would you describe Nick Heron's management

18  style?

19           MR. GARDNER:  Object to the form.

20           Go ahead.

21           THE WITNESS:  There was limited communication.

22  BY MS. FREED:

23      Q.   Okay.  Limited communication between you and

24  Mr. Heron?

25      A.   Yes.



1      Q.    Anything else?

2      A.    Not that I recall.

3      Q.    Did you get along well with Mr. Heron?

4      A.    I believed I did.

5      Q.    Did you consider him a friend?

6      A.    No.

7      Q.    Did you consider him just an acquaintance?

8      A.    Yes.

9      Q.    Fair to say you did not socialize outside of

10   work?

11     A.    Correct.

12     Q.    Did you -- would you describe Mr. Heron as

13   trustworthy?

14     A.    Yes.

15     Q.    Ever known him to lie?

16     A.    No.

17     Q.    Did Mr. Heron ever express any concerns with

18   your performance?

19     A.    I don't know.

20     Q.    Did he ever express any concerns with your

21   performance to you?

22     A.    I don't remember.

23           MS. FREED:   I'm going to go ahead and take our

24   first break.

25           (Recess taken from 10:37 to 10:48 a.m.)



```
 1      Q.   You would also agree with me, though, you didn't
 2  have to maintain equipment and supplies, correct, once the
 3  DMB program became formalized?
 4      A.   Clarify that.
 5      Q.   Sure.
 6           So DMB implemented a formal stringing program by
 7  purchasing a machine, correct?
 8      A.   Correct.
 9      Q.   And purchasing the supplies for stringing?
10      A.   No.
11      Q.   Okay.  You continued to purchase the supplies
12  for stringing?
13      A.   Yes.
14      Q.   What supplies?
15      A.   Stringing, head guards, grips.
16      Q.   Okay.  Did you pay anything for the equipment?
17      A.   Yes.
18      Q.   DMB's equipment?
19           I'm sorry.  I think we're confusing ourselves.
20           DMB purchased the stringing machine, correct?
21      A.   Yes.
22      Q.   Did you pay any of the cost of stringing
23  machine?
24      A.   No.
25      Q.   And did you submit expenses related to the
```



 1   stringing activities?

 2       A.   Yes.

 3            MS. FREED:  All right.  I'm going to mark

 4   Exhibit 3.

 5            (Exhibit 3 marked.)

 6   BY MS. FREED:

 7       Q.   Mr. McNicol, I've handed you what's been marked

 8   as Exhibit 3.  Do you recognize Exhibit 3?

 9       A.   Yes.

10       Q.   And can you tell me what it is?

11       A.   It is an expectations for success.

12       Q.   It's a memo to you from Nick Heron, correct?

13       A.   Correct.

14       Q.   And it's dated July 5th of 2016?

15       A.   Correct.

16       Q.   And it appears to be -- it was signed by you on

17   August 1st of 2016?

18       A.   Correct.

19       Q.   Do you recall receiving this document from

20   Mr. Heron?

21       A.   Yes.

22       Q.   Okay.  Did you discuss the document with him?

23       A.   Yes.

24       Q.   Okay.  Do you recall when you discussed it with

25   him?



 1    A.    No.

 2    Q.    Okay.  Was anyone else involved in the

 3  discussion about Exhibit 3?

 4    A.    I believe Jim Krimbrill.

 5    Q.    And tell me what you can recall about that

 6  discussion.

 7    A.    I cannot remember why we were discussing a

 8  matter but, yeah, it was presented to me.

 9    Q.    Okay.  Do you recall whether Mr. Heron or

10  Mr. Krimbrill explained why the memo was being presented

11  to you?

12    A.    No.

13    Q.    Is it you don't recall what they said or that

14  you don't believe they said why it was being presented?

15    A.    I don't remember -- I don't remember why.

16    Q.    Okay.  Do you recall that Nick and/or Jim

17  expressed any concerns with your performance?

18    A.    I don't recall.

19    Q.    Do you recall anything about your discussion

20  with Mr. Heron and Mr. Krimbrill about Exhibit 3?

21    A.    I totally forgot about Exhibit 3.

22    Q.    Okay.  So you don't have any recollection of the

23  meeting whatsoever?

24    A.    No.

25    Q.    Okay.  Do you recall where it took place?



1    A.    In Jim Krimbill's office.

2    Q.    Do you know how long you met?

3    A.    No.

4    Q.    No idea?

5    A.    No.

6    Q.    And does reading Exhibit 3 refresh your

7  recollection about anything that was discussed?

8    A.    Yes.

9    Q.    Okay.  What does it -- what do you recall after

10  reviewing Exhibit 3?

11   A.    I recall that I was -- that we discussed this.

12   Q.    Okay.  But, as you sit here today, you don't

13  recall what specifically was discussed?

14   A.    Huh-uh, other than other than the points that

15  were -- that were mentioned.

16   Q.    Okay.  So you're pointing at Exhibit 3 and

17  saying the bullet points on Exhibit 3 were discussed

18  during the meeting?

19   A.    Correct.

20   Q.    Okay.  But you don't recall anything more than

21  what's typed in Exhibit 3?

22   A.    No.

23   Q.    So if I were to ask you what was discussed about

24  bullet point 2, bring a positive attitude to work each

25  day, you couldn't tell me what the three of you discussed



1  that day?

2       A.   I believe that's what I did every day.

3       Q.   Do you recall being informed by either Nick or

4  Jim that they felt you were not bringing a positive

5  attitude to work each day?

6       A.   Say that again.  Sorry.

7       Q.   Do you recall that either Nick or Jim indicated

8  that they did not believe that you were consistently

9  demonstrating a positive attitude?

10      A.   No.

11      Q.   You don't recall that?

12      A.   No.

13      Q.   Is it possible that that was said?

14           MR. GARDNER:  Form.

15           THE WITNESS:  Possibly.

16  BY MS. FREED:

17      Q.   'Cause you don't recall?

18      A.   Well, if we discussed it, it was -- yes, it was

19  possibly brought up.

20      Q.   Okay.  What about the fourth bullet down?  [As

21  read]:  If a member and I have a disagreement, I will not

22  be confrontational, but understand that the member is our

23  number one priority and try to care -- try to care [sic]

24  of them to the best of my ability.

25           Do you recall discussing that statement?



1    A.   Yes.

2    Q.   What do you recall?

3    A.   I just recall discussing this statement.  Is

4 there any particular incident?  I don't remember.

5    Q.   So you don't know if there was a specific

6 incident that was being referred to here in bullet

7 point 4?

8    A.   Correct.

9    Q.   Okay.  You don't recall if there was a

10 confrontation between you and a member?

11    A.   Correct.

12    Q.   Okay.  What about the next bullet point?  Do you

13 recall discussing the expectation that you maintain an

14 atmosphere of trust in your team?

15    A.   Yes.

16    Q.   Okay.  What do you recall?

17    A.   Discussing the bullet point.

18    Q.   Okay.  And I'm sorry.  I'm not -- you've

19 testified that you don't recall anything in addition to

20 what's typed in Exhibit 3, correct?  You don't recall?

21    A.   You mean Exhibit 5?  Oh, I'm sorry.  Yes, I

22 don't recall, no.

23    Q.   Do you recall either Jim or Nick expressing that

24 they believed you did not have a trusting relationship

25 with the team?



1      A.    No.

2      Q.    You don't recall that?

3      A.    I don't recall.

4      Q.    Do you recall having any disputes or concerns

5   with other members of the tennis department team?

6      A.    No.

7      Q.    What about the third-to-the-last bullet point?

8   [As read]:  Participate in member events, networking

9   functions, and team functions unless prior approval is

10   received from the tennis instructor or general manager to

11   be absent.

12          Do you recall discussing anything more than the

13   statement I just read?

14      A.    No.

15      Q.    Okay.  Do you recall if you had been absent from

16   any types of member events, networking functions, or team

17   functions?

18      A.    I could have been, yes.

19      Q.    Okay.  But you don't recall, as you sit here

20   today?

21      A.    Which ones?

22      Q.    Correct.

23      A.    No.

24      Q.    What about the last bullet point?  [As read]:

25   No clients will pay under the table effective immediately.



```
 1          Do you recall anything that was discussed
 2   regarding that language?
 3       A.   Yes.
 4       Q.   Okay.  Tell me what you recall.
 5       A.   I recall a client -- a client that I was
 6   teaching.
 7       Q.   And who was that?
 8       A.   Art Levy.
 9       Q.   And was Mr. Levy paying you cash for lessons?
10       A.   No.
11       Q.   Okay.  Was there concern that he was paying you
12   cash for lessons?
13       A.   I don't know.
14       Q.   Okay.  What do you recall discussing about Art
15   Levy?
16       A.   That he was to no longer pay me directly.
17       Q.   Okay.  Is it your testimony he was not paying
18   you directly --
19       A.   He was.
20       Q.   -- prior to this memo?
21       A.   Yes.
22       Q.   Okay.  And when you say paying you directly,
23   meaning, it wasn't being run through DMB?
24       A.   Correct.
25       Q.   And you understood "under the table" to mean
```



1   being paid outside of DMB systems, correct?

2       A.   Correct.

3       Q.   Okay.  Was Art Levy the only member who was

4   paying you under the table?

5       A.   Yes.

6       Q.   What about Zino Zacchino, Z-a-c-c-h-i-n-o, did

7   he ever pay you under the table?

8       A.   No.

9       Q.   Did you ever receive trade for lessons --

10      A.   No.

11      Q.   -- in lieu of pay?

12      A.   No.

13      Q.   Okay.  After you received this memo, did

14  Mr. Levy continue to pay you under the table?

15      A.   No.

16      Q.   Did he pay through DMB systems at that time?

17      A.   Yes.

18      Q.   He continued to take lessons?

19      A.   Yes.

20      Q.   Did you understand, after receiving Exhibit 3,

21  that these were the expectations that Mr. Heron and

22  Mr. Krimbrill had of you?

23      A.   Yes.

24      Q.   That these were the expectations for you to be

25  successful in your role as the head tennis professional?



1      A.   I didn't believe this was specifically to me.  I

2  believe it was something that was presented to all of us.

3      Q.   Okay.  And what made you believe that?

4      A.   Well, my name wasn't written on the page, and it

5  says in order for our group to succeed, the following is

6  expected of each of us.

7      Q.   So you believe that Exhibit 3 was the

8  expectations for everyone in the tennis department?

9      A.   Correct.

10     Q.   And that these were the standards by which

11  everyone in the tennis department would be held to?

12     A.   Correct.

13     Q.   Okay.  And were you ever told that these

14  expectations no longer applied to you in your employment

15  at DMB?

16     A.   No.

17     Q.   Now, in August of 2016, you reported that you

18  had not been compensated for overtime pay, correct?

19     A.   Correct.

20     Q.   How did you -- I guess, what caused you to

21  report that to DMB?

22     A.   Laura Frederickson brought it to my attention.

23     Q.   Okay.

24     A.   That I was illegible [sic] for overtime.  I

25  wasn't aware that I was illegible [sic] for overtime.



1    Q.    What do you mean?

2    A.    I wasn't -- I wasn't aware that I was able to

3    get paid for overtime.

4    Q.    Okay.  And how did she bring that to your

5    attention?

6    A.    In a meeting.

7    Q.    Do you recall when the meeting took place?

8    A.    August of 2016.

9    Q.    Okay.  Was anyone else present at the meeting?

10   A.    Yes.

11   Q.    Who else?

12   A.    Jim Krimbrill, and I cannot remember if Nick

13   Heron was there or not.

14   Q.    Tell me what -- to the best of your

15   recollection, what you can recall about the meeting.

16   A.    I believe we were discussing ways for me to be

17   compensated, compensated in a way to increase my income.

18   Q.    Okay.

19   A.    And so Laura Frederickson mentioned I was able

20   to -- you know, can't I work overtime?  And I replied I

21   didn't know that I was able to work overtime.

22   Q.    And how did this meeting come about?

23   A.    I don't remember.

24   Q.    Okay.  Do you recall who initiated the meeting?

25   A.    Could have been Nick Heron and myself, but



1   I'm -- I would be assuming.  So...

2        Q.   You don't recall?

3        A.   I don't recall specifically.

4        Q.   Was the purpose of the meeting to talk about

5   your compensation?

6        A.   Yes.

7        Q.   Okay.  And at that time, were you dissatisfied

8   with your compensation at the Village?

9        A.   No.

10       Q.   Okay.  So what prompted the meeting to discuss

11   your compensation.  Do you know?

12       A.   I was looking for a better way to --

13       Q.   You were looking to increase --

14       A.   -- compensate.

15       Q.   -- you were looking to increase your

16   compensation?

17       A.   Yes.

18       Q.   Okay.  And during the context of that

19   discussion, Ms. Frederickson asked about your ability to

20   work overtime?

21       A.   Correct.

22       Q.   Okay.  And you indicated at that time you didn't

23   realize you were eligible for overtime pay?

24       A.   Correct.

25       Q.   Okay.  And did, during that discussion, you



 1  indicate that you had already been working overtime?

 2       A.    Correct.

 3       Q.    Okay.  And what was Ms. Frederickson's response?

 4       A.    I can't remember.

 5       Q.    And you indicated prior to that meeting you

 6  weren't aware that you could be compensated for working

 7  overtime, correct?

 8       A.    Correct.

 9       Q.    And you weren't reporting overtime hours in the

10  payroll system?

11       A.    Correct.

12       Q.    And was that because you didn't believe you were

13  eligible to be paid for it?

14       A.    I didn't fill out a time sheet until -- I forget

15  the date.

16       Q.    Until after this meeting, sometime after this

17  meeting?

18       A.    No, I started filling out a time sheet before

19  the meeting.

20       Q.    Okay.  And did you ever report overtime pay on

21  the time sheet?

22       A.    Yes.

23       Q.    Starting when?

24       A.    I don't recall.  I believe it was the end of

25  September, maybe October 2015.



1            MS. FREED:  Mark Exhibit 4.

2            (Exhibit 4 marked.)

3    BY MS. FREED:

4       Q.   Mr. McNicol, do you recognize Exhibit 4?

5       A.   Yes.

6       Q.   This was a memo that was sent to you in

7    September of 2016 related to overtime pay, correct?

8       A.   Correct.

9       Q.   And subsequent to your conversation with Laura

10   Frederickson and Jim Krimbrill, the Village went back and

11   attempted to calculate the overtime that you had not been

12   paid for, correct?

13      A.   Correct.

14      Q.   And you'll agree with me that Exhibit 4 sets

15   forth the method that the Village used to try to calculate

16   the overtime that you were due?

17      A.   Correct.

18      Q.   Okay.  And they, ultimately, calculated a total

19   sum due to you of $5,964.33 gross, correct?

20      A.   Correct.

21      Q.   Did you think that that amount was a fair

22   allocation or assessment of the overtime that you were

23   owed?

24      A.   Yes.

25      Q.   You didn't dispute the amount?



 1      A.    No.

 2      Q.    And you'll agree with me that you were

 3   instructed about the importance of tracking all the hours

 4   worked after -- or in this memo?

 5      A.    Correct.

 6      Q.    Okay.   And you were continued to pay overtime if

 7   you reported it on your paycheck after this memo?

 8      A.    Correct.

 9      Q.    Did you have any issues in terms of being paid

10   proper overtime after September of 2016?

11      A.    No.

12      Q.    Now, Mr. Heron left employment with the Village

13   in September of 2016, correct?

14      A.    Yes.

15      Q.    Do you know why he left DMB's employment?

16      A.    No.

17      Q.    Did you keep in contact with him after his

18   resignation?

19      A.    Maybe for one month.

20      Q.    Do you recall what you kept in contact with him

21   about over that month?

22      A.    His end-of-year party for his resignation.

23      Q.    His resignation party?

24      A.    Yes.

25      Q.    I mean, just to clarify, did DMB throw a going



1  away party or something like that for him?

2      A.   Yes, after he resigned.

3      Q.   And that's what you kept in contact with him

4  about?

5      A.   He just mentioned about it.

6      Q.   Did you attend the party?

7      A.   No.

8      Q.   Why not?

9      A.   I don't know.

10     Q.   You don't recall or --

11     A.   I don't recall.

12     Q.   Now, after Mr. Heron resigned, DMB posted his

13  position, correct?

14     A.   Yes.

15     Q.   And you applied for the director of tennis

16  position?

17     A.   Yes.

18     Q.   Okay.  You were not selected, correct?

19     A.   Correct.

20     Q.   Do you have any idea why?

21     A.   No.

22     Q.   Do you know -- do you have any personal

23  knowledge of who made the hiring decision for the director

24  of tennis?

25     A.   Yes.



```
1      Q.    Who?

2      A.    Jim Krimbrill.

3      Q.    And what's the basis for your belief that Jim

4  Krimbrill made the hiring decision?

5      A.    He's the general manager.

6      Q.    Anything else?

7      A.    No.

8      Q.    Do you know if anyone else was involved in that

9  hiring decision?

10     A.    I don't know.

11     Q.    Did it frustrate you to not be selected for the

12 director of tennis position?

13     A.    I was upset, yes.

14     Q.    Did it cause you to look for other employment?

15     A.    Time?  During what time?  Immediately, no.

16     Q.    Yeah, let's -- so that's a fair question.

17           So Nick resigned in September of 2016, and I

18 think we've talked about the fact that Mr. Critchley was

19 hired as the director of tennis in November of 2016.

20 Would you agree with me on that timing?

21     A.    Yes.

22     Q.    Did you learn, before November of 2016, that

23 Dave Critchley had been hired and that you were not going

24 to be hired?

25     A.    I believe in October.
```



1    Q.   And when did you bring your phone in to
2  Speakeasy?
3    A.   I don't recall.  It would be in the middle of
4  2016 -- 2018.
5    Q.   Well, you indicated you made one recording on
6  April 4th of 2018 and one recording on May 3rd of 2018,
7  correct?
8    A.   Correct.
9    Q.   Did you -- did you just go to Speakeasy at one
10  time when you had both recordings?
11    A.   Yes.
12    Q.   So it would have been after May 3rd of 2018?
13    A.   Yes.
14    Q.   And how did you get the idea to record
15  conversations?
16    A.   I believed I was being singled out for policies
17  that didn't apply to everybody.
18    Q.   And when did you first believe you were being
19  singled out?
20    A.   Well, I believed I was being -- Mr. Critchley
21  had mentioned to me in our first meeting that Jim
22  Krimbrill wanted me fired because I cost the company too
23  much money in my overtime pay and, then, in January of
24  2018, Lisa Owens sent an email saying that no -- the
25  non-members that I was teaching could no longer come to



1  the club unless they joined.

2      Q.    Okay.  Is there anything else that made you feel

3  like you were being singled out?

4      A.    Not being able to teach during academy hours.

5      Q.    Okay.  Anything else?

6      A.    No.

7      Q.    When did your conversation with Dave take place

8  regarding -- I guess, strike that.

9          You indicated that Mr. Critchley informed you

10  that Mr. Krimbrill wanted you fired, correct?

11      A.    Correct.

12      Q.    When did that conversation take place?

13      A.    January of 2017.

14      Q.    And where did the conversation take place?

15      A.    At the tennis center.

16      Q.    And what was -- what were you discussing in that

17  conversation?

18      A.    We were discussing what the programs were going

19  to be.

20      Q.    Okay.  What do you mean "what the programs were

21  going to be"?

22      A.    Well, what Mr. Krimbrill was going to be

23  bringing to the Village.

24      Q.    Can you help me understand what that means?

25      A.    The junior academy.



1       Q.    Okay.  So there was a discussion about the fact
2   that Mr. Krimbrill would be starting a junior academy at
3   DMB?
4       A.    Correct.
5       Q.    Okay.  And what do you remember discussing with
6   Mr. Critchley about that?
7       A.    That it was going to be a very active program.
8       Q.    Do you recall discussing anything else with him
9   during that conversation?
10      A.    No.
11      Q.    And the junior program would be something
12  positive for the tennis department, correct?
13      A.    Correct.
14      Q.    It would generate a lot of -- potentially, a lot
15  of revenue?
16      A.    Correct.
17      Q.    And, potentially, generate a lot more new
18  members down the road?
19      A.    Correct.
20      Q.    How did you come to talk about Mr. Krimbrill --
21  I guess, how did -- how did Mr. Critchley get to the topic
22  of Mr. Krimbrill wanting to fire you?
23      A.    I don't remember.
24      Q.    Okay.  So you don't recall how that conversation
25  came up?



1   Scottsdale Ranch Park.  I had contacted Gainey Ranch.  I

2   believe I contacted Camelback.

3       Q.   Camelback?

4       A.   Camelback Village.

5       Q.   And Camelback Village is also DMB --

6       A.   Correct.

7       Q.   -- club?

8       A.   Yes.

9       Q.   This was all in the January 2017 time frame?

10      A.   I believe so.

11      Q.   Did you formally apply at any of these clubs?

12      A.   No.

13      Q.   You just made calls to see if there were

14  positions available?

15      A.   Yes.

16      Q.   Did you learn if any positions were available?

17      A.   No.

18      Q.   You indicated you were -- you felt you were

19  being singled out in not being able to teach in academy

20  hours, correct, or during the junior academy hours?

21      A.   Correct.

22      Q.   When did you believe you were being singled out

23  with respect to teaching during academy hours?

24      A.   A text message was sent out by the front desk

25  about somebody inquiring for a lesson at 5:00 on a



 1  Tuesday, and Mr. Critchley replied that Justin had it

 2  covered.

 3      Q.   Do you recall when you received that text?

 4      A.   I can't remember, but -- I can't remember.

 5      Q.   Do you recall what year that occurred?

 6      A.   2018.

 7      Q.   Do you recall what month?

 8      A.   April or May.

 9      Q.   Now, after you brought the audio recordings to

10  Speakeasy, did you delete them off your phone?

11      A.   No.

12      Q.   Okay.  You kept -- you kept a copy on your

13  phone?

14      A.   Yes.

15      Q.   And you still have a copy?

16      A.   Yes.

17      Q.   It's your testimony you didn't alter or shorten

18  the recording?

19      A.   I did not.

20      Q.   Okay.  And you provided complete copies to your

21  attorney?

22      A.   Yes, of the transcript.

23      Q.   Okay.  I'm talking about the audio recording.

24      A.   No, I did not.

25      Q.   Do you retain audio copies of the recordings on



1    your iPhone?

2         A.   Yes.

3         Q.   Do you still have audio copies of the recording

4    on your iPhone today?

5         A.   Yes.

6         Q.   And how are those -- are those just saved as a

7    file on your iPhone?

8         A.   Yes.

9         Q.   In your recording --

10        A.   Yes, correct.

11        Q.   -- app?

12        A.   Yes.

13        Q.   You mentioned you were informed by Lisa Owens

14   that certain non-members that you were giving lessons to

15   at the Village could no longer take lessons at the

16   Village, correct?

17        A.   Correct.

18        Q.   Okay.  And you've testified you received that

19   email sometime in early 2018?

20        A.   Yes.

21        Q.   And Lisa Owens is the director of membership?

22        A.   Correct.

23        Q.   And do you know why Ms. Owens sent that email to

24   you?

25        A.   I don't know.



1    Q.   Do you know if she gave a similar directive to

2  any other individuals at DMB?

3    A.   I don't know.

4    Q.   And who were the non-members that you were not

5  allowed to teach or give instructions to at DMB?

6    A.   One was Marie Discerni.

7    Q.   Marie?

8    A.   Discerni.

9    Q.   How do you spell her last name?

10    A.   D-i-s-c-e-r-n-i.

11    Q.   Was she the only non-member that you were giving

12  lessons to at the Village?

13    A.   No.

14    Q.   I thought you said there were nine.  Did I

15  misunderstand you earlier?

16    A.   Yeah, I didn't say nine.

17    Q.   How many non-members were you giving lessons to

18  at the Village at the time Lisa Owens gave you the

19  directive that they could no longer take lessons at the

20  Village?

21    A.   I believe it was two.

22    Q.   Marie was one?

23    A.   Yes.

24    Q.   And who was the other?

25    A.   Lisa Joseph.



 1      Q.    And how often were Marie and Lisa taking lessons
 2 with you at that time?
 3      A.    It was periodically.
 4      Q.    Not on any regular basis?
 5      A.    No.
 6      Q.    Did you, in fact, stop teaching non-members at
 7 the Village after receiving that instruction from
 8 Ms. Owens?
 9      A.    Yes.
10      Q.    And do you know whether any other members of the
11 tennis department had non-members taking lessons at the
12 Village?
13      A.    You mean tennis pros?
14      Q.    Yes.
15      A.    I don't know.  I believe Dave Critchley was.
16      Q.    Okay.  And what's the basis for your belief that
17 Dave was providing lessons to non-members at DMB?
18      A.    Because I witnessed it.
19      Q.    Okay.  Who did you witness?
20      A.    Varesh -- I forget Varesh's last name; his --
21 his girlfriend at the time, Alex; Julian Rasmussen, Max
22 Geiger.  That's all I can remember.
23      Q.    Okay.  And you indicate you witnessed Dave
24 providing lessons to Varesh and his girlfriend Alex?
25      A.    Uh-huh.



1     Q.    Yes?

2     A.    Yes.

3     Q.    And when did you witness that?

4     A.    In the evening tennis.

5     Q.    During what period of time?

6     A.    On a regular basis.

7     Q.    What do you mean by a "regular" basis?

8     A.    Probably twice a month, maybe three.

9     Q.    Do you recall any specific dates when you saw

10   him giving them lessons?

11    A.    No, no.

12    Q.    Do you recall any specific time periods?

13    A.    It was during the course of Dave Critchley's

14   employment.

15    Q.    Throughout the course of his employment?

16    A.    Yes.

17    Q.    What about Julian Rasmussen?

18    A.    Same.

19    Q.    Do you recall how frequently she took lessons

20   with Mr. Critchley?

21    A.    Regularly.

22    Q.    Were these one-on-one lessons or clinics or...

23    A.    Julian was the academy.

24    Q.    The junior academy?

25    A.    Uh-huh.



1    Q.   Do you know how old Julian is?

2    A.   Eighteen.

3    Q.   And what about Max Geiger?  Was he in the junior

4  academy as well?

5    A.   Yes.

6    Q.   And do you know how old he is?

7    A.   Right now or at the time?

8    Q.   At the time.

9    A.   Sixteen.

10   Q.   Was Julian 18 at the time?

11   A.   I believe so.

12   Q.   Okay.  Do you know how often Max Geiger took

13  lessons from Dave Critchley?

14   A.   No.

15   Q.   Do you recall any specific dates when you

16  observed Dave giving Max Geiger --

17   A.   During the course of his employment.

18   Q.   Now, you obtained employment at Desert Highlands

19  while you were employed with DMB, correct?

20   A.   Correct.

21   Q.   And you were hired by Desert Highlands in

22  February 2018, correct?

23   A.   Correct.

24   Q.   You were hired as an assistance tennis

25  professional?



1    A.    Correct.

2    Q.    At a rate of $15 per hour?

3    A.    I believe so.

4    Q.    Were you -- were there any other aspects to your

5  pay arrangement with Desert Highlands other than $15 per

6  hour?

7    A.    I received commission for teaching lessons.

8    Q.    What was your commission?

9    A.    65 percent.

10   Q.    Do you know what you charged for lessons the

11 time you started?

12   A.    Either 80 -- 80 or $85 an hour.

13   Q.    For all individual lessons?

14   A.    Yes.

15   Q.    How did you come to apply at Desert Highlands?

16   A.    Mr. Anderson was looking for somebody to help on

17 Sundays.

18   Q.    And when were you approached by Mr. Anderson?

19   A.    Yes.

20   Q.    That's Eric Anderson?

21   A.    Yes.

22   Q.    He's a tennis instructor?

23   A.    Yes.

24   Q.    Tennis instructor for Desert Highlands?

25   A.    Yes, correct.



1     A.    Marie Discerni.

2     Q.    And so, then, did you reach out to

3   Mr. Anderson --

4     A.    Yes.

5     Q.    -- about the potential for the position?

6     A.    Yes.

7     Q.    Okay.  And when was that?

8     A.    In February of 2018.

9     Q.    Okay.  And Desert Highlands' records reflect you

10  were hired on the 21st of February in 2018.  Does that

11  refresh your recollection as to when you contacted

12  Mr. Anderson?

13    A.    Correct.

14    Q.    How much -- how long before you were hired did

15  you actually speak with Mr. Anderson about the position?

16    A.    Couple of weeks.

17    Q.    So sometime in early February?

18    A.    Yes.

19    Q.    And did you learn -- what did you learn from

20  Mr. Anderson when you reached out to him?

21    A.    That there was an opportunity for me to be the

22  assistant pro.

23    Q.    Was that different from just helping out on

24  Sundays?

25    A.    Correct.



1    Q.   Okay.  So what did Mr. Anderson tell you about

2  the assistant tennis pro position?

3    A.   That I could teach members or he could provide

4  me with lessons to members whenever needed.

5    Q.   And were there any specific hours you were

6  required to work at Desert Highlands?

7    A.   No.

8    Q.   You could set your own schedule?

9    A.   Yes.

10    Q.   And you could bring your own clients, for lack

11  of a better word?

12    A.   Not specifically, no.

13    Q.   Okay.

14    A.   They had to be referred by a member.

15    Q.   So you could teach members of Desert

16  Highlands --

17    A.   Correct.

18    Q.   -- or you could teach individuals who were

19  referred by a member of Desert Highlands?

20    A.   Correct.

21    Q.   And did Mr. Anderson indicate that there were

22  folks that he could -- strike that.

23        Did Mr. Anderson indicate that he could provide

24  you with members who were looking for instruction?

25    A.   Correct.



1  that you had worked with at DMB that also began taking

2  lessons with you at Desert Highlands?

3      A.   I believe I taught one lesson.

4      Q.   Okay.  Who was that?

5      A.   Shelly Harding.

6      Q.   And just so I'm understanding, she was a member

7  of which club?

8      A.   Both.

9      Q.   Both DC Ranch and Desert Highlands?

10     A.   Correct.

11     Q.   Okay.  And what about Marie?  Did Marie Discerni

12 begin taking lessons with you at Desert Highlands?

13     A.   Yes.

14     Q.   Did Desert Highlands provide some of their

15 members or referrals of their members for you to give

16 instruction to?

17     A.   Yes.

18     Q.   Do you recall what the volume of that -- those

19 referrals were was?

20     A.   No, I don't recall the volume.

21     Q.   When you first began working at Desert

22 Highlands, did you have any duties other than providing

23 lessons?

24     A.   Stringing rackets.

25     Q.   And when you -- you said you made your own



1  schedule at Desert Highlands, correct?

2      A.   Except for the one day a week that I was

3  scheduled to work.

4      Q.   Okay.  And what was that?

5      A.   It varied.

6      Q.   So each week you were scheduled to work one day?

7      A.   Not necessarily, no.

8      Q.   How did it work?

9      A.   Depending if they needed somebody on a Sunday, I

10  would work on a Sunday, or if it was a Saturday, my

11  schedule worked out, I would work a Saturday.

12     Q.   So how was it that you were communicated or that

13  Desert Highlands communicated to you that they needed you

14  to work?

15     A.   Phone.

16     Q.   And was it optional for you to work?

17     A.   Yes.

18     Q.   So they would offer you the opportunity to work,

19  and you could decide whether or not to accept the offer?

20     A.   Correct, correct.

21     Q.   Okay.  But other than that, you could also

22  determine if you wanted to work certain days and certain

23  hours?

24     A.   Correct.

25     Q.   Okay.  And you would just communicate to Desert



1   the junior academy at the -- at DC Ranch, correct?

2       A.   Yes.

3       Q.   And wasn't it Dave Critchley who brought the

4   junior academy to DC Ranch?

5       A.   The junior academy?

6       Q.   Correct.

7       A.   Yes.

8       Q.   So when Dave Critchley started at DMB, he helped

9   initiate the junior academy program at DMB, correct?

10      A.   There was already a junior program.

11      Q.   But he helped expand it significantly, correct?

12      A.   Correct.

13      Q.   Based on his prior employment, correct?

14      A.   Correct.

15      Q.   Do you know whether he needed to get approval

16  from Mr. Krimbill to expand the junior academy program?

17      A.   I don't know.

18           MR. FREED:   Mark Exhibit 5.

19           (Exhibit 5 marked.)

20  BY MS. FREED:

21      Q.   Mr. McNicol, I've handed you what's been marked

22  Exhibit 5.  Do you recognize it?

23      A.   Yes.

24      Q.   This is an email exchange between you and

25  Mr. Krimbill on October 7th of 2016, correct?



1      A.   Yes.

2      Q.   And this was during the time period between when

3  Mr. Heron resigned and when Mr. Critchley became the

4  director of tennis, correct?

5      A.   Yes.

6      Q.   And is this the email you were referencing

7  earlier when you indicated that Mr. Krimbill asked you to

8  describe what duties you were performing?

9      A.   The continuing of this --

10     Q.   Okay.

11     A.   -- I believe so, yes.

12     Q.   So this was part of your dialogue with

13  Mr. Krimbill about your job duties at the -- in the tennis

14  department?

15     A.   Correct.

16     Q.   And Mr. Krimbill writes in his email [as read]:

17  As we continue to evaluate the operations of tennis, can

18  you please describe of what you spend your time on outside

19  of teaching with your time sheet, like, number of rackets,

20  et cetera.

21          Do you know what Mr. Krimbill meant by 'as we

22  continue to evaluate the operations of tennis"?

23     A.   No.

24     Q.   You didn't know what he was doing in terms of

25  evaluating the tennis operation?



1      A.   No.

2      Q.   Okay.  Do you know why he was asking you to

3   provide a description of what you spent your time on

4   outside of teaching?

5      A.   No.

6      Q.   Do you know what he was referring to when he

7   said "like, number of rackets"?

8      A.   Correct.

9      Q.   Did you understand that to be a question about

10  the number of rackets you were stringing?

11     A.   Yes, I did, but it could also be viewed in the

12  system.

13     Q.   The number of rackets that were stringing?

14     A.   Yes.

15     Q.   Okay.  And let's look at your response to

16  Mr. Krimbill.  You state [as read]:  Good morning.  I can

17  do that, but not sure why when I've told you that, besides

18  stringing, I'm promoting this club and helping with

19  everything here at the club.

20          What did you mean by that?

21     A.   I'm helping the front desk with the duties that

22  I mentioned earlier, maintaining a good attitude, helping

23  the maintenance at the courts, providing lessons.

24     Q.   I'm sorry?

25     A.   Providing lessons, promotional lessons.



1    Q.   Can I understand your email to mean that you and

2   Mr. Krimbill had already had a verbal discussion about

3   what you were doing at the club?

4    A.   I don't remember.

5    Q.   Okay.  Well, you say [as read]:  I've told you

6   that, besides stringing, I'm promoting this club.

7         Was that in a conversation?

8    A.   I believe it was in an email.

9    Q.   Okay.  Do you believe, previously, you had

10   informed Mr. Krimbill of what you were doing to promote

11   the club?

12    A.   Yes.

13    Q.   Okay.  And it included helping at the front

14   desk?

15    A.   I believe I've mentioned that, yes.

16    Q.   And maintaining a good attitude?

17    A.   I don't know if I said that.

18    Q.   Okay.  Maintaining the court?

19    A.   Also, don't know if I said that.  That was part

20   of my job description.

21    Q.   Providing lessons, including promotion lessons?

22    A.   Also part of my job description.

23    Q.   Okay.  Was there anything else at any time

24   during this period that you informed Mr. Krimbill that you

25   were doing outside of teaching?



1    A.    I don't remember.

2    Q.    You'll agree with me that providing lessons and

3  promotion lessons was teaching, right?

4    A.    Yes.

5    Q.    And you go on to say [as read]:  If you feel

6  that my just above $7 is too much, then maybe you would

7  like to take that away.

8          What did you mean by that?

9    A.    That the items -- that the items specified in

10 Mr. Krimbill's email to me were not part of -- were not

11 part of my -- I was not capable of doing those duties, so

12 that's why I referred to that.

13   Q.    What did you mean by $7 an hour or $7?

14   A.    My base salary --

15   Q.    Okay.

16   A.    -- broken down per hour.

17   Q.    You had calculated your base salary to being the

18 equivalent of $7 per hour?

19   A.    Correct.

20   Q.    On a --

21   A.    Average, yes.

22   Q.    Averaging how many hours a week?

23   A.    Forty.

24   Q.    And what were the duties you felt you were not

25 able to perform that Mr. Krimbill indicated he believed



1  were part of your job duties note?

2     A.   Purchasing of tennis balls.

3     Q.   Okay.  Anything else?

4     A.   Purchasing of racket stringing equipment.

5     Q.   Okay.

6     A.   That's all.

7     Q.   So other than purchasing tennis balls and

8  purchasing racket stringing equipment, was there anything

9  else that Mr. Krimbill indicated he expected to you do but

10 that you indicated you weren't able to do or that you felt

11 was outside your job description?

12    A.   Correct.

13    Q.   Those were the only two things?

14    A.   That I can remember, yes.

15    Q.   Okay.  Well, what do you mean by "if you feel

16 that my just above $7 is too much, then maybe you would

17 like to take that away"?

18    A.   I believed I was fulfilling my job description.

19    Q.   And you were challenge Mr. Krimbill, correct?

20    A.   I wouldn't say challenging, no.

21    Q.   Okay.  Well, what did you think of the tone of

22 your -- that sentence?  Were you suggesting that

23 Mr. Krimbill take away your salary?

24    A.   It seemed like that's what they wanted to do.

25    Q.   So you suggested that maybe he should do that?



```
 1        A.    Correct.

 2        Q.    Okay.  And saying you were refusing to do more

 3   because you weren't being compensated enough?

 4        A.    No.

 5        Q.    Well, let's read the rest of your email.

 6              [As read]:  If you -- I am feeling like the

 7   longer I am here, the more it seems I have to justify

 8   everything I do, and I'm financially struggling more.  You

 9   have taken away close to a hundred dollars a month from

10   me, and it seems as though with the stringing you want to

11   take more away.  Not sure why.  Jim.

12              Tell me what you meant by that, the rest of that

13   email.

14        A.    Well, they changed my -- they changed my

15   commission on stringing from $20 to $15.

16        Q.    Okay.  Do you know why?

17        A.    So that the club could profit from it.

18        Q.    Do you know if others were paid similarly for

19   stringing?

20        A.    I don't know.

21        Q.    You don't know -- do you know whether other

22   people were performing stringing duties?

23        A.    Not at this moment in time.

24        Q.    Okay.  Do you know if, ultimately, other

25   employees performed stringing?
```



1      A.    Yes.

2      Q.    Were you all paid the same flat rate?

3      A.    I don't know.

4      Q.    Okay.  Do you have any reason to believe others

5   were paid more than you?

6      A.    I don't believe more, no.

7      Q.    What else?  You said [as read]:  You've already

8   taken away close to a hundred dollars a month from me.

9            What's that in reference to?

10     A.    Stringing.

11     Q.    Were you frustrated with your employment at this

12   point in time?

13     A.    No, I just applied for the director of tennis.

14     Q.    Okay.  Did you feel like the tone of your email

15   was respectful to send to the general manager of the

16   Village?

17     A.    It wasn't intended to be disrespectful.

18     Q.    Could you see where it could be interpreted to

19   be disrespectful?

20     A.    I don't know.

21     Q.    Okay.  Could you see how suggesting that if the

22   general manager felt like $7 an hour was too much to pay

23   you, then maybe he should just take that away; could you

24   see how that could be interpreted as either challenging or

25   disrespectful?



1       A.    I don't know.

2       Q.    You don't see how it could be interpreted that

3    way?

4       A.    No.

5       Q.    Okay.  Did you have any discussion with

6    Mr. Krimbill about this email?

7       A.    No.

8            (Exhibit 6 marked.)

9    BY MS. FREED:

10      Q.    Mr. McNicol, I've handed you what's been marked

11   as Exhibit 6.  Do you want an opportunity to review it?

12      A.    I've reviewed it.

13      Q.    Okay.  Is this one of the documents you reviewed

14   in preparation for your deposition?

15      A.    No.

16      Q.    Okay.  Do you recall the last time you reviewed

17   it?

18      A.    December 8, 2016.

19      Q.    Okay.  Is it your testimony that you have not

20   reviewed this document since December 2016?

21      A.    I have not reviewed it, no.

22      Q.    Okay.  Well, why don't you go ahead and take an

23   opportunity to review it.  I'm going to ask you some

24   questions about it.

25            Okay.  Mr. Krimbill [sic], you received this



 1  evaluation in December of 2016, correct?

 2      A.   You said Mr. Krimbill.

 3      Q.   I'm sorry.  See, I need lunch.

 4           Mr. McNicol, you received this evaluation in

 5  December of 2016, correct?

 6      A.   Yes.

 7      Q.   Okay.  Do you have any personal knowledge of who

 8  prepared your 2016 evaluation?

 9      A.   No.

10      Q.   Okay.  Do you have personal knowledge of who

11  provided input into your evaluation?

12      A.   No.

13      Q.   Okay.  Fair to say you don't know if

14  Mr. Krimbill provided input?

15      A.   He gave the deposition -- he gave the

16  performance review.

17      Q.   Okay.  So when you sat down to get the

18  performance evaluation, who was present?

19      A.   Dave Critchley and Jim Krimbill.

20      Q.   Okay.  Is it fair to say that neither of you --

21  neither of them informed you of exactly who prepared the

22  evaluation?

23      A.   Yes.

24      Q.   But it was your perception that they both had

25  input into the evaluation because they met with you to



1  deliver the evaluation?

2      A.   Yes.

3      Q.   Okay.  Did any of them -- did either of them

4  specifically say that they had provided specific input

5  into the evaluation?

6      A.   No.

7      Q.   During the discussion, did you go through all of

8  the comments in the performance evaluation?

9      A.   Yes.

10     Q.   Okay.  Do you recall any specific discussion you

11 had other than what's set forth in Exhibit 6?

12     A.   Say that again.  Sorry.

13     Q.   So you just read through Exhibit 6, correct?

14     A.   Yeah.

15     Q.   Independent of what's written in Exhibit 6, do

16 you have a recollection of what you discussed with

17 Mr. Krimbill and Mr. Critchley during that evaluation?

18     A.   It was just the evaluation.

19     Q.   You went through each of the comments from under

20 the heading of Managers Comments and the evaluation

21 ratings with Mr. Krimbill and Mr. Critchley?

22     A.   Correct.

23     Q.   Okay.  But it's fair to say, as you sit here

24 today, you don't remember any discussion independent of

25 what's written in Exhibit 6?



1      A.    Yes.

2      Q.    You don't recall anything Mr. Krimbill said

3  specifically?

4      A.    Other than what is written here, no.

5      Q.    Okay.  Same question with respect to

6  Mr. Critchley.

7      A.    Mr. Critchley didn't say anything.

8      Q.    Okay.  Is it your recollection that Mr. Krimbill

9  actually made statements during the meeting, but you just

10  don't recall what he said?

11      A.    I don't remember.

12      Q.    Do you remember if Mr. Critchley made any

13  comments during the meeting?

14      A.    He made comments referring to the performance

15  review.

16      Q.    Okay.  But you don't remember any comments he

17  made other than what's stated in Exhibit 6?

18      A.    No.

19      Q.    Okay.  What about yourself?  Do you remember any

20  comments that you made during the discussion?

21      A.    I believe I made comments that I didn't agree

22  with certain things that are written in here.

23      Q.    Well, can you tell me which things you disagreed

24  with?

25      A.    No.



1    Q.   Do you have any recollection of anything you
2    disagreed with?
3    A.   Not to my knowledge right now, no.
4    Q.   Okay.  And you agree with me you had the
5    opportunity to comment on the evaluation, correct?
6    A.   Correct.
7    Q.   But you did not, correct?
8    A.   I was told it didn't matter.
9    Q.   By whom?
10   A.   Mr. Krimbill.
11   Q.   What do you recall him saying in that regard?
12   A.   There was something that I didn't agree to, and
13   he said it didn't matter.
14   Q.   Do you remember what that was?
15   A.   No.
16   Q.   Did you discuss the comment section with
17   Mr. Krimbill specifically?
18   A.   No.
19   Q.   Okay.  In your lawsuit, you allege that you
20   became aware that DMB hired two minors, correct?
21   A.   Correct.
22   Q.   And by "minors," you do mean someone under the
23   age of 18?
24   A.   Yes.
25   Q.   Tell me what you became aware of.



 1        A.    No.

 2        Q.    Do you know -- do you have any personal

 3   knowledge of their ages or dates of birth?

 4        A.    No.

 5        Q.    Tell me -- let's just talk start with Cole.

 6              When did you --

 7        A.    Can I -- can I clear something?  I did know Cole

 8   was hired.

 9        Q.    Okay.  So it's your testimony that you have

10   personal knowledge that he was a formally hired by DMB?

11        A.    Yes.

12        Q.    And how did you learn that?

13        A.    Because when you bring up your name, as one of

14   the pros mentioned, his name was there on Spectrum.

15        Q.    Okay.  So when you go into the -- is this the

16   scheduling for the lessons --

17        A.    Yes.

18        Q.    -- in the Spectrum system?

19        A.    Yes.

20        Q.    You had visibility to see the other pros who had

21   scheduled lessons?

22        A.    Yes.

23        Q.    And Cole's name was listed on that?

24        A.    Yes.

25        Q.    What about Max?



1      A.    No.

2      Q.    Okay.  And when did you first learn or come to

3  believe that Cole was providing lessons at DMB?

4      A.    In May 2017.

5      Q.    Do you remember when?

6      A.    The exact date, no.

7      Q.    And did you have concerns about Cole being hired

8  by DMB?

9      A.    Cole?  No.

10     Q.    Okay.  So does anything in your lawsuit relate

11 to Cole's employment with DMB?

12     A.    No.

13     Q.    Okay.  Let's talk about Max.  You've indicated

14 you weren't aware of whether Max was formally hired with

15 DMB, correct?

16     A.    Correct.

17     Q.    But your understanding is that he was providing

18 lessons --

19     A.    Correct.

20     Q.    -- at DMB?

21     A.    Correct.

22     Q.    And tell me what you learned about Max.

23     A.    He was teaching in the junior academy.

24     Q.    Do you know when he taught in the junior

25 academy?



1       A.    From May or periodically throughout --
2   throughout 2017.
3       Q.    2017 or 2018?
4       A.    I can't recall if he taught in 2018 or not.
5       Q.    Let's go back to how you first became aware that
6   Max was teaching in the junior academy.
7       A.    Okay.
8       Q.    How did you learn that he was teaching?  You
9   just saw it or did you --
10      A.    I saw -- no, I saw him teaching.
11      Q.    Okay.  And that was when?  When was the first
12  time you became aware that he was teaching in the junior
13  academy?
14      A.    Around May of 2017.
15      Q.    May of 2017.
16            Okay.  And did you have any concerns with him
17  teaching in May of 2017?
18      A.    Yes.
19      Q.    Okay.  What were your concerns?
20      A.    That it was illegal activity going on.
21      Q.    Why did you think it was illegal for Max to be
22  teaching at the junior academy?
23      A.     'Cause he wasn't employed.  He was getting
24  paid -- he was getting paid under the table.
25      Q.    And how did you learn that he was being paid



1  under the table?

2      A.    Dave Critchley asked him for his hours.

3      Q.    And when -- when did that happen?

4      A.    May 2017.

5      Q.    You heard Dave ask Max for his hours?

6      A.    Correct.

7      Q.    Okay.  Do you recall when you heard that

8  conversation?

9      A.    No.  I don't know what date specifically.

10     Q.    Okay.  And other than hearing Dave ask Max for

11 his hours, was there anything else that led you to believe

12 he was being paid under the table?

13     A.    Yes.

14     Q.    What else?

15     A.    Warren Race mentioned that his hours were

16 increased in order to pay Max.

17     Q.    And when did Warren tell you that?

18     A.    April 2018.

19     Q.    Was it your understanding from Warren that he

20 was paying Max?

21     A.    I only knew that after he mentioned that to me.

22     Q.    Okay.  So starting in May of 2017, you learned

23 that Max was teaching at the junior academy, correct?

24     A.    Correct.

25     Q.    Was it around that time that you learned that or



1  believed that Dave was paying Max under the table?

2      A.   Correct.

3      Q.   Meaning, he was giving him cash or otherwise

4  paying him outside of DMB --

5      A.   Yes.

6      Q.   -- payroll?

7      A.   Yes.

8      Q.   Did you ever discuss that with Dave?

9      A.   Yes.

10     Q.   When was that?

11     A.   April 4th, 2018.

12     Q.   Prior to April 4th of 2018, did you ever discuss

13 Max Geiger with Dave Critchley?

14     A.   No.

15     Q.   Did you ever express concerns to anyone about

16 Max Geiger providing lessons at DMB?

17     A.   Max Geiger or concerns about what was going on?

18     Q.   Max.  Let's talk about Max Geiger, specifically.

19     A.   No.

20     Q.   And, I guess, prior to April 4th of 2018, did

21 you ever report to anyone that you believed Max Geiger was

22 being paid under the table for providing lessons at DMB?

23     A.   No.

24     Q.   Okay.  And you just clarified my last question

25 saying -- about Max specifically or about other things



1  that were going on.  Can you -- can you help me understand

2  what you were trying to clarify there?

3      A.   Yes, there was a British citizen that was

4  teaching as well.

5      Q.   That's Harry Busby?

6      A.   Correct.

7      Q.   Before we turn to Harry, I just want to talk

8  about your conversation with Warren Race.  You said that

9  was in April of 2018?

10     A.   Correct.

11     Q.   Was that prior to your discussion with Dave on

12  April 4th of 2018?

13     A.   No.

14     Q.   Okay.  It was after?

15     A.   Yes.

16     Q.   Okay.  And do you recall what specific date you

17  spoke with Warren?

18     A.   I don't recall.

19     Q.   Okay.  And do you recall specifically what

20  Warren told you about his pay and Max's pay?

21     A.   He told me that his pay was increased to

22  full-time so that he could receive company benefits

23  because he was sick and he needed them and, in return, he

24  would pay Max out of his own pocket and that Igor Perasic

25  and Cole Stofflett knew about it.



1      Q.   Do you know what type of illness Max or -- I'm

2   sorry -- Warren Race had?

3      A.   He said he had Valley Fever.

4      Q.   And did he tell you how this arrangement came

5   about?

6      A.   No.

7      Q.   Did he indicate whether Dave Critchley was aware

8   of it?

9      A.   He said Dave -- Dave increased his hours.

10     Q.   You said Dave increased his hours to full-time?

11     A.   Yes.

12     Q.   Did he say that Dave had instructed him to pay

13  Max?

14     A.   I don't remember.

15     Q.   You don't know?

16     A.   I don't.

17     Q.   You mentioned two people who were aware of the

18  arrangement.  Cole Stofflett.

19     A.   Uh-huh.

20     Q.   What was the other?

21     A.   Igor.

22     Q.   Igor Perasic?  Can you spell that?

23     A.   P-r-e-s-i-c [sic].

24     Q.   And what was Igor's position?

25     A.   He was assistant tennis pro.



1    Q.    And did Mr. Race tell you what Igor and Cole
2  knew about the arrangement?
3    A.    No.
4    Q.    He just said they were aware of it?
5    A.    Correct.
6    Q.    Did he indicate whether anyone else was aware of
7  it?
8    A.    He didn't.
9    Q.    Did you ever learn that anyone else was aware of
10 this arrangement that you just described?
11   A.    No.
12   Q.    And you indicated -- we talked about Harry Busby
13 is a British citizen?
14   A.    I believe so.
15   Q.    And what did you learn about Harry?
16   A.    That Harry was -- that Harry was teaching a
17 specific lesson.  A lesson request came in through the
18 front desk by Susan Cabano, and Dave Critchley and myself
19 were sitting there, and the lesson request was asked if
20 either of us wanted it, and Dave Critchley said he had it
21 covered.
22   Q.    When did this happen?
23   A.    In the summer of 2017.
24   Q.    And fair to say you don't recall what month?
25   A.    I believe we have it.  Right now, I don't



1   recall.

2       Q.   Was Harry an employee of DMB; do you know?

3       A.   No.

4       Q.   Did you know him --

5       A.   Did I know if he was?

6       Q.   Yes.

7       A.   He was not.

8       Q.   And how did you know that?

9       A.   Because his name was not on the Spectrum.

10      Q.   Any other reason?

11      A.   He didn't have a work visa.

12      Q.   And how do you know that?

13      A.   Warren Race asked Dave Critchley about Harry

14  Busby, and Dave Critchley mentioned he was volunteering

15  and that he cannot be employed.

16      Q.   Because he didn't have -- he mentioned he didn't

17  have a work visa?

18      A.   Mr. Critchley mentioned that, yes.

19      Q.   Have you ever worked without a work visa?

20      A.   Yes.

21      Q.   During what period of time?

22           MR. GARDNER:  Object to the form on that

23  whole -- this whole area, but go ahead and answer.

24           THE WITNESS:  '99 to 2005.

25  BY MS. FREED:



1  about the lesson being covered?

2      A.    No, it was a couple months afterwards.

3      Q.    So in the fall of 2017?

4      A.    That would be accurate enough, yes.

5      Q.    Do you know whether or not Mr. Busby actually

6  performed any lessons at DMB?

7      A.    Yes, I do.

8      Q.    Do you know how many times?

9      A.    I know for sure two.

10     Q.    And were these both in the summer of 2017?

11     A.    Yes.

12     Q.    Do you know who he provided lessons to?

13     A.    Yes.

14     Q.    Who?

15     A.    Rich Bruno.

16     Q.    Is Mr. Bruno a member?

17     A.    I believe so.

18     Q.    And do you know if he was paid in any form for

19  his lesson?

20     A.    I don't know.

21         MS. FREED:  Off the record.

22         (Lunch recess taken from 12:32 to 1:15 p.m.)

23  BY MS. FREED:

24     Q.    Mr. McNicol, prior to the lunch break, we were

25  talking about Harry Busby.  You indicated that you learned



1   sometime in 2017 that Mr. Busby was providing lessons at

2   the Village, correct?

3       A.   Yes.

4       Q.   Sometime in the summer of 2017?

5       A.   Yes.

6       Q.   Did you ever discuss your -- Mr. Busby's

7   activities at DMB with anyone other than Warren Race?

8       A.   Yes.

9       Q.   Okay.  Who else?

10      A.   Kathryn Brassfield.

11      Q.   What's Kathryn's role?

12      A.   Right now, she's the lead front desk attendant.

13      Q.   And what was her role at that time or I should

14  say --

15      A.   I don't know if -- she was a front desk

16  attendant.

17      Q.   And do you recall when you had a conversation

18  with Ms. Brassfield about Mr. Busby?

19      A.   The day Mr. Busby was teaching.

20      Q.   In the summer of 2017?

21      A.   He why.

22      Q.   And is it your testimony you had concerns about

23  him providing lessons at DMB?

24      A.   Yes.

25      Q.   Okay.  And what were your concerns?



1      A.    That an illegal immigrant was teaching lessons

2  at the Village.

3      Q.    So you had concerns with someone who didn't have

4  work visa working in the U.S., correct?

5      A.    Correct.

6      Q.    Okay.  But you had done that yourself and didn't

7  have concerns at that time?

8      A.    I wasn't employed by anybody.

9      Q.    Okay.  Is it your testimony that providing

10 services in exchange for somewhere to live is not working

11 for someone?

12     A.    I wasn't being compensated.

13     Q.    You weren't being given money?

14     A.    Correct.

15     Q.    But you did have somewhere to stay without

16 having to pay for the cost of that, correct?

17     A.    Correct.

18     Q.    You were given room and board?

19     A.    Correct.

20     Q.    It's your testimony that that's not working

21 illegally?

22     A.    I don't know.

23     Q.    Okay.  Did you file taxes during that time

24 period?

25     A.    No.



1    Q.   Okay.  Did you consult with a lawyer about

2  whether or not that was considered working illegally?

3    A.   No.

4    Q.   Okay.  But when you learned of Mr. Busby, that

5  was concerning to you?

6    A.   Yes.

7    Q.   Okay.  The fact that he did not have the legal

8  right to work in the U.S.?

9    A.   Correct.

10    Q.   Okay.  And you believed that to be the case

11  based on comments from Mr. Critchley?

12    A.   Correct.

13    Q.   You don't know that for a fact, correct?

14    A.   No, I don't.

15    Q.   You never spoke with Mr. Busby about that?

16    A.   No.

17    Q.   Did you ever report your concerns about

18  Mr. Busby to anyone?

19    A.   Not Mr. Busby in general, no.

20    Q.   Okay.  Specifically, with respect to Mr. Busby,

21  did you raise concerns about his providing lessons at DMB

22  with anyone in management at DMB?

23    A.   I did raise my concerns with somebody in

24  management, not specifically about Mr. Busby.

25    Q.   Okay.  What do you mean by that?



```
 1        A.    I raised concerns with someone in management

 2   about the illegal activity that was going on at DC Ranch.

 3        Q.    And was that with Mr. Critchley?

 4        A.    No -- well, yes.

 5        Q.    Okay.  When was -- when did you raise your

 6   concerns with Mr. Critchley?

 7        A.    About Mr. Busby?

 8        Q.    Yes.

 9        A.    April 4th.

10        Q.    Okay.  Did you discuss your concerns about

11   illegal activity at DMB with anyone other than

12   Mr. Critchley?

13        A.    Yes.

14        Q.    Who was that?

15        A.    Paul Apana.

16        Q.    What's Paul's last name?  How do you spell it?

17        A.    A-p-a-n-a.

18        Q.    What's Paul's position?

19        A.    He's the general manager at Camelback.

20        Q.    Does Mr. Apana have any responsibilities at the

21   Village DC Ranch?

22        A.    I don't know.

23        Q.    When did you have a conversation with Mr. Apana?

24        A.    April 14th.

25        Q.    Of what year?
```



```
 1      A.   He told me that I sounded like I was working in
 2  a toxic environment.
 3      Q.   Did he give you any advice?
 4      A.   Yes.
 5      Q.   What did he say?
 6      A.   Told me to write a letter or an email to the
 7  president of the company.
 8      Q.   Did you know who the president of the company
 9  was?
10      A.   Yes.
11      Q.   Who was that?
12      A.   Carol Nalevanko.
13      Q.   Did you follow Mr. Apana's advice?
14      A.   Yes.
15      Q.   When did you do that?
16      A.   Mr. Marshall sent an email to Carol Nalevanko on
17  May 16th.
18      Q.   Between April 14th of 2018 and May 16th of 2018,
19  did you do anything to follow Mr. Apana's advice?
20      A.   I had a meeting with Mr. Critchley on the 3rd of
21  May 2018.
22      Q.   Did you do anything else?
23      A.   No.
24      Q.   Did Mr. Apana tell you why he suggested that you
25  reach out to the president?
```



```
 1        A.    No.

 2        Q.    Do you know whether Mr. Apana discussed your

 3   concerns with anyone at DC Ranch?

 4        A.    I don't know.

 5        Q.    Do you know whether he discussed your concerns

 6   with anyone?

 7        A.    I don't know.

 8        Q.    Or any of the content of your conversation?

 9        A.    I don't know.

10        Q.    And you indicated you were represented by

11   Mr. Marshall beginning May 16th of 2018, correct?

12        A.    Yes.

13        Q.    So on the very day you retained Mr. Marshall, he

14   sent a communication to Ms. Nalevanko?

15        A.    Correct.

16        Q.    And you continued to be represented by

17   Mr. Marshall throughout your employment with DMB, correct?

18        A.    From May 16th onwards --

19        Q.    Correct.

20        A.    -- yes.

21        Q.    Okay.  So he was available to you for advice and

22   counsel during that time period?

23        A.    Correct.

24        Q.    And you'll agree with me you did seek his advice

25   and counsel during that time period, correct?
```



 1   to you to provide that information to us?

 2        A.   Yes.

 3        Q.   And would your written discovery responses be

 4   the most accurate summary of your efforts to locate other

 5   employment?

 6        A.   Yes.

 7        Q.   You'll agree with me that those written

 8   responses are more accurate or more detailed than what you

 9   can recall, as you sit here today?

10        A.   Yes.

11        Q.   Now, you made the decision to remove yourself

12   from participating in the junior academy, correct?

13        A.   Correct.

14        Q.   And when did you make that decision?

15        A.   May of 2017.

16        Q.   Okay.  And what was the reason?

17        A.   There was illegal activity taking place in the

18   junior academy.

19        Q.   Okay.  And what illegal activity are you

20   referring to?

21        A.   People teaching that weren't employed, as well

22   as getting paid under the table.

23        Q.   Is that Max that you're referring to?

24        A.   As well as Harry Busby.

25        Q.   Is it your testimony that Mr. Busby was



 1  participating in the junior academy?

 2      A.   Yes.

 3      Q.   Okay.  When?

 4      A.   Summer of 2017.

 5      Q.   Did you make the decision to stop participating

 6  in the junior academy before you learned about Mr. Busby's

 7  activities?

 8      A.   Yes.

 9      Q.   Did you tell anyone the reason you were not

10  participating in the junior academy?

11      A.   No.

12      Q.   Okay.  You'll agree with me that you informed

13  Mr. Critchley that the reason you weren't participating in

14  the junior academy was because of the pay, correct?

15      A.   Correct.

16      Q.   You indicated to him that you weren't paid a

17  high enough hourly rate to compensate you for

18  participating in the junior academy, correct?

19      A.   I viewed my -- I viewed my concern that the

20  other pros were getting paid a higher rate than I was.

21      Q.   And that's what you informed Mr. Critchley was

22  the reason you weren't participating in the junior

23  academy, correct?

24      A.   That's what I recall.

25      Q.   When was the first time you had that discussion



 1  have any personal discussions with her about the alleged

 2  illegal activity?

 3      A.   No.

 4      Q.   And what about anybody in HR?

 5      A.   No.

 6      Q.   Okay.  So turning to Exhibit 7, do you recognize

 7  this as the performance review that you received for your

 8  performance in 2017?

 9      A.   Correct.

10      Q.   And it's signed by you on August 6th -- I'm

11  sorry -- December 6th of 2017.

12      A.   Yes.

13      Q.   Okay.  And do you have any personal knowledge of

14  who prepared Exhibit 7?

15      A.   No.

16      Q.   Okay.  Do you have any personal knowledge of who

17  had input into your 2017 evaluation?

18      A.   No.

19      Q.   Okay.  Would you agree with me that your 2017

20  performance evaluation was generally positive?

21      A.   Yes.

22      Q.   Do you believe that the feedback in Exhibit 7

23  and the comments are accurate?

24      A.   I believe so, yes.

25      Q.   Do you know whether or not Mr. Krimbill reviewed



1  evaluation, your testimony was that you didn't recall any

2  discussion independent of what was included in the

3  comments that were included in the evaluation, right?

4      A.   Say that again.

5      Q.   Let me just ask.

6           With respect to your 2017 evaluation, did you

7  meet with Mr. Critchley to go over the evaluation?

8      A.   Yes.

9      Q.   Was anyone else present?

10     A.   No.

11     Q.   Okay.  Did you and Mr. Critchley discuss the

12  comments in the evaluation?

13     A.   Yes.

14     Q.   As you sit here today, do you recall anything

15  specific that was discussed?

16     A.   No, other than what's on -- other than what's on

17  this.

18     Q.   Would it be fair to say you reviewed the

19  comments that are included in your evaluation, but you

20  don't have an independent recollection of anything other

21  than what's set forth in the evaluation?

22     A.   Correct.

23     Q.   Okay.  And you don't similarly recall anything

24  you said to Mr. Critchley during that meeting?

25     A.   No.



1    follow through on the suggestion to create new and

2    exciting programs that is open to all members of the

3    appropriate level.

4           Correct?

5      A.   Correct.

6      Q.   Do you know what that was referring to in terms

7    of new and exciting programming that you created?

8      A.   I think it was the lessons that I provided.

9      Q.   Okay.  The next sentence goes on to state [as

10   read]:  You now have several classes on the monthly tennis

11   calendar and, as noted, are an integral part of all of our

12   tennis socials.

13          Do you agree with that?

14     A.   Yes.

15     Q.   You placed new classes on the monthly tennis

16   calendar?

17     A.   Different classes.  They were the same classes.

18   They were just -- they were just called different -- they

19   were just called different classes.

20     Q.   Okay.  And you were an integral part of the

21   tennis socials --

22     A.   Yes.

23     Q.   -- at least in Mr. Critchley's opinion?

24     A.   Yes.

25     Q.   Okay.  And the evaluation goes on to state [as



 1  read]:  I would encourage you to expand some of your

 2  programs to include younger pros, both to increase revenue

 3  and help mentor and teach our younger staff, as well as

 4  get more involved in the larger junior and/or adult

 5  programs at the club.

 6          That was shared with you during the evaluation?

 7      A.   Yes.

 8      Q.   And did you do that in following the evaluation?

 9      A.   Did I do what?

10      Q.   Did you expand your programs to include younger

11  pros to increase revenue and help mentor and teach the

12  younger staff?

13      A.   I believe I mentored the younger staff.  I

14  didn't include them in the programs that I created.

15      Q.   What about, did you get more involved in the

16  larger junior and/or adult programs at the club?

17      A.   What are you referring to?

18      Q.   Well, there's an encouragement in your

19  evaluation to get more involved in the larger junior

20  and/or adult programs at the club.  I'm asking whether or

21  not you followed that suggestion.

22      A.   I had programs that were available to adults.

23      Q.   Anything other than having programs available?

24      A.   I created programs.

25      Q.   Okay.  Did you create new programs in 2018?



 1      A.    I don't know.

 2      Q.    Okay.  Did you do anything else, other than

 3  create new programs, to become more involved in the larger

 4  junior and/or adult program?

 5      A.    Excuse me?  Did I create new programs?

 6      Q.    Well, you just indicated you're not sure if you

 7  created new programs in 2018, correct?

 8      A.    Correct.

 9      Q.    And I'm asking whether or not you can identify

10  anything specifically you did to get more involved in the

11  larger junior adult programs?

12      A.    Well, I wasn't going to be involved in the

13  junior programs because there was illegal activity --

14      Q.    So the answer is no?

15      A.    No.

16      Q.    And on paragraph 6, your evaluation states [as

17  read]:  You were very open to the several new

18  responsibilities given to you by the director.

19          Who was the director at that time?

20  Mr. Critchley?

21      A.    Yes.

22      Q.    Okay.  And the evaluation lists the following

23  responsibilities:  Scheduling and communicating with new

24  members, tracking stringing inventory, taking more of a

25  coaching leadership role at the front desk, taking on a



 1  larger role during socials and assisting and planning

 2  events and the tennis programs at the club.

 3          You'll agree with me you did those things in

 4  2017?

 5      A.   Yes.

 6      Q.   And you were very open to those

 7  responsibilities?

 8      A.   Yes.

 9      Q.   Okay.  Would you agree with me those were new

10  responsibilities that were given to you by the director in

11  2017?

12      A.   No.

13      Q.   Okay.  But you'll agree with me you didn't

14  comment on that in the evaluation?

15      A.   Yes.

16      Q.   Okay.  Were those responsibilities that

17  previously existed prior to 2017?

18      A.   Yes.

19      Q.   Okay.  It had always existed in your position?

20      A.   Yes.

21      Q.   Now, you and Mr. Critchley had repeated

22  conversations about your role at DC Ranch, correct?

23      A.   Yes.

24      Q.   Discussed your off-duty off-the-court duties, so

25  to speak?



1   Mr. Krimbill.  I believe that's Exhibit 5.  And when we

2   spoke about Exhibit 5, you testified that you didn't feel

3   that the additional items that Mr. Krimbill was asking you

4   to do were -- that your salary provided enough

5   compensation for you to add those duties to your job,

6   correct, or for you to perform those duties?

7       A.   Can you please say that again?

8       Q.   Yeah.  So you testified that Mr. Krimbill was

9   expecting you to do things like purchase tennis balls,

10  purchase racket stringing equipment, correct?

11      A.   Correct.

12      Q.   You'd agree with me those are off-the-court

13  administrative duties, correct?

14      A.   Yes.

15      Q.   And, at that time, you were paid a base salary

16  for off-the-court administrative duties, correct?

17      A.   Correct.

18      Q.   And you disagreed with Mr. Krimbill that you

19  should have to perform those duties based on the base

20  salary you were being paid, correct?

21      A.   That I disagreed?

22      Q.   Yes.

23      A.   I don't believe I disagreed.

24      Q.   Well, what was your testimony, then?  You felt

25  like you were responsible for purchasing tennis balls?



1    A.    No, I was not.

2    Q.    Okay.  Why not?

3    A.    I didn't know how.

4    Q.    Any other reason?

5    A.    Nobody had informed me that that was part of my

6  duty.

7    Q.    Okay.  And what about purchasing racket

8  stringing equipment?

9    A.    Same thing.  Nobody informed me that that was...

10    Q.    And that was the reason you weren't responsible

11  for performing it?

12    A.    Correct.

13    Q.    And is it your testimony that you have never

14  taken the position that you are not sufficiently

15  compensated with your base salary by DMB?

16    A.    That I'm not sufficiently compensated?  I don't

17  know.

18    Q.    Have you listened to the recordings of the

19  conversations between yourself and Mr. Critchley?

20    A.    Yes.

21    Q.    When was the last time you listened to that?

22    A.    When -- when it was -- actually, I don't know.

23  It's been a long time.

24    Q.    Was it -- has it been more than a year?

25    A.    Yes.



1    Q.   Have you reviewed the transcripts within the

2  last year?

3    A.   No.

4    Q.   Would you agree with me that Mr. Critchley

5  indicated to you he was frustrated, that he felt like he

6  was doing all of the off-the-court administrative duties

7  in the tennis department?

8    A.   Yes.

9    Q.   And that you were not supporting him in

10  performing some of those duties?

11    A.   That's what he said, yes.

12    Q.   Okay.  And do you recall that you responded

13  repeatedly to Mr. Critchley that you didn't get paid

14  enough to do all the things he was asking you to do?

15    A.   I believed it wasn't in my job description.  I

16  questioned things because I did not know how to do them.

17    Q.   And what things Mr. Critchley asking you to do

18  that you didn't think were in your job description?

19    A.   Create a stringing poster and contact directors

20  of tennis within part of the United States to find out how

21  their pros were being paid, as well as themselves.

22    Q.   Okay.  Anything else?

23    A.   No, I don't remember.

24    Q.   You indicated that one of the reasons -- I

25  guess, strike that.



1           You indicated that you informed Mr. Critchley

2    that you were not participating in the junior academy

3    because other pros were being paid at a higher hourly rate

4    to perform that work, correct?

5         A.   Correct.

6         Q.   That was the only reason you gave Mr. Critchley

7    for your non-involvement in the junior academy, correct?

8         A.   If I told him that, I -- I believed -- I

9    believed I was going to get fired.

10        Q.   You told him what?

11        A.   If I told him that there was illegal activity

12   going on.

13        Q.   You believed that you if you told Mr. Critchley

14   that there was illegal activity going on, that you would

15   be terminated?

16        A.   That was my thought.

17        Q.   But you did it in April of 2018, anyway,

18   correct?

19        A.   Correct.

20        Q.   Okay.  And why did you believe Mr. Critchley

21   would fire you if you reported that activity?

22        A.   Because that was Mr. Krimbill's director.

23        Q.   That you learned through Mr. Critchley?

24        A.   Correct.

25        Q.   Never heard Mr. Krimbill say that to you



 1  directly, correct?

 2      A.   No, correct.

 3      Q.   Did you ever have any conversations with

 4  Mr. Krimbill about the overtime issue after August of

 5  2016?

 6      A.   No, other than to track my hours.

 7      Q.   Other than him indicating you should be tracking

 8  your overtime, correct?

 9      A.   Correct.

10      Q.   Okay.  You'll agree with me that DMB had made a

11  point of indicating you needed to report those hours if

12  you work overtime?

13      A.   I did.

14      Q.   And they encouraged you to do that?

15      A.   Correct.

16      Q.   So that they could pay you for it, correct?

17      A.   Correct.

18      Q.   Which pros -- tennis pros did you learn were

19  paid a higher hourly rate than yourself?

20      A.   Ali Borani, Mike McCay, Ken Feuer.

21      Q.   Anyone else?

22      A.   Dave Critchley.

23      Q.   Ali's last name is what, please?

24      A.   Borani, I believe, B-o-r-a-n-i.

25      Q.   Okay.  What did you believe Mr. Borani received



 1  per hour?

 2      A.    $50.

 3      Q.    Do you know what he -- what types of activities

 4  he was paid $50 per hour?

 5      A.    Teaching the academy.

 6      Q.    Do you know if he had any other rates or

 7  commissions with DMB?

 8      A.    Yes.

 9      Q.    What else?

10      A.    Hourly -- his hourly -- his hourly rate for

11  teaching was a hundred dollars an hour.

12      Q.    Anything else?

13      A.    That's all.

14      Q.    And where did you get that information?  What's

15  the basis for your belief that that was his pay structure?

16      A.    Well, Mr. Critchley told me $50 was his pay for

17  teaching the academy, and it's in Spectrum what his hourly

18  rate was to teach lessons.

19      Q.    When did Mr. Critchley inform you of

20  Mr. Borani's pay rate at the academy?

21      A.    I don't remember.

22      Q.    What was the context of the discussion?

23      A.    I don't know.

24      Q.    Okay.  Did Mr. Critchley ever indicate to you

25  that he was advocating for a different pay structure for



1   also listed Mr. Borani's pay?

2        A.   Yes.

3        Q.   Where in the Spectrum system is the pay listed?

4        A.   I believe -- I believe it's the -- no, I don't

5   think it's listed.  My mistake.  I don't think it's

6   listed, but it was the hourly rate that he charged.

7        Q.   Okay.  So --

8        A.   My mistake.

9        Q.   Let me just clarify then.

10            When you said Mr. Borani's hourly rate is a

11  hundred dollars an hour, is that the rate he charges for

12  lessons?

13       A.   Correct.

14       Q.   And is it your testimony that he receives the

15  full lesson fee?

16       A.   I don't know.

17       Q.   Okay.  Do you know how much DMB pays Mr. Borani

18  for private lessons?

19       A.   I don't know.

20       Q.   Do you know if it's higher or lower than your

21  pay for private lessons?

22       A.   I have no idea what the commission is.

23       Q.   Same with respect to the rate for the junior

24  academy.  Was the $50 you mentioned what Mr. Borani was

25  paid for the junior academy?



1      A.   I believe so.

2      Q.   Okay.  Where did you get information about

3  Mr. Borani's lesson fee?

4      A.   I believe Mr. Borani said -- told us.

5      Q.   So other than learning from Mr. Borani that DMB

6  charged a hundred dollars an hour for lessons by him, do

7  you have any other basis for believing that's what he

8  was -- what DMB charged for his lessons?

9      A.   So say --

10      Q.   Yeah, I'm just trying to understand the basis

11  for your belief that he charged a hundred dollars per --

12      A.   That's what was Mr. Critchley said.

13      Q.   Mr. Critchley or Mr. Borani?

14      A.   Both.

15      Q.   Okay.  Well, what were you charged at per hour

16  for private lessons?

17      A.   I believe it was 85.

18      Q.   Okay.  What about Mr. McCay?  What do you know

19  about his pay?

20      A.   I believed he was also at $50.

21      Q.   For the junior academy?

22      A.   Yes.

23      Q.   And did you learn that by speaking with

24  Mr. Critchley?

25      A.   I believe Mr. Critchley mentioned that, yes.



1      Q.   Okay.  And did you ever talk with Mr. McCay

2  about his --

3      A.   No.

4      Q.   -- pay?

5           Do you know any other rates that Mr. McCay was

6  charged for lessons?

7      A.   No.

8      Q.   Okay.  What were you paid when you did -- I

9  guess, did you ever participate in the junior academy?

10     A.   I did.

11     Q.   Okay.  During what period of time?

12     A.   Well, from the time of my employment until May

13  of 2016, and I believe I taught a couple of times during

14  that time.

15     Q.   What were you paid for junior academy?

16     A.   40.

17     Q.   Ken Feuer, do you know what he was paid?

18     A.   Not exactly, no.

19     Q.   Do you believe he was paid more than you?

20     A.   Yes.

21     Q.   Okay.  What's the basis for your belief?

22     A.   I had to look into his commission report.

23     Q.   When was that?

24     A.   Throughout his employment.

25     Q.   When was he employed?



1      A.   I believe either December 2016 or January of

2   2017 when -- when the academy started.

3      Q.   And why did you have to look at his commission

4   report?

5      A.   Because it was often not correct.

6      Q.   Did someone ask you to look at his report?

7      A.   He did.

8      Q.   What was not correct about it?

9      A.   The hours that he was teaching.

10     Q.   And is it your testimony you don't recall now

11  what his pay was?

12     A.   I don't know the exact rate.

13     Q.   And you don't know if it was higher or lower

14  than yours?

15     A.   Well, I wouldn't know because $40 an hour times

16  two is $80 if you taught for two hours.  His wasn't $80,

17  but I don't know an exact figure.

18     Q.   Your testimony is, it was higher than $40 an

19  hour --

20     A.   Yes.

21     Q.   -- For the academy?

22     A.   Yes.

23     Q.   Do you know any other aspects of Mr. Feuer's

24  pay?

25     A.   No.



1      Q.    Okay.  Do you know specifically whether

2  Mr. Critchley sought to get an increased rate for you for

3  the junior academy?

4      A.    I believe he spoke to Mr. Krimbill, yes.

5      Q.    Do you know what -- what they discussed

6  specifically?

7      A.    Other than Mr. Krimbill would absolutely not

8  give me a raise.

9      Q.    Okay.  Did Mr. Critchley inform you why?

10      A.    No.

11      Q.    Okay.  Did he say whether or not Mr. Krimbill

12  had provided a reason why?

13      A.    No, but Mr. Critchley offered to compensate me

14  by adding my hours in order to compensate for not getting

15  a raise.

16      Q.    He offered to let you work additional hours,

17  correct?

18      A.    No, not work.  He would just add additional

19  hours to my compensation --

20      Q.    So he offered --

21      A.    -- to my hourly rate without teaching those

22  hours.

23      Q.    So is it your testimony that he specifically

24  said you wouldn't have to work extra hours?

25      A.    I believe it's in --



1    Q.   It's in the recording, correct?

2    A.   Yes.

3    Q.   So we can trust the recording's accurate,

4    correct?

5    A.   Yes.

6    Q.   Your memory may not be as accurate as the

7    recording?

8    A.   At this moment in time, no.

9    Q.   You mentioned earlier that one of the things

10   that Mr. Critchley asked you to do is create a stringing

11   poster.

12   A.   Yes.

13   Q.   And you didn't do that, correct?

14   A.   No.

15   Q.   And Mr. Critchley also asked you to help in

16   planning, as well as attending, all of the social events

17   that the tennis department put on, correct?

18   A.   Planning.  I don't know about attending.

19   Q.   Okay.  Well, so is it your testimony he asked

20   for you to assist in the planning of social events at the

21   club?

22   A.   Yes.

23   Q.   Okay.  And that he expected you to do that?

24   A.   Yes.

25   Q.   And that he was frustrated that he felt like he



1      Q.   Okay.  And you indicated that you and

2    Mr. Critchley discussed the potential for you to take on a

3    different role at the club if you did not want to perform

4    the duties of the head tennis professional, correct?

5      A.   Correct.

6      Q.   When did those discussions take place?

7      A.   May 3rd.

8      Q.   And that was discussed on the recording?

9      A.   Correct.

10     Q.   Any other discussions about that?

11     A.   I can't remember if he discussed it in the

12   April 4th meeting or not.

13     Q.   But other than April 4th, 2018, or May 3rd,

14   2018, and in those recorded discussions, there was no

15   other time where you and Mr. Critchley discussed a

16   potential different role for you at DC Ranch?

17     A.   No.

18     Q.   So if he didn't offer you -- strike that.

19          MS. FREED:  Let me go ahead and mark Exhibit 9.

20          (Exhibit 9 marked.)

21   BY MS. FREED:

22     Q.   Mr. McNicol, do you recognize Exhibit 9?

23     A.   Yes.

24     Q.   This is an email to you from Mr. Critchley dated

25   May 14th of 2018 --



```
 1      A.    Yes.

 2      Q.    -- regarding the head pro duties?

 3      A.    Correct.

 4      Q.    And you'll agree with me that Mr. Critchley

 5   indicates in his email this is an outline of what he

 6   envisioned from the head pro role moving forward?

 7      A.    Correct.

 8      Q.    And he indicated that you had discussed it a

 9   couple of times?

10      A.    Correct.

11      Q.    Did you respond to Mr. Critchley's email?

12      A.    No, I told him I would take look at it.

13      Q.    And how did you do that?

14      A.    Email.

15      Q.    You responded that you would take a look at it?

16      A.    Correct.

17      Q.    Other than emailing him that you would take a

18   look at Exhibit 9, did you otherwise communicate with

19   Mr. Critchley about Exhibit 9?

20      A.    No.

21      Q.    Did you ever indicate to him that you wished to

22   move forward in the head pro role?

23      A.    Say that again.

24      Q.    Did you ever confirm to Mr. Critchley that you

25   intended to stay in the head pro role?
```



1     A.   I didn't -- I didn't communicate with him about

2   it.

3     Q.   One way or the other?

4     A.   No.

5     Q.   Okay.  You didn't indicate to him that you no

6   longer wanted to perform the head pro role either?

7     A.   Correct.

8     Q.   Okay.  So the only communication regarding

9   Exhibit 9 is this email and your response that you would

10   take a look at it?

11     A.   Yes.

12     Q.   And you'll agree with me this isn't the first

13   time that you and Mr. Critchley discussed the potential

14   changes to the head pro role?

15     A.   I believe it was in the recording.

16     Q.   Okay.  On which date?

17     A.   I believe it was May 3rd.

18     Q.   Okay.  And did you know, prior to May 3rd, that

19   Mr. Critchley wanted to talk to you about some changes to

20   the role?

21     A.   No.

22     Q.   You never --

23     A.   I don't remember.

24     Q.   You don't recall?

25     A.   I don't.



 1      Q.   It's possible he did?

 2      A.   Possible.

 3      Q.   You've alleged that your access to the systems

 4   at DMB changed, correct?

 5      A.   Correct.

 6      Q.   What changed?

 7      A.   Certain things that a manager was able to access

 8   was no longer able to access.

 9      Q.   Okay.  And were you in a manager role at DMB?

10      A.   I believe I had managerial access.

11      Q.   To what?

12      A.   To Spectrum.

13      Q.   Do you know why you had managerial access to

14   Spectrum?

15      A.   Because I was the head pro.

16      Q.   And what access did you have that changed?

17      A.   My certain access to -- actually, I don't know,

18   but access that would allow me to look into Spectrum at --

19   actually, I don't know.

20      Q.   So it's your belief your access to Spectrum

21   changed, but you don't know how?

22      A.   Correct.  I was limited to where I could go.

23      Q.   So you had -- when did your access change?

24      A.   In May 2018.

25      Q.   Do you know when in 2018?  I'm sorry.  Do you



1  know when in May of 2018?

2      A.   No.

3      Q.   How did you learn that it changed?

4      A.   I believe I tried to use my password to look at

5  something and it was denied.

6      Q.   Okay.  Do you know what you tried to look at?

7      A.   No.

8      Q.   I can't recall what you were trying to look at?

9      A.   I can't recall whether I was trying to look at a

10 program that was -- that was in the system.  It had to do

11 with a program.

12     Q.   Do you recall what program?

13     A.   No.

14     Q.   Do you know whether or not, as the head pro, you

15 were supposed to have managerial access to Spectrum?

16     A.   I believe I was, yes.

17     Q.   Based on what?

18     A.   I would communicate with Laura Gaunt, and she

19 would give me certain duties to perform managerial.

20     Q.   And what were those?

21     A.   Reserving courts more than 50 hours in advance.

22 That's all I remember.

23     Q.   Do you know why your access was changed?

24     A.   No.

25     Q.   Do you know who changed your access?



1    A.   Well, I do -- sorry.  I do know why my access

2  was changed.

3    Q.   Okay.

4    A.   Because I was constructively charged as head

5  pro.

6    Q.   What do you mean by that?

7    A.   Well, because of the -- because of being forced

8  into the -- potentially being forced back into the academy

9  where the illegal activity was taking place and for being

10  written up for -- for socials that I literally did not

11  attend, which was inaccurate.  I was constructively

12  discharged as head pro and remained as a teaching pro as

13  what was offered me -- to me by Mr. Critchley.

14    Q.   Okay.  Well, let's start with, you don't know

15  who changed your access in Spectrum, correct?

16    A.   No.

17    Q.   And you don't know why they changed your access?

18    A.   I don't know.

19    Q.   Okay.  You don't know if you were expected to

20  have managerial access in Spectrum in your role as head

21  pro, correct?

22    A.   I believe I was.

23    Q.   You believe you were based on being able to

24  reserve courts 50 hours in advance or more?

25    A.   I don't know what the other -- what



 1   the others -- I don't know what else.

 2        Q.   You don't even know what access you had that you

 3   were deprived of at a later date, correct?

 4        A.   Well, at this moment, I don't remember.

 5        Q.   Well, are you going to remember it in the

 6   future?

 7        A.   Maybe.

 8        Q.   Do you have a diary where you've written down

 9   the access that you were deprived of?

10        A.   No, I don't.

11        Q.   You agree with me you had to make significant

12   disclosures in this case, correct?

13        A.   Correct.

14        Q.   And if the reason the information to which you

15   were denied access isn't listed in those disclosures, do

16   you have any reason to believe you're going to wake up

17   tomorrow and remember it?

18            MR. GARDNER:   Object to the form.

19            Go ahead.

20            THE WITNESS:   I believe one of the duties or one

21   the things I was able to do was to override point of

22   sale --

23   BY MS. FREED:

24        Q.   Okay.

25        A.   -- entries.



1    Q.    Okay.  So other than overriding point of sale

2  entries and reserving courts more than 50 hours in

3  advance, you can't tell me any other duties that

4  managerial access allowed you to perform in Spectrum,

5  correct?

6    A.    Creating and deleting of programs.

7    Q.    Okay.  Anything else?

8    A.    Adding pros to certain programs.

9    Q.    Anything else?

10    A.    No.

11    Q.    Do you know if after your access changed you

12  were unable to reserve courts more than 50 hours in

13  advance?

14    A.    I don't know.

15    Q.    Did you ever try?

16    A.    I don't -- I don't remember.

17    Q.    Okay.  What about creating and deleting

18  programs?  Did you attempt to create or delete programs

19  after your access to Spectrum was changed?

20    A.    I believed I wanted to add my name to a program

21  that I was teaching and was not able.

22    Q.    Did you make any effort to do that other than

23  using Spectrum?

24    A.    No.

25    Q.    Okay.  What program were you trying to add to?



1      A.    A program that I -- I believe I was teaching.

2      Q.    Okay.  What was that?

3      A.    A doubles clinic on Tuesday mornings.

4      Q.    What was it?

5      A.    It was called the Adult Drill Clinic.

6      Q.    So what were you unable to do then?

7      A.    Add my name as the instructor.

8      Q.    Did you call the front desk to seek assistance

9  with that?

10     A.    Actually, I don't remember.  I may have.

11     Q.    Okay.  Did you actually attend that morning

12 clinic?

13     A.    Yes.

14     Q.    What was the date?

15     A.    I don't know.

16     Q.    Do you recall the month?

17     A.    It would have been in May 2016.

18     Q.    2016?

19     A.    2018.

20     Q.    Okay.  Did you call Laura Gaunt and ask her to

21 help you with the access to Spectrum?

22     A.    No, I did not.

23     Q.    What about adding other pros to the programs?

24 Did you ever attempt to do that?

25     A.    I did.



1  terms of ability to review the lessons that had been

2  booked?

3       A.    No.

4       Q.    You could still review lessons that were booked?

5       A.    Yes.

6       Q.    You could still review courts that were booked?

7       A.    Yes.

8       Q.    Did you ever use the Spectrum system to look up

9  pay of other employees?

10      A.    No.

11      Q.    And you mentioned that you were being forced

12 back to the junior academy.  Tell me about that.

13      A.    That it was -- well, it was going to become my

14 job description, the main part of my job description as

15 head pro was to be teaching in the junior academy.

16      Q.    And so other than discussions with Mr. Critchley

17 where he indicated that the head pro would be involved

18 with the junior academy, was there any other basis for

19 your belief you were being forced back to the academy?

20      A.    No.

21      Q.    Was one of your concerns with the fact that

22 there were individuals being paid under the table in the

23 junior academy, that it might affect your citizenship?

24      A.    Yes.

25      Q.    Tell me about that.



```
 1   BY MS. FREED:
 2        Q.   Concealment, is that --
 3             MR. GARDNER:  Object to the form.
 4             THE WITNESS:  It is troublesome.
 5   BY MS. FREED:
 6        Q.   You weren't Max's supervisor, correct?
 7        A.   No.
 8        Q.   You weren't responsible for reviewing his time
 9   card --
10        A.   No.
11        Q.   -- or reviewing his payroll?
12        A.   No.
13        Q.   Same with Mr. Busby?
14        A.   Correct.
15        Q.   You did not supervise him?
16        A.   No.
17        Q.   You did not approve his time cards?
18        A.   No.
19        Q.   You did not approve his payroll, correct?
20        A.   No.
21        Q.   You indicated a couple of minutes ago that you
22   were written up for socials that you did not attend,
23   correct?
24        A.   Correct.
25        Q.   And I think you said something about -- remind
```



1  me what you said about that.

2      A.   I believe Mr. Critchley sent me a text message

3  on May 15th or 16th saying that Mr. Krimbill himself and I

4  needed to meet to sign a write-up.  I questioned whether

5  that write-up was to agree to my job description, and he

6  said no, for not attending the past five socials at the

7  club.  The socials that he mentioned were not accurate

8  because I was excused from some of them.

9      Q.   Which ones were you excused from?

10     A.   You would have to show me.  You'll have to help

11  me remember.

12     Q.   Well, I think we talked about the St. Patty's

13  Social.

14     A.   Correct, which I let him know on the Tuesday,

15  even though he asked me to run it, and I said I was out of

16  town, so he's writing me up for that.

17     Q.   The Club Mixed Doubles Champ Social?

18     A.   I didn't attend that.

19     Q.   Did you have approval not to attend that?

20     A.   No.

21     Q.   The TGen Fundraiser Clinic, you didn't attend

22  that.

23     A.   I didn't attend it because it was on the wrong

24  day that was communicated with me, as well as what was

25  poster that was advertised.



1      A.   Didn't resign.

2      Q.   Your lawyer submitted a notice that you believed

3   you were constructively discharged, correct?

4      A.   Correct.

5      Q.   At that time, you had already been working at

6   Desert Highlands, correct?

7      A.   Correct.

8      Q.   You had already increased your hours at Desert

9   Highlands significantly, correct?

10     A.   From the time of my constructive discharge?

11     Q.   Well, when you believed you were constructively

12  discharged?

13     A.   May 16th.

14     Q.   Okay.  That's the date?

15     A.   Uh-huh.

16     Q.   Okay.  And so after May 16th, you started

17  working more hours at Desert Highlands than you had been

18  before, correct?

19     A.   Correct.

20     Q.   You, basically, shifted the time you were

21  working at DMB over to Desert Highlands, correct?

22     A.   I had no -- I had no lessons, additional lessons

23  that were provided to me at -- at the Village, so yes.

24     Q.   So you felt like it was the Village's

25  responsibility to fill your lesson plate for you?



1       A.    I believed it was part of the Village to promote

2   the pros.

3       Q.    Well, you were the first -- you had the right of

4   first refusal for lessons, correct?  You were on the text

5   chain with the other pros when lessons were sought,

6   correct?

7       A.    There weren't any.  From May 16th?

8       Q.    Do you know that anyone requested lessons during

9   that time period?

10      A.    Don't know.

11      Q.    You have no idea, do you?

12      A.    I don't know.

13      Q.    And you would agree with me that you repeatedly

14  turned down opportunities to teach lessons in 2018,

15  correct?

16      A.    I wouldn't say repeatedly.

17      Q.    Okay.  Well, on January 5th of 2018, you said

18  [as read]:  It's all you, Warren, to take on a lesson for

19  Blake Buller, correct?

20      A.    You would have to refresh my memory of the

21  names, because that information is not correct.

22      Q.    So do you know that you accepted a lesson on

23  January 5th of 2018?

24      A.    I don't know.

25      Q.    Did you keep records of the text messages that



 1  Jared Parker with [as read]:  I can't do either?

 2      A.   I don't remember.  Possibly.

 3      Q.   On April 13th of 2018, do you recall responding

 4  to a lesson request for Debbie Hogan [as read]:  I can't?

 5      A.   I don't remember.

 6      Q.   Okay.  On April 26, 2018, responding to a

 7  request for a lesson for Reggie Opera [as read]:  I can't?

 8      A.   I don't remember.

 9      Q.   Did you ever dine at the restaurant where you

10  planned the social in 2016?  I believe you said it was

11  Tutti Santi?

12      A.   Did I ever dine there?  Yes.

13      Q.   Yes.

14           Do you know who owns that restaurant?

15      A.   Yes.

16      Q.   Who?

17      A.   Leonardo Zacchino.

18      Q.   And Leonardo is the father to Zino?

19      A.   Yeah, correct.

20      Q.   And you provided lessons to Zino?

21      A.   Yes.

22      Q.   Okay.  And it's your testimony you never

23  received free meals at Tutti Santi from Leonardo?

24      A.   Correct.

25      Q.   And you were promoted to the head tennis



1  professional at Desert Highlands in on August 29th of

2  2018?

3       A.   Correct.

4       Q.   And you went to full-time at that time?

5       A.   Yes.

6       Q.   Not prior to August 29th of 2018?

7       A.   Correct.

8       Q.   You received a pay increase from -- to $17 per

9  hour?

10      A.   Correct.

11      Q.   And a promise that that would increase to 17.60

12  after 90 days at full-time?

13      A.   Correct.

14      Q.   And what's your current hourly rate?

15      A.   17.60.

16      Q.   And have any other aspects of your pay with

17  Desert Highlands changed?

18      A.   Yes.

19      Q.   Tell me about that.

20      A.   My commissions changed.  It has been increased

21  by half a cent from my director of tennis.

22      Q.   Okay.  Any other changes?

23      A.   I was supposed to get an increase on my hourly

24  rate but, for some reason, I did not because Desert

25  Highlands -- I believe Desert Highlands has raised



1      A.    I don't recall, no.

2      Q.    Okay.  Is it possible that you did?

3            MR. GARDNER:  Object to the form.

4            THE WITNESS:  I don't know.

5   BY MS. FREED:

6      Q.    You don't know if you clocked her in or out of

7   the timekeeping system?

8      A.    I might have, yes.

9      Q.    Do you recall when you may have done that?

10     A.    No.

11     Q.    So if she were to testify that you did, in fact,

12  do that for her, you wouldn't have any basis to dispute

13  that?

14     A.    Probably not, no.

15     Q.    Now, we've talked about the junior academy a

16  little bit today, and the junior academy was set hours

17  during the school year, correct?

18     A.    Yes.

19     Q.    From 4:00 to 6:00 p.m. --

20     A.    Yes.

21     Q.    -- approximately?

22     A.    Approximately, maybe later, yeah.

23     Q.    And the junior academy took up a certain number

24  of courts?

25     A.    Correct.



1     Q.   The tennis department reserved six of the eight
2  courts for the junior academy, correct?
3     A.   Eight.
4     Q.   Eight of the ten?
5     A.   Yes.
6     Q.   Okay.  And the other two were available for
7  members to use?
8     A.   Correct.
9     Q.   Okay.  And it's your -- did you ever ask to be
10  able to teach lessons during the junior academy on the
11  other courts?
12     A.   Yes.
13     Q.   Okay.  Was that ever granted?
14     A.   It was, but I couldn't do it on a regular basis
15  because it was against policy.
16     Q.   Okay.  And who granted you an exception to teach
17  during the junior academy?
18     A.   Dave.
19     Q.   How many times?
20     A.   I don't know.
21     Q.   Can't recall?
22     A.   No.
23     Q.   Did he ever decline your request to teach during
24  the junior academy?
25     A.   He -- he -- he said I could do it one-off, but I



1  could not do it on a regular basis.  So I couldn't have a

2  regular client taking a lesson every week.

3      Q.   But did you ever ask him for a one-off time to

4  do lessons during the junior academy and have him tell you

5  no?

6      A.   I don't remember.

7      Q.   You don't know if --

8      A.   I believe it depended if there was a court

9  available or not.

10      Q.   Okay.  Is there anyone that you recall that you

11  turned down for a lesson because it was during the junior

12  academy --

13      A.   Yes.

14      Q.   -- time?

15           Who?

16      A.   Sophia Kleingardner [phonetic].

17      Q.   Anyone else?

18      A.   Well, did I decline or did I stop teaching?

19  Can't remember names.

20      Q.   Can you recall the names of anyone you stopped

21  teaching because of the junior academy hours?

22      A.   No.  If I saw it, I would tell you, but I can't

23  remember off the top of my head, no.

24      Q.   And how many times did Sophia request lessons

25  during the hours of the junior academy?



STUART MCNICOL
McNicol vs DMB Sports Clubs Limited Partnership

September 17, 2019
239

```
1         DEPOSITION ERRATA SHEET OF STUART MCNICOL
     Assignment No. J4445557   Taken:  September 17, 2019
2    Reported by:  Shelley E.D. Pearce, RPR, AZ CR No. 50301

3    Page No. 20  Line No. 19  Change to:  1999 - 2006.

4    _____

5    Reason for change: _____

6    Page No. 27  Line No. 5  Change to:  Eusebio Sarabia

7    _____

8    Reason for change:  Spelling Correction

9    Page No. 27  Line No. 12  Change to:  Joffler

10   _____

11   Reason for change:  Spelling Correction

12   Page No. 27  Line No. 23  Change to:  Stoffler

13   _____

14   Reason for change:  Spelling Correction

15   Page No. 69  Line No. 24  Change to:  Eligible

16   _____

17   Reason for change:  Spelling Correction

18   Page No. 85  Line No. 4  Change to:  2018

19   _____

20   Reason for change:  Date change.

21   Page No. 94  Line No. 21  Change to:  Jillian

22   _____

23   Reason for change:  Spelling Correction

24   SIGNATURE: _____  DATE: 10/22/19

25         STUART MCNICOL
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1        DEPOSITION ERRATA SHEET OF STUART MCNICOL
       Assignment No. J4445557   Taken:  September 17, 2019
 2     Reported by:  Shelley E.D. Pearce, RPR, AZ CR No. 50301

 3   Page No. 95 Line No. 17  Change to: Jillian

 4   _____

 5   Reason for change:    Spelling  Correction .

 6   Page No. 95 Line No. 23  Change to: Jillian

 7   _____

 8   Reason for change:    Spelling  Correction .

 9   Page No. 96  Line No. 10  Change to: Jillian

10   _____

11   Reason for change:    Spelling  Correction

12   Page No. 130  Line No. 23  Change to: Perisic

13   _____

14   Reason for change:    Spelling  Correction

15   Page No. 184  Line No. 17  Change to: Gevelhoff

16   _____

17   Reason for change:    Spelling  Correction .

18   Page No. 204  Line No. 5  Change to: 2018

19   _____

20   Reason for change:    Incorrect date .

21   Page No. 205 Line No. 8  Change to: 2018

22   _____

23   Reason for change:    Incorrect date .

24   SIGNATURE: _____. DATE: 10/22/2019
            STUART MCNICOL
25
```



STUART MCNICOL
McNicol vs DMB Sports Clubs Limited Partnership

September 17, 2019
241

```
 1        DEPOSITION ERRATA SHEET OF STUART MCNICOL
        Assignment No. J4445557   Taken: September 17, 2019
 2      Reported by: Shelley E.D. Pearce, RPR, AZ CR No. 50301

 3    Page No. 216  Line No. 18  Change to: Zeno.

 4    _____

 5    Reason for change:  Spelling  Correction
                    217
 6    Page No. 216  Line No. 21  Change to: Five Percent

 7    _____

 8    Reason for change:  MIS understanding
 9    Page No. 228  Line No. 16  Change to: kleingartner

10    _____

11    Reason for change:  Spelling Correction
12    Page No. 229  Line No. 22  Change to: kleingartner

13    _____

14    Reason for change:  Spelling Correction
15    Page No. 236  Line No. 5  Change to: 2017 and 2018

16    _____

17    Reason for change: _____
18    Page No.____ Line No.____ Change to: _____

19    _____

20    Reason for change: _____
21    Page No.____ Line No.____ Change to: _____

22    _____

23    Reason for change: _____

24    SIGNATURE:  S. McNicol.        DATE: 10/22/2019
25          STUART MCNICOL
```



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

To: Stuart McNicol

RE: Expectations for Success                                    Date: July 5th, 2016

From: Nick Heron

In order for our group to succeed, the following expectations of each of us must become effective immediately.

I understand that I am expected to:

- Arrive at work dressed professionally, and wearing my nametag and a smile.  I understand that I am held to the Attendance Policy as outlined in the Employee Handbook and that I am expected to report to work on time.
- Bring a positive attitude to work each day.
- Conduct my work the Village Way using our Core Values (FIT²) Fun, Friendship, Integrity, Involvement, Trust and Teamwork.
- Take care of each member.  If a member and I have a disagreement, I will not be confrontational but understand that the member is our number one priority and try to take care of them to the best of my ability.  If I am not able to help them after making an attempt, I will make sure to get the Tennis Director involved and work towards a resolution together.
- Establish and maintain an atmosphere of trust in my team.  If I have a disagreement with another teammate I will try to work it out with that teammate quickly, privately and respectfully as possible.  I will give my teammates the benefit of the doubt and ask questions to resolve issues. If my attempts at resolution are not successful, I will get the Tennis Director involved and work towards a resolution together.
- Not engage in gossip about a member or another Village employee.  Discussing another employee or member in a negative manner is unacceptable.  This behavior leads to distrust and a negative vibe in our club.  It is imperative that we are the positive promoters within the club and establish good working relationships with all departments as well as within our department.
- Participate in member events, networking functions and team functions unless prior approval is received from the Tennis Director or General Manager to be absent.
- Use my best judgment in all situations.  If I and/or my manager feel that a situation was not handled the "Village Way" we will review what could have been done differently so that we know how to deal with it in future case.
- No clients will pay under the table effective immediately.



EXHIBIT NO. 3
McNicol
9.17.19

DMB000021

Expectations for Success

In order for our group to succeed, the following expectations of each of us must become effective immediately.

I understand that I am expected to:

- Arrive at work dressed professionally, and wearing my nametag and a smile. I understand that I am held to the Attendance Policy as outlined in the Employee Handbook and that I am expected to report to work on time.
- Bring a positive attitude to work each day.
- Conduct my work the Village Way using our Core Values (FIT$^2$) Fun, Friendship, Integrity, Involvement, Trust and Teamwork.
- Take care of each member. If a member and I have a disagreement, I will not be confrontational but understand that the member is our number one priority and try to take care of them to the best of my ability. If I am not able to help them after making an attempt, I will make sure to get the Tennis Director involved and work towards a resolution together.
- Establish and maintain an atmosphere of trust in my team. If I have a disagreement with another teammate I will try to work it out with that teammate quickly, privately and respectfully as possible. I will give my teammates the benefit of the doubt and ask questions to resolve issues. If my attempts at resolution are not successful, I will get the Tennis Director involved and work towards a resolution together.
- Not engage in gossip about a member or another Village employee. Discussing another employee or member in a negative manner is unacceptable. This behavior leads to distrust and a negative vibe in our club. It is imperative that we are the positive promoters within the club and establish good working relationships with all departments as well as within our department.
- Participate in member events, networking functions and team functions unless prior approval is received from the Tennis Director or General Manager to be absent.
- Use my best judgment in all situations. If I and/or my manager feel that a situation was not handled the "Village Way" we will review what could have been done differently so that we know how to deal with it in future case.
- No clients will pay under the table effective immediately.

Stuart McNicol

08/01/16.

08·01·16

**David Critchley**

| | |
|---|---|
| **From:** | Jim Krimbill |
| **Sent:** | Monday, October 31, 2016 5:24 PM |
| **To:** | David Critchley |
| **Subject:** | Stuart include description of activity with payroll time sheet |

**From:** Stuart McNicol
**Sent:** Friday, October 07, 2016 6:57 AM
**To:** Jim Krimbill <JKrimbill@dmbclubs.com>
**Subject:** Re: Tennis Overview

Good morning.
I can do that but not sure why when I've told you that besides stringing I'm promoting this club and helping with everything here at the club. If you feel that my just above $7 is too much then maybe you would like to take that away. I'm feeling like the longer I'm here the more it seems that I have to justify everything I do and I'm financially struggling more. You have already taken away close to $100 a month from me and it seems as though with this stringing you want to take more away. Not sure why Jim.

Stuart McNicol
Head Tennis Professional
DC Ranch Village Health Club and Spa
W....480-515-4040
C....480-203-3564

On Oct 7, 2016, at 6:44 AM, Jim Krimbill <JKrimbill@dmbclubs.com> wrote:

> As we continue to evaluate the operations at Tennis can you please include a description of what you spend your time on outside of teaching with your time sheet – like number of rackets, etc.

> <image002.jpg>**Jim Krimbill  |  General Manager | USPTA Master Professional**
> DC Ranch Village Health Clubs & Spas  |  **P** 480.502.8844
> <image003.jpg> <image004.jpg> <image005.jpg> <image006.jpg> <image007.jpg> | **W**
> **www.villageclubs.com**

> <image008.png>

EXHIBIT NO. 5
McNicol
9.17.19

1



# Village Health Clubs and Spas
## Hourly and Commission
## Performance Review Form
## Year 2017

| Employee Name: Stuart McNicol |
| --- |
| Employee Title: Head Tennis Professional |
| Date of Hire: 03/24/2014 |
| Department: Tennis 505 |
| Supervisor Name & Title: Dave Critchley Tennis Director |
| Date of Evaluation:   12/03/2017 |
| Date of Next Evaluation: 12/06/2018 |

| Outstanding 1 | Exceeds Standards 2 | Meets Standards 3 | Needs Improvement 4 | Unsatisfactory 5 |
| --- | --- | --- | --- | --- |

## 1. Attendance and Punctuality
- Shows up on time dressed to play. Regularly shows up for scheduled shifts on time and ready to work.

☐1- OUT    ☐ 2- ES    ☒ 3-MS    ☐ 4- NI    ☐ 5- UN

**Manager's Comments:**

You are always dressed professionally and are early to lessons and bring great energy to the club.

## 2. Customer Service
- Greets members and employees in a friendly manner with a smile and pleasant attitude.
- Responds gracefully and promptly to member inquiries and attempts to resolve customer questions and concerns, which includes directing members to the proper person to help with the inquiry if further assistance is needed.
- Consistently takes care of member needs. Finds a way to say "Yes" to members.

☐1- OUT    ☐ 2- ES    ☒ 3-MS    ☐ 4- NI    ☐ 5- UN

**Manager's Comments:**

You have been a great asset to the club this past year. You have been here since the beginning and many of our members joined the club because of you. You are largely a face of our tennis program as you are often at the club stringing when not on court and you have fostered many great friendships with members and staff. You have really stepped up in planning and execution of all our monthly socials, volunteering to man the grill when needed, call out the pairings and play in the socials.

You have jumped in to play with men in the midafternoon, come in during off times to string a racket if needed and have gone above and beyond. Recently you have been tasked with doing many of the new member initial orientations and have done a great job welcoming new members and communicating with the director and membership as new members are incorporated.

You are on several teams and use these opportunities to create meaningful relationships with members and show that you are an integral part of our tennis community and lead by example. Your attitude is always positive and you bring a great energy to your work and are always engaged and responsive when we

Page 1 of 4

EXHIBIT NO. 7
McNicol
9.17.19

DMB000057



### 3. Co-Worker Relations: Promotes Fun, Friendship, Integrity, Involvement, Teamwork, Trust
- Helps to maintain a climate of trust and respect and promotes harmony among coworkers.
- Helps to maintain a professional environment by having a positive "can do" attitude.
- Offers assistance to fellow employees or managers when needed, including such tasks as covering shifts or helping with club events.

☐ 1- OUT      ☒ 2- ES      ☐ 3-MS      ☐ 4- NI      ☐ 5- UN

**Manager's Comments:**

You are well respected by all the staff.  You have been very willing to fill in when available for lessons, orientations, and programs to fill on teams when needed.

Your attitude is now positive and you bring a great energy to your lessons and the club in general.  You are quick to make suggestions on how to improve processes at the club, ideas for new programs and formats for socials.  You have been a huge asset to the director as you have a great knowledge of the members, their personalities and their tennis needs.

### 4. Completion of Assignments and Projects
- Follows through on tasks or projects when asked to complete them.
- Completes tasks or projects on time.

☐ 1- OUT      ☐ 2- ES      ☒ 3-MS      ☐ 4- NI      ☐ 5- UN

**Manager's Comments:**

As Head Professional it was to great to see you follow through on the suggestion to create new and exciting programming that is open to all members of the appropriate level.  You now have several classes on the monthly tennis calendar and as noted are an integral part of all our tennis socials.  This has grown your visibility and interacting with more club members and we are moving away from clicks of members at the club.

I would encourage you to expand some of your programs to include younger pros both to increase revenue and help mentor and teach our younger staff as well as get more involved in the larger junior and or adult programs at the club.

### 5. Work Effort
- Demonstrates a high level of expertise in role and is confident in abilities.
- Maximizes personal strengths and uses abilities to the fullest.
- Puts forth full effort to complete the responsibilities of role with a high level of enthusiasm.

☐ 1- OUT      ☐ 2- ES      ☒ 3-MS      ☐ 4- NI      ☐ 5- UN

You demonstrate great professionalism on court while teaching.  You are loud, engaged and clearly have a vested interest in your students learning and achieving their tennis goals.  Your student's often give positive feedback and referrals which is why you very successful.

Despite already being very experience and accomplished tennis professional you have tried to improve your skills by enrolling in the PTR's Master of Tennis a very in-depth program that shows your dedication to your craft.

Page 2 of 4

DMB000058



**6. Work Habits (Organizational Skills, Time Management)**
- Uses time productively
- Looks for things to do to help out during slow periods.
- Prioritizes responsibilities in order of importance

☐1- OUT     ☐ 2- ES     ☒ 3-MS     ☐ 4- NI     ☐ 5- UN

**Manager's Comments:**

You were very open to the several new responsibilities given to you by the director. Including scheduling and communicating with new members, tracking string inventory, taking more of a coaching leadership role with front desk, taking on a larger role during socials and assisting in planning events and the tennis programs at the club.

When at the club you are quick to help where needed whether answering a phone, answering questions about programs or coaching front desk staff on tennis programs or stringing. You maximize your time at the club and are efficient when stringing and have often volunteered to help when needs arise.

You have been very proactive in making suggestions on new programs, scheduling, new teams and socials.

**Overall Score:  2.83**

**7. Future Expectations/Goals to Accomplish for Success:** *(To be discussed during meeting with employee).*

| Goal | Date to be completed by |
|---|---|
| 1.  Be aware of all programs and socials and promote to members | Daily |
| 2.  Develop relationships with participants and use their first name | Daily |
| 3.  Be engaged, energetic, patient and positive at all times while coaching | Daily |
| 4.  Be patient at all times while coaching – the member is always correct | Daily |
| 5.  Communicate openly with Director on suggestions, feedback from members | Daily |

**Employee Comments (use additional pages if necessary):**

_____

_____

_____

Page 3 of 4

DMB000059

**Village**
HEALTH CLUBS & SPAS

I have reviewed this Performance Evaluation and discussed the contents with my supervisor.  My signature indicates that I have been advised of and understand my performance evaluation.

_____       12/ 6/ 2017.
Employee Signature                                   Date

_____       1 2 /06 /2017
Supervisor Signature                                 Date

_____       _____
General Manager Signature                       Date

DMB000060

From: David Critchley <DCritchley@dmbclubs.com>
Date: May 14, 2018 at 12:37:06 AM MST
To: Stuart McNicol <SMcNicol@DMBClubs.com>
Subject: Head Pro duties

Stuart,

Here is a quick outline of what I envision from the Head Pro Role moving forward as we have discussed a couple times.

The position will require 15-20 hours each week of off court work and I have outlined the main responsibilities below.  The Village views the salary as compensation for fulfilling the specific duties of job, it is not an hourly or base to offset the percentage of commission the club keeps of lessons as you believe was communicated to you when you were hired.  The longer weeks would be when we have a social or other event.  As we discussed it is also possible moving forward that these roles be divided among different individuals as they require different knowledge of members and skillsets.  The below specific roles would be in addition, not in place of the current duties listed in the Head Pro Job Description.  As the activity and programming has doubled in the past 18 months all our responsibilities have increased significantly.

U10 help:

- Answering all inquiries about all U10 programs at the club
- Once per month do a review of each student's progress
- Once per month have a phone or in persons conversation with one parent from each student
- Create and maintain a data base of all participants
- Follow up with any students that have left the program
- Create a yearly development plan for each specific program
- Create daily lesson plans for each class and provide to coach
- Create and deliver a monthly newsletter specific for U10 participants highlighting what the students worked on that month, any standouts and instructional article

Interclub teams

- Respond to all inquiries about any team related items
- Place new players who are wanting to be on a team get on a roster
- Ensure all courts are booked for home matches
- Conduct annual survey of all players to check satisfaction
- Create and host a yearly kickoff event
- Create and host a closing event
- Host a captain's luncheon at the beginning and end of each interclub season

Tennis Programs

EXHIBIT NO. _9_
McNicol
9.17.19

SM 030

Workspace Webmail :: Print

- Create new programs
- Conduct quarterly surveys to see if there is demand for new specific programs and satisfaction level with programs
- Manage the member master sheet that tracks all member activity at the club
- Target specific members in an attempt to get them involved in new and different activities
- Promote all round-robins, clinics, socials to specific groups of members by level

Intraclub Leagues
- Promote and manage all in-house leagues
- Create session schedules
- Email participants at the beginning and end of each session
- Move players into appropriate level each session based on performance
- Host session playoff/social (organize food, be present for playoff)
- Obtain and present prizes

Copyright © 2003-2018. All rights reserved.

SM 031   2/2