**McNicol v. DMB**

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT B



**Critchley Depo**

# BAMFORD
## REPORTING SERVICE INC.

Transcript of the Testimony of **David Critchley**

**Date:** October 14, 2019

**Case:** McNicol v. DMB Sports Clubs

Printed On: October 22, 2019

Bamford Reporting Service
Phone: 602-265-5974
Fax: 602-265-1332
Email: brs@bamfordreporting.com
Internet: bamfordreporting.com

McNicol v. DMB Sports Clubs                          David Critchley

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Stuart McNicol,                    )
                                   )
        Plaintiff,                 )
                                   )
vs.                                ) Case No.:
                                   ) 2:19-cv-00750-SMB
DMB Sports Club Limited            )
partnership, a Delaware            )
limited partnership,               )
                                   )
        Defendant.                 )
                                   )

DEPOSITION OF DAVID CRITCHLEY

Mesa, Arizona

October 14, 2019

Reported by:  Cathy A. Miccolis, RPR/CRR

Certified Reporter, No. 50068

McNicol v. DMB Sports Clubs                              David Critchley

Page 2

```
 1                    A P P E A R A N C E S

 2

 3    For the Plaintiff:        Bradley D. Gardner, Esq.
                                UDALL SHUMWAY PLC
 4                              1138 North Alma School Road
                                Suite 101
 5                              Mesa, AZ  85201-6695
                                Bdg@udallshumway.com
 6

 7

 8

      For the Defendant:        Leah S. Freed, Esq.
 9                              OGLETREE, DEAKINS, NASH, SMOAK
                                & STEWART, P.C.
10                              Esplanade Center III, Suite 800
                                2415 East Camelback Road
11                              Phoenix, AZ  85016
                                Leah.freed@ogletreedeakins.com
12

13

14    Also Present:            Stuart McNicol
                                James Krimbill
15

16

17

18

19

20

21

22

23

24

25
```

McNicol v. DMB Sports Clubs                    David Critchley

```
                                                  Page 3

 1                      I N D E X

 2  Witness                                        Page

 3      DAVID CRITCHLEY

 4          EXAMINATION BY MR. GARDNER              4

 5

 6

 7

 8                    E X H I B I T S

 9  Exhibit      Description                        Page

10  PREVIOUSLY MARKED TO MCNICOL'S DEPOSITION:

11   Exhibit 3    Memo to Stuart McNicol from Nick  48
                  Heron, July 5, 2016, Bates
12                DMB000021 and 24

13   Exhibit 4    Memo dated September 19, 2016,    61
                  Bates DMB000025 and 26
14
                  Email string, first from Jim     63
15   Exhibit 5    Krimbill to David Critchley,
                  October 31, 2016, SMB000510
16
     Exhibit 6    Performance Review Form Year 2016, 65
17                Bates DMB000052 to 56

18   Exhibit 7    Performance Review Form Year 2017, 65
                  Bates DMB000057 to 60
19
     Exhibit 8    Email exchange, first from Stuart  69
20                McNicol to David Critchley, March
                  16, 2018, Bates DMB000084
21
     Exhibit 9    Email from David Critchley to      71
22                Stuart McNicol, May 14, 2018,
                  Bates SM030 and 31
23

24

25
```

Bamford Reporting Service 602-265-5974

McNicol v. DMB Sports Clubs                      David Critchley

Page 4

```
 1              THE DEPOSITION OF DAVID CRITCHLEY was taken on
 2   October 14, 2019, commencing at 8:58 a.m. at the offices
 3   of UDALL SHUMWAY PLC, 1138 North Alma School Road, Suite
 4   101, Mesa, Arizona, before CATHY MICCOLIS, a Certified
 5   Reporter in the State of Arizona.
 6
 7                        DAVID CRITCHLEY,
 8   having been first duly sworn to tell the truth, the whole
 9   truth, and nothing but the truth, was examined and
10   testified as follows:
11
12                         EXAMINATION
13   BY MR. GARDNER:
14        Q.   Good morning.
15        A.   Good morning.
16        Q.   Please state your name for the record.
17        A.   David Critchley.
18        Q.   May I call you Dave or David during this
19   deposition?
20        A.   I prefer Dave.
21        Q.   Dave?
22        A.   Yeah.
23        Q.   Dave, have you ever had your deposition taken
24   previously?
25        A.   I have not.
```

McNicol v. DMB Sports Clubs                    David Critchley

Page 84

```
 1   STATE OF ARIZONA         )
                              )  ss.
 2   COUNTY OF MARICOPA       )

 3           BE IT KNOWN that the foregoing deposition was

 4   taken before me, Cathy A. Miccolis, RPR, a Certified

 5   Reporter, Certificate #50068, for the State of Arizona,

 6   and by virtue thereof authorized to administer an oath;

 7   that the witness before testifying was duly sworn by me to

 8   testify to the whole truth; that the questions propounded

 9   to the witness and the answers of the witness thereto were

10   taken down by me in shorthand and thereafter reduced to

11   print by computer-aided transcription under my direction;

12   that pursuant to request, notification was provided that

13   the deposition is available for review and signature; that

14   the transcript consisting of 84 pages is a full, true and

15   accurate transcript of all proceedings and testimony had

16   and adduced upon the taking of said deposition, and

17   preparation, production and distribution of the transcript

18   and copies comply with law and code as required by ACJA

19   7-206(F)(3), all done to the best of my skill and ability.

20           I FURTHER CERTIFY that I am in no way related to

21   nor employed by any of the parties hereto, nor am I in any

22   way interested in the outcome hereof.

23   DATED at Phoenix, Arizona, October 20, 2019.

24   _____
     Cathy A. Miccolis, RPR/CRR, Certified Reporter #50068
25   Bamford Reporting Service, Inc.
```

McNicol v. DMB Sports Clubs                    David Critchley

Page 21

1        Q.   **What do you recall?**

2        A.   Salary and 60 percent commissions on lessons.

3        Q.   **Any other compensation?**

4        A.   Hourly for other groups I taught and a

5    percentage of the junior program, profits.

6        Q.   **Do you recall the percentage?**

7        A.   Of which?

8        Q.   **Junior.  Junior category.**

9        A.   20, 20 percent.

10       Q.   **Since you accepted the position, have you ever**

11   **received any increase in your compensation at DMG?**

12       A.   DMB?

13       Q.   **Yeah.  I'm sorry.**

14       A.   Yes.

15       Q.   **How many times have you received increases in**

16   **your pay?**

17       A.   I'd have to look.

18       Q.   **More than once?**

19       A.   I'm not sure.

20       Q.   **Do you recall you have received increases in**

21   **your pay since you first started there?**

22       A.   Yes.

23       Q.   **And what position did you secure?**

24       A.   Tennis director.

25       Q.   **And you've always been the tennis director?**

McNicol v. DMB Sports Clubs                          David Critchley

Page 22

1        A.   Yes.

2        Q.   So you don't recall how many times you received

3   increases in your compensation; is that correct?

4        A.   That's correct.

5        Q.   But you know it's been at least one time?

6        A.   Yes.

7        Q.   Maybe two times?

8        A.   Yeah, maybe.

9        Q.   So we know at least two times.  Maybe three

10  times?

11            MS. FREED:  Objection.

12  BY MR. GARDNER:

13       Q.   Go ahead and answer if you can.

14       A.   I need more specifics.

15       Q.   Sure.  Do you recall specifically what portion

16  of your compensation increased?

17       A.   I remember getting one salary raise, yes.

18       Q.   And the salary raise, how much was the salary

19  raise?

20       A.   I don't recall.

21       Q.   Can you recall the percentage?

22       A.   I believe it was 10 percent.

23       Q.   Any other increases in any other portion of

24  your compensation package?

25       A.   My hourly rate went up.

McNicol v. DMB Sports Clubs                          David Critchley

Page 23

1        Q.    And what did it go up to?  Do you recall?

2        A.    50, $50 an hour.

3        Q.    Do you recall any other increases in your

4    compensation package?

5        A.    I don't.

6        Q.    Tell me how it was that you were able to secure

7    an increase or increases in your compensation package.

8        A.    I believe my salary was raised because the

9    tennis department performed much better than it ever had

10   in the company's existence.

11       Q.    And what time frame would that have been?

12       A.    From when I started in 2016 until end of 2017.

13       Q.    And maybe I should give you a better question.

14   I'm interested in knowing whether or not you had to go and

15   ask for an increase or if someone just went up to you and

16   said, "Hey, you're doing a great job; we're going to give

17   you an increase."

18       A.    Specific to the raise in salary?

19       Q.    Right.  I'm just trying to get an idea of, how

20   does one go about getting an increase in their

21   compensation package?

22       A.    I don't remember the specifics of that raise.

23       Q.    Can you remember generally?

24       A.    I don't remember.

25       Q.    Now, do you remember the general time frame

McNicol v. DMB Sports Clubs                          David Critchley

Page 24

1    when you were actually hired as the tennis director?

2         A.   Yes.

3         Q.   What was the time frame?

4         A.   September -- you mean my start date?

5         Q.   Yes.

6         A.   First week in November 2016.

7         Q.   And since you started in September 2016 --

8         A.   November.

9         Q.   November.  Excuse me.  Have your duties changed

10   at all as tennis director?

11        A.   Can you be more specific?

12        Q.   Well, when you received the job offer, I think

13   you indicated you received an offer letter; correct?

14        A.   Yes.

15        Q.   Did that offer letter actually outline your

16   terms and conditions of your employment, what your

17   expectations were as the tennis director?

18        A.   I don't recall.

19        Q.   Well, did your hours increase at all over time?

20        A.   Yes.

21        Q.   And when did the hours increase as time passed?

22        A.   From -- from the beginning until probably

23   mid-2018.

24        Q.   And then November 2018 they leveled off?

25             MS. FREED:   Objection.

McNicol v. DMB Sports Clubs                          David Critchley

Page 26

1      A.   I did.

2      Q.   And when Scottsdale Athletic Club closed, did a

3  lot of those juniors follow you over to DMB?

4      A.   Yes.

5      Q.   Have you ever been disciplined while at DMB?

6      A.   Yes.

7      Q.   When?

8      A.   I don't recall.

9      Q.   Generally?

10     A.   2018.

11     Q.   First half of 2018 or the second half of 2018?

12     A.   I don't remember.

13     Q.   What were you disciplined for?

14     A.   Paid cash to someone to hit in my lessons.  I

15  allowed another employee to pay someone to cover his

16  shifts.

17     Q.   I'm not sure I understand that answer, so

18  you're going to have to be a little more specific on what

19  happened.  First off, who was it that actually imposed

20  discipline on you?  Is that Mr. Krimbill?

21     A.   Yes.

22     Q.   And how did you first learn from Mr. Krimbill

23  that you were going to be disciplined?

24     A.   I was presented with a final performance plan.

25     Q.   When you say final performance plan, what do

McNicol v. DMB Sports Clubs                    David Critchley

Page 27

1   you mean by final?

2           A.    There are three levels, so final is your last

3   warning.

4           Q.    And you received prior warnings?

5           A.    No.

6           Q.    So they just went right to the final; is that

7   correct?

8           A.    Yes.

9           Q.    So do you consider that a serious offense in

10  your mind?

11          A.    I do.

12          Q.    But he did?   That was your impression?

13          A.    I don't know.

14          Q.    I'm sorry?

15          A.    I can't answer someone's...

16          Q.    Now, tell me in a fairly simple fashion what

17  exactly you were disciplined for.   And I say that because

18  I don't really know your business very well.   I played a

19  little tennis in my life, but at a very elementary level,

20  and I don't know what exactly you were disciplined for

21  based on what you just said.   So if you can outline it for

22  me in as simple fashion as you can, please.

23          A.    I paid one individual, Harry, to hit tennis

24  balls in my lessons when I was injured and couldn't feed.

25  And I allowed another employee to pay a nonemployee to

McNicol v. DMB Sports Clubs                    David Critchley

Page 28

1    cover his classes.

2          Q.    And maybe the best way to do this, because I'm

3    still a little unclear, but can you kind of describe what

4    happened?  Maybe that's an easier way to do it.  So you

5    said, first off, you were injured?

6          A.    I was recovering from knee surgery.

7          Q.    And what time frame was that?

8          A.    I'd have to go back and look.  I don't

9    remember.

10         Q.    2018?

11         A.    I think the surgery was in '17, but I think it

12   was summer of '17, but I'm not sure.

13         Q.    And so you had physical limitations because of

14   the surgery; correct?

15         A.    Yes.

16         Q.    And what was it you were unable to do at that

17   time?

18         A.    Hit tennis balls.

19         Q.    And what was it that Mr. Krimbill said that you

20   did inappropriately in view of the fact that you couldn't

21   hit tennis balls?

22              MS. FREED:  Objection.

23              Go ahead.

24   BY MR. GARDNER:

25         Q.    Go ahead and answer.

McNicol v. DMB Sports Clubs                        David Critchley

1       A.    I paid an individual to hit tennis balls in my

2   lessons.

3       Q.    **You paid an individual to hit tennis balls?**

4       A.    Yes.

5       Q.    **To the customer or clients?**

6       A.    In my lesson and in the groups, yes.

7       Q.    **So it was a group lesson?**

8       A.    Both.

9       Q.    **So it was both individual lessons and group**

10  **lessons, and you had someone cover for your lessons; is**

11  **that correct?**

12      A.    No.

13      Q.    **What am I missing here?**

14      A.    I was present.

15      Q.    **You were present, but someone else hit balls?**

16      A.    Yes.

17      Q.    **To the customers?**

18      A.    Yes.

19      Q.    **Clients?  Okay.  And that was considered**

20  **inappropriate?**

21      A.    Yes.

22      Q.    **Did you consider it inappropriate?**

23      A.    Not at the time.

24      Q.    **And what did Mr. Krimbill say was inappropriate**

25  **about that?**

McNicol v. DMB Sports Clubs                          David Critchley

Page 30

1              MS. FREED:  Objection.

2    BY MR. GARDNER:

3         Q.    You can go ahead and answer.

4         A.    I believe it was the tax implications for the

5    company.

6         Q.    Did he say what the tax implications were for

7    the company?

8         A.    No.

9         Q.    So you ended up, when this individual hit balls

10   for you, you ended up paying him out of your pocket?

11        A.    Yes, out of my pocket.

12        Q.    So you got paid your regular compensation, but

13   then you paid someone else that came in, and DMB did not

14   pay that individual any money?

15        A.    Correct.

16        Q.    So there were no withholdings or anything like

17   that taken out of that money?

18        A.    Correct.

19        Q.    Did you pay that individual cash?

20        A.    Yes.

21        Q.    What was his name?

22        A.    Harry Busby.

23        Q.    Can you spell that last name?

24        A.    I'd rather not.  I'm not good at spelling.

25   Busby.

McNicol v. DMB Sports Clubs                          David Critchley

Page 32

1          A.    Not that I recall.

2          Q.    **Did he say anything like that?**

3          A.    Not that I recall.

4          Q.    **Did he ever indicate to you that it would get**

5    **DMB in trouble because there weren't any withholdings**

6    **being taken from the payment that you made to that**

7    **individual?**

8          A.    I don't remember.

9          Q.    **How did Mr. Krimbill indicate to you that he**

10   **found out about this?**

11              **MS. FREED:**  Objection.

12              **THE WITNESS:**  I told Mr. Krimbill.

13   **BY MR. GARDNER:**

14         Q.    **What were the circumstances of you telling**

15   **Mr. Krimbill?**

16         A.    I had a -- I spoke to him and told him.

17         Q.    **And when you told him that, how did he react?**

18         A.    He notified HR.

19         Q.    **How do you know that?**

20         A.    Because I was given a written performance

21   improvement plan.

22         Q.    **And what did the written performance plan say?**

23         A.    I don't recall.

24         Q.    **Can you recall generally what it said?**

25         A.    (Witness nods head affirmatively.)

McNicol v. DMB Sports Clubs                          David Critchley

Page 33

1      Q.    You're shaking your head up and down like you

2   recall.  What can you recall as you sit here today?

3      A.    The two events that I outlined:  I paid someone

4   cash at a hitting lesson, and I allowed another employee

5   to pay a nonemployee to cover his shifts.

6      Q.    So you let another employee cover your shifts?

7      A.    No.

8      Q.    Then you've lost me on that.  Tell me what

9   happened on that.

10      A.    I allowed an employee to pay a nonemployee to

11   cover his shifts that he got paid for.

12      Q.    So there was an employee who paid somebody

13   else --

14      A.    Yes.

15      Q.    -- to cover their shifts, somebody who was not

16   an employee?

17      A.    Yes.

18      Q.    And who was the other employee involved?

19      A.    Warren Race.

20      Q.    And who was the nonemployee that --

21      A.    Max Geiger.

22      Q.    And do you recall anyone from DMB advising you

23   what was inappropriate specifically about that?

24      A.    Not specifically.

25      Q.    How about generally?

McNicol v. DMB Sports Clubs                        David Critchley

Page 41

1    Mr. Krimbill in which he indicated that he wanted to fire

2    my client because of an overtime claim he made in 2016?

3         A.   No.

4         Q.   Do you have any knowledge of any overtime claim

5    my client made in 2016?

6         A.   Yes.

7         Q.   How did you become aware of that?

8         A.   I don't remember.

9         Q.   Did Mr. Krimbill discuss that with you?

10        A.   Not that I recall.

11        Q.   Have you ever had any conversation with

12   Mr. Krimbill in which he indicated that he wanted to

13   terminate the employment of my client?

14        A.   Not that I remember.

15        Q.   Do you recall any conversations you had with

16   Mr. Krimbill in which he was critical of my client's work

17   performance?

18        A.   Yes.

19        Q.   And when did you have those first

20   conversations, if you recall?

21        A.   Throughout his employment.

22        Q.   And do you recall specifically what complaints

23   Mr. Krimbill had concerning his job performance?

24        A.   I do.

25        Q.   If you'd be good enough to outline each and

McNicol v. DMB Sports Clubs                          David Critchley

Page 45

1        A.    I don't recall the specifics.

2        **Q.    And what did he complain about to members about**

3  **you?**

4        A.    I don't remember the specifics.

5        **Q.    Do you remember generally?**

6        A.    Not the conversation.

7        **Q.    And identify for me by name each and every**

8  **client or customer he complained to.**

9        A.    I don't remember the specific people.

10       **Q.    Was my client a good teacher?**

11       A.    Yes.

12       **Q.    Was he a personable individual with the clients**

13  **or customers?**

14       A.    Sometimes.

15       **Q.    When you claim that he spoke badly of Jim,**

16  **Carol and yourself to members, did you discipline my**

17  **client?**

18       A.    No.

19       **Q.    Now, you were his boss at that time, weren't**

20  **you?**

21       A.    I was.

22       **Q.    Did you say anything to him at that time?**

23       A.    Yes.  We had several conversations.

24       **Q.    And what did you say?**

25       A.    I don't recall everything I said.

McNicol v. DMB Sports Clubs                    David Critchley

Page 54

1   you were his supervisor?

2          A.   (Pause.)

3               No.

4          Q.   How about the next one:  "Not engage in gossip

5   about a member or another Village employee"?  Did he ever

6   violate that provision while you were his supervisor?

7          A.   Yes.

8          Q.   How so?

9          A.   He often complained about the compensation and

10  the people that made those decisions.

11         Q.   That was just your prior testimony?

12         A.   Yes.

13         Q.   Next:  "Participate in member events,

14  networking functions and team functions unless prior

15  approval is received from the Tennis Director or General

16  Manager to be absent."  Do you see that?

17         A.   I do.

18         Q.   Did he ever violate that provision?

19         A.   He did.

20         Q.   In what ways?

21         A.   He stopped attending socials in 2018.

22         Q.   Do you know why he stopped attending?

23         A.   I do not.

24         Q.   Was it your job to find out?  You were his

25  supervisor, weren't you?

McNicol v. DMB Sports Clubs                        David Critchley

Page 55

1        A.   I was.

2        Q.   **Why didn't you go to him and find out why he**

3    **was missing?**

4        A.   I did.

5        Q.   **And what did he say?**

6        A.   Which event?

7        Q.   **Any one that you can remember as you sit here.**

8        A.   I don't remember the specific reasons he gave

9    for each event.  There were different excuses given.

10       Q.   **Did you ever order him to appear?**

11       A.   Yes.

12       Q.   **And do you recall which events you ordered him**

13   **to appear at?**

14       A.   In our conversations and per this document, he

15   was expected to be at all social events.

16       Q.   **So your testimony is you ordered him to appear**

17   **at all social events and he didn't?**

18       A.   Yes.

19       Q.   **And each time you say he did have a reason for**

20   **not attending; correct?  You just can't recall what they**

21   **are?**

22            **MS. FREED:**  Objection.

23            **THE WITNESS:**  I can't recall the specifics to

24   each one, no, I don't.

25   **BY MR. GARDNER:**

McNicol v. DMB Sports Clubs                          David Critchley

Page 56

1          Q.   Can you recall generally?

2          A.   Not for each one, no.

3          Q.   Well, for any of them?

4          A.   Yes.

5          Q.   Okay.  Tell me what you can recall.

6          A.   He said he didn't -- was unaware or he said he

7    had family obligations.  One time he said he was out of

8    town.

9          Q.   When he gave you these reasons, did you believe

10   him or did you think he was making them up?

11         A.   I thought he was making them up.

12         Q.   And what's the basis for that belief?

13         A.   That he attended all of them in 2017 and he

14   missed four or five consecutively in 2018.

15         Q.   Do you know my client's wife?

16         A.   I do.

17         Q.   Do you know when they got married?

18         A.   I do not.

19         Q.   Next:  "Use my best judgment in all

20   situations."  It refers to handling things in the "Village

21   Way."

22              Did he ever violate that?

23         A.   Yes.

24         Q.   How so?

25         A.   One specific that comes to mind is he inserted

McNicol v. DMB Sports Clubs                          David Critchley

Page 60

1          Q.   What else did you do?

2          A.   I encouraged him to teach more groups where he

3    made more money per hour.  I offered him more hours in set

4    programs.

5          Q.   Now, while my client was employed at DMG, did

6    you ever talk to Mr. Krimbill about my client's position

7    on this?

8          A.   At DMB?

9          Q.   Yeah.

10         A.   Yes.

11         Q.   And what was his response?

12         A.   I don't remember.  Several conversations.

13         Q.   Well, let me ask you this:  Do you have any

14   recollection of Mr. Krimbill doing anything to increase

15   the compensation for my client?

16         A.   No.

17         Q.   Did Mr. Krimbill ever indicate to you why he

18   was not going to increase my client's compensation?

19         A.   Can you rephrase that?

20         Q.   Yes.  Did Mr. Krimbill at any time --

21         A.   Krimbill?

22         Q.   -- Krimbill ever indicate to you why he was not

23   going to increase the compensation for my client?

24         A.   I don't know how to answer that because I don't

25   remember a specific conversation where he was -- where

McNicol v. DMB Sports Clubs                              David Critchley

Page 61

1    that was a topic.  Most tennis pros didn't get increases.

2         Q.   But some did?

3         A.   Of any tennis pros?  Probably.  I know I did.

4         Q.   You've been handed what was marked as Exhibit

5    No. 4 to my client's deposition.  Do you see that?

6         A.   I do.

7         Q.   And that's a two-page document; correct?

8         A.   Correct.

9         Q.   Have you seen this memo before?

10        A.   I don't believe so.

11        Q.   Now, this is a memo that is dated September 19,

12   2016, and it talks a little bit about a claim for overtime

13   that my client is making.  Do you see that?

14        A.   I do.

15        Q.   And it talks about my client working overtime.

16   Do you see that?

17        A.   I do.

18        Q.   Now, since you've been employed with DMB, have

19   you kept track of all of your hours of time?

20        A.   I have not.

21        Q.   Why not?

22        A.   I am not eligible for overtime.

23        Q.   Why not?

24        A.   I assume, state law.

25        Q.   Since you became the tennis director, have the

McNicol v. DMB Sports Clubs                    David Critchley

Page 67

1       Q.   Did my client ever indicate to you that he did
2   not think you were doing enough to try to assist with his
3   issues relating to his compensation?
4       A.   Yes.
5       Q.   How many times did he complain to you?
6       A.   Can you rephrase?
7       Q.   Sure.  How many times did he complain to you
8   that you weren't doing enough to look into his
9   compensation arrangement?
10      A.   Once or twice that specific complaint.
11      Q.   And how did you respond to him when he said
12  that?
13      A.   I -- my recollection is that I said we would
14  need to change the compensation structure for the entire
15  club would be our best avenue.
16      Q.   Your review, Exhibit No. 7 to the McNicol
17  deposition indicates that my client has been a great asset
18  to the club in 2017.
19      A.   Correct.
20      Q.   That was a true statement; correct?
21      A.   Correct.
22      Q.   Many of the members joined the club because of
23  him; correct?
24      A.   Correct.
25      Q.   "You," being my client, "are largely a face of

McNicol v. DMB Sports Clubs                    David Critchley

Page 68

1    the tennis program."  Was that true?

2         A.   That was.

3         Q.   Apparently must have been a smiling face at

4    that time; correct?

5         A.   At times; correct.

6         Q.   In fact, he has even gone above and beyond in

7    terms of his performance in 2017; correct?

8         A.   I believe that was specific to -- which

9    paragraph is that?

10        Q.   Well, the second from the bottom.  I can read

11   it for you.  "You have jumped in to play with men in the

12   midafternoon, come in during off times to string a racket

13   if needed and have gone above and beyond."

14        A.   In those areas, yes.

15        Q.   He has done a great job welcoming new members

16   and communicating with the director and membership as new

17   members are incorporated; correct?

18        A.   Correct.

19        Q.   The fact is in terms of coworker relations,

20   promoting fun, friendship, integrity, all of that stuff,

21   he was actually graded as exceeding standards; correct?

22        A.   Correct.

23        Q.   In fact, I don't see anything in any part of

24   this review that's negative.  If I'm missing something,

25   could you point it out for me, anything that you thought

McNicol v. DMB Sports Clubs                    David Critchley

Page 71

1       Q.   Is it your position that the tennis pros at DMB
2  never get an increase in salaries or the compensation
3  package?
4       A.   No.
5       Q.   They do get increases sometimes; correct?
6       A.   Correct.
7       Q.   But my client in four years never got any;
8  correct?
9       A.   Not correct.
10      Q.   When did he get a raise?
11      A.   I believe when I first came on, we increased
12  the lesson prices, which had him make more money per hour.
13      Q.   And what was the increase of the lesson prices?
14      A.   I don't recall what.
15      Q.   I have just handed you what's been marked as
16  Exhibit No. 9 to the McNicol deposition.  Please take a
17  look at that.
18      A.   Yeah, I'm familiar with it.
19      Q.   Why was this sent to my client?
20      A.   It started with the conversation I had with our
21  head HR person, Laura Frederickson, that Stuart was not
22  fulfilling his duties as head pro.  She suggested that I
23  meet with him and discuss what my expectations were.  In
24  that conversation Stuart asked me to produce an outline of
25  what my vision for the head pro was.  This is what I

McNicol v. DMB Sports Clubs                    David Critchley

Page 72

1    produced and shared with Stuart.

2         Q.   Do you recall how it is you came up with this

3    form?  Did you copy it from some other document?

4         A.   No.  I created it from --

5         Q.   From scratch?

6         A.   Yes, sir.

7         Q.   Now, at the time you outlined these duties of

8    the head pro, did you ever indicate either in writing or

9    verbally to him that if he complied with all of this, he

10   would be entitled to an increase in his pay?

11        A.   Can you rephrase?  This was -- this was what I

12   envisioned for that pro.  That was not an official change

13   of the job duties.

14        Q.   But my question was:  Did you ever indicate to

15   him -- either you did or you didn't -- that if he complied

16   with your vision here, that he would be entitled to an

17   increase in his compensation?

18        A.   No, not that I recall.

19        Q.   Did you ever have any conversations with my

20   client which led you to believe that he considered this an

21   increase in his job duties from those originally assigned

22   to him?

23        A.   Yes.

24        Q.   And what did you discuss along those lines?

25        A.   That there were two salary positions at the

McNicol v. DMB Sports Clubs                           David Critchley

Page 73

1    club, and the activity at the club had greatly increased

2    and that the job of tennis -- job of head pro was

3    changing, and the expectations were different.  And that

4    was with guidance from HR.

5         **Q.   You said Laura had some issues with his job**

6    **performance; is that correct?**

7              MS. FREED:  Objection.

8              THE WITNESS:  I don't believe I said that.

9    BY MR. GARDNER:

10        **Q.   Well, then, why did you issue this memo to him?**

11   **I'm confused now.**

12        A.   I had issues with his job performance.  Laura

13   Fredrickson is the head of HR.  I reached out to

14   her because she guided me --

15        **Q.   So she -- I see.**

16             MS. FREED:  You interrupted the witness.

17             Go ahead.

18             THE WITNESS:  I reached out to her to seek

19   guidance on how to handle the situation.

20   BY MR. GARDNER:

21        **Q.   Got it.  Now I understand.**

22             MR. GARDNER:  Why don't we take another break.

23             (Recess taken at 11:04 a.m.; resumed at

24   11:19 a.m.)

25   **BY MR. GARDNER:**

McNicol v. DMB Sports Clubs                      David Critchley

Page 74

1        Q.   Did my client ever discuss with you his belief
2    that your paying money to have people cover your classes
3    was inappropriate and/or illegal?
4        A.   Can you rephrase the question?  Cover my
5    classes?
6        Q.   Sure.  You testified earlier in some detail
7    about the fact you got disciplined.
8        A.   Yes.
9        Q.   It sounded like it was kind of a final warning;
10   correct?
11       A.   Yes, it was.
12       Q.   Did my client, before you received this
13   warning, ever discuss these activities with you and
14   indicate to you that he thought that they were either
15   inappropriate or illegal?
16       A.   I don't remember the time frame, but he
17   discussed them with me, yes.
18       Q.   And this is before you were reprimanded;
19   correct?
20       A.   Before I received the --
21       Q.   The warning.
22       A.   Yes.
23       Q.   And when he discussed that with you, what
24   specifically do you recall him saying?
25       A.   The only thing I remember is him saying that he

McNicol v. DMB Sports Clubs                     David Critchley

1   knew that Max was getting paid to -- to cover Warren's

2   classes.  That's the only specific.

3          Q.    What was Max's last name?

4          A.    Geiger.

5          Q.    How many instances were there of your having

6   someone else take your classes and then you had to pay

7   them out of your own pocket?

8              MS. FREED:  Objection.

9   BY MR. GARDNER:

10         Q.    How many times did that occur?

11         A.    I didn't pay anybody to cover my classes.

12         Q.    Hit balls for you?  I'm just trying to --

13         A.    It was over a couple -- a few weeks.  Not a

14   very long period.

15         Q.    And I understand that.  I just want to have you

16   identify for me the name of each and every individual who

17   came and assisted you in your class.

18         A.    Harry Busby.

19         Q.    Harry Busby?

20         A.    Yes.

21         Q.    Anybody else?

22         A.    Not hitting in the classes.

23         Q.    Was there anybody else that you paid money to?

24   Not necessarily just for hitting balls, but to assist you

25   in any way with any of your classes?

McNicol v. DMB Sports Clubs                          David Critchley

Page 76

1        A.    Not that I recall.

2        Q.    When my client indicated that he thought your

3   activities were inappropriate and/or illegal, did you

4   believe him, or what exactly did you do at that point when

5   he told you that?

6              MS. FREED:  Objection.

7   BY MR. GARDNER:

8        Q.    Go ahead.

9        A.    Yes, I believed him.

10        Q.    Once he expressed his opinion on that, did you

11   refrain from doing that again?

12        A.    I believe I had already stopped.

13        Q.    On Exhibit 9, you outlined your vision as to

14   the duties of the head pro.  Just a few things to clarify.

15   When you refer to U10, that references students under 10

16   years of age; is that right?

17        A.    Correct.

18        Q.    And do I understand there is not a head pro at

19   this time?

20        A.    There is not.

21        Q.    Let's go down the line.  At the present time,

22   and this is under the "U10 help" paragraph, do you see

23   that?

24        A.    Yes.

25        Q.    Who is answering all inquiries about all U10

McNicol v. DMB Sports Clubs                          David Critchley

Page 77

1    programs at the club at the present time?

2        A.   I am.  I shouldn't say all.  I mean basic

3    questions are answered by the front desk, but as far as

4    tennis pros, it comes to me.

5        Q.   So the front desk and you both do that;

6    correct?

7        A.   Yes.

8        Q.   The next thing here:  "Once per month do a

9    review of each student's progress."  Who does that at the

10   present time?

11       A.   We're not currently doing that.

12       Q.   Why not?

13       A.   We don't have a position filled to do it.

14       Q.   The next:  "Once per month have a phone or in

15   person conversation with one parent from each student."

16   Is that being done?

17       A.   When possible, but not always.

18       Q.   "Create and maintain a database of all

19   participants."  Who is doing that at the present time?

20       A.   Kathryn, one of our lead front desk persons.

21       Q.   Next:  "Follow up with any students that have

22   left the program."  Who is doing that?

23       A.   Under 10 specifically, I'm not sure anyone is.

24       Q.   How about:  "Create daily lesson plans for each

25   class and provide to the coach"?

McNicol v. DMB Sports Clubs                          David Critchley

Page 78

1          A.    The specific coach that's teaching the class.

2    A variety of coaches.

3          Q.    "Create and deliver a monthly newsletter."  Who

4    is doing that at the present time?

5          A.    It does not exist.  Remember, these were --

6    these were potential.

7          Q.    I understand.  I'm not suggesting you are.  I

8    just wanted to know if you implemented them and, if so,

9    who is doing them.

10         A.    Sure.

11         Q.    The next category is "Interclub teams."  First

12   thing you have under there:  "Respond to all inquiries

13   about any team related items."  Is that being done at

14   present?

15         A.    First by the front desk and then passed on to

16   me if they can't answer it.

17         Q.    Second:  "Place new players who are wanting to

18   be on a team get on a roster."

19         A.    I do that.

20         Q.    Do you get help from anybody at the front desk?

21         A.    They will -- we have a new form where players

22   request teams.  So in conjunction with the captains, who

23   are not employees, the person at the front desk might

24   collect the form.  A couple of them occasionally provide

25   input as to players' levels and what times might be

McNicol v. DMB Sports Clubs                        David Critchley

                                                        Page 79

1    appropriate.

2          Q.    Next:  "Ensure all courts are booked for home

3    matches."  Who does that?

4          A.    The captains communicate their schedules to me,

5    and then I forward that to our leads, and then the leads

6    physically book the courts in the computer.

7          Q.    Who are the leads when you refer to leads?

8          A.    Susan Cabano and Kathryn Brassfield.  There's

9    two lead tennis desk positions.  They have a little more

10   responsibility than the normal.

11         Q.    "Conduct annual survey of all players to check

12   satisfaction."  Is that being done?

13         A.    We have done one.

14         Q.    Who did that?

15         A.    I created it.

16         Q.    You did what?

17         A.    I created it and sent it out in a survey.

18         Q.    "Create and host a yearly kickoff event."  Is

19   that being done?

20         A.    Yes.

21         Q.    Who is doing that?

22         A.    I am.

23         Q.    Next:  "Create and host a closing event."  Who

24   is doing that?

25         A.    We did not do a closing event.

McNicol v. DMB Sports Clubs                    David Critchley

Page 80

1        Q.   "Host a captain's luncheon at the beginning and

2    end of each interclub season."  Are you doing that?

3        A.   I'd like to go back to the event that kicks off

4    the areas -- the captain's luncheon.  So that's just one

5    event.

6        Q.   How about "Host a captain's luncheon at the

7    beginning and end of each interclub season"?

8        A.   We have done the beginning of the last two

9    seasons.  I hosted that.  But not at the end.  Just at the

10   beginning.

11       Q.   Next:  "Tennis programs."  Do you see that

12   reference?

13       A.   Yes.

14       Q.   Who is now creating new programs?

15       A.   I am.

16       Q.   Next:  "Conduct quarterly surveys to see if

17   there is demand for new specific programs and satisfaction

18   level with programs."  Who is doing that, if anybody?

19       A.   It's not currently happening.

20       Q.   Next:  "Manage the member master sheet that

21   tracks all member activity at the club."

22       A.   Various front desk people.

23       Q.   You're not involved in that generally?

24       A.   I oversee it.  I don't manually go in and make

25   many entries.

McNicol v. DMB Sports Clubs                        David Critchley

Page 81

1        Q.    "Target specific members in an attempt to get
2    them involved in new and different activities"?
3        A.    All the tennis pros and front desk staff.
4        Q.    "Promote all round-robins, clinics, socials to
5    specific groups by level."  Do you get involved in that?
6        A.    All the tennis pros and front desk staff.
7        Q.    And then finally "Interclub Leagues."  First:
8    "Promote and manage all in-house leagues."  Do you do
9    that?
10       A.    Everyone promotes them.  Kathryn Brassfield
11   manages the schedule and recordings for us.
12       Q.    Next:  "Create session schedules."  Do you do
13   that?
14       A.    Kathryn.
15       Q.    "Email participants at the beginning and end of
16   each session."  Who does that?
17       A.    Kathryn.
18       Q.    "Move players into appropriate level each
19   session based on performance."  Who does that?
20       A.    Kathryn.
21       Q.    "Host session playoff/social."  Who does that?
22       A.    Kathryn.
23       Q.    "Obtain and present prizes."  Who does that?
24       A.    Kathryn.
25       Q.    During this whole time what's Kathryn's

McNicol v. DMB Sports Clubs                    David Critchley

Page 82

1    **position?**

2          A.    She's lead tennis front desk attendant, I

3    guess.

4                **MR. GARDNER:**  Those are all the questions I

5    have.

6                **MS. FREED:**  We will read and sign.  Thank you.

7                (Concluded at 11:31 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**McNicol v. DMB**

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT C

**Krimbill Depo**



Transcript of the Testimony of **James Edward Krimbill**

**Date:** October 14, 2019

**Case:** McNicol v. DMB Sports Clubs

Printed On: October 22, 2019

Bamford Reporting Service
Phone: 602-265-5974
Fax: 602-265-1332
Email: brs@bamfordreporting.com
Internet: bamfordreporting.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Stuart McNicol,                    )
                                   )
        Plaintiff,                 )
                                   )
vs.                                ) Case No.:
                                   ) 19-cv-00750-SMB
DMB Sports Club Limited            )
partnership, a Delaware            )
limited partnership,               )
                                   )
        Defendant.                 )
                                   )

DEPOSITION OF JAMES EDWARD KRIMBILL

Mesa, Arizona

October 14, 2019

Reported by:  Cathy A. Miccolis, RPR/CRR

Certified Reporter, No. 50068

McNicol v. DMB Sports Clubs                    James Edward Krimbill

```
                                                        Page 2
 1                A P P E A R A N C E S

 2

 3   For the Plaintiff:       Bradley D. Gardner, Esq.
                              UDALL SHUMWAY PLC
 4                            1138 North Alma School Road
                              Suite 101
 5                            Mesa, AZ  85201-6695
                              Bdg@udallshumway.com
 6

 7

 8
     For the Defendant:       Leah S. Freed, Esq.
 9                            OGLETREE, DEAKINS, NASH, SMOAK
                              & STEWART, P.C.
10                            Esplanade Center III, Suite 800
                              2415 East Camelback Road
11                            Phoenix, AZ  85016
                              Leah.freed@ogletreedeakins.com
12

13

14   Also Present:           Stuart McNicol

15

16

17

18

19

20

21

22

23

24

25
```

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 3

1                          I N D E X

2    Witness                                        Page

3        JAMES EDWARD KRIMBILL

4
            EXAMINATION BY MR. GARDNER                  4
5

6

7

8                        E X H I B I T S

9    Exhibit        Description                      Page

10   PREVIOUSLY MARKED EXHIBITS TO MCNICOL'S DEPOSITION:

11    Exhibit 3      Memo to Stuart McNicol from Nick     46
                     Heron, July 5, 2016, Bates
12                   DMB000021 and 24

13    Exhibit 4      Memo dated September 19, 2016,       51
                     Bates DMB000025 and 26
14
      Exhibit 5      Email string, first from Jim         52
15                   Krimbill to David Critchley,
                     October 31, 2016, SMB000510
16
      Exhibit 6      Performance Review Form Year 2016,   55
17                   Bates DMB000052 to 56

18    Exhibit 7      Performance Review Form Year 2017,   55
                     Bates DMB000057 to 60
19
      Exhibit 8      Email exchange, first from Stuart    56
20                   McNicol to David Critchley, March
                     16, 2018, Bates DMB000084
21
      Exhibit 9      Email from David Critchley to        57
22                   Stuart McNicol, May 14, 2018,
                     Bates SM030 and 31
23

24

25

McNicol v. DMB Sports Clubs                    James Edward Krimbill

1              THE DEPOSITION OF JAMES EDWARD KRIMBILL was

2    taken on October 14, 2019, commencing at 12:34 p.m. at the

3    offices of UDALL SHUMWAY PLC, 1138 North Alma School Road,

4    Suite 101, Mesa, Arizona, before CATHY MICCOLIS, a

5    Certified Reporter in the State of Arizona.

6

7                    JAMES EDWARD KRIMBILL,

8    having been first duly sworn to tell the truth, the whole

9    truth, and nothing but the truth, was examined and

10   testified as follows:

11

12                       EXAMINATION

13   BY MR. GARDNER:

14       Q.   Please state your full name for the record.

15       A.   James Edward Krimbill.

16       Q.   And Mr. Krimbill, have you had your deposition

17   taken previous to today?

18       A.   No.

19       Q.   This is your first time?

20       A.   Personally, yes.

21       Q.   You have had the opportunity to sit through the

22   depositions of both my client and Mr. Critchley, who was

23   deposed earlier this morning; correct?

24       A.   Correct.

25       Q.   So you have a pretty good understanding of the

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 62

```
 1   STATE OF ARIZONA          )
                               )  ss.
 2   COUNTY OF MARICOPA        )
```

 3           BE IT KNOWN that the foregoing deposition was

 4   taken before me, Cathy A. Miccolis, RPR, a Certified

 5   Reporter, Certificate #50068, for the State of Arizona,

 6   and by virtue thereof authorized to administer an oath;

 7   that the witness before testifying was duly sworn by me to

 8   testify to the whole truth; that the questions propounded

 9   to the witness and the answers of the witness thereto were

10   taken down by me in shorthand and thereafter reduced to

11   print by computer-aided transcription under my direction;

12   that pursuant to request, notification was provided that

13   the deposition is available for review and signature; that

14   the transcript consisting of 62 pages is a full, true and

15   accurate transcript of all proceedings and testimony had

16   and adduced upon the taking of said deposition, and

17   preparation, production and distribution of the transcript

18   and copies comply with law and code as required by ACJA

19   7-206(F)(3), all done to the best of my skill and ability.

20           I FURTHER CERTIFY that I am in no way related to

21   nor employed by any of the parties hereto, nor am I in any

22   way interested in the outcome hereof.

23   DATED at Phoenix, Arizona, October 20, 2019.

24   _____

     Cathy A. Miccolis, RPR/CRR, Certified Reporter #50068
25   Bamford Reporting Service, Inc.

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 4

1              THE DEPOSITION OF JAMES EDWARD KRIMBILL was

2     taken on October 14, 2019, commencing at 12:34 p.m. at the

3     offices of UDALL SHUMWAY PLC, 1138 North Alma School Road,

4     Suite 101, Mesa, Arizona, before CATHY MICCOLIS, a

5     Certified Reporter in the State of Arizona.

6

7                   JAMES EDWARD KRIMBILL,

8     having been first duly sworn to tell the truth, the whole

9     truth, and nothing but the truth, was examined and

10    testified as follows:

11

12                       EXAMINATION

13    BY MR. GARDNER:

14         Q.   Please state your full name for the record.

15         A.   James Edward Krimbill.

16         Q.   And Mr. Krimbill, have you had your deposition

17    taken previous to today?

18         A.   No.

19         Q.   This is your first time?

20         A.   Personally, yes.

21         Q.   You have had the opportunity to sit through the

22    depositions of both my client and Mr. Critchley, who was

23    deposed earlier this morning; correct?

24         A.   Correct.

25         Q.   So you have a pretty good understanding of the

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 9

1        Q.    More than an hour?

2        A.    Could be right about there.

3        Q.    And what other specific HR policies have you

4   had training in?

5        A.    Just our standard manager training that -- it's

6   like a half a day training that we go through.

7        Q.    And who does that training?

8        A.    Laura Fredrickson, chief human resource

9   director.

10       Q.    And how often do you take that?

11       A.    We take it as -- at employment.

12       Q.    There are no refresher courses or anything?

13       A.    No.

14       Q.    And how long have you been employed with DMB?

15       A.    Roughly, 10 years.

16       Q.    So your training on HR policies, with the

17  exception of harassment, you haven't had any training for

18  about 10 years?

19       A.    Correct.

20       Q.    Do you know what retaliation is from an HR

21  perspective?

22       A.    I don't know what they define it as.

23       Q.    What do you define it as?

24       A.    Conducting some type of activity towards

25  another person as a result of something that maybe you

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 12

1          A.     Roughly, about 18 months.

2          Q.     **So that takes us through about 1998, 1999.**

3   **Where were you employed after that?**

4          A.     I stayed with the management company, Med

5   Sports, but the hospital-based facility called Caritas

6   decided not to build a multi-purpose club, and they

7   decided to sell the facility, so Med Sports moved me to

8   Grand Blanc, Michigan, where I was the tennis director at

9   the Genesis Athletic Club under Med Sports.

10         Q.     **And how long were you there?**

11         A.     Roughly, eight years.

12         Q.     **So that would take us to around 2005; correct,**

13   **if my math is right?**

14         A.     Probably somewhere around there, yeah.

15         Q.     **And where did you become employed after that?**

16         A.     I came to the Village Health Club and Spas,

17   Scottsdale, Arizona.

18         Q.     **And when did you start working for the Village?**

19         A.     March of that -- whatever -- it was like March

20   of -- I'm not sure what the year was.

21         Q.     **2004, 2005, around in there?**

22         A.     For some reason I thought it was later than

23   that, because it was right after -- it was right when the

24   economy fell.

25         Q.     **That would likely have been 2008?**

McNicol v. DMB Sports Clubs                James Edward Krimbill

Page 15

1    time frame or have you changed positions at all?

2        A.    Title?

3        Q.    Yeah.  Have you always been the general

4    manager, in other words?

5        A.    Yes, sir.

6        Q.    Have you ever received pay increases during the

7    years you've been a GM?

8        A.    Yes.

9        Q.    How many pay increases have you received?

10   Yearly?

11       A.    Possibly.

12       Q.    More than one a year?

13       A.    Yes.

14       Q.    I'm not interested in what you make, but can

15   you tell me what factors play into your compensation

16   package?

17       A.    Do you mean like bonuses and those type of

18   things?

19       Q.    Uh-huh.

20       A.    Okay.  There is -- I get my salary, and then

21   there's -- bonuses are -- it's roughly like 10 percent,

22   and it's broken into -- you know, there's subjective and

23   objective parts of it, and it will be paid out -- there's

24   quarterly, and then there's also year-end bonus.

25       Q.    And do you know what factors are taken into

McNicol v. DMB Sports Clubs                James Edward Krimbill

Page 16

1    consideration?

2         A.    There's, you know, there's a financial

3    component to it.   There's customer service, meeting the

4    core values.   And then a list of other objectives that we

5    set out at the beginning of the year.

6         Q.    **When you say the financial component, what are**

7    **you referring to?**

8         A.    You know, making your budget or meeting your

9    budget.

10        Q.    **When you say "making your budget," you are**

11   **given a budget every year that you have to meet or you try**

12   **to meet?**

13        A.    Yes.   I put together a budget with my staff;

14   correct.

15        Q.    **Does the budget include the salaries and other**

16   **compensation paid to the tennis pros?**

17        A.    Say that again.

18              (Record read:   "Does the budget include the

19   salaries and other compensation paid to the tennis pros?")

20        A.    Well, part of the budget is everybody's

21   salaries.

22        Q.    **So the answer is yes, it includes everybody's**

23   **salaries, including the tennis pros?**

24        A.    Correct.

25        Q.    **Let's talk about your perception of the job**

McNicol v. DMB Sports Clubs                James Edward Krimbill

1      Q.    What are those?

2      A.    We have, you know, different club metrics that

3  list different things like, you know, retention.

4      Q.    When you say "retention," what are you

5  referring to?

6      A.    It's a percentage of people who stay with

7  your -- with your club.

8      Q.    What else?

9      A.    Let me think of some of the other things that

10  are on the metrics there.  Usage, that's another number.

11      Q.    By usage, you mean what?

12      A.    You know, check-ins of people to the club.

13  There's others too.

14      Q.    What others?

15      A.    I can't think of them right offhand.

16      Q.    And who do you report to exactly?

17      A.    Carol -- the president of Village Health Club

18  and Spa, Carol Nalevanko.

19      Q.    During your employment with DMB, have you ever

20  been disciplined for any reason?

21      A.    No.  No.

22      Q.    Have you ever been written up for any reason?

23      A.    No.

24      Q.    Do you give performance evaluations?

25      A.    For myself?

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 29

 1  even going to try that last name.

 2      A.   We're both on the same page.

 3      Q.   We'll call her Gabrielle L.

 4      A.   L.; okay.

 5      Q.   What is her position?

 6      A.   She's a human resource employee.  So she

 7  reports to Laura Fredrickson.

 8      Q.   And do you know what connection she has to my

 9  employer, whether it be job performance, payroll, anything

10  else?

11      A.   No.

12      Q.   The next witness listed is Max Geiger.  Who is

13  Max Geiger?

14      A.   He's the student that was involved in the

15  incident with Dave Critchley.

16      Q.   This is when Mr. Critchley received the warning

17  notice from you?

18      A.   The PIP.

19      Q.   The PIP?

20      A.   Uh-huh.

21      Q.   Personal improvement plan?

22      A.   Yes.

23      Q.   He referred to it as a final warning, or words

24  to that effect.  Was that an accurate description, or

25  would you describe it in a different way?

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 30

1        A.    Yes.

2        Q.    **Yes, it was accurate?**

3        A.    Yes.  I'm not sure if you'd call it a warning.

4    It's a final step before termination.

5        Q.    **Was this the final step before termination?**

6        A.    Correct.

7        Q.    **So whatever he did, you considered it pretty**

8    **serious?**

9        A.    Absolutely.

10       Q.    **And tell me exactly what he did that warranted**

11   **this final warning.**

12       A.    The final -- well, he -- there was two

13   incidences, and one was with Max Geiger, and the other one

14   was with -- was it Harry Bizby?

15       Q.    **Harry Busby?**

16       A.    Busby; correct.

17       Q.    **Tell me what happened with these two incidents,**

18   **as far as you know.**

19       A.    Well, as far as I know is that Harry was a

20   hitting partner with Dave's lesson while Dave was

21   teaching.  Dave wasn't able to be able to run around and

22   hit balls with this particular client.  So he had this guy

23   hitting in there.  My understanding is he also had him in

24   group lessons to, you know, help, you know, have somebody

25   in there that's a top player to get the energy going in

McNicol v. DMB Sports Clubs                     James Edward Krimbill

Page 31

1    the group lesson.

2              And then Max Geiger was to do with -- he was

3    covering classes for I believe Warren Race.

4         Q.   Was it the fact that they were just assisting

5    him that you objected to or the fact that he was paying

6    them out of his own pocket or both?

7         A.   He didn't follow the hiring procedures that we

8    require at the Village Health Club and Spa.

9         Q.   So this was done completely without your

10   knowledge?

11        A.   Correct.

12        Q.   And the fact that he paid the money out of his

13   own pocket, that didn't bother you at all?

14        A.   Oh, it bothered me; of course, it did.

15        Q.   And why?

16        A.   Because it's not the proper...

17        Q.   It's not --

18        A.   It's not proper.

19        Q.   What do you mean it's not proper?

20        A.   It's not proper in terms of under the

21   compensation and payment of people.

22        Q.   Is that because there are no withholdings being

23   made by -- being made by Mr. --

24        A.   Uh-huh.  Federal and state, all those things;

25   correct.

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 32

1          Q.    And of course, if they follow the proper

2    protocol, then they are paid by the employer, and then the

3    proper federal and state deductions will be taken out?

4          A.    Correct.

5          Q.    Did you ever ask -- strike that.

6                Did you ever ask Mr. Critchley if he ever took

7    out withholdings from these payments he made to these

8    individuals?

9          A.    No.

10         Q.    Do you know how he paid them?

11         A.    No.

12         Q.    You don't know if it was cash, check or some

13   other fashion?

14         A.    No.

15         Q.    Was that not important to you?

16         A.    That's important to me.

17         Q.    How did you learn about these incidents?

18         A.    Carol Nalevanko, the president of the Village

19   Health Club and Spa, contacted me that she received a

20   letter I believe from a previous attorney employed by

21   Stuart McNicol.

22         Q.    Do you recall the name of that attorney?

23         A.    No.

24         Q.    And you said she received a letter from this

25   attorney; is that correct?

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 33

1      A.   Yes.

2      Q.   **What did she say was in the letter?**

3      A.   She explained to me what it stated and asked me

4   if any of the stuff was true, and I said I -- I'm not

5   aware of it, but I'll find out.

6      Q.   **And who did you talk to to find out?**

7      A.   The person that it was being alleged to.

8      Q.   **Well, let me ask you this:  Did you talk to**

9   **Mr. Geiger?**

10     A.   No.

11     Q.   **Did you talk to Mr. Busby?**

12     A.   No.

13     Q.   **Did you talk to the head of tennis operations?**

14     A.   No, but I talked to Dave Critchley, tennis

15  director.

16     Q.   **And where did that meeting take place?**

17     A.   I called on the phone, because it was urgent --

18  when I heard about it, it was urgent.

19     Q.   **And what did he say?**

20     A.   He admitted to all of it and took

21  responsibility.

22     Q.   **He didn't try to talk his way out of it or**

23  **anything like that?**

24     A.   Not at all.  Not at all.

25     Q.   **So your impression was he knew he had done**

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 34

1    wrong and he was going to fess up to it?

2          A.   Absolutely.

3          Q.   Did Carol have you do anything else other than

4    to look into it?

5          A.   Well, once I spoke to Dave, then I got back in

6    touch with her, and then we got human resources involved.

7          Q.   And who in --

8          A.   Laura Fredrickson.  Sorry, didn't mean to...

9          Q.   When you say you got HR involved, how did she

10   get involved?

11         A.   I called her and explained to her what

12   occurred.

13         Q.   And what did she say?

14         A.   She said that we needed to, you know, take our

15   next -- we talked about the next steps that we have to do.

16         Q.   Did she recommend any specific steps?

17         A.   Just the -- yeah.

18         Q.   Did she tell you he should be fired?

19         A.   No.  She said that he needed to be counseled

20   and written up.

21         Q.   Did she counsel you that he should be given a

22   final warning letter?

23         A.   Uh-huh.

24         Q.   Yes?

25         A.   Yes.

McNicol v. DMB Sports Clubs                James Edward Krimbill

Page 36

1    hours that he was not paid?

2         A.   No.

3         Q.   How did you first find out that he was making

4    an additional claim for monies --

5              MS. FREED:   Objection.

6    BY MR. GARDNER:

7         Q.   -- for hours that he wasn't paid?

8              MS. FREED:   Objection.

9    BY MR. GARDNER:

10        Q.   Go ahead.

11        A.   So the question you're asking is, if I

12   understand it, is how did I -- how did we come up with the

13   knowledge that he had overtime?

14        Q.   Right.   For example, did my client walk up to

15   you and say, you know, "I'm incurring all these hours and

16   I'm not getting paid for them"?   Anything like that ever

17   occur?

18        A.   No.   I can answer your question now from what

19   you said.

20        Q.   Go ahead.

21        A.   So Laura Fredrickson, myself and Stuart, and

22   I'm not sure if anyone else was present, but I knew the

23   three of us were present, we had a meeting to discuss his

24   compensation.   And so the chief financial officer had laid

25   out, you know, his compensation and everything else

McNicol v. DMB Sports Clubs                    James Edward Krimbill

 1   because Stuart was saying -- was claiming that he was

 2   being underpaid, that he was making the company, you

 3   know -- I don't know exactly what he said, but to some

 4   extent making the company a ton of money and everything

 5   else.  So we felt it was important to show him, you know,

 6   the breakdown of, you know, everything.

 7            And during that meeting, Laura Fredrickson, in

 8   dialogue -- I don't have the specifics of what they

 9   specifically said, but in the dialogue she realized that

10   Stuart was saying that, you know, he puts in, you know,

11   extra overtime.  And she said, "Well, if you're putting in

12   extra overtime, then you need to be compensated."  And

13   that's where it started where all of a sudden she came up

14   with saying, "Hey, based on what you're saying, it sounds

15   like we need to do something if in fact you're doing

16   overtime."  She asked him if he had documentation.  He

17   said no.  We didn't have documentation, and we went

18   through the process of finding some acceptable payment.

19        Q.   **Was he supposed to be keeping documentation?**

20        A.   On his time sheet, yes.

21        Q.   **Do you know if anyone advised him of that?**

22        A.   No, I don't.

23        Q.   **Did someone advise him that if he kept accurate**

24   **records, he would be compensated in full for all the hours**

25   **he incurred?**

McNicol v. DMB Sports Clubs                    James Edward Krimbill

1       A.    You mean their salaries or their hourly?   We

2   don't have a lot of people that get salaries.

3       **Q.    Well, you tell me how you factor that into your**

4   **budget.  Do you factor in that at all, the amount that the**

5   **tennis pros make irrespective of how they get paid?   Is**

6   **that something that's factored in?**

7       A.    You factor everything in when you do a budget.

8       **Q.    Including your salaries?**

9       A.    Uh-huh.

10      **Q.    Yes?**

11      A.    Yes.

12      **Q.    Do you know if the other tennis pros are making**

13  **more money than my client?**

14      A.    I would -- I don't know for a fact, but I would

15  assume that Stuart was making the most.

16      **Q.    Why would you assume that?**

17      A.    He teached -- he was teaching more than the

18  other pros were.

19      **Q.    Let's talk a little bit about Mr. Critchley and**

20  **his hiring.  Were you involved in the hiring process of**

21  **Mr. Critchley?**

22      A.    Yes.

23      **Q.    To what extent were you involved in the hiring**

24  **process?**

25      A.    I interviewed him.

McNicol v. DMB Sports Clubs                James Edward Krimbill

Page 42

1          Q.    Describe the hiring process for me, if you can.

2          A.    Typically, they fill out the application and

3    there's a, you know, phone interview.  Then there's a

4    one-on-one interview, and then there's group interviews.

5          Q.    And then the job was offered?

6          A.    Yeah, either -- either the job is offered or

7    there is -- there's not a job offer.  Either case.

8          Q.    Did my client fill out an application?

9          A.    I wasn't there at the time.

10          Q.    What do you mean you weren't there at the time?

11    You were involved in the hiring process, were you not?

12          A.    Yes, but not at that time when Stuart was

13    hired.  I was at a different facility.

14          Q.    So you don't know if he even applied for the

15    position?

16          A.    I don't know.

17          Q.    How many applicants did you have for that

18    position; do you know?

19          A.    For which one?

20              MS. FREED:  Objection.

21    BY MR. GARDNER:

22          Q.    The one that Mr. Critchley was hired for.

23          A.    I don't know offhand.

24          Q.    Can you give me a general idea?

25          A.    Probably about 20 or more.  Maybe even 50.

McNicol v. DMB Sports Clubs                James Edward Krimbill

Page 43

1      Q.    Just so we're clear, you're not aware that my

2    client filed an application; is that correct?

3      A.    For that particular position?

4      Q.    Yes.

5      A.    Yeah.

6      Q.    Do you know if my client ever had an interview

7    for that position?

8      A.    I believe he had a phone interview with

9    Gabrielle L.

10     Q.    How do you know that?

11     A.    Because I'm part of the hiring process.

12     Q.    Did my client have a group interview?

13     A.    No.

14     Q.    How come?

15     A.    He wasn't considered as a candidate.

16     Q.    And who made the decision that he would not be

17   considered as a candidate?

18     A.    It was my decision.

19     Q.    And who made the ultimate decision to offer

20   that position to Mr. Critchley?

21     A.    Critchley?

22     Q.    Yeah.

23     A.    Myself, obviously with approval from the

24   president.

25     Q.    But you recommended him to the president;

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 47

1        Q.    And what was discussed between you and
2    Mr. Heron, specifically as it relates to this memo?
3        A.    He was very frustrated with Stuart, and he felt
4    that -- you know, he wrote -- as he wrote in here, he felt
5    that there was, you know, not -- there wasn't trust and
6    everything else.  And he said, "Hey, you know what.  You
7    need to sit down and talk to Stuart."  And I believe he
8    worked with human resources in terms of writing this up.
9        Q.    Do you know who he would have worked with at
10   human resources?
11       A.    I believe it would have been Gabrielle L.
12       Q.    Now, this is entitled "Expectations for
13   Success."  At least it is on the first page --
14       A.    Uh-huh.
15       Q.    -- of that exhibit.  Were you of the belief
16   that this was being sent to him to correct deficiencies in
17   his work performance or more as a reminder this is how you
18   get successful?
19            MS. FREED:  Objection.
20   BY MR. GARDNER:
21       Q.    In other words, was that a negative connotation
22   or a positive connotation, if you know?
23            MS. FREED:  Objection.
24            THE WITNESS:  I don't know.
25   BY MR. GARDNER:

McNicol v. DMB Sports Clubs                James Edward Krimbill

Page 48

```
 1          Q.   Had you ever observed my client dress

 2   unprofessionally?

 3          A.   No.

 4          Q.   Were you aware that there were any attendance

 5   issues with him?

 6          A.   No.

 7          Q.   Were you aware that he brought anything other

 8   than a positive attitude to work each day?

 9          A.   I don't know.

10          Q.   Do you have any reason to believe that he did

11   not conduct his work the Village Way using your core

12   values?

13          A.   During this time period?

14          Q.   Yes, during the time period July 5, 2016.

15          A.   Not offhand.

16          Q.   Did you actually observe him not taking care of

17   any member?

18          A.   Not offhand.

19          Q.   Did you ever observe him not establish and

20   maintain an atmosphere of trust with his team?

21          A.   Not offhand.

22          Q.   Did you ever observe my client engage in

23   gossip?

24          A.   Not -- not offhand.

25          Q.   Did you ever observe, during this time frame,
```

McNicol v. DMB Sports Clubs                    James Edward Krimbill

Page 49

1    him not participating in member events, network functions,

2    and team functions?

3         A.    I don't have any specifics on that.

4         Q.    Do you have any specific examples of him not

5    using his best judgment?

6         A.    Not offhand.

7         Q.    And do you have any knowledge that clients were

8    paying him under the table?

9         A.    There was some concerns.

10        Q.    And what firsthand do you have of that?

11        A.    One time I observed him finishing up a lesson

12   and a client gave him some cash.  So I talked to Nick

13   since he reports to Nick, and it was a tip.  And then at

14   some point in time we included -- we coached that, you

15   know, any type of payment should go through our POS

16   system.

17        Q.    Including tips?

18        A.    Those things, yeah.  And then there was another

19   concern with Zeno Zacchino -- that's Leo's son -- that he

20   was teaching private lessons once a month with where --

21   there was times where it wasn't even listed on the court

22   sheet, but then all of a sudden the young man would show

23   up, and then his name would go on the court sheet but

24   there was no payment.

25             And the father, Leo -- since I play tennis, he

McNicol v. DMB Sports Clubs                 James Edward Krimbill

Page 55

```
 1          A.   I don't recall.
 2          Q.   Exhibit 6 and 7.
 3          A.   Okay.
 4          Q.   You've seen these evaluations before, have you
 5     not?
 6          A.   Correct.
 7          Q.   And would you agree with me that Exhibit 7 is a
 8     more favorable review of my client's performance when
 9     compared to Exhibit 6?
10          A.   Correct.
11          Q.   And who actually prepared this Exhibit No. 7?
12          A.   Dave Critchley.
13          Q.   Once it was completed, did he review it with
14     you?
15          A.   I don't remember.
16          Q.   Were you pleasantly surprised in terms of my
17     client's improved performance?
18          A.   I was very happy.
19          Q.   It indicates that my client was a great asset
20     to the club during this past year.  Many of the members
21     joined the club because of him.  He was largely the face
22     of the tennis program.  Someone who has received a review
23     like that is someone you'd want to keep; correct?
24          A.   Uh-huh.  Correct.
25          Q.   And the best way to keep an employee is
```

McNicol v. DMB Sports Clubs                 James Edward Krimbill

Page 56

1    obviously to reward them appropriately with their

2    compensation package; correct?

3         A.   No.

4         Q.   That's incorrect?

5         A.   Correct.

6         Q.   What other ways would you be able to reward an

7    employee other than their compensation package?

8         A.   Providing a rich and rewarding environment,

9    providing the tools necessary to do your job.  There's a

10   host of things as a tennis pro that -- you know, having

11   quality tennis balls to teach your lessons.  The list goes

12   on.  Positive --

13        Q.   The list does go on, but the bottom line is, he

14   wasn't complaining about these other issues.  He's

15   complaining about not being paid appropriately; correct?

16        A.   In his mind.

17        Q.   Exhibit 8.

18        A.   (Pause.)

19        Q.   Have you seen this previously?

20        A.   Yes.

21        Q.   When was the first time you saw this?

22        A.   I don't remember.

23        Q.   Now, this email from my client appeared to go

24   to David Critchley, but at the bottom it looks like there

25   is an email string with you as the author.  Do you see

# McNicol v. DMB

## 2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT D

**Performance Improvement Plan**



## Performance Improvement Plan

July 6, 2018

Employee Name:  Dave Critchley
Employee Job Title:  Tennis Director
Manager Name:  Jim Krimbill
Employee Department: Tennis

**Performance Improvement Plan Level:**     Verbal ☐     Written ☐     Final ☒

**Specific Reasons for Counseling Session:**

- On May 16, 2018, it was brought to the attention of Jim Krimbill, DC Ranch General Manager, by Carol Nalevanko, President, that Dave Critchley had been paying two individuals who were not employed by Village Health Club & Spa to provide tennis instruction at the DC Ranch Tennis Center.
- The two individuals were Max Geiger and Harry Busby.  Max and Harry were being paid cash payments by both Dave and Warren Race (Tennis Professional) to hit balls for several lessons on the following dates and times.

  **Max Geiger**
  - February 3, 2018, 9:00am-1:00pm;
    Red Ball JR437 9:00am-10:00am
    Orange Ball JO54 10:00-11:30am
    Challenge JC313 11:30am-1:00pm

  - February 10, 2018, 9:00am-1:00pm;
    Red Ball JR437 9:00am-10:00am
    Orange Ball JO54 10:00am-11:30am
    Challenge JC313 11:30am-1:00pm

  - February 24, 2018, 9:00am-1:00pm;
    Red Ball JR437 9:00am-10:00am
    Orange Ball JO54 10:00am-11:30am
    Challenge JC313 11:30am-1:00pm

  - March 10, 2018, 9:00am-1:00pm;
    Red Ball JR437 9:00am-10:00am
    Orange Ball JO54 10:00am-11:30am
    Challenge JC313 11:30am-1:00pm

  - March 17, 2018, 9:00am-1:00pm;
    Red Ball JR437 9:00am-10:00am
    Orange Ball JO54 10:00am-11:30am
    Challenge JC313 11:30am-1:00pm

  - April 7, 2018,   9:00am-1:00pm;
    Red Ball JR437 9:00am-10:00am

Page 1 of 3

Orange Ball JO54 10:00am-11:30am
Round Robin 11:30am-1:00pm

- April 14, 2018, 9:00am-1:00pm
  Red Ball JR437 9:00am-10:00am
  Orange Ball JO54 10:00am-11:30am
  Challenge JC313 11:30am-1:00pm (total of 28 hours)

  **Harry Busby**
- September 4,5,6,7,11,12,13 and 14, 2017,  JC42-TPA group
  4:00pm-6:00pm
- 7 additional hours hitting in lessons with a member in September 2017.
  (total of 23 hours)

- On July 2, 2018, Jim Krimbill spoke with Dave to let him know that a documented Performance Improvement Plan was forthcoming.  Dave stated that he takes full responsibility and that the reason he did this was because at the time he did not have anyone available to cover the classes.

## Specific Improvement(s) Required:

Per the Prohibited Conduct and Conflict of Interest policies in the Employee Handbook, which Dave signed an Acknowledgement of Receipt for on October 24, 2016, *"Employees are expected at all times to conduct themselves in a positive manner as to promote the best interests of the club.  Such conduct includes: Refraining from behavior or conduct deemed offensive or undesirable, or which is contrary to the Village's best interests."*

*"The list below includes but is not limited to, examples of conduct that is prohibited and will be subject to disciplinary action, up to and including termination:*
- *Falsifying or altering any company record or report including, but not limited to, an application for employment, a medical report, a productivity record, a time record, an expense account or an absentee report"*

*"In addition, employees are prohibited from providing any services whatsoever to Village members while on or off the Village premises without using the point of sale system, Spectrum NG.  These services include but are not limited to Personal Training, Tennis, Pilates, Spa and Salon services.  "Under the table" or cash payments made directly to Village employees from Village members are prohibited, whether on Village premises or not."*

Effective immediately, Dave is to follow hiring procedures to ensure that only employees who have been officially hired and on the payroll perform any work for his department and are paid using the Village payroll system.  Dave is required to ensure that all transactions are run through the point of sale system (Spectrum) and that all workers are hired using the hiring procedures and practices put in place by Village Health Club & Spas.

If Dave has questions as to whether his actions may violate policy, he is expected to ask his General Manager or Human Resources for further clarification prior to proceeding.

Future violations of company policy, procedures and/or not improving performance may result in further disciplinary action up to and including termination.

Employee Comments (Optional):

DMB000523

Employee's Signature: _____ Date: _July 12, 2018_

Manager's Signature: _____ Date: _7/12/18_

Witness Signature: _____ Date: _7/12/18_

GL

DMB000524

**McNicol v. DMB**

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT E

**Miller Declaration**

I, Elizabeth Miller, was an employee at the Village at DC Ranch Tennis Centre from October 2013 thru February 2018. Under the management of Tennis Director, David Critchley, I found the work environment at the front Desk changed and became increasingly disgruntled and frustrating as communication between Mr. Critchley and the staff deteriorated. When staff meetings were held the staff were continually told what a poor job they were doing and were blamed for problems outside their control. Staff, including myself, who attempted to go to upper management and HR received punitive treatment including continually changes to their schedule, decreased hours and being ignored by Mr. Critchley. In the space of a few months( the end of 2017 to early 2018) three employees left due to the environment created.

I was aware that not all the Academy kids joined the Club, as we were told they all had to. Also, private lessons with Mr. Critchley were charged at varying rates and many lessons did not get put on the court booking schedule and charged. I was also instructed not to put a private lesson Mr. Critchley taught on the schedule at the same time he was teaching a clinic as he would not get paid for both. I was also aware that there were two young men – Max Geiger and Harry Busby, who taught in the Academy and helped with clinics that were not employees of the Village.

During my years at the Tennis Center I worked with Head Pro Stuart Mc Nicol. He was always professional with members and very supportive and helpful to the Front Desk staff. He attended many member social functions, doing all the BBQ work.

I hereby swear under penalty of perjury that this information is true and accurate .


*Elizabeth Miller*
Elizabeth Miller

*Amy S. Stayer*                    April 5/ 2019

Notary Public State of Arizona
Maricopa County
Molly B Stryer
My Commission Expires 03/09/20?

# McNicol v. DMB

## 2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT F

**Paystubs**

2/18/19, 8:11 PM

| CO. | FILE | DEPT | CLOCK | VCHR NO. | 073 |
|-----|------|------|-------|----------|-----|
| DG6 | 021/038 | 078320 | GN50X | 0000230058 | 1 |

## Earnings Statement

ADP

THE DESERT HIGHLANDS ASSOCIATION
PAYROLL ACCOUNT
10040 E. HAPPY VALLEY RD. (480)585-7444
SCOTTSDALE  AZ 85255

Period Ending:    06/03/2018
Pay Date:         06/06/2018

Taxable Marital Status: Married
Exemptions/Allowances:
Federal:        1
AZ:            Tax is 1.8%

STUART  MCNICOL
4303  E  WILDCAT  DR
CAVE  CREEK  AZ  85331

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 15.6000 | 62.50 | 975.00 | 2,889.90 |
| Lessons–Gratuit | | | 965.25 | 4,454.45 |
| Gratuity | | | | 16.76 |
| **Gross Pay** | | | **$1,940.25** | 7,361.11 |

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | Federal Income Tax | –131.74 | 304.10 |
| | Social Security Tax | –120.30 | 456.39 |
| | Medicare Tax | –28.14 | 106.74 |
| | AZ State Income Tax | –32.83 | 127.59 |
| | **Other** | | |
| | 401K$ | –116.42* | 272.73 |
| | **Net Pay** | **$1,510.82** | |
| | Checking 1 | –1,510.82 | |
| | **Net Check** | **$0.00** | |

| Other Benefits and Information | this period | total to date |
|-------------------------------|-------------|---------------|
| 401K | | 272.73 |
| Sick Accrl Bal | | 6.16 |

* Excluded from federal taxable wages

Your federal taxable wages this period are
$1,823.83

© 4xqx v.00, std

THE DESERT HIGHLANDS ASSOCIATION
PAYROLL ACCOUNT
10040 E. HAPPY VALLEY RD. (480)585-7444
SCOTTSDALE, AZ  85255

Advice number:    00000230058
Pay date:         06/06/2018

| Deposited to the account of | Account number | transit ABA | amount |
|-----------------------------|----------------|-------------|--------|
| STUART  MCNICOL | ▮▮▮▮▮▮ | XXXX XXXX | $1,510.82 |

THIS IS NOT A CHECK

**NON–NEGOTIABLE**

SM 047
Page 1 of 1

12/18/19, 8:11 PM

| CO. | FILE | DEPT | CLOCK | VCHR. NO. | 075 |
| J183 | 045898 | 505 | | 0000240432 | 1 |

**Earnings Statement**

ADP

DMB SPORTS CLUBS, L.P.
4444 E CAMELBACK  RD
PHOENIX, AZ 85018
(602) 840–6412

Period Ending:    06/09/2018
Pay Date:            06/15/2018

Taxable Marital Status:  Single
Exemptions/Allowances:
Federal:        1
AZ:             Tax is 1.8%

STUART MCNICOL
4303  E.
WILDCAT  DR
CAVE  CREEK  AZ 85331

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 570.47 | 80.00 | 570.47 | 6,845.64 |
| Commission | | | 828.00 | 20,793.00 |
| Overtime Adjust | | | | 90.16 |
| **Gross Pay** | | | **$1,398.47** | 27,728.80 |

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | –114.19 | 3,166.02 |
| | Social Security Tax | –86.71 | 1,718.19 |
| | Medicare Tax | –20.28 | 402.07 |
| | AZ State Income Tax | –23.66 | 469.13 |
| | Other | | |
| | 401K | –83.91* | 1,863.74 |
| | **Net Pay** | **$1,069.72** | |
| | Checking | –1,069.72 | |
| | **Net Check** | **$0.00** | |

| Other Benefits and Information | this period | total  to date |
|---|---|---|
| Comm Memo Hrs | 13.50 | 375.50 |
| Pto Balance | 40.00 | |

* Excluded from federal taxable wages

Your federal taxable wages this period are
$1,314.56

© past soft, Ltd

DMB SPORTS CLUBS, L.P.
4444 E CAMELBACK  RD
PHOENIX , AZ 85018
(602) 840–6412

Advice number:     00000240432
Pay date:            06/15/2018

Deposited  to the account  of
STUART MCNICOL

| | account  number | transit  ABA | amount |
|---|---|---|---|
| | XXXX XXXX | | $1,069.72 |

THIS IS NOT A CHECK

**NON–NEGOTIABLE**

SM 048

Page 1 of 1

| CO. | FILE | DEPT | CLOCK | VCHR NO | CFS |
| JB3 | 045606 | 505 | | 00002860427 | 1 |

**Earnings Statement**

ADP

DMB SPORTS CLUBS, L.P.
4444 E CAMELBACK  RD
PHOENIX,  AZ 85018
(602)  840–6412

Period Ending:   06/23/2018
Pay Date:       06/29/2018

Taxable Marital Status:   Single
Exemptions/Allowances:
  Federal:      1
  AZ:          Tax is 1.8%

STUART   MCNICOL
4303   E.
WILDCAT   DR
CAVE  CREEK  AZ 85331

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 570.47 | 40.00 | 570.47 | 7,416.11 |
| Commission | | | 327.00 | 21,120.00 |
| Pto | | 40.00 | | |
| Overtime Adjust | | | | 90.16 |
| **Gross Pay** | | | **$897.47** | 28,626.27 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Comm Memo Hrs | 6.00 | 381.50 |

| Deductions | Statutory | | |
|---|---|---|
| | Federal Income Tax | –57.68 | 3,223.70 |
| | Social Security Tax | –55.64 | 1,774.83 |
| | Medicare Tax | –13.01 | 415.08 |
| | AZ State Income Tax | –15.16 | 484.31 |
| | **Other** | | |
| | 401K | –53.85* | 1,717.59 |
| | **Net Pay** | **$702.11** | |
| | Checking | –702.11 | |
| | **Net Check** | **$0.00** | |

\* Excluded from federal taxable wages
  Your federal taxable wages this period are $843.62

DMB SPORTS CLUBS, L.P
4444 E CAMELBACK RD
PHOENIX, AZ 85018
(602) 840–6412

Advice number:   00002860427
Pay date:        06/29/2018

Deposited  to the account of          account number   transit ABA      amount
STUART  MCNICOL                       XXXX XXXX                         $702.11

THIS IS NOT A CHECK

**NON–NEGOTIABLE**

Sm 049

Page 1 of 1

2/22/19, 10:53 AM

| CO. | FILE | DEPT. | CLOCK | VCHR NO. | 079 |
| DQ8 | 027008 | 076320 | 6NA50X | -000027000Z | 5 |

**Earnings Statement**

ADP

THE DESERT HIGHLANDS ASSOCIATION
PAYROLL ACCOUNT
10040 E. HAPPY VALLEY RD. (480)585–7444
SCOTTSDALE, AZ 85255

Period Ending:    07/01/2018
Pay Date:          07/06/2018

Taxable Marital Status: Married
Exemptions/Allowances:
  Federal:        1
  AZ:       Tax is 1.6%

STUART MCNICOL
4303 E WILDCAT DR
CAVE CREEK AZ 85331

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 15.6000 | 28.50 | 444.60 | 3,623.10 |
| Lessons—Gratuit | | | 695.50 | 6,043.70 |
| Gratuity | | | | 16.76 |
| **Gross Pay** | | | **$1,140.16** | 9,685.56 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| 401K | | 412.08 |
| Sick Accrl Bal | | 7.73 |

| Deductions | Statutory | | |
|---|---|---|
| | Federal Income Tax | –46.79 | 401.55 |
| | Social Security Tax | –70.69 | 600.38 |
| | Medicare Tax | –16.53 | 140.41 |
| | AZ State Income Tax | –19.29 | 166.89 |
| | **Other** | | |
| | 401K$ | –68.41* | 412.08 |
| | **Net Pay** | **$918.39** | |
| | Checking 1 | –918.39 | |
| | **Net Check** | **$0.00** | |

\* Excluded from federal taxable wages

Your federal taxable wages this period are
$1,071.69

© 2000 ADP, LLC

THE DESERT HIGHLANDS ASSOCIATION
PAYROLL ACCOUNT
10040 E. HAPPY VALLEY RD. (480)585–7444
SCOTTSDALE, AZ 85255

Advice number:    00000276052
Pay date:          07/06/2018

| Deposited to the account of | account number | transit ABA | amount |
|---|---|---|---|
| STUART MCNICOL | | XXXX XXXX | $918.39 |

THIS IS NOT A CHECK

**NON–NEGOTIABLE**

Page 1 of 1

SM 050

2/22/19, 10:54 AM

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. | 273 |
|-----|------|-------|-------|-----------|-----|
| JB9 | 045088 | 505 | | 00000280430 | 1 |

**Earnings Statement**  ADP

DMB SPORTS CLUBS, L.P.
4444 E CAMELBACK  RD
PHOENIX,  AZ 85018
(602) 840-6412

Period Ending:     07/07/2018
Pay Date:          07/13/2018

Taxable Marital Status:   Single
Exemptions/Allowances:
   Federal:       1
   AZ:         Tax is 1.8%

STUART  MCNICOL
4303  E.
WILDCAT  DR
CAVE CREEK  AZ  85331

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 570.47 | 80.00 | 570.47 | 7,986.58 |
| Commission | | | 507.00 | 21,627.00 |
| Overtime Adjust | | | | 90.16 |
| **Gross Pay** | | | **$1,077.47** | 29,703.74 |

| Other Benefits and Information | this period | total to date |
|-------------------------------|-------------|---------------|
| Comm Memo Hrs | 9.50 | 391.00 |

| Deductions | Statutory | | |
|-----------|-----------|-------------|-------------|
| | Federal Income Tax | -77.98 | 3,301.68 |
| | Social Security Tax | -66.80 | 1,841.63 |
| | Medicare Tax | -15.62 | 430.70 |
| | AZ State Income Tax | -18.23 | 502.54 |
| | **Other** | | |
| | 401K | -64.65* | 1,782.24 |
| | **Net Pay** | **$834.19** | |
| | Checking | -834.19 | |
| | **Net Check** | **$0.00** | |

\* Excluded from federal taxable wages

Your federal taxable wages this period are
$1,012.82

DMB SPORTS CLUBS, L.P.
4444 E CAMELBACK  RD
PHOENIX, AZ 85016
(602) 840-6412

Advice number:     00000280430
Pay date:          07/13/2018

Deposited  to the account of
STUART  MCNICOL

| | account number | transit ABA | amount |
|---|---|---|---|
| | | xxxx xxxx | $834.19 |

THIS IS NOT A CHECK

**NON-NEGOTIABLE**

SM 051

Page 1 of 1

2/22/19, 10:55 AM

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. | 079 |
|-----|------|-------|-------|-----------|-----|
| JB3 | 045966 | 505 | | -0000300490 | 1 |

**Earnings Statement**

ADP

DMB SPORTS CLUBS, L.P.
4444 E CAMELBACK RD
PHOENIX, AZ 85018
(602) 840-6412

| | |
|---|---|
| Period Ending: | 07/21/2018 |
| Pay Date: | 07/27/2018 |

Taxable Marital Status:  Single
Exemptions/Allowances:
Federal:    1
AZ:         Tax is 1.8%

STUART  MCNICOL
4303  E.
WILDCAT  DR
CAVE  CREEK  AZ 85331

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Commission | | | 587.00 | 22,224.00 |
| Regular | | | | 7,986.58 |
| Overtime Adjust | | | | 90.16 |
| Pto Adjust | | | | 560.00 |
| **Gross Pay** | | | **$587.00** | 30,860.74 |

| Other Benefits and Information | this period | total to date |
|--------------------------------|-------------|---------------|
| Comm Memo Hrs | 7.50 | 398.50 |

| Deductions | Statutory | | |
|------------|-----------|---|---|
| | Federal Income Tax | -25.93 | 3,380.78 |
| | Social Security Tax | -37.02 | 1,913.37 |
| | Medicare Tax | -8.66 | 447.48 |
| | AZ State Income Tax | -10.10 | 522.12 |
| | **Other** | | |
| | 401K | -35.82* | 1,651.65 |
| | Advance Repay | | 410.91 |
| | **Net Pay** | **$479.47** | |
| | Checking | -479.47 | |
| | **Net Check** | **$0.00** | |

\* Excluded from federal taxable wages
   Your federal taxable wages this period are $561.18

DMB SPORTS CLUBS, L.P.
4444 E CAMELBACK RD
PHOENIX, AZ 85018
(602) 840-6412

| Advice number: | 00000300490 |
|----------------|-------------|
| Pay date: | 07/27/2018 |

Deposited  to the account of
STUART  MCNICOL

| account number | transit ABA | amount |
|----------------|-------------|--------|
| | XXXX XXXX | $479.47 |

*THIS IS NOT A CHECK*

**NON-NEGOTIABLE**

Sm 0S2

Page 1 of 1

# McNicol v. DMB

## 2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT G

**Performance Reviews**



**Village Health Clubs and Spas**
**Performance Review Form**
**Year 20 14**

| Employee: Stuart McNicol | Employee Supervisor: Nick Heron |
|---|---|
| Employee Position: Head Tennis Professional | Review Period: ☐ Mid-Year  ☑ Year End |
| Employee Department: Tennis | Employee Club: DC Ranch |

**Instructions:** List the key objectives from the entire previous review period. Briefly describe the results for each objective and level of achievement. Assign the appropriate evaluation rating using the rating categories below and support with comments. When possible, use dates in supporting comments. Each of the objectives listed should be related to the applicable Leadership Competency section.

| LEADERSHIP COMPETENCIES | Rating | Weight | Score |
|---|---|---|---|
| **Budgetary Controls:**<br>• Met or exceeded department EBITDA for current fiscal year. **(if applicable)** N/A<br>• Performs job utilizing methods that achieve and/or increase revenue potential within the clubs.<br>• Controls operating costs by effectively utilizing staff and/or available resources.<br>• Demonstrates innovation in expense reduction and/or cost control methods. | 2.00 | 30% | 0.60 |
| **Objectives/Comments:** | | | |

Page 1 of 6

DMB000037

**Villlage**
HEALTH CLUBS & SPAS

| LEADERSHIP COMPETENCIES | Rating | Weight | Score |
|---|---|---|---|
| **Performance Results Management:** <br><br> • Establishes goals for self and/or department and works with team to achieve goals. <br><br> • Actively engaged in company-wide or specialized training initiatives, as a facilitator, coach or participant to continually develop self and/or team. <br><br> • Leads by example <br> • Hires employees who are qualified and well suited for department position **(if applicable).** N/A <br><br> • Clearly defines responsibilities and performance standards to employees **(if applicable).** N/A <br><br> • Completes performance reviews and relevant performance related documentation promptly to encourage team alignment with departmental and company initiatives **(if applicable)** N/A | 2.00 | 20% | 0.40 |

**Objectives/Comments**

Page 2 of 6

DMB000038

**Village**
HEALTH CLUBS & SPAS

| LEADERSHIP COMPETENCIES | Rating | Weight | Score |
|---|---|---|---|
| **Accountability:**<br><br>• Successfully completed all front line training, all employees up to date on CPR and New Hire Orientation. **(Not eligible for a score of 3 if any staff member is out of compliance for 60 days or more during the review year).**<br>• Takes ownership of goals and initiatives for self and/or team.<br>• Assumes responsibility for actions and outcomes for self and/or team.<br>• Formulates realistic solutions to issues and prompt follow up to ensure timely resolution.<br>• Makes informed business decisions in a timely manner that considers cost and benefit.<br>• Supports company mission, vision and culture. | 3.00 | 20% | 0.60 |

**Objectives/Comments**

Page 3 of 6

DMB000039



| LEADERSHIP COMPETENCIES | Rating | Weight | Score |
|---|---|---|---|
| **Customer/Member Service:**<br>• Promotes and assists in maintaining a clean environment free of safety hazards and clutter and reports hazards or incidents immediately.<br>• Maintains courtesy and diplomacy with internal (employees) and external (members, vendors, etc) customers.<br>• Effectively partners with internal and external customers to resolve issues.<br>• Strives to meet or exceed internal or external customer expectations. | 2.00 | 15% | 0.30 |

**Objectives/Comments**

Page 4 of 6

DMB000040

Village

| LEADERSHIP COMPETENCIES | Rating | Weight | Score |
|---|---|---|---|
| **Promotes Fun, Friendship, Integrity, Involvement, Trust and Teamwork and Village Standards:**<br>• Maintains a positive and engaged attitude.<br>• Promotes a fun environment while staying focused on responsibilities.<br>• Treats everyone fairly, genuinely and with respect.<br>• Demonstrates a willingness to assist other departments and/or clubs when needed.<br>• Inspires trust and confidence from others and maintains high professional ethics. | 3.00 | 15% | 0.45 |

**Objectives/Comments**

Page 5 of 6

DMB000041



**Rating Categories:**

1. **Outstanding**
2. **Exceeds Standards**
3. **Meets Standards**
4. **Needs Improvement**
5. **Unsatisfactory**

**Merit Increases:**

- <u>Must</u> have met or exceeded annual department EBITDA to be eligible for an increase.
- Rating on each Leadership Competency area must be 3.5 or better to be eligible for an increase.  A score of 4 in any category or a Written or Final PIP during the reivew year will eliminate eligibility for merit increase.
- <u>Any</u> exceptions to the above must be explained in the comment section and will ultimately require approval from President prior to increase being granted.

**Bonus Eligibility:**

- Bonuses are prorated based on ratings earned per the weighted scale for each category.  Ratings of 3 or better in each category are eligible for the full bonus amount.
- <u>Any</u> exceptions to the above must be explained in the comment section and will ultimately require approval from President prior to increase being granted.

Performance Rating: __2.35__ / __1.2766__

Bonus Eligibility/Bonus Earned: _____ / $ 0.00

Employee
_____

Date   12·16·14

Manager
_____

Date   12·15·74

**Employee Comments:**

Page 6 of 6



**Village Health Clubs and Spas**
**Hourly and Commission**
**Performance Review Form**
**Year 2015**

| | |
|---|---|
| **Employee Name:  Stuart McNicol** | |
| **Employee Title:  Head Tennis Professional** | |
| **Date of Hire:  03.24.2014** | |
| **Department:  Tennis – (505)** | |
| **Supervisor Name & Title:    Nick Heron   Tennis Director** | |
| **Date of Evaluation:    12/11/2015** | |
| **Date of Next Evaluation: December, 2016** | |

**Instructions:**

- *Employees are reviewed in each of the categories, using the rating key below*
- *For any rating other than Meets Standards, manager's comment should accompany the rating.*
- *An <u>overall</u> rating of Unsatisfactory should be accompanied by a performance improvement plan*

| Outstanding | Exceeds Standards | Meets Standards | Needs Improvement | Unsatisfactory |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |

## 1. Attendance and Punctuality
- Shows up on time dressed to play.  Regularly shows up for scheduled shifts on time and ready to work.

☒1- OUT      ☐ 2- ES      ☐ 3-MS      ☐ 4- NI      ☐ 5- UN

**Manager's Comments:**
Always arrives prepared and early for all lessons, events & meetings.
Has never missed a lesson since starting at DC Ranch Village.

## 2. Customer Service
- Greets members and employees in a friendly manner with a smile and pleasant attitude.
- Responds gracefully and promptly to member inquiries and attempts to resolve customer questions and concerns, which includes directing members to the proper person to help with the inquiry if further assistance is needed.
- Consistently takes care of member needs.  Finds a way to say "Yes" to members.

☐1- OUT      ☒ 2- ES      ☐ 3-MS      ☐ 4- NI      ☐ 5- UN

**Manager's Comments:**
Always accessible to members and takes time to look after clients and members needs and requests. Is present at the club 7 days a week. Always responds to member's phone calls, text messages and emails regardless of the time or the day.

## 3. Co-Worker Relations: Promotes Fun, Friendship, Integrity, Involvement, Teamwork, Trust
- Helps to maintain a climate of trust and respect and promotes harmony among coworkers.



Page 1 of 3



- Helps to maintain a professional environment by having a positive "can do" attitude.
- Offers assistance to fellow employees or managers when needed, including such tasks as covering shifts or helping with club events.

☐1- OUT     ☐ 2- ES     ☒ 3-MS     ☐ 4- NI     ☐ 5- UN

**Manager's Comments:**
Always present and assisting execute at tennis events, interacting with members.
Always willing to assist when at all possible in all aspects of the operation.
Efficiently and comprehensively manages facility in Directors absence.

### 4. Completion of Assignments and Projects
- Follows through on tasks or projects when asked to complete them.
- Completes tasks or projects on time.

☐1- OUT     ☒ 2- ES     ☐ 3-MS     ☐ 4- NI     ☐ 5- UN

**Manager's Comments:**
Tasks are always completed in a timely manner.

### 5. Work Effort
- Demonstrates a high level of expertise in role and is confident in abilities.
- Maximizes personal strengths and uses abilities to the fullest.
- Puts forth full effort to complete the responsibilities of role with a high level of enthusiasm.

☐1- OUT     ☒ 2- ES     ☐ 3-MS     ☐ 4- NI     ☐ 5- UN

**Manager's Comments:**
Constantly evaluating current procedures and formats, looking for ways the program can be improved and provide more for the members.
Spends time outside of work to improve and perfect his tennis teaching ability through researching and subscriptions.
Promotes and represents the Village in a positive manner through extensive networking and relationships with many Directors and pros in the area.

### 6. Work Habits (Organizational Skills, Time Management)
- Uses time productively
- Looks for things to do to help out during slow periods.
- Prioritizes responsibilities in order of importance

☐1- OUT     ☒ 2- ES     ☐ 3-MS     ☐ 4- NI     ☐ 5- UN

**Manager's Comments:**
Is always working on some aspect of the program when not on court. Is constantly stringing rackets, communicating with members and heavily involved in team coordination. Always promoting himself and the club to members and nonmembers.

**Overall Score:  (Sum of all scores divided by 6)  2.0**

### 7. Future Expectations/Goals to Accomplish for Success: *(To be discussed during meeting with employee).*

Page 2 of 3

DMB000044



| | Goal | Date to be completed by |
|---|---|---|
| 1. | Phase out team coordinator position. Team captains to play a larger role in team operations. | February 1st, 2016 |
| 2. | Singles Ladder Events: 2 events in 2016. | Jan – May, 2016 & Aug – Dec, 2016 |
| 3. | Conduct regular meetings with tennis pros to discuss, evaluate & implement programs & current teaching principles. | January, 2016. March, 2016. August, 2016. October, 2016. |
| 4. | Attend 2 Village social events in 2016 | December, 2016 |
| 5. | | |

**Employee Comments (use additional pages if necessary):**

_____
_____
_____
_____

**I have reviewed this Performance Evaluation and discussed the contents with my supervisor.  My signature indicates that I have been advised of and understand my performance evaluation.**

Employee Signature _____   Date  12·11·15

Supervisor Signature _____   Date  12.11.15

Page 3 of 3

DMB000045

**McNicol v. DMB**

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT H

**E-mails (SM16)**

Sent from my iPhone

On Dec 2, 2016, at 6:24 AM, Jim Krimbill <JKrimbill@dmbclubs.com> wrote:

Maybe a sign at main club front desk. Also have them where the ask me button to promote? They already have the buttons, just tell them what you want said

Sent from my iPhone

On Dec 1, 2016, at 10:17 PM, David Critchley <DCritchley@dmbclubs.com> wrote:

Awesome!  Already had two red balls sign up for free two weeks in December! Changed it to the first two weeks, because we are offering camps over the break!

Thanks,

Dave

Sent from my iPhone

On Dec 1, 2016, at 5:12 PM, Jim Krimbill <JKrimbill@dmbclubs.com> wrote:

OK, 17 works.

Sent from my iPhone

Begin forwarded message:

**From:** Carol Nalevanko <CNalevanko@DMBClubs.com>
**Date:** December 1, 2016 at 4:34:53 PM MST
**To:** Jim Krimbill <JKrimbill@dmbclubs.com>
**Subject: RE: Tennis stringing and assistants on court**

If they are both 17, I could live with it but tell them to say they are 18 if anyone asks…which they shouldn't.  No 16 year olds.
Carol

**From:** Jim Krimbill
**Sent:** Thursday, December 01, 2016 4:00 PM

SM 015

**To:** Carol Nalevanko <CNalevanko@DMBClubs.com>
**Subject:** Re: Tennis stringing and assistants on court

We agree with Niles. The 17 year old, Cole, has helped Dave with camps for a couple summers and strings. We want to get two juniors stringing to replace Stuart

Sent from my iPhone

On Dec 1, 2016, at 3:32 PM, Carol Nalevanko <CNalevanko@DMBClubs.com> wrote:

We can hire 18 years old and older...I don't want to open the door on hiring 16 year olds since we have been pretty good with not doing so at all the clubs.  Are these older players 16 years old or older?  With regards to this Niles character...I support Laura F. on not transferring an employee who is on a final write up to another club.  Josh just wants to get rid of this guy but isn't doing a good job managing him out.
Carol

**From:** Jim Krimbill
**Sent:** Thursday, December 01, 2016 10:22 AM
**To:** Carol Nalevanko <CNalevanko@DMBClubs.com>
**Subject:** Tennis stringing and assistants on court

Can we hire students 16-18 for these roles ?

**From:** David Critchley
**Sent:** Thursday, December 01, 2016 10:16 AM
**To:** Jim Krimbill <JKrimbill@dmbclubs.com>
**Subject:** Coaches

Jim,

In talking with HR I learned we can not hire anyone under 18 and through my discussions about Niles, rules seem absolute.

Any thought on how I can use a couple older players as coaches?  Cole and Max Geiger have both worked my summer camp the last two years and offer a great

SM 016

value for what I pay them?

Also Cole was on my list of stringers I would like to use in January when we
overhaul the stringing system!

Dave

Sent from my iPhone

On Dec 1, 2016, at 10:10 AM, Jim Krimbill <JKrimbill@dmbclubs.com> wrote:

Absolutely lets have Cole play.  Can you send Brian first and last names

**From:** David Critchley
**Sent:** Thursday, December 01, 2016 10:04 AM
**To:** Jim Krimbill <JKrimbill@dmbclubs.com>
**Subject:** Re: Looking for players this Saturday Camelback 2pm

I just texted Jonah again, Cole can play, but has to leave 4pm, if we get desperate
could be worth the risk!

Dave

Sent from my iPhone

On Dec 1, 2016, at 9:57 AM, Jim Krimbill <JKrimbill@dmbclubs.com> wrote:

1. Aaron Pfister
2. Cameron Krimibll
3. Troy Werth
4.
5. Jim Krimbill
6.
7. . Jay Backstrom
8. Alex Dollarhide
9. Adam Kline
10. Greg Eden

SM 017

<image002.jpg>**Jim Krimbill** | General Manager | USPTA Master Professional
DC Ranch Village Health Clubs & Spas | P 480.502.8844
<image003.jpg> <image004.jpg>  <image005.jpg>  <image006.jpg>  <image007.jpg> | W **www.villageclubs.com**

<u>**image008.png**</u>

SM018

**McNicol v. DMB**

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT I

**E-mails (SM8-10)**

From: Stuart McNicol SMcNicol@dm<span>...</span>
Subject: **Fwd: New Tennis Director**
Date: May 28, 2018 at 10:47:02 PM
To: Stuart McNicol stuart.j.mcnicol@gmail.com

Stuart McNicol
Head Tennis Professional
DC Ranch Village Health Club and Spa
W....480-515-4040
C....480-203-3564

Begin forwarded message:

**From:** Karen Bailey <klbphx@yahoo.com>
**Date:** September 20, 2016 at 3:08:00 PM MST
**To:** Stuart McNicol <smcnicol@dmbclubs.com>
**Subject: Fw: New Tennis Director**
**Reply-To:** Karen Bailey <klbphx@yahoo.com>

This is what I sent.:-) I would be soooo Happy!!!!

**Subject:** FW: New Tennis Director

**Subject:** New Tennis Director

Dear Mr. Krimbill

I would personally like to recommend Stuart McNicol for the position of the New Tennis Director.

Do to his teaching ability, kindness and sincere concern for his members is the reason I joined The Village at DC Ranch

He always greets people with a smile and a hug, making you feel welcome.

SM008

His coaching has gotten me to the 5.0 level which I never thought was achievable. He has improved both my physical and mental game.

Staying calm on the court and my eye on that ball. Footwork, Stroke techniques, My Serve now can be placed and sometimes not returnable!!!

It has been an exciting experience. Stuart is an asset to this club and I would be so proud to say "My Coach is the Director of Tennis"

Thank you for your time, Please feel free to call me at 602 620-4933

Karen Bailey

Sm 009

From: kester888@cox.net
Subject: **Fwd: Stuart McNicol**
Date: Sep 22, 2016 at 8:54:33 AM
To: stuart.j.mcnicol@gmail.com

**My email to carol and her response. Sent exact email to krimbill but never heard back**

**Sent from my iPhone**

**Begin forwarded message:**

**From:** Carol Nalevanko <CNalevanko@DMBClubs.com>
**Date:** September 21, 2016 at 2:42:01 PM MST
**To:** Andrea Kester <kester888@cox.net>
**Subject: RE: Stuart McNicol**

Andrea,
Thank you for your email.  Fortunately we have received over 40 applications for this position and will work towards selecting the best candidate.
Carol

**From:** outlook_f509bef7bd0a18c2@outlook.com
[mailto:outlook_f509bef7bd0a18c2@outlook.com] **On Behalf Of** Andrea Kester
**Sent:** Wednesday, September 21, 2016 2:25 PM
**To:** Carol Nalevanko <CNalevanko@DMBClubs.com>
**Subject:** Stuart McNicol

Good Afternoon,

I understand that a new Director of Tennis is being hired, and I would love to see Stuart McNicol fill this position for several reasons.

First, Stuart has always made me feel like a valued member of the Village.  Without fail, he greets me with a big smile, hug and high five.  He is genuinely happy to see me and his positive energy is contagious.  Stuart sets an upbeat tone as soon as you walk in the door.  I immediately feel welcome and excited to be there.

SM 010

**McNicol v. DMB**

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT J

**McNicol Declaration**

# UDALL | SHUMWAY
COUNSELORS AT LAW SINCE 1965

1138 NORTH ALMA SCHOOL ROAD, SUITE 101
MESA, ARIZONA 85201
Telephone: 480.461.5300 | Fax:  480.833.9392

Bradley D. Gardner (SBN: 011211)
bdg@udallshumway.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stuart McNicol, | Case No.:  2:19-cv-00750-MTL |
| Plaintiff, | **DECLARATION** |
| v. | |
| DMB Sports Clubs Limited Partnership, | |
| Defendants. | |

Stuart McNicol hereby states as follows:

1.   I am the Plaintiff in this action.

2.   I am over the age of eighteen and competent to testify.

3.   I state the matters herein of my own personal knowledge unless otherwise stated.

4.   On or about February 8, 2018 I received an email from Lisa Owens, the Director of Membership for the DC Village Health Club & Spa (hereinafter "Club"), which is owned by Defendant DMB Sports Clubs Limited Partnership.  The e-mail indicated to me that I could no longer provide lessons at the Club for non-members.

5.   I and other tennis professions (including the Tennis Director) had been providing lessons at the Club for non-members for years.

6.   I saw David Critchley, the Tennis Director for the Club who was hired in November 2016, providing tennis lessons to non-members of the Club both before and after the e-mail from Lisa Owens.

7.    Critchley was my direct supervisor and oversaw and was responsible for the tennis programs and events at the Club.

8.    After I received the e-mail from Owens I called her to complain. She told in the phone conversation that I could not teach non-members at the Club under any circumstance and I was free to go elsewhere to teach them while remaining an employee of DMB. This call is what prompted me to seek employment with Desert Highlands Association.

9.    Documents bates labeled as SM073-126 are to the best of my recollection an accurate transcript of my full conversation on April 4, 2018 with David Critchley. That transcript is marked as Exhibit N to the Plaintiff's Response to Defendant's Motion for Summary Judgment. I recorded the conversation on that date on my phone. Jim Sperry of Speak House Audio made a copy of the recording and that copy was provided to Marybeth Abodeely to transcribe. I have listened to the full recording and read the transcript prepared from it, and I believe the transcript is accurate.

10.    Documents bates labeled as SM127-151 are to the best of my recollection an accurate transcript of my full conversation on May 3, 2018 with David Critchley. That transcript is marked as Exhibit M to the Plaintiff's Response to Defendant's Motion for Summary Judgment. I recorded the conversation on that date on my phone. Jim Sperry of Speak House Audio made a copy of the recording and that copy was provided to Marybeth Abodeely to transcribe. I have listened to the full recording and read the transcript prepared from it, and I believe the transcript is accurate.

11.    The transcripts submitted by Defendant in Docket 44 and 44-1 are only a part of the full conversation I had with David Critchley on April 4, 2018 and May 3, 2018.

12.    At the May 3, 2018 meeting with David Critchley, as reflected in the transcript prepared (SM 138), Critchley told me that he was pissed about my reporting of illegal activity to him at our April 4, 2018 meeting. Critchley told me he did not even speak to me about the Ladies Luncheon scheduled for the following day because he was

1  too pissed. I told Critchley, as reflected in the transcript prepared (SM 138-139), at the

2  meeting I was aware of the illegal way he paid Max Geiger and had been bumping up

3  the hours of another Tennis Professional, Warren Race, so Warren could pay Geiger.

4        13.    I was notified in late April 2018 that Critchley was seeking to get a

5  Performance Improvement Plan ("PIP) imposed on me for alleged failure to perform

6  certain duties. Critchley sent an e-mail to Gabrielle Lachpaelle ("Gabrielle"), Human

7  Resources Generalist, outlining such alleged failures. I met with Gabrielle on April 25

8  to discuss Critchley's allegations.

9        A.    Critchley had indicated I had failed to complete a poster promoting

10 racquet stringing and write an informative article about racquet stringing. However, this

11 type of task is not within my job description. I did not have the knowledge, skills, or

12 equipment to be able to create a poster. I told this to Critchley. Gabrielle told me at our

13 meeting that these tasks should not have been delegated to me as the Club has a

14 marketing team who handles both types of items and Critchley was aware of the team.

15        B.    Critchley indicated I did not attend the mandatory Strategic Plan

16 meeting on April 6, 2018. However, I was excused from attending due to a sick child

17 which Critchley later confirmed in a text. A true copy of the text is bates labeled as

18 SM0035.

19        C.    Critchley indicated I had not attended the last four social events

20 and that it was "clearly" outlined to Plaintiff that he was expected to attend all tennis

21 social events at the Club. That was not true. One of the events referenced was the St.

22 Patrick's Day social and I was out of town. Critchley was aware I was out of town for

23 that event as I told him, and he excused my absence. For the TGen social event, I went

24 on the day it was scheduled but it did not happen that day. It apparently had been

25 moved to a different day and I was not informed. As I explained to Gabrielle, my Job

26 Description does not state I must attend all social events and the word social does not

27 appear in that Job Description. My yearly reviews for 2016, 2017 and 2018 also did not

28 list attendance at all social events as required duty.

D. Critchley indicated I had failed to timely complete my online LinkedIn Learning programs. I had reached out to management to inquire about how and where to take this training as I did not have my own computer at work. I was informed that I could complete the online training in Critchley's office. However, Critchley's office only had monitors and no computer tower. His office was filthy and unsanitary, and rats were seen on numerous occasions. I ended up having to complete the training off the clock, without pay, on my own personal time. More importantly, the deadline for completion of the online training was March 31, 2018 and I completed it on March 25 prior to the deadline.

14. I was also notified via text on May 15, 2018 that a PIP was going to be given to me at a meeting with General Manager Jim Krimbill. However, that meeting never took place and no PIP was ever given to me.

15. During an April 2018 conversation, Warren Race told me that despite only working part-time, the hours on his commission reports were being altered with the approval of Critchley to bump him up to full-time employment, allowing him to become eligible for benefits. This was done according to Warren because: (1) Warren had been sick since January 2018 and needed to have full-time employment status to obtain healthcare benefits, and (2) with the understanding that Warren would then pay Max Geiger out of his pocket. Warren told me other pros were aware of this arrangement, namely, Cole Stoffel and Igor Perisic.

16. I believed that what Warren told me is an illegal way to pay an employee in violation of state laws, and just as importantly a fraud upon the Club and the insurance company providing these healthcare benefits.

17. From May 16, 2018 on, the Club, contrary to its practice, provided no new lesson opportunities for me. I only handled Club members who already had tennis lessons scheduled regularly with me. The Club failed to effectively communicate with me during this period and so I continued to lose commissions. My commission income in June 2018 was approximately $2,295.00, compared to the $4,231.00 that I received in

4

1   June 2017.  In July 2018, my commission income was approximately $1,104.00 as
2   compared to the approximate $3,614.00 received in July 2017.

3       18.     After July 20, 2018 my attorney informed me that that per the Club's
4   attorney Leah Freed the Club policy as a former employee I was banned from DMB's
5   property. On March 7, 2019, Club attorney Justin Caresia also informed me of the same
6   information.

7       19.     I am aware and have personally seen the following former DMB
8   employees who returned to the Club: Susan Spatz, Elizabeth Miller, Nick Heron, Niles
    Jackson (a non-member of the Club), and Desiree Jackson.
9
10      20.     I am the only former employee who has been banned from these
    properties to my knowledge.
11
12      21.     I declare under penalty of perjury under the laws of the United States of
    America that the foregoing is true and correct.
13
        **DATED:** January 12 , 2020.
14

15

16                                          _____
17                                          Stuart McNicol

18  5640961.1/117296.1
19

20

21

22

23

24

25

26

27

28

                                        5

**McNicol v. DMB**

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT K

**E-mail (DMB 000094)**

**From:** Laura Frederickson
**Sent:** Monday, April 16, 2018 1:36 PM
**To:** Jim Krimbill <JKrimbill@dmbclubs.com>; David Critchley <DCritchley@dmbclubs.com>
**Subject:** RE: Stuart

If it is a concern that Stuart is teaching up there, why would that be? Many of our employees have other jobs. Also I would ask Stuart directly and make sure that he is not to take our members there. I would suggest leaving the Director out of it as going to his employer seems underhanded and not a good approach.



Laura Frederickson, MBA, PHR, SHRM-CP
Chief Human Resources Officer
**T:** 480-579-2918 | **M:** 480-220-9376 | **F:** 480-404-9988
www.villageclubs.com

-----Original Message-----
From: Jim Krimbill
Sent: Friday, April 13, 2018 11:29 AM
To: David Critchley <DCritchley@dmbclubs.com>
Cc: Laura Frederickson <LFrederickson@DMBClubs.com>
Subject: RE: Stuart

Yes and let's get Laura's feedback as to how we should approach this first. It can wait until she returns. I would suggest sending an email to Eric the Director, that it has been brought to your attention by a number of members that Stuart is teaching Tuesday and Thursday at Desert Highlands. Ask him if he is a contractor or employee. Then, once confirmed, ask Stuart and _____ ( based on Laura's feedback).

-----Original Message-----
From: David Critchley
Sent: Friday, April 13, 2018 11:24 AM
To: Jim Krimbill <JKrimbill@dmbclubs.com>
Subject: Stuart

Jim,

Eric is out of town, but David confirmed Stuart has been teaching up there.

Should I follow up with Laura F or try to get an email from Eric confirming this?

Dave

Dave Critchley
Director of Tennis
DC Ranch Village

DMB000094

McNicol v. DMB

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT L

**Texts**

3:58



David ›

Mon, Apr 23, 2:07 PM

Sophia Kleingartner is requesting a private lesson on either Mon,Tue,Wed,Thurs between 4-6. Can I get a court during that time?

Probably Tues - but policy is no lessons so just tell them can't be a reg thing.  HS almost over

Tue, May 1, 8:53 AM

Need to have a another chat about your role at the club. Let me know if you have any time Thursday or Fri and I will do what I can to accommodate a good time for you

Wed, May 2, 8:15 PM

  

    

SM027

4:14



6 People >

Mon, Apr 30, 8:54 PM

dcrvillagetennis@icloud.com



Can anyone take this lesson
tmrw evening at 5?
Beginners – called on
Sunday to book lesson but
no confirmation has been
given. Please respond if you
can do it



     

SM 028

4:10



6 People ›

Can anyone take this lesson tmrw evening at 5? Beginners - called on Sunday to book lesson but no confirmation has been given. Please respond if you can do it

Or give me a time that could work in the evening and I will call. I know 5pm is tricky with juniors

Justin has it covered -- thx

I was told policy was no lessons are to be taught during academy hours. Is that still true? Perhaps front desk needs to be aware of that policy.

sm029

McNicol v. DMB

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT M

**Transcript of 5/3/18 recording**

## INDIVIDUAL ACKNOWLEDGMENT

State/Commonwealth of ____Arizona____ } ss.

County of ____Maricopa____

On this the __11th__ day of __March__, __2019__, before me,
                 *Day*            *Month*              *Year*

____Alma Susana Crane____, the undersigned Notary Public,
              *Name of Notary Public*

personally appeared ____Stuart J McNicol____
                              *Name(s) of Signer(s)*

☐ personally known to me – **OR** –

☒ proved to me on the basis of satisfactory
   evidence

to be the person(s) whose name(s) is/are subscribed
to the within instrument, and acknowledged to me
that he/she/they executed the same for the purposes
therein stated.

WITNESS my hand and official seal.

_____
*Signature of Notary Public*

**ALMA SUSANA CRANE**
**Notary Public - Arizona**
**Maricopa County**
**My Comm. Expires Jul 21, 2019**

____07/21/2019____
*Any Other Required Information*
*(Printed Name of Notary, Expiration Date, etc.)*

*Place Notary Seal/Stamp Above*

──────────────── **OPTIONAL** ────────────────

*Not required by law, this information can be useful to those relying on the document and prevent fraud.*

**Description of Any Attached Document**

Title or Type of Document: __Exhibit 9 In-Person Conversation Between__

Document Date: __01/01/2019__   Number of Pages: __24__

Signer(s) Other Than Named Above: ____n/a____

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |
| Stuct and | David |

© 2010 National Notary Association • NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)     Item #15936

SM127

Stuart McNicol
4303 E. Wildcat Dr.
Cave Creek, AZ 85331
(480) 203-3564
Email: stuart.j.mcnicol@gmail.com


**EXHIBIT 9**


Case No. 2:19-CV-00750-SMB


Mandatory Initial Discovery


Print Name: <u>Stuart McNicol</u>

Signature: _____

Date: _03/11/2019_

EXHIBIT 9

Transcribed voice recording of meeting on May 03, 2018

| Complaint 29: | page 10, lines 4-17 |
| Complaint 35: | page 10, lines 4-17 |
| Complaint 36: | page 18, lines 8-12 |
|  | page 6, lines 20-23 |
|  | page 7, lines 1-2 |
| Complaint 37: | page 9, lines 12-19 |
| Complaint 38: | page 19, lines 1-20 |

SM129

1

|   |   |
|---|---|
| 1 | In-Person Conversation Between Stuart and David |
| 2 | |
| 3 | DAVID:  [indiscernible] |
| 4 | STUART:  Yeah wouldn't that be nice. |
| 5 | DAVID:  …. Alright so where you at overall mentally, everything? |
| 6 | STUART:  I don't know. |
| 7 | DAVID:  So between you and I personally I do not like that you looked into my stuff |
| 8 | 'cause I think I've gone out of my way to make it work here so that beyond rubbed me |
| 9 | the wrong way. |
| 10 | STUART:  Well David I feel like there is lack of communication. |
| 11 | DAVID:  Well that's why I'm protecting it. |
| 12 | STUART:  No I know it but we need to do it more often then when these things that are |
| 13 | going wrong.  You also, we could have talked about Desert Highlands.  You didn't.  You |
| 14 | went and you did that and you did it again after we spoke and it's like you could have just |
| 15 | DAVID:  No I went in after we spoke. |
| 16 | STUART:  You did.  You sent Eric an email the next morning. |
| 17 | DAVID:  No I'd already the thing.  That was over the weekend.  He was out of town. |
| 18 | STUART:  He was out of town right?  Yeah.  But it's like you could have talked to me. |
| 19 | You didn't have to…. |
| 20 | DAVID:  Okay but in reverse  - hold on, let me respond to that.  In reverse we're both |
| 21 | under the impression that we're supposed to do all our lessons here.  If you're going to go |
| 22 | and teach somewhere else you could have told me, hey, just so you know, 'cause it came |
| 23 | from Will so it's already out.  So it makes me look stupid too.  Some member's telling |
| 24 | Will that Stuart's leaving and teaching at Desert Mountain.  I'm not saying that's true, |

2

1    that's the rumor.  It gets to Jim, Jim says hey you know Eric am I supposed to ignore my

2    boss and say no?  You could have come to me first then when Jim said that I go oh no,

3    he's just hitting with a friend of his up there.  You could have helped me so that that

4    didn't get out.  That's not my job to come to you and

5    STUART:  But I don't feel like we have that relationship.  We don't have that

6    communication between us.  The same both ways.  I know you expect me to help out

7    with everything but nothing gets communicated.  You just do it and I'm supposed to

8    follow it.  We don't discuss anything.

9    DAVID:  When I have asked you to do things I said hey come up with a poster for

10   stringing or write an article.  [indiscernible] it only helps you.  No response.  The last two

11   socials you just didn't show up to.  Are you saying you didn't know?  You didn't know

12   when they were?  I asked you about the TGen thing

13   STUART:  I thought we should be -- no you didn't.  The TGen thing?  Well it was first

14   on Tuesday

15   DAVID:  I didn't want to have - but you should be involved.  You're the head pro.

16   STUART:  But we're supposed to be involved in planning it not just have a plan and me

17   just either show up.  It hasn't even been discussed whether I'm even available to do it.

18   DAVID:  No but that's the whole point.  So I talked to HR.  They look at the salary is to

19   do all those things.  We do not get paid an hourly; it's not broken up hourly.

20   STUART:  Do you have a copy of my job description?

21   DAVID:  Yes and I have one that's Jim and Nick put together after that too for you

22   specifically.

23   STUART:  I don't have that one.

24   DAVID:  I'll give that if you want that

SM131

1  STUART:  Then let's have a look at that because I've done everything that I think I'm

2  supposed to do is assist in the planning, assist in helping.  Not doing it.  So if I'm

3  supposed to do it well then I should be compensated definitely in order to do it on my

4  own.

5  DAVID:  But that's what I'm getting at.  Do you want to keep the salary and keep the

6  head job because that's – they're never going to pay us what it's worth and I'm tired of

7  doing all of the work

8  STUART:  But then we need to talk about it.  You can't just do it and just expect me to

9  just follow in whatever the decisions

10  DAVID:  Yeah but when I have asked you -- I asked you to call two clubs and get

11  STUART:  But Dave that's not – you can't ask the

12  DAVID:  I'm not asking you to do that

13  STUART:  No, that's not something that I'm supposed to be doing.  That is something

14  that HR is supposed to be doing.  But they're not doing it.  That was to benefit both of us

15  and I did it.  I reached out to five or six clubs and

16  STUART:  Yeah but you're the director.  I'm the head pro.  Nobody's going to give me

17  information.  I look like an idiot.

18  DAVID:  Well then say that.  Don't just not do it.  They know people in tennis.  Like it's

19  not that hard to go hey what's your deal?  What do you make?  Not how much do you

20  make but like what's the commission – a lot of it's unofficial too.  Like Jason didn't want

21  to email back.  He's like call me and I'll discuss that with you.  So I get that.  But I'm just

22  trying to get a feel so that if I go to Carol then they don't reach out to people and go, well

23  you said the average is this.  Well I called these three people.  It's like ….  But the point

1   is when I have asked you to do little things you don't do them so then I'm supposed to

2   ask you to do more stuff?  Like it's frustrating for me too.

3   STUART:   Well you asked me to do the two things.  You asked me to do the promotion

4   on the stringing and stuff like that.  But then it's like okay well if we want promote

5   stringing I'll raise promote stringing with everybody that I teach

6   DAVID:   Okay but that's the problem.  Everything is everybody that I teach.  Everything

7   is my lessons.

8   STUART:   Well I mean -- and the other club.  But I have mentioned what about the

9   juniors?  How come no juniors other than two get their racquets strung at the club?

10  DAVID:   I don't know.  That's why I wanted you to do that 'cause that's your role.  That

11  would create more revenue for you potentially.

12  STUART:   I mean I can do that but it's not -- I don't know how to create a brochure.  I

13  mean I can sit down with somebody and do that.

14  DAVID:   It's just an article.  Well I'm having trouble with it.  What were you thinking?

15  Don't just blow me off.  That's why I end up having to do everything 'cause when I do

16  ask you the little things you just don't do it.  Most of the examples are coming but I'm

17  like well, it's like – I mean the head pro going forward, this division is not going to be a

18  stringer so that's going to be in – we're going to like revamp the thing.  So I'm trying to

19  figure out

20  STUART:   Well I know – I mean okay so here's things that I've built up, right?  I know

21  from almost the time you started that the stringing was going to be taken away from me

22  and be given to two kids.

23  DAVID:   Well that's because the club

5

1   STUART:  But do you see what I'm saying?  And I know that because you copied me on

2   an email that I wasn't supposed to be in.

3   DAVID:  But the backdrop that I did your job for you for a year because I respected that

4   that's what they had told you in the past.  I didn't ask you to do much.  Fair enough?

5   STUART:  Uh huh (yes)

6   DAVID:  I can't keep doing that.  You don't make very much.  I've talked to HR, she

7   said no.  Your guy's salary is to do xy and z so in your mind you split that into how many

8   hours that is and the head pro should be doing 10-20 hours a week off court.

9   STUART:  Have you looked at my job description?

10  DAVID:  I've seen it [indiscernible due to ambient noise]… clean it up and me more

11  specific.  You don't sweep the courts; they were missing a sign on court 10.  You never

12  [indiscernible]

13  STUART:  What do you mean?  How do you know that?

14  DAVID:  Because you've never once told me or told somebody hey [indiscernible]

15  STUART:  Why do I have to tell him?  Oh, do you mean replacing the net steps?

16  DAVID:  Yeah

17  STUART:  I wouldn't know that they needed replacing other than the courts that I've

18  been on which I have.

19  DAVID:  Okay which it says, the point here is to do a sweep.  It's on the thing.  General

20  keep the courts clean.  Doing a sweep for maintenance.  Make sure things are up.

21  STUART:  Who do you think dried the courts yesterday?

22  DAVID:  That's for *your* lessons.

23  STUART:  It wasn't for my lessons.  I dried all three courts.

24  DAVID:  But for when?  What time?

6

1   STUART:  For yesterday.  For the people that were showing up.  Tim showed up, the

2   guy showed up, Dez was supposed to have a lesson; never showed up for the lesson.  So I

3   do do things.  You can't say that I don't do things, I do do things.  There's a lot of things

4   that I do.

5   DAVID:  But there's a lot of things that also don't get done [indiscernible due to

6   scratchy ambient noise].  Those are the things to think about.

7   STUART:  Okay

8   DAVID:  The way they're going to look at it and the way I'm going to for myself too is

9   administrative stuff is going to be like $15-$20 an hour and it's going to be allotted like

10  almost -- like it was before.  Like you gotta show what you're doing to the

11  [indiscernible].  If you want to do that I'm open to that still but it doesn't seem like that

12  you want to do that.  I've asked you since I came to get involved in the juniors.  That's a

13  big part of what we do.  That's more than half of the revenue but then you want to teach

14  during that time but you don't want to help with the juniors.  That doesn't make sense.

15  STUART:  Well I know it doesn't make sense and let me tell you why it doesn't make

16  sense.  Because I know that every pro that is there; Ali, Ken, Mike all get paid way more

17  than I do

18  DAVID:  A few dollars

19  STUART:  Jason -- but it's still a few dollars.  A few dollars an hour adds up to a lot.

20  DAVID:  Okay and what have I told you?  What did I tell you when we talked about

21  this?  I said I would get it to where it was the same as when you talked to me.  I asked

22  Jim if I could give you a raise he said no so my hands are tied.  So getting angry about the

23  things we can't fix or we can make it work and I give you an extra hour a week to get the

1    hourly up to where it's the same as when you teach. I've reached out. I've said these

2    things and you're just like

3    STUART:  I know because in my mind it's like okay

4    DAVID:   But in reverse it's like you need to have some faith and jump in and start

5    getting involved. Get to know the other coaches, be part of the team. Everybody else

6    works together, gets along, does the stuff and Stuart's like here. I'm on

7    STUART:  'Cause I do. I feel left out. You're right.

8    DAVID:   But that's because you don't take responsibility. I almost beg. I'm like hey

9    I'd love you to be in the juniors. I know you work in the mornings two days a week. I let

10   you pick what days. I said which group do you want to work with; you want to work

11   with some better kids. I bent over backwards to try and include you.

12   STUART:  I know but it's very disheartening to know that you want me included but it

13   comes down to money. It seriously comes down to money and I understand that you can

14   work it out. I guess in my mind I don't want it to be fudged. I mean I can't help that. I

15   don't want to do that.

16   DAVID:   I don't either. I'm a very rule follower. I'm not going to do yeah well you two

17   kids just pay me $500 a month for clinic. Everything's done through the club. So, but

18   yeah. Jim wouldn't let me give you – like I tried to give you like $3.00 'cause you're

19   only here at 42 so it would come up to 45 just to give him something, he said no,

20   absolutely not so that was that.

21   STUART:  Okay.

22   DAVID:   So given those things, those things aren't going to change.

23   STUART:  I know

8

1    DAVID:   So that's where – you're going to try to do this positively, civilly like you want

2    to – if the salary went away do you want to say?  I'm working on getting all of our

3    commissions bumped but I can't make that as a promise with the salaries.  'Cause the

4    things that I want the head pro to do, like the junior program for as much as people think

5    it's this and that, made the club $260,000 last year.  That's all revenue.  So I need the

6    head pro to be – 'cause all we get for off court stuff is our two salaries, so I need

7    somebody in that role that's going to like help grow the juniors; communicate with

8    parents, do a junior news letter.  There's a lot of things that I need done that are specific

9    because you just pretty much do your kids.  You're not involved in those things.

10   STUART:   Correct.  I know.

11   DAVID:   And that's where like I said, I'm a tennis pro.  I knew what it felt like when

12   Mr. _____ changed my deal.  It sucks.  And that's where we're at.  It's not

13   going back.  And it doesn't make sense for the club to say we're still working on it.

14   We're going to let you keep 100% of the stringing, we're going to pay the front desk

15   person, we're going to pay for the machine and we're going to lose money.  Those are

16   things that we're not going to continue.  I don't know why they were like that when it

17   started.  I got your side of it.  I tried to make it work but I don't know what else you want

18   me to do.

19   STUART:   I know.  But that's the thing.  I know there's nothing that you can really do

20   about it.  I know that.  But I don't understand in this place how there's no way other than

21   to work more to make more money.

22   DAVID:   'Cause they don't value tennis pros.  For whatever reason, and that comes from

23   Carol.

1   STUART:  But yet they're very happy to keep taking in taking away from what you're

2   making as revenue, they're very happy to dig into that.  Little bit by little bit, year after

3   year.  You'll find out in time.  You'll see.

4   DAVID:  Oh I know.  I'm already seeing it.

5   STUART:  You already are seeing it.  Little bit over time.

6   DAVID:  He didn't give me what he told me would happen after a year and it's like as

7   long as I've got to make it work and that's part of the reason it sucks.  That's part of the

8   reason why I'm like; I can't keep doing all the work.  I can't keep doing everything when

9   I'm given two salaries to work with to get everything in tennis done and I'm not saying

10   you don't do anything but the majority of the things that need to get done, yeah you're

11   helpful on the phone 'cause things that anybody that works at the Village should do, but

12   you don't do -- you're not dealing with the ladies' luncheon I got tomorrow

13   STUART:  You didn't even talk to me about that

14   DAVID:  you're not answering emails.

15   STUART:  Seriously, you haven't even said one word to me about the ladies' luncheon.

16   DAVID:  Well that's 'cause the last couple weeks I was pissed off that you went in and

17   looked at specific people that I work with.

18   STUART:  Like?

19   DAVID:  It pissed me off.  When you said in our meeting you're like well you looked up

20   what's his name and I don't even teach [indiscernible] but you're looking at

21   [indiscernible due to cross talk]

22   STUART:  Okay so listen to me.  Okay so this is what I hear.  I know how Max gets

23   paid.

24   DAVID:  Okay

1  STUART:  Not by you

2  DAVID:  How is that bad?  He helps when I can't find anybody on Saturdays.  He really

3  does.

4  STUART:  No but listen.  Do you understand?  Now you can agree with me here or not

5  that I know Warren is a full time employee right?

6  DAVID:  No Warren's leaving.  He's never been full time.

7  STUART:  Well he's leaving but he has been.  He has been.  Well Warren's hours get

8  bumped up and then after Warren gets paid Warren pays Max?  That's what I heard.

9  DAVID:  Who'd you hear it from?

10  STUART:  I'm not going to say that 'cause it's going to get that person in trouble.  But

11  Dave that's tax [indiscernible].  If somebody went to HR and mentioned that to them do

12  you know how much shit this company would be in?  Those are serious things.  I'm not

13  going to say anything.  But those are things that I'm hearing.  How else would I know

14  that?  Do you think that I sucked that out of my thumb?

15  DAVID:  And the companies pay - taxes are paid on that.  Not on Max.  Max can ago to

16  jail.  Could.  Whether he would or not he could go to jail.

17  DAVID:  He's volunteering

18  STUART:  So yeah I hear a lot of things.  I see resignation letters that haven't been

19  turned in because people are unhappy.  How do we fix that?  There's a lot of things that

20  are going on right now.

21  DAVID:  And a resignation letter not turned in; who's that?

22  STUART:  I'm not going to say it because it's going to

1    DAVID:  Like Susan who lied about when she put it in the box because [indiscernible

2    due to cross talk] my [indiscernible due to cross talk] box on Wednesday and she said she

3    put it in like two weeks ago; complete bull shit.

4    STUART:  Susan's a nut.  But no, there's others.  I would like to talk to you about those

5    things because we need to communicate.  We have to.  For things to be better we have to

6    communicate.  How ever that is, whether I'm doing my job or not doing my job,

7    obviously people are telling me stuff that is not good stuff.

8    DAVID:  I don't see what that has to do with …

9    STUART:  No it doesn't.  I'm just telling you where I am in my mind.  It doesn't have

10   anything to do with my work performance or my role here at the club other than

11   obviously people look at me as somebody who thinks I can help them which I do

12   otherwise they would be gone.

13   DAVID:  Well I don't think anybody's ever questioned your own court teaching.

14   STUART:  Well it's not on court it's obviously other employees.  So yes I probably

15   don't do create programs or stuff like that but obviously people are looking at me as a

16   leader.  But we don't have any communication between the two of us on things that are

17   happening.  We need to and whatever you want me to do.  I mean I'm not planning on

18   leaving - yet.  I'm still here.  But we have to talk openly.

19   DAVID:  So what's happening at Desert Highlands?  You working with that one person?

20   STUART:  No I haven't – I mean I just teach Marie pretty much.

21   DAVID:  Does he let you? [indiscernible]

22   STUART:  I'm employed part time at Desert Highlands.

23   DAVID:  It's a little different than -- okay so you're on their payroll over there like

24   you're set up …

1   STUART:  Yeah

2   DAVID:  Do you think that's a good look for the head pro?

3   STUART:  No it's not.  I didn't create that.  It was created.

4   DAVID:  'Cause like I said, since I've been here I've given you the first crack at every

5   lesson that's come in so yeah Lisa cracked down membership.  Again, beyond my

6   control.  All we can do is work within the rules we're given.  When I fought back against

7   Lisa she threatened to go to Carol and like making a big stink.  So I wasn't winning that

8   fight.  So alright tell us what are the rules.  And you're taking the $10 now?  Yeah.  You

9   can get pissed about it, or you can leave, or we can make it work.

10   STUART:  I want to make it work.  You think I want to move somewhere else?

11   DAVID:  So you got to let go of the 'my clients'.  Replace them.  Say hey, you know

12   what?  I'm sorry I work at the club I know I've taught for whatever,

13   STUART:  Dave that's not enough.  How am I supposed to replace them?

14   DAVID:  Well one, it's the nature of tennis pros and you gotta be willing to come out of

15   your box and work at night if you want more hours.  Like it's not always going to fit in

16   from 7-2.

17   STUART:  I understand that.

18   DAVID:  So I mean like that's it.  That's the only way I know how to do it is that when

19   those new lessons come across you say yes and make it work.  You've turned down 25

20   lessons easily this year; things that have come across.  I can't.  I can't.  It's not well I can

21   do this …

22   STUART:  That's only been recent.  It's only been recent.

1    DAVID:  Yeah but my point is I've given you the first crack at all those lessons.  I don't

2    take them.  I don't need more lessons.  So the whole like, well they're taking away two

3    non-member lessons from me

4    STUART:  You're right but those are relationships.  It's not –

5    DAVID:  I understand

6    STUART:  I know you understand that.  That is important

7    DAVID:  I can't change that so

8    STUART:  I know you cannot change it

9    DAVID:  So it's like they can come twice a month which is the rule so I can't change it.

10   So I don't know.  That's just what I'm saying.  Telling me the things that I know that I

11   can't change, it doesn't help.  It just leads to frustration.  Like okay I know.  And it sucks

12   that they take 40% of my lessons.  And I brought 90% of the individual lessons like

13   you...

14   STUART:  It's the same for both of us.

15   DAVID:  But I've decided for now to stay so we've got to make a living.  That's why I

16   do the big groups at night.  I try and do 8 ladies in the clinic.  I wouldn't show up and do

17   that but the juniors I do just to keep the juniors program is if I don't coach them they

18   leave.  Like if I won't actually be their coach they won't stay in the academy.  That's the

19   only reason I do those privates.  I really don't want to do privates and make $48 or

20   whatever.  I used to keep 100% of that, $85.  So you're complaining about I don't like ...

21   STUART:  Well it's the same for both of us.  We both work for ourselves.

22   DAVID:  Yeah.

23   STUART:  I know.  I get that.

1   DAVID:  But right now with how little you're doing to the role, you're at like almost

2   80% with the salary kicked in.  So you're keeping a way better percentage than me but I

3   still do all the work.

4   STUART:  Well then I will help you.

5   DAVID:  But to do that, like I said, the things I need help with are a lot of the junior

6   stuff so you willing to get involved in that and help?  And I've already hired two guys to

7   come and help with that so now we're going backwards but it's still possible.

8   STUART:  Well but we've should have had this discussion already.

9   DAVID:  You've been here for six months that you were not going to get involved.

10   STUART:  No I didn't want to get because I'm hurt.  I'm hurt.

11   DAVID:  What are you hurt by?

12   STUART:  I'm hurt by the fact that people get paid more than I do.  I know that we can

13   work that out, I get that.

14   DAVID:  Oh yeah that's what they were getting before so I just kept them the same.

15   Jason is $3.00 higher than you because he wanted 50 so I was like if I do 45.  Ken is I

16   think the same as you.

17   STUART:  Ken's more.

18   DAVID:  If he's more he's at 45 he's not at 50.

19   STUART:  No he's not.

20   DAVID:  But the other thing is to get a raise it's like get involved and then it's like okay

21   I can bump you up whether we officially and again…

22   STUART:  I know that's never going to happen

1   DAVID:  But you don't do anything hourly so where's the  -- you don't do anything

2   hourly so why does that even rub you the wrong way.  You literally don't clock in hourly

3   ever that I know of unless you fill in

4   STUART:  I don't have an hourly.

5   DAVID:  Yes you do

6   STUART:  No I don't

7   DAVID:  Not to clock in like at the club but if you were to jump in in juniors you get

8   paid an hourly rate.

9   STUART:  Oh yeah, okay.  Sorry.  Yes.

10   DAVID:  'Cause that's how you're comparing Jason and _____.  It was like an

11   hourly rate for teaching.  I can't just come plug you in at that rate.  Nobody does.

12   STUART:  Okay.  Just between us, I hope you know I'm not doing anything wrong

13   about working somewhere else.

14   DAVID:  It's not wrong as far as it's …

15   STUART:  I know they don't like it.  Yes I am in my boundaries as long as I don't take

16   members away.

17   DAVID:  Or teach members

18   STUART:  Or teach members.  Yes.

19   DAVID:  But it sucks 'cause it doesn't look good that the head pro is also teaching

20   [indiscernible].

21   STUART:  Well no it doesn't.  I have to make a living Dave.  I have to make a living.  I

22   have a family to support.

23   DAVID:  But you're telling me that one lesson a week or does she take more than one

24   lesson a week?

1   STUART:  Well no.  There's obviously  - those are Highland members that are taking

2   lessons yes.  Not on a regular basis.  I don't know, Eric just lets me know whatever.

3   DAVID:  So why don't you get rid of the salary, teach some there, teach some here and

4   then everything would be fine.  'Cause it's the salary that is what Jim doesn't like.  He

5   doesn't think you earn it.  That's what's frustrating me.  And I'll keep working on the

6   commission then just -- wouldn't you rather teach one at  -- I mean if one works out to

7   teach an extra two lessons there or here rather than me start giving you a list of like I

8   need you to do a junior email [indiscernible due to ambient scratchy noise] and if you

9   organize those [indiscernible] and you won't want to spend 10, 20 hours a week off court

10  doing that kind of stuff?

11  STUART:  No.  No I don't.

12  DAVID:  That's the issue.  The issue is the salary.  [indiscernible] It's the same thing.  I

13  was going to say no, like well it mentally felt better if I was like, divide that by how

14  many hours I'm here then at least I'm making an extra 10.  And I talked to Laura and

15  she's like no, when we pay someone a salary it's to do things for the club.  And going

16  forward I'm going to make that more specific amongst my role and for the head pro role

17  and ideally what I want to do is break it up.  So I want to have somebody that's in charge

18  of the under 10 program like make a phone call to every family once a month, make sure

19  they're happy because our retention's not good.  People are unhappy.  Because I can't run

20  that and run the academy so I need – and that's where the salary has to go, it's got to go

21  to programs that are like generating revenue for the club so eventually things could

22  change.  So I  said listen, we're making money we can give our staff some bigger

23  commission.  That's the one good thing about the juniors for everybody is the club is

24  making money in tennis.  I know it sucks for me because I'm giving up my business that

1   I built up.  Long term that gives me some flexibility to say hey, I need a bigger salary.  A

2   head pro should be a bigger salary but we have to be able to show that this is what we do

3   and those activities are generating revenue; those salaries if you look at it from a

4   corporate standpoint it's like if somebody is going to give somebody a salary it's a

5   company, it's got to come back and help the company.  Like cleaning courts and

6   answering phones that's great but that's just expected of anybody.

7   STUART:  If you look at this [indiscernible] this is what $7.00 an hour does.

8   DAVID:  That's if you divide it by how many  - like about a 40 hour week.

9   STUART:  Correct.  Which that's what it is.

10  DAVID:  And pro for off court should be like 15-20 so the hourly is like somewhere in

11  that 15, 17 dollar range.

12  STUART:  No it's based on a 40 hour week.  If you're here 40 hours a week

13  DAVID:  I talked to Laura it's not.  And one; full time at the club is 30 hours, and two,

14  commission is separate.  That's why I don't get paid over time if I work over time.  The

15  commission is separate from -- the salary is paid to do x, y, and z.  They don't actually

16  iron it out and go okay this is how many hours, that's what I'm going to do going forward

17  and let's say okay this is the head pro.  He's got a x, y, z this should take two hours a

18  week for all these people just to do this.

19  STUART:  Wow.  Okay.  How much time do I have?

20  DAVID:  There's no thing, it's like but otherwise I have to start writing you up for not

21  showing up and all of a sudden it's going to get even worse.

22  STUART:  I know and I don't want that to happen.

23  DAVID:  And then Jim said well we can take away stringing.  He said a head pro can't

24  string.  It's not in the job description.  I don't want to play this game of like -- it's stupid.

1   STUART:  It is

2   DAVID:   The rules are the rules.  I feel like I've done everything I can to make it work

3   for you and I've got a little frustrated.  I'm tired of doing all the work for nothing.  That's

4   the best resolution.  If you want to try and go the other way, if you want to get involved

5   in the juniors and show that you're doing it, you're going to call the parents and do that,

6   like I don't know.  That doesn't seem like your forte.

7   STUART:  No

8   DAVID:  And I mean if you want hours which is revenue you can work with the juniors

9   and their lessons.  You can jump in and use them clinically.  I want one night and then

10   you have to go home but you know.  I want to use other things at [indiscernible] and I

11   know you've got family but like I think I've probably asked you ten times, like hey I

12   can't do the evening clinics can you cover.  Not one time have you ever said yeah I can

13   do it.  A couple times the juniors you'll cover, but stuff like that, it's like yeah, you're

14   supposed to assist the director.  Like in theory I can be like no, Stuart.  You need to cover

15   it.  You're the head pro and we don't have it covered but I never do.  I'm like okay.  So

16   when I stopped asking – I didn't ask you and I'm like that's okay pro.  So every time I do

17   it's no.  So I've got hurt feelings too.  Like I said, you haven't really embraced me

18   coming on even though I think I went out of my way to try to make it work.  I get it, you

19   applied for the job, you were here first, this is a weird situation but I don't want to go

20   down the road of fighting, writing you up and fighting over this and stringing

21   commission, it's going to be hell.  It's not going to help anybody.  [indiscernible due to

22   ambient outside noise]

23   STUART:  And I think it's best to just take salary away.

1   DAVID:   Okay.  And I'll keep fighting for this to get everybody.  I mean myself too.  I

2   could get a higher commission and specifically [indiscernible due to outside ambient

3   noise] Stuart's going to forego the salary if we bump him to whatever.

4   STUART:   Good luck to you.  I know that's not going to happen.

5   DAVID:   It might happen.  If the people coming in want Will's job  or like asking

6   astronomical amount.  I want 200 grand for my program [indiscernible].  Jim is hoping

7   that Carol's kind of like seeing we don't pay our people well.  We don't care if people

8   [indiscernible].  And I wrote up a big 15 page thing; hey we've had 18 tennis pros at this

9   club and three directors in five years.  This is like **the** place to work.  Why do we have so

10  much turnover?  That's not good for membership or customer retention.  We've got

11  unhappy pros.  So we'll see.  Do you want to think about that before I say you're willing

12  to do that?  I mean I don't know what the hourly is.  I mean you're just talking two or

13  three more hours.

14  STUART:   I know

15  DAVID:   It would replace the salary

16  STUART:   I know that

17  DAVID:   I mean rather than start forcing you to do a bunch of stuff you don't really

18  want to do that's $15 an hour on court.  I don't think you're going to resent the whole

19  thing anymore.  …. the time sheet, I've already done this, I got to do this, bunch of

20  emails.  It eats time like you wouldn't believe.

21  STUART:   Oh I know that.  I know that.

22  DAVID:   Some of the ladies seen the emails; well we do this, or what emails just came

23  in.  It's like I don't do it at the club anymore 'cause I found I couldn't get it done.  But

24  like even my morning job, half the time I start on the last job in the place so I can get an

SM148

1   email from Lisa, email from Jim, this lady, this guy is texting me, the guys are texting me

2   from the academy it's like even when I'm not here I'm still always on the clock and

3   always working. It's nuts. And I'm doing like a hundred junior program where I'm the

4   contact person for everything, from a frickin' red baller that wants to know what class to

5   come, I'm like dude, call the front desk, don't refer that to me.

6   STUART:  · Well I think the front desk doesn't know a lot of the answers so they send it

7   to you.

8'   DAVID:   Yeah well that's a whole nother problem of the club is that that should be like

·9   we have here. Like _____ and Lisa, people that work every day when they get to

10   know the program; I mean ten different people work two shifts, they certainly know a

11   little bit of their own world but that's it. They don't know. So obviously the direction

12 ·  with me is trying to get the people that work more often like I proposed to you, like

13   change one of the leads to like a program director where like their whole job is just to fill

14   clinics. Call people; call the [indiscernible] up. Jim is like well just go give the front

15   desk [indiscernible] and tell Barry to do [indiscernible phrase].

16   STUART:  As the assistant?

17   DAVID:  Uh huh

18   STUART:  65

19   DAVID:  Be an hourly too huh? While you're teaching?

20   STUART:  Double. More than double.

21   DAVID:  Well like I said that's based on which guys don't work. Well David, does he

22   get paid like $15

23   STUART:  He's in charge of all the buying and all that stuff. But yeah he's probably

24   over $20 a hour and that's 70%.

SM149

1   DAVID:   It's a different world [indiscernible] $80,000 for your initiation

2

3   Remainder of recording is Stuart and a female discussing his banking/finances, a club

4   charge.

5   End of recording.

6

7

8

9                                    Certification

10

11         I, Marybeth Abodeely, MBA Legal Transcription, Phoenix, Arizona, do hereby

12   swear and/pr affirm that the foregoing is an accurate transcript to the best of my ability.

13         I FURTHER CERTIFY that I am in no way related to nor employed by any of the

14   parties hereto, nor am I in any way interested in the outcome hereof.

15

16                                    Marybeth Abodeely

17                                    Dated approximately January 1, 2019

18

19

20

21

22

23

24

22

1

2

3

4

5

6

7

SM151

**McNicol v. DMB**

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT N

**Transcript of 4/4/18 recording**

## INDIVIDUAL ACKNOWLEDGMENT

State/Commonwealth of ___Arizona___ } ss.

County of ___Maricopa___

On this the ___11 th___ day of ___March___, ___2019___, before me,
       *Day*          *Month*        *Year*

___Alma Susana Crane___, the undersigned Notary Public,
*Name of Notary Public*

personally appeared ___Stuart J McNicol___
                                 *Name(s) of Signer(s)*

☐ personally known to me **– OR –**

☑ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same for the purposes therein stated.

WITNESS my hand and official seal.

_____
*Signature of Notary Public*

**ALMA SUSANA CRANE**
Notary Public - Arizona
Maricopa County
My Comm. Expires Jul 21, 2019

___07/21/2019.___
*Any Other Required Information
(Printed Name of Notary, Expiration Date, etc.)*

*Place Notary Seal/Stamp Above*

―――――――――――――――― **OPTIONAL** ――――――――――――――――

*Not required by law, this information can be useful to those relying on the document and prevent fraud.*

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

**Description of Any Attached Document**  ___Exhibit 8___

Title or Type of Document: ___Stuart McNicol's Recorded Conversation___ ___with David Critchley___

Document Date: ___01 / 01 / 2019___  Number of Pages: ___53___

Signer(s) Other Than Named Above: _____

© 2010 National Notary Association • NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #15936

SM073

Stuart McNicol
4303 E. Wildcat Dr.
Cave Creek, AZ 85331
(480) 203-3564
Email: stuart.j.mcnicol@gmail.com

**EXHIBIT 8**

Case No. 2:19-CV-00750-SMB

Mandatory Initial Discovery

Print Name: <u>Stuart McNicol</u>

Signature: _____

Date: _03/11/2019_

EXHIBIT 8

Transcribed voice recording of meeting on April 4, 2018

Complaint 8:              page 34, line 10

Complaint 13:             page 5, lines 14-18

Complaint 20 &21:         page 20, lines 15-20

Complaint 27:             page 34, lines 10-15

Complaint 28:             page 5, lines 14-18

Complaint 43:             page 1, lines 11-20

1

1               Stuart McNicol's Recorded Conversation with David Critchley

2

3     DAVID:  Tell me where you're at because we had this talk quite a while ago and I had

4     the sense that you were like a little happier and going and now I kind of feel like you're

5     going back and heard some things that are concerning.  I mean I get it so.

6     STUART:  But then, I mean if you get it then how do we rectify it you see.

7     DAVID:  That's the problem.

8     STUART:  I don't know if that's something you can do.

9     DAVID:  I don't think I can so that's why I'm here going okay well.

10    STUART:  So then what are you supposed to do you know?

11    DAVID:  It's like we gotta make it work like we said when we sat down so okay here's

12    the system.  We going to make it work or try and change the system a little bit.  That's

13    why I said Carol gave the okay to look at commission structure but they're going to look

14    at like  - I just asked Doug for the info to run your stuff from last year when you didn't

15    have health insurance but the year they paid you over time, not including membership

16    which they never will, you know they lost money on you so I don't know that I would

17    ever been able to get them to consider going to (indiscernible)

18    STUART:  But that's something that should have been – that was dealt with, that should

19    be over.  You can't affect me for the next four or five years.

20    DAVID:  No I'm saying I'm looking -- I don't have a lot of data points to do it you

21    know.  I mean they've done it – I don't think they necessarily even – from the things I've

22    heard I don't think they necessarily want to make money off of us, I mean they do want

23    to make sure they're not losing money.  They don't want to lose money on their tennis

1   pros.  They want it to be a break even.... I understand you but you've got to look at it

2   from their stand.  We're not going to change ...

3   STUART:   Okay so if I'm costing them money why do I cost them money?

4   DAVID:   Like I said, I understand the membership revenue and you brought in the

5   members 'cause I'm in the same boat so they're just looking at that report.  I don't think

6   you are costing them money.

7   STUART:   Well correct.  But how many pros do we have?

8   DAVID:   Are you talking about people that work here or just including the juniors?

9   STUART:   Well I don't know – well okay so Ken for instance.  Ken's not just here for

10  juniors.  Ken's here teaching as well.

11  DAVID:   I'm aware of him and he's only doing that when we can't fill the lessons so

12  he's not actively – 'cause I've told him that you're doing just the juniors and I started to

13  use him because like nobody could fill him and then somebody asked him stuff.

14  STUART:   Okay so alright but do you see what I'm saying.  So there's pros that are

15  working, there's pros that are getting employed but they don't cost the company money

16  to employ them?  It's only me?

17  DAVID:   Well they don't because there's no benefits.  I mean the academy makes the

18  club a lot of money so that's why that's a unique situation.  The club's made over a

19  hundred thousand on juniors last year profit and that's after paying those guys, that's not

20  before.  So those guys are a little unique in that their primary hours like Ken teaches his

21  10 hours a week is it's in the academy and he does – some months he did nothing, now

22  he's got William

1   STUART:   Right. He's got William, he's had Katherine's son, he's doing that hour and

2   a half clinic and lesson once a week; it was on the schedule for yesterday so it obviously

3   must have gotten cancelled but those are becoming regulars.

4   DAVID:   But those things are good because they make the club money; that's the way I

5   look at it. I don't have time to do those hours. You always get the first shot as lessons

6   and don't seem like you want to…

7   STUART:   Well no but I mean – well those lessons weren't even discussed with

8   anybody.

9   DAVID:   Well that's just William; but they just want him.

10   STUART:   Oh no, I mean I get it. I get it.

11   DAVID:   And long term that's an issue. Those people either need to pretty much only

12   do the juniors and that's why I'm looking at and then Warren stopped taking lessons. He

13   pretty much checked out.

14   STUART:   Yeah I know.

15   DAVID:   That's a whole other issue.

16   STUART:   That's another issue. I'm just looking at it Dave, I mean I look at my

17   financial situation; my home okay? My mortgage goes up every year, Monica's school

18   goes up every year, well I'm sorry, if I'm earning the same amount I'm earning more

19   because I'm working more but if I'm earning the same amount as I did four years ago

20   that's not okay. How ever this company looks at it that's not okay. And I mean I know

21   that the pros that are getting hired for the academy are getting paid more per hour than

22   what I am. Well you can't add in my hourly rate my salary rate which is still – do you

23   know that that is minimum that you can pay somebody – salary at $7.00 an hour.

24   DAVID:   Do you know it almost changed? It almost went to 47 grand.

SM078

1    STUART:  Yeah well that would be – but it's not.

2    DAVID:  Cause that position might disappear at that point…

3    STUART:  Well then that's – okay.  So even if I listen to you right now everything is

4    .getting taken away.  At one step at a time everything gets taken away.  When I came a

5    hundred percent of what I sold in racquets was mine.  A hundred percent of racquets;

6    stringing was mine.  That's a lot.

7    DAVID:  I get it but like those are the things we can't change.  Like if you were a

8    director and you run a club and they're looking at what Will does at Camelback; Will

9    makes a lot of money on stringing racquets, structurally you have to kind of at least look

10   at it from their standpoint otherwise it won't work.  Why would they let a pro make all

11   the money off of racquets?  I get that your deal was your deal personally so you get paid

12   pretty much half of what I get paid.  Do you feel like you do a third of all the stuff that I

13   do management wise 'cause that's the way they look at it.

14   STUART:  Well no because I've - to be honest with you I've probably stopped doing a

15   lot of stuff.

16   DAVID:  Well I understand.  So now look at it from my point of view 'cause I hear a lot

17   why this and I get it and I try to respect them when I come in but when I go there I'm like

18   hey tennis is busy and I need leads.  They're saying well you already have two salaried

19   employees that are – I know that wasn't your deal but they're looking at it like any other

20   situation the head pro would do more work than me on this stuff.

21   STUART:  But a head pro would get paid more than $7 an hour to do it.

22   DAVID:  Maybe so but you're acting like I'm Carol.  I can't change that.

1    STUART:   But then something needs to be said.  Something needs to go to Carol and

2    something has to change.  I mean Warren – Warren gets paid more than I do.  If he's not

3    on the court and he's working here, he gets paid more than I do.

4    DAVID:   You mean at the front desk?

5    STUART:   Yeah

6    DAVID:   Yeah well it depends on what you're talking about.

7    STUART:   And then if he's stringing while he's clocked in at the front desk he's getting

8    paid way more than I am.  So when I look at things like that

9    DAVID:  I don't think he strings when he's the front desk very often.

10   STUART:   He jus did – well he does.

11   DAVID:   Was he clocked in?

12   STUART:   Yeah of course he's clocked in.  So when you look at things like that how am

13   I supposed to be positive when there's things that are like that that are going on.  Max

14   Geiger.  Max teaches here.

15   DAVID:   He assists.  I can't hire him officially.

16   STUART:   I know that but you've got to pay him somehow.

17   DAVID:   It come out of me.  It sucks for me.  I lose that money and I only do it when I

18   can't find anybody else.

19   STUART:   I know but you, you

20   DAVID:   I know their system but I'm logical from the standpoint of okay so let's find

21   some solutions or okay so I asked you to kind of help gather some data so I could make a

22   presentation of like hey let's – and you said you called one place so you're not even

23   willing to help me fight the system.  Like that's what I was going to do.  It's like hey

24   listen, once a pro has earned this much 'cause they have a tiered system for the personal

1    trainers; once a pro is paid this much they've covered their benefits potentially which I

2    know you're not even taking them but the models you're going to need to cover that.

3    They're not going to build a system where they can just eat the benefits and then you say

4    okay maybe it flips to 70 or 80 or whatever.  I just know they're going to look at the pros

5    and say they're going to look at pro's and once we pay this and pay that... but if we can

6    show that hey well across the street because DC Ranch takes 20% from the country club.

7    Desert Highland only takes 10% and then Eric can choose how much of other people's he

8    takes.  So that's my goal is to present that information and say listen, these other places –

9    I know you lose money on your group fitness director because you pay their salary and

10   group X doesn't generate money.  They're free classes.  I get that.  And tennis is always

11   kind of in that weird thing where it's like well they pay a membership but they don't get

12   classes free where versus if you go you can take yoga classes so I don't know.  But I just

13   want to know how

14   STUART:  I know you are.  Well that's exactly the thing, it's like what do you think?

15   You've been here for a year and a half.  What is your thought?

16   DAVID:  I think it's a bad system.  My personal belief is I think they should much

17   'higher reward me for how much profit the tennis center makes.  Like that should be my

18   goal.  The director of an area should be like I want the club to make profit or, and this is

19   what they have to kind of tell me which they kind of want their cake and eat it too, if it's

20   just all about activity then make it that or maybe it's a 50-50, hey we want to make some

21   money but we want activity so that I have a clear objective so I'm not going, well I can

22   sit in my office and promote socials and do this and do that, or I can go teach and actually

23   make a living.  It's like it's a weird system that they have where they pay you 7 and they

1   pay me $14 an hour which I might as well – I didn't spend the last twenty years

2   developing my reputation and my skills to sit behind a desk and send out emails.

3   STUART:  For $14 an hour.

4   DAVID:  For $14 an hour.

5   STUART:  Correct.

6   DAVID:  And then it just depends on whether you look at that salary as okay that salary

7   is they're paying me to go to my staff meeting and do payroll and do whatever 'cause I

8   don't sit in my office much away from here.  It's probably at least ten hours a week of

9   emails, phone calls, sitting in the office and whatever which I don't know what that

10   averages up to but it's probably even more because some weeks I'm here all day.  Like

11   payroll on Sunday night it takes me like two hours so there's a lot of things personal but

12   that's where I'm coming from.  Like okay the system is this; we have two salaried people

13   that are supposed to be doing all this and because I tried to respect what they promised

14   you when you came in I'm going to be pretty much doing it all whereas ....

15   STUART:  Well I mean I do a lot of helping out when I'm here and I'm here a lot.

16   DAVID:  Oh yeah you're good at answering the phone.  I get all that but I mean there's

17   like being the one organizing things.  Okay Stuart you handle the social.  You can figure

18   out the date.  There's a lot of things at other clubs.

19   STUART:  But then few need to talk

20   DAVID:  Yeah that's why we're here

21   STUART:  Well I know but see you're

22   DAVID:  But all of a sudden you're already not happy so if I go hey I need you to start

23   doing more and more you're going to be well it's going backwards even more.  So that's

24   why ...  I understand so here's the point.  So it's like do we start looking for someone

SM082

1    else?  Do we try to get him to fight?  Do we come and sit like …. 'cause I don't want you

2    here angry.  That doesn't help me and it doesn't help us.  Membership said you were kind

3    of implying some things that I don't want to go into but it's like you can't be talking

4    about this and that and well it's hurting things and you can't go over there and be like

5    that's mine 'cause that gets back to Jim and that's why you have that reputation of this is

6    the only thing about Stuart and that's the reason …

7    STUART:  Well because it's not right.

8    DAVID:  I mean you can deal with Jim and just be like hey, I'm not happy, this is why.

9    Dave can't help me, he says ….

10    STUART:  So you heard about how I was from what Jim told you pretty much.

11    DAVID:  Membership wise

12    STUART:  No not recently, I'm talking about

13    DAVID:  Before when I first got here?

14    STUART:  Yes.  Well where did Jim get that information from?

15    DAVID:  I don't remember.  I don't know who he gets it from.

16    STUART:  He got that information from Nick.

17    DAVID:  Essentially (indiscernible)

18    STUART:  And how did that work out?  How did that work out?  So he has the

19    impression that my attitude's getting bad, who says my attitude's bad?  Where's my

20    attitude going bad?  Look at how much I do teach and how much I do for the clients and

21    the reviews.  The one or two; whatever.  Those are good reviews.

22    DAVID:  I don't think anybody even Jim, I don't think anybody questions your on-court

23    stuff.  But are you happy to be here and stuff which (indiscernible)

1   STUART:  When you're financially making less money every year, yeah, how can I

2   continue being happy?  And then clients that I had a rapport with for many many years

3   now they no longer come here.

4   DAVID:  Well that's the membership aspect I was talking about.

5   STUART:  Yeah but do they understand?  And if that's the case for me,

6   DAVID:  They don't care

7   STUART:  Okay but if that's the case for me

8   DAVID:  And like the thing that killed us was Lisa joining 'cause if Lisa hadn't joined it

9   would have been a whole different track 'cause now they think oh, if you push these

10  people all these people that Stuart's teaching would pay (indiscernible)

11  STUART:  Does she understand why Lisa joined?

12  DAVID:  I'm just telling you personally when that

13  STUART:  Did I get a thank you for that?

14  DAVID:  I'm just telling you her joining was actually -- it would have been better if she

15  left.  Now listen, if you push these people that just want one lesson a week to join they're

16  going to leave, they're not going to pay that.  But because she joined now she's on this

17  thing looking for anybody that's ever set foot in here well they should join, they should

18  join which

19

20  STUART:  But Dave that's not who – how do you … ?

21  DAVID:  But it's not my view so don't argue with me.

22  STUART:  No I'm not arguing with you but you would have to go – I can't fight it.

23  DAVID:  I can't fight you because Lisa she'll point to Carol and Carol – Carol thinks

24  that everybody that walks in Village should be a member.  So just so you know, from the

1   top down. So if we try and fight that we will lose, there's no question. Carol doesn't

2   give a shit how much money you or I make or

3   STUART:  No she doesn't

4   DAVID:  and she said that so that's the system we're in so that's what I'm saying. So if

5   we try and go Lisa already threatened; we had a big blow up so I've already tried but I

6   figure does making an enemy out of her when she's closer to Carol in the tree as far as

7   driving 800 thousand dollars a month in membership dues, I'm not going to win that

8   fight. She's like hey Dave and Stuart are bringing in non-members. Carol doesn't like

9   non-members. She wants members; she wants them to be choice so we can't fight that.

10  Trying to go for a proposal where we allow non-members to do more. I'd already tried it

11  so I said listen, I said you gotta trust me. You've got to trust me. People that I let come

12  in we're working on trying to get them to join but it also has to be practical for them. If

13  they live in wherever and they just really like me and Stuart and they drive for their

14  lesson but they're not going to be on teams, they're never going to join so I said why not

15  at least make some revenue out of it like something and keep our pros busy until we get

16  to the point where there's just literally no courts 'cause there's no members which I kind

17  of threw back at her and like well that's your job is to fill the club with members. Our

18  job is to teach them. If we have to go outside the membership to teach

19  STUART:  Got to make a living

20  DAVID:  but then she went and fired off at Jim and Carol. Dave's more worried about

21  non-member revenue then memberships and bla, bla, bla. And we had to have a big

22  meeting and then so that's where I was like okay, I'm not going to win that fight. I've

23  got to downplay that. And what I did is I turned around and said no, it's not about the

24  revenue. I said the only way we're going to keep growing membership is to let people

11

1    come and experience it.  So on a smaller scale I understand part of it where if it's more

2    than once a week why would anybody ever join and it's a membership club and members

3    are going to be like shit, I only played one match and do a clinic like I'll just drop my

4    membership and so.  Most people don't but from the corporate -- you know, in the book

5    I kind of get that side and then she's like us, she's looking at her bonuses are based on

6    memberships.  She doesn't get anything if we make a better living.

7    STUART:  But does she understand that -- I know they don't care about what we do.

8    DAVID:  Well she cares.  I told her, I'm like yeah …

9    STUART:  about our livelihood

10   DAVID:  I told her I said yeah okay this is whatever.  Now this $10 guest fee, that means

11   like we're back down to like 50% on what the person's paying for lessons.  It pushes us

12   down even more than 10 percent.

13   STUART:  Correct

14   DAVID:  I'm trying to fight it but I also there's certain things you can't fight.  I'm trying

15   to just get her to fuckin' leave us alone.  So I'm like okay, whatever you say.  But she's

16   going in.  She's looking at everything and that's why we got to talk about your guy and

17   even the trading because they're like the -

18   STUART:  What trading?

19   DAVID:  I don't know, whatever the trading – you trade lessons instead of.

20   STUART:  Okay but then if that's

21   DAVID:  I just don't want to fight over a 10 dollar thing.  We can maybe approach them

22   about paying a court fee for something 'cause the club's getting cut out of whatever

23   STUART:  Well hold on 'cause if that's the same for me then it applies to us.

24   DAVID:  Applies to who?

12

1    STUART:  You too.

2    DAVID:  Yeah?  Who do I trade with?

3    STUART:  Well the Frazier kids.

4    DAVID:  I do those for free.  That's a little different than trading.

5    STUART:  Well then I do it for free.  Emily Chang?

6    DAVID:  She pays through the desk every day.

7    STUART:  But she doesn't pay the regular price.

8    DAVID:  'Cause I grandfather her in at the price but she still pays.  But that still makes

9    money.

10   STUART:  But it's the same thing.

11   DAVID:  And she's also 12 so she can't join the club by herself.

12   STUART:  Okay she pays for two days a week but she comes every day.

13   DAVID:  Uh huh.

14   STUART:  Same thing Dave.

15   DAVID:  That's the nature of an academy though.

16   STUART:  No it's not.  What's the difference between whether I teach an adult or I have

17   a guest in a clinic other than the …

18   DAVID:  The difference is the academy makes the club a hundred thousand dollars a

19   year.

20   STUART:  But it's still a guest.  If you're thinking guests whether it's adult or a kid it's

21   exactly the same thing.

22   DAVID:  And I can list 20 kids that joined, Ethan joined.  Adam's a member, Josie and

23   Julie Alexandra from …

1    STUART:  I had Zane and them join as well.  And the only reason why they joined is

2    because -- there's a lie.  So we can go back and forth.  If it's for me then it's for

3    everybody.

4    DAVID:  Oh no because the club has a -- if it's 14 or under then they don't have to join.

5    STUART:  So they can come and take lessons, as many lessons as they like, they can do

6    whatever they like, they can do whatever they like,

7    DAVID:  According to the academy right now yes.

8    STUART:  Keon Geiger same thing.

9    DAVID:  He doesn't do lessons here.

10   STUART:  Yeah he does.  He takes lessons with you.

11   DAVID:  No he doesn't.

12   STUART:  Keon doesn't take any lessons with you?

13   DAVID:  He only takes lessons with Mike.

14   STUART:  Huh?

15   DAVID:  He only takes lessons with Mike.  I've give Keon maybe one lesson when we

16   first moved here and I've given Max one or two since we've moved here.

17   STUART:  That's a lot Dave.  Andrew Fuci.

18   DAVID:  Andrew Fuci joined.

19   STUART:  He's not in

20   DAVID:  Not anymore.  He joined when he was taking lessons.  I haven't seen him for

21   three months.  He's done.  He's hurt.  He joined.  Anybody that's going to come and

22   STUART:  But that money is not in the system.

23   DAVID:  That money is in the system.

24   STUART:  It's not.

14

1    DAVID:  It's for home school.

2    STUART:  It's not.  It's not in the transaction history.

3    DAVID:  Well it should be in the home school 'cause I have a home school 'cause I

4    have a home school button where I get a little higher percentage for the kids that I work

5    with from like 12-2 or 12-3.  That's another thing I would try and propose.  Well I mean

6    do you want to try and come after me you can do that after the meeting [indiscernible due

7    to cross talk]

8    STUART:  No I'm not.  I'm just saying here I am doing things

9    DAVID:  But the difference is the academy creates 100 thousand dollars profit for the

10   club so there's some leeway there and it's generating a lot of memberships.

11   STUART:  So does membership know about all of that?

12   DAVID:  Well they know that if you're under 14 you don't have to join.

13   STUART:  Okay.

14   DAVID:  We had a whole big meeting and that got passed through.

15   STUART:  Ken's girls.  They're not even in the system.

16   DAVID:  He doesn't charge his own daughters for lessons.

17   STUART:  But he's hitting with them.

18   DAVID:  Yeah.

19   STUART:  For free

20   DAVID:  So if you bring your daughter up you don't think you should?

21   STUART:  No but I'm just saying it's the same thing.  So if I had my regular who I hit

22   with three times a week why can't I do that?

23   DAVID:  Because he's not a member and you're getting or paying (indiscernible)

1    STUART:  I'm not getting paid.  So it's got to be the same for everyone.  I'm doing

2    exactly the same thing as everybody else is doing.  I'm not doing anything different.

3    DAVID:  I don't see it that way.

4    STUART:  How?  How can it not be the same?

5    DAVID:  Because you said he loaned you money so you're basically paying him back a

6    loan and ( indiscernible) with him so you're receiving financial benefit from it.  Why

7    don't I get to teach somebody three days a week and keep a hundred percent of the

8    money?  I'm the fucking director so how is that fair and the same?

9    STUART:  Well you're teaching the three girls.

10    DAVID:  I don't teach Zander and I get with Julia like during academy like once every

11    other week.

12    STUART:  No they come in in the afternoons for lessons before the academy.

13    DAVID:  When?  Who?

14    STUART:  Julia doesn't come in for lessons?

15    DAVID:  She didn't even get here till 3:30.  Dani but Dani pays.  Dani comes.  She's a

16    little girl.  Julie can't get here before academy.

17    STUART:  Alright.  Alright.

18    DAVID:  Well I mean that was their deal at the old club; Josie's brought in a lot of

19    juniors over the years so I honor the deal 'cause they joined.  They also joined.  I got the

20    club a membership.  The whole family joined.  They're all members so in their mind

21    they're like well shit that's going to cost another $300 a month which sucks for me

22    because all that money used to come to me.  So trust me, the system's not great for me.  I

23    get 20% of the academy.  It used to be mine 100% but you being upset all the time is not

24    helping anybody.  It's not helping anything.

1    STUART:  I'm trying to make a living Dave.

2    DAVID:  I know but getting upset is not helping it you know.  Like the thing with the

3    class and you do a lot on the laptop.  I mean you sit there and do your  -- what do you do

4    to help us?  Like I don't know …

5    STUART:  No no no do you not -- there's no computer in your office.

6    DAVID:  Well there can be if you need it.  I told you you can have [indiscernible] if you

7    want.

8    STUART:  But hold on.  That's nothing against you.  Do you know why I brought that

9    up?

10    DAVID:  No why?

11    STUART:  Because Jim through a big fit about any messages or emails that got sent to

12    any employees after hours and that we were not allowed to work on our own personal

13    devices unless it was during working hours; not even on our own personal device.  We

14    were supposed to use a computer that was in here, the front desk, or the computer in your

15    office.  That is why I brought it up.

16    DAVID:  Okay well put that in the an email.   Tell me so I know 'cause all I did was

17    give him  -- I'm just going ahead and saying I've asked Stuart four times just to sign up

18    ´ for this thing and he hasn't done it yet.

19    STUART:  From where?

20    DAVID:  You can sign it.  It takes 30 seconds to sign up for it even if you don't want to

21    do it.

22    STUART:  To sign up for it?  I had to the end of the month and I did it okay?  But I

23    didn't create the policies.  The policies were created; I'm just trying to follow it.  Yes, am

1   I being stubborn? Probably because it's so much easier for me to just do it on my own.

2   It is.

3   DAVID: I don't think he cares about you doing (indiscernible) thing. That was about

4   the Susan thing or people getting email because it's a new law or whatever they're

5   thinking about banning or responding to emails during non-business hours.

6   STUART: Well that was directed to me.

7   DAVID: Well I don't know if that (indiscernible)

8   STUART: Yeah that was directed to me that he started having the phone messages and

9   stuff like where members weren't allowed to contact us.

10   DAVID: Is that an overtime issue or what was that?

11   STUART: I don't know what it was. I can't remember off the top of my head how that

12   all came up. Oh probably because of – yeah, because of dealing with all the teams. I

13   mean I did do all the teams before and that's a full time job. And Susan did the same

14   thing, So Susan also was – when she was the lead coordinator wasn't allowed to work

15   outside of being here so that's where it all stemmed from.

16   DAVID: There was a ton of stuff that handed down from being parented by a big

17   corporate company and they all are HR and everything 'cause they're looking at him.

18   Most tennis clubs are like Don _____ or even Mr. _____ . It's like the guy

19   owns the club and there's a couple employees and that's it. Down here it's like working

20   for IBM with a tennis pro so those things just don't always mesh 'cause they look at

21   employees differently. And this club's going to continue without me and without you.

22   They don't care.

23   STUART: I know they don't care. That's the point, they don't care. They don't care

24   about you or me.

1   DAVID:   You know some solutions on how to make you happy or make this work but

2   I'm getting to the point I'm being honest where like I said, I need the head pro to

3   contribute and I have a hard time asking you because I get it.  It wasn't the deal you were

4   cut so do we look at maybe seeing if they would adjust the commissions, take away the

5   salary like we talked about?  Is there a certain number where you'd be happier 'cause I

6   don't see how you're going to be happy if I start asking you to do more stuff; for your

7   salary 'cause then that's going backwards again.

8   STUART:   Correct.  I don't to go backwards.

9   DAVID:   And I get the [indiscernible due to both talking at the same time] from my

10  standpoint I took the job and they're like, you need to make more money.  We'll sell

11  directors [indiscernible].  I tried to be very fair to you but at the same time

12  STUART:   Well but that is totally fine.  I agree with you 100 percent but there has to be

13  a way to compensate us differently.  There has to be a way.  The solution to that I don't

14  know the solution to that.

15  DAVID:   Have you looked at the numbers to see that it's not as bad as we think it is

16  because  I was pissed and I looked and I was like oh fuck, it's actually not as bad as I

17  thought.

18  STUART:   The numbers as in…?

19  DAVID:   Looking back when you look at by the time they pay our payroll tax and

20  they're not taking benefits because I get health insurance.  By the time you look at it

21  STUART:   I haven't taken benefits for three years

22  DAVID:   I understand that

23  STUART:   That's $20,000

19

1    DAVID:  I don't know how to get around that model 'cause HR will not approve a

2    model where if say God forbid your wife lost her job then okay you need benefits.  By

3    law we can't change it.

4    STUART:   You can change benefits.  If it's a life changing event you can change.

5    DAVID:  I don't think so and I talked to HR about this because I'm in the process of

6    trying to present a new tier, like once you get to certain levels the percentage changes.  I

7    said it would be illegal for me to pay you less to say hey Stuart, I'll pay you $20 an hour

8    if you take benefits but if you don't take your befits I'll pay you $30.  That's illegal.

9    Because if somebody qualifies for benefits you have to just give it to them.  You can't

10    affect their other compensation for not.  You know what I mean?  Like you can't bribe

11    them to not take their health insurance; there's laws against that which HRs very strict on

12    how many -- and when I show the proposal , well hey, we've been making money off

13    Stuart the last couple years.  My selling point is that here we need to grow membership

14    still.  We still aren't full as far as like tennis people so we want the best pros we have to

15    keep the members happy and keep brining in new members.  You have to look at it from

16    their standpoint.  If you go in there saying poor me I don't get paid enough it's not fair,

17    they won't change it.

18    STUART:   Then I would like you to do that.  I can't do that.

19    DAVID:  They won't change it for me.  I'm in the same boat.  They won't change it for

20    me.  But what we could do is we have to look at it from their point and say hey, we have

21    happier coaches if we know we're getting compensated the same as the pros across the

22    street.  That's going to be good to drive membership.  It has to be from the standpoint of

23    how it's going to benefit them.  They don't care if we're happy.  They figure tennis pros

24    are replaceable.  That's 100 percent the way Carol looks at tennis pro's.  So our two

1    options are you find a way to make the system work or we find somewhere else to work.

2    I'm already looking too like long term just so you know. 'Cause I'm like look, I can

3    make almost the same money or I make less, but almost the same amount of money and

4    just running the academy out of like community college.

5    STUART:   Yeah you could. I know that.

6    DAVID:   And that's before you even mix in the whole like, well how much do I report.

7    Well that's a whole other topic. But yeah it's like some people are paying you cash or in

8    check and you go cash it and boom. It's like it's a huge difference especially when

9    you've got the club [indiscernible] takes 30% of what's left it's hard. But you took the

10   job, I took the job. So as long as we're here…

11   STUART:   I took the job but I was also told that it would change in a year.

12   DAVID:   Well I was told the same thing when I took the job. I told Jim I said is this the

13   best you guys -- with the 60/40 and the 20% and he said well if it goes well they're going

14   to want

15   STUART:   You got a maximum raise.

16   DAVID:   I'm on salary

17   STUART:   I know

18   DAVID:   $3,000 [indiscernible]. I made the club $100,000 [indiscernible]

19   STUART:   I haven't got ten cents. Do you hear what I'm saying. There hasn't been for

20   me 10 cents in four years. So I mean I get it and obviously my attitude for the most part

21   is good

22   DAVID:   Your attitude's great

23   STUART:   other than when things get thrown out of whack and you

24   DAVID:   How many of your lessons are non-member right now?

1   STUART:  Well there's actually not many any more.  Actually off the top of my head I

2   don't have any.  The one guy I hit with.  One guy that comes in is a non-member.

3   Everybody else is a member.

4   DAVID:  They're going to find that 'cause they're over here and I don't want to be fired

5   over one guy.  Can you do it somewhere else if you can?  If he won't join or whatever?  I

6   know it will be a pain.

7   STUART:  He's not going to join.  Why would he...?

8   DAVID:  I understand

9   STUART:  I know.  I get it.

10  DAVID:  I mean she's going through classes.

11  STUART:  Well that's what I'm going to have to do.

12  DAVID:  She's going through classes.  She's looking.  That's what I said.  Like as much

13  as you can put lessons in.  I mean even if you got to go back and change 'em, don't book

14  courts 'cause I'm telling you those are red flags on you.

15  STUART:  Well I think I do take my name out of the court.

16  DAVID:  I'm sure you do eventually.

17  STUART:  I don't even put the hour in on my time sheet.

18  DAVID:  Yeah but they're like looking so I mean – I don't mean that one, I just mean

19  like on Saturday morning.  Put in the lessons you think you have and then take them out

20  if they're not going to do it.

21  STUART:  I think I do.  I think I do.

22  DAVID:  I still see Stuart reserves court.  So you don't want Jim or Lisa.  Jim or Lisa if

23  they're just booking a court and happen to look, they're looking into everything.  They're

24  looking into classes so I'm giving you heads up.  Book lessons.

1   STUART:  Yeah.

2   DAVID:  Plus courts are busy and I know you usually fill them all but we got to get all

3   the pros and have it like, if you have a lesson book it but we can't all just go, well I'm

4   just going to reserve courts and ...

5   STUART:  No I know, otherwise ... well but if you don't do that and I get a lesson like

6   yesterday or the day before, you can't get a court.

7   DAVID:  Yeah.  So long term we'd have to look at like limiting certain pros; like I don't

8   do Thursday.  It's just like okay everybody takes a morning off.  And just like you said,

9   and then when you have times you want to fill, okay Thursday I'm here from 8 to

10  whatever, and try and fill those blocks of times and then we can keep the courts from

11  filling but we're not quite there yet.  I don't think I've ever, like maybe twice I went to

12  Gray Hawk to hit with Adam so still ran the money through the club sucks.  So give me

13  thoughts on so if I go and not do this proposal are you going to be a happy camper if it

14  goes to 70?  Like what's ...?

15  STUART:  Yeah of course I would.  Anything.  Anything.  Something.  That's all I ask

16  for.  Just something.  Show me something rather than nothing over a long long period of

17  time because like I said that's just not okay.  Something has to work it out.  I don't even

18  know how many hours I teach.  Work it out.  When it gets to a certain amount of hours

19  something changes.

20  DAVID:  How many hours do you teach between 12-4.  Could you teach more in that

21  time if it was a better deal?  Like if it was 80/20 during those hours?

22  STUART:  Yeah I'm on the court almost every day

23  DAVID:  But then again so the way you sell it to the club is.  If we can push more of the

24  lessons and clinics into that non prime time when people aren't just going to come and

1  play, that opens up more courts for our members during the time.  The club's still making

2  money.  It's a way to let the pros make a little extra but it's a win win.  But the selling

3  point has to be that it's going to free up more court even if it doesn't.  The selling point is

4  why don't we do that to free up more courts in the morning when courts are just jammed

5  you know.  Encourage the pros to have a prime time and a non prime time.  Teach

6  between 12 and 4.

7  STUART:  I mean yeah I'm on the court all the time in the middle of the day.

8  DAVID:  Like I said, those are constructive ideas that I can maybe see them going okay

9  we'll give him that [indiscernible] between 12 and 4.  I don't think [indiscernible] 80 but

10  they might go 70 or 75 maybe.  'Cause in theory they're still not [indiscernible] it's going

11  to be maybe 25% of your hours if you tweaked it.  If you really push those hours.

12  STUART:  That's not going to work in the summer.

13  DAVID:  [indiscernible] summer

14  STUART:  In the summer and that's not going to happen

15  DAVID:  Well that's why I said.  You've got to look at things that they're going to look

16  at and say okay that would benefit the Village.  Everything they look at, so even if like

17  with us being happier it has to be well this is going to be to the advantage of the Village.

18  If we don't have pros turning over you'll lose Eusebio you'll lose Warren because our

19  pros aren't happy 'cause the commission's not comparable.  He finds out he can go teach

20  at the Phoenician.  They just take a $10 court fee and then lose them and there's some

21  disruption and you lose maybe a couple members or lose some revenue.  I've got to

22  retrain 'em, you got to hire 'em, so those are the selling points.  You say well okay like a

23  lot of positions, like okay, you lose a little more, maybe we lose a little on pros or we

24  don't make as much but the pros are happy, the members are happy, and that's what's

SM098

1   really driving the bus which is their whole mindset anyway.  So we got to sell it to them

2   from that stand point 'cause poor me is not going to work.

3   STUART:   No and I get that and I'm not good at communicating that way so you can do

4   that.

5   DAVID:   And Carol just so you know too, like at Camelback they cut Mike's salary in

6   half.  So like I said [indiscernible] whatever,

7   STUART:   I don't think they even can cut money in half.

8   DAVID:   What I'm saying is that as bad as it is it's worse' cause a lot of peoples' jobs

9   got cut when Will came in; what's her name, the deal they wanted to give her she left.

10   What's her name.  I haven't been there for a while.  So I got to figure out how to make it

11   work.  I'm actually going to stop teaching privates and only do the semis just for making

12   the kids pair up cause net and if I pay base salary only $25 an hour.  By the time you take

13   out the taxes, if I pay a baby sitter and (indiscernible) just bring him on Saturdays I said

14   fuck

15   STUART:   Well I can't afford – you're in the same boat.  I can't afford it.  How?  What I

16   do pays for our bills.   And I get it, work more.  Work more you make more but no, you

17   can't work like that.  It's unhealthy.

18   DAVID:   I agree.  I've done it for years and it's catching up now.  I have this adrenaline

19   thing, I don't sleep good, my back's fucked up, my knee's fucked up.  It's like am I going

20   to do this for the next 15 years, it's like wasn't I even like getting out of what can I

21   getting out of teaching?  And like mortgages or something – have finance.  That's a

22   whole other – trying to start over in a new career at 45 is kind of a scary concept too

23   'cause starting salaries aren't 200 grand.  It's like 35 if that.  I don't even know how you

24   can live on 35 grand.  After taxes 20?  $2,000 a month?  Like what?  What?  That's like

SM099

1   an average starting salary like at a college.  But in every other industry you stick in over

2   ten years then you're making like 150, 200.  Dennis goes well look I made $25 an hour

3   cash.  This is good.  And then 20 years later he's like oh I'm making $45 an hour and I'm

4   like, it's not that much better.

5   STUART:  No.  I mean let's see.  Let's see what we can do.  We'll brainstorm and see

6   what we can come up with.

7   DAVID:   You know people [indiscernible] those are like bigger classes and more semis

8   and less privates.  Those are the long term otherwise you're going to make more per hour.

9   STUART:  Yeah

10  DAVID:   Those evening clinics probably got 15 people let's hope.  Let's jack up the

11  hourly a little bit and get 15 people.  Some days I only get pretty consistently between 13

12  and 16 and 20 bucks for an hour and a half so that's -- it's like the system is the system.

13  We can maybe tweak it but they're not going to change it and come back -- Stuart's

14  unhappy, well let's give him 30 grand a year and 80% of [indiscernible].  It's not going to

15  happen.

16  STUART:  I know

17  DAVID:   So you need to either look for alternatives, like I said I've already started - I

18  wouldn't say like actively 'cause tennis is a pretty small community but I don't know if

19  I'm going to be doing this for another 10 years.  And then like you, he said well we made

20  a hundred thousand dollars more then [indiscernible] budget.

21  STUART:  That's gone.  You know that.  Nobody's looking at that anymore.  That's last

22  year.

23  DAVID:   That's why I'm doing this like now 'cause I'm like well if I can't cash in on

24  that then in a year I'm not going to have those kind of numbers.  So we'll see.

1    STUART:   Same thing with you.  Were you going to go in a year?  What are you going

2    to get at the end of this year?  Think you're going to get a huge bonus?

3    'DAVID:   Bonuses are a joke.  $400 and the other people get so excited.  I wonder what

4    they make the other directors.  $400 does not excite me not when I'm bringing in …

5    STUART:   So you can make that in a day.

6.   DAVID:   [indiscernible]

7    STUART:   I get it.  I get it.  What do you want me to do now?  I mean if I have to

8    change those they're going to go.  Zano and them, they're going to go.  They're not going

9    to do it.

10   DAVID:   What does it cost?  It costs them something when [indiscernible].  That's his

11   [indiscernible].  How many do you do?  Do you do two a week?

12   STUART:   Well right now it's actually only just one and then he pays for the clinic that

13   he comes to on Thursdays.

14   DAVID:   She's looking into everything.  Just got to be super careful with having courts

15   booked in your name.  You do not want Jim

16   STUART:   I didn't think I put my name in

17   DAVID:   I think you're taking them out at the end of the day.

18   STUART:   I don't think I put my name in for him.  I put Zeno's name in -- and that's it.

19   That's the only – that's it.  It's the only one I do.

20   DAVID:   Yeah I don't know.  I don't know.  I'm tired.  It's been a long year.  I

21.  definitely lost my motivation to help make the Village make money, you know what I

22   mean?

23   STUART:   Well unfortunately you're -- I warned you.

24   DAVID:   That was the best alternative at the time.

1   STUART:  I know.

2   DAVID:  The club closing and just wanted to protect the academy so I guess that served

3   its purpose.  By luck today all the kids would come.  Give out the orange and green ball

4   but you can rebuild that because that's a local thing.  The kids that young are going to go

5   STUART:  But your academy it's not

6   DAVID:  A little bit.  That will be – it's always like brothers and sisters and so yeah you

7   could rebuild it.  Like these kids wouldn't leave.  They're not going to drive to

8   somewhere else [indiscernible].

9   STUART:  But you'd always keep your kids.

10  DAVID:  Yeah my kids would all come.  Yeah.  But now it's like fuck, there's no

11  facilities.  Desert Ridge is gone basically.  The facilities are shrinking.  So I'm like

12  looking and the only viable alternatives I'm seeing are like high schools but then that's a

13  nightmare till high school season.

14  STUART:  Well you couldn't move too far could you?

15  DAVID:  Ideally no 'cause I've already done that and [indiscernible] more central.  And

16  the other things that's a whole new nightmare is finding somebody that understands

17  politics and I've thought to go lobby the City of Scottsdale and transition the academy

18  into my foundation and say it would all be free even.  Obviously you pay the pros so it

19  would just be like here, like okay.  I can pay the pros 'x' amount.  Make it on the surface

20  be like okay turn SRP into a junior training facility like Barnes [indiscernible] so the

21  center's not meant to make money; the pros have to get paid but say it's a non-profit, will

22  be free, red ball classes will be free, the [indiscernible] 'cause they'd probably lose

23  money on us.  You could probably convince some mayor or city council to let somebody

24  else run it as long as it looked like it was still meeting the objectives of the [indiscernible]

1    entry level and good for the community but that's a crap shoot whether you get it

2    [indiscernible] I don't know anything about that whole world. Or you can. I found out

3    because I pursued it a little. You can rent courts for $20 an hour at a corporate rate.

4    Anybody can.

5    STUART:  Alright Scottsdale Ranch?

6    DAVID:  Uh huh

7    STUART:  Yeah

8    DAVID:  About 20% I was talking to him. And that's without getting in there and

9    knowing like if I run 8 courts at $20 bucks an hour are you guys going to flip if I tell

10   them half an hour early. Like you don't the gray areas. You gonna work with us like

11   when you see how much or is it just like nope. 'Cause I talked to somebody pretty high

12   up in the city about that. Well there's this corporate rate which the people running it

13   would never tell you about that because that's above their pay grade.

14   STUART:  Yeah 'cause what's the guy that runs it?

15   DAVID:  We're getting off topic.

16   STUART:  Forget him. It's something like 4 or 5 bucks an hour to rent a court.

17   DAVID:  If you teach their classes.

18   STUART:  Yeah you have to teach a few of their classes. But you could do whatever

19   you wanted and charge whatever you want.

20   DAVID:  You could just call them group lessons and do a series of group lessons but

21   yeah whoever I brought there we'd all have to teach different classes though. But then

22   Lou got in there somehow and he teaches and doesn't do 'em so it's like

23   STUART:  But then you could have kids join whatever you were doing. You're still

24   doing it. I know. Anyway.

1    DAVID:   Yeah so.  There's options.  [indiscernible] that's what I said, look at the

2    numbers too' cause then I looked at Mike; what are the benefits and it's like shit like that

3    adds up.  I think when I was paying out of pocket it was $1,200 a month for a family.

4    STUART:   Well yeah I mean the only thing that I get that I get here is the 401k which I

5    could actually drop because [indiscernible] gets

6    DAVID:   A thousand dollars a year right around?

7    STUART:   Well whatever it is but I just saw that Carol just sent out that email yesterday.

8    I guess it's only 50 cents.  They pay 50 cents on the dollar up to 6%.  She gets 100% on

9    5% and then they match it up to 12% so it's a percentage.

10   DAVID:   12% is what you put in?

11   STUART:   Yeah

12   DAVID:   Ours is up to half of 6%?

13   STUART:   We only get half – 50 cents up to 6%.

14   DAVID:   So that's not very much money.

15   STUART:   No.  So

16   DAVID:   That's pretty much  - take it

17   STUART:   I could – well yeah exactly so 6% is what I do.  But I could drop mine and

18   raise hers to 12.

19   DAVID:   Oh she doesn't put in all hers?

20   STUART:   huh un (no).  So I mean there's ways that I could – if I lost, if the benefits

21   disappeared it wouldn't really change any of that.

22   DAVID:   The health care's the only decent one so if you're not using that then that's

23   STUART:   No I'm not

24   DAVID:   So that's $600 bucks a month for an individual.  So it cost the club

SM104

1   STUART:  They pay $800 a month

2   DAVID:  That's what they pay for us?

3   STUART:  No Jelena's. My insurance through Jelena's. The company pays $800.

4   DAVID:  For an individual or for you and her?

5   STUART:  Our whole family.

6   DAVID:  Okay that's about what it was here. Cause when I first started my ex was still

7   on club on the family and she's off on her own now I think it's $600 for an individual.

8   Doesn't go up that much more for a family. We pay a lot more. So when you start

9   adding your family you end up paying a lot more of it than the club does. So I guess it's

10  fair. Alright well I'll put in that proposal and see if anything changes earth shattering but

11  as I look at, if the money's the same are you -- 'cause before we talked about sliding the

12  salary into commission. And I looked at it

13  STUART:  I need to think about it.

14  DAVID:  I looked at it and said that you get paid the same. Commissions are taxed the

15  exact same as salary because I was looking at that for me when I ask for stuff like that. I

16  thought well you better take a bigger salary but when I looked into it on line and it said

17  STUART:  Is it the same

18  DAVID:  it all gets put into the same pool eventually. Was it your accountant that told

19  you that? 'Cause I was quoting you.

20  STUART:  Actually no. I just looked at that on line. So yes the other thing that you

21  need to realize, I don't know if the company knows this or not but everything that you

22  could write off you can no longer write it off.

23  DAVID:  If you're what? If you're salaried?

24  STUART:  If you're commission. So you could write off a lot of stuff

1   DAVID:   Your massages, your clothes

2   STUART:   You can't do it anymore

3   DAVID:   Oh really?

4   STUART:   Yes.  Now the company – this is what the accountant told me.  The company

5   won't tell you that.  So really they should be paying you more.  And the law just changed

6   this year.

7   DAVID:   Oh it's one of the new things

8   STUART:   You cannot write off as much as what you did

9   DAVID:   You can't do all the

10  STUART:   I don't exactly what it is but he did mention that your company – you should

11  go to your company and tell them that they should be paying you more money because

12  you cannot write off all your equipment or your shoes or your clothes or whatever the

13  case may be.

14  DAVID:   Wonder if she'd give us a clothing allowance then when it comes down.

15  STUART:   And I think that has also something to do with the taxes.  'Cause

16  [indiscernible] corporate taxes have dropped.  So when they come to you and they say oh

17  well it's cost us so much money to bring up the minimum wage but they don't tell you

18  about the corporate tax being dropped that they're saving money on.

19  DAVID:   Well put some thought into the salary 'cause at some point if I'm saying I need

20  the other salary position to be doing more [indiscernible].  Like I said, I get it.  That was

21  not the deal when you came her but when I go to HR with this proposal they're going to

22  go, well you already have two people.  I'm going to be like well Stuart really doesn't do a

23  lot of administration or running or training

24  STUART:   But he teaches a lot

1   DAVID:   Yeah that's why I said I've got to propose like a different position where the

2   head pro's like a really good teacher that just generates revenue and keeps members

3   happy that way.  And then my thought was to maybe turn the salary position into more

4   like a program director and give them the whole edict that your job is to fill Stuart's

5   clinics, fill my clinics, fill the socials.

6   STUART:   That would be smart

7   DAVID:   Be here from 9-5 Monday through Friday.  Now that person is generating

8   money for the club and that person's generating money for you and I 'cause like you said,

9   if you lose a salary but your clinics average 8 people instead of 5 or 4 you're going to

10   make that back and then some and I think we need more members.  We're pretty much

11   tapped out.  The people that take clinics take clinics.  There's not a lot of adding new

12   clinics or changing the name.  It's okay Charles _____, and Cam does this, or

13   Cam goes _____.  It's like the same people are just moving around.  We still need

14   to keep adding which long term is what I told Lisa.  I'm like you've got to let us expose

15   people to our teaching.  That's got to be how we bring them in.  And I've said there needs

16   to be some parameters.  Like maybe get – I think the once a week but that's kind of what

17   I said to said to you with Lisa.  I knew -- and she started coming and using guest fees; I

18   was tell her she cannot do that 'cause it's going to blow up like all the little things we

19   kind of get away with and it did.  And when she joined I was like – anybody

20   STUART:   Well I mean I did tell her not to join.

21   DAVID:   Now she's just going to think anybody they should just join.  And she doesn't

22   care.  She's kicked like five people out of my evening clinics.  And the people like Chad

23   the dentist; the guy lives in California.  He was flying here twice a month.  I've got it

24   down to twice a month and she was just pissed at him so now he can't come twice a

1   month and I'm like well how's that fair right now? Like our policy is twice...? Well

2   he's a former member. Former members can't come. I'm like

3   STUART talking about her: You're just making it up as you go.

4   DAVID: [indiscernible due to them speaking over each other. But again, I can't go to

5   Carol with that 'cause Lisa will take, remember, he should be member, he's a former

6   member, he's an orthodontist, he has the money and Carol's going to side with her all day

7   and night over a $20 clinic charge. And yeah, so on the same basis I'm trying to protect

8   some of those juniors 'cause if they make those 12 year olds have to join, like a 12 year

9   old can't join [indiscernible]. You're going to make them pay $200? They're already

10   paying $500 a month for the academy. And so those deals, like the full price for the

11   academy is kind of like the jewelry store. I think I've had three kids that have ever paid

12   the full price. And the way the academy works too, you want those kids like Emily

13   'cause they're the ones that go to tournaments and do well.

14   STUART:  Oh I know. I totally get it. I get it.

15   DAVID:  You want to give the old lady – if you want to give them a deal that's fine. I

16   mean I don't care. You can charge people whatever you want for clinics

17   STUART:  I know. No I don't want to do that 'cause I just don't want to do it. Well

18   what is it now? What is it 730 on an hour?

19   DAVID:  What do you make like in 60s from here to here? revenue? The last one I saw

20   was 2015. So 10% would only be only 6 grand so we need to move at lest 20% to recoup

21   the [indiscernible]

22   STUART:  The salary is $14,000. If you looked at it on an hour 80 bucks it would have

23   to be -- is that 10% to be the same?

1    DAVID:  That would be 20.  It would be a minimum 20.  About to go to 80.  I don't

2    know if they would do that.

3    DAVID:  I don't think so either 'cause they're going to build in all those – so like I said

4    STUART:  I'd still do all the other stuff.  I'd still do all the stringing that I do.  I'm not

5    worried about that.  I'm not worried about work.  You must know that.  I'm not worried

6    about working.

7    DAVID:  What do you mean, as far as not being here

8    STUART:  Like how much work I do.  I'm not worried about that.  I work.  There's

9    work to be done and I work.  You know that.

10    DAVID:  Yeah.  No I get it.  That's why I didn't come in.  Jim wanted you to kind of go

11    away when I got here and I'm not going to do that to somebody but now I'm like looking

12    at the salaries from their point of view and they're like, we already have Stuart there, he

13    should be helping to do all this stuff.  I'm like well that wasn't the deal and they're

14    basically like well that's the deal now.  Jobs change, positions change which puts both of

15    us in a shitty position.

16    STUART:  Then maybe we change it.

17    DAVID:  Yeah?

18    STUART:  Especially if you took everything away.  If you took the 401k

19    DAVID:  Mr. [indiscernible] did that to me.  I started with this deal and then he saw that

20    I was making money so then it was this deal.  And then he came in and just said I'm

21    taking a percentage of your academy.  If you don't like it you can leave.  I was like, that

22    was never the deal.  I was like the whole reason why I was offered no salary and no

23    benefits.  So yeah it sucks.  I worked there and I went there because it was a facility and I

24    didn't see him much and I looked around and it was still a better deal  - a relatively better

1   deal when you factor in how many kids I'd lose if I moved to like Phoenix [indiscernible]

2   Center or some shit hole, like leaving the Scottsdale area. So yeah it sucks. So I've been

3   there and that's why I tried to be respectful of it but like I said, the system is the system.

4   They look at it as well you have two salaried positions to get all this stuff done so I'm

5   trying to figure out okay well - it's like Eric Anderson you know David does all the

6   work. Eric comes in and sits in his office. Hey call all the people for the whatever and

7   get this set and strolls out of the way. Yeah he's there, he makes sure stuff's getting done

8   but he's not as outgoing, not like fliers. But then he also has a dedicated - not like

9   assistants but there's always somebody who's there in the tennis shop. And their shop is

10  so empty that's all they have to do is make calls and Kyle just fuckin' watches tennis and

11  golf on Sunday. Does a couple lessons or hits in the morning social or whatever. So then

12  the only other big thing is with the commission is I want to sell them on is hey we're the

13  Village. It should be like every tennis pro's dream in town to come work at the Village.

14  And I don't know how to portray to them that it's not like tennis pros -- you know what I

15  mean? Cause they think it is. Like oh you're working at the Village. I'm like, you don't

16  give us uniforms, you don't give us any of those little extras that the other nice clubs do.

17  It's a shitty commission split. The salaries are below average for the size of the clubs and

18  what you would normally pay somebody. Yeah there's a lot of people so you can

19  generate lessons but that's great for like a des. So the whole thing is I'm trying to

20  separate us from Camelback and say well we need more members so we need people that

21  are bringing in members but you can mend fences with membership. If they think you're

22  all about your – if they [indiscernible] about your people that aren't members and

23  STUART:  I don't have any. But you know what I'm saying, I don't have any.

36

1    DAVID:  I know but that's the perception so you gotta make them think that you're

2    working bringing them in.  I know you have.  I'm just saying if you're going to be in the

3    corporate world you gotta learn to work it.  You can go into them saying it's not fair.  I'm

4    making …. Because they don't care.

5    STUART:  No.  Obviously.

6    DAVID:  If they cared then we'd all get raises or the deals would be much better.  And I

7    think Camelback just fucks it up because they're so busy.

8    STUART:  Everybody's walking into the place.

9    DAVID:  That's what I'm saying.  They could have monkeys teaching and the monkeys

10   would fill every lesson.  There's so much demand there and they have to limit how many

11   – he could probably teach even more; not him but I mean everybody if that was his goal.

12   Create new programs it's like the courts are so busy he says he's kind of set a limit to

13   where I think they only teach on four courts at once.  So I don't know.  I'll put this in the

14   other and send it out the pipeline and see.  And then I'm kind of torn between – like I'm

15   telling you not to, like okay I'm probably going a hundred thousand dollars.  I was told

16   that we could reevaluate.  I got like a different deal for me or then or do I try and push

17   this tiered system and the non prime time as a way to make it better for the Village and if

18   happens to benefit me on the back end because I can teach in those hours too and do it

19   that way because I have the same fear.  If I go in going Carol -- what Jim told me, Carol

20   said well Dave knew what he was getting into.  I'm like well, or maybe Carol you don't

21   know what Jim told me.  Like if things go well 'cause I didn't know.  Like I don't know

22   how many kids will come when I go to the academy and I don't know if the academy will

23   stay successful.  It's kind of north.  It's different, I don't know if everybody's going to

24   have to join.  I didn't know so I didn't want to make promises.  Like I guarantee 200

SM111

1   grand a year but the juniors are bringing in crazy revenue so it's like 25 grand a month

2   and all the other stuff is like 16 to 18. So those two hours a day bring in more money

3   than all our ladies clinics, all our evening clinics. So it's tough.

4   STUART:  Thank you.

5   DAVID:  Sure. I want it to work. But talking about [indiscernible] any alternatives or

6   we can't get anything changed here?   Any thoughts on where you could go or anything?

7   STUART:  I don't know.

8   DAVID:  Well that's fine.

9   STUART:  I don't know.

10  DAVID:  I thought about Doc Brooke's mom and dad teach at Pinnacle.  He's the

11  director at Pinnacle Peak Country Club.  Like two brand new courts.  So in my mind I'm

12  like alright,

13  STUART:  I've thought that for a couple years

14  DAVID:  8 ladies a couple mornings a week.

15  STUART:  So what are you going to do?

16  DAVID:  small juniors like just have a really higher level but good juniors.  But the

17  danger is those things fall apart quickly too.  Like with the juniors if Johnny's sick and

18  Kean gets pissed and then you've got 5 and then there's no energy involved.  That's why

19  I've always liked bigger 'cause I've seen the little academies.  They come and go because

20  they're like those magnets like a Josie they're huge.  If you lose the wrong kid well your

21  program's just gone.  Like if the kid that's popular that's good isn't there anymore, done.

22  That's why I've always liked to keep it bigger even though it's – once you get past like

23  20 kids it doesn't get exponentially more profitable to have 40 kids 'cause you've gotta

24  have other pros that you pay a lot.  Like you can't have 10 pros and [indiscernible due to

1    cross talk]. It's like you have some people that the kids respect. But it's nice cause then

2    like we lost this whole group of kids like Haley Stells, Cole Stells. Like this whole --

3    when we lost them they were like 13, 14. And some of [indiscernible] started at the

4    Hyatt and it was like small and just that age and so they were [indiscernible]. It just went

5    on. Like we lost 8 kids and a month later when you went out everything's full. Like if

6    those are your only 8 kids that you lost

7    STUART:  You're screwed

8    DAVID:  you're like out. You're like broke. The only nice thing about here there is the

9    security of full time lessons.

10   STUART:  It is. It is but I mean

11   DAVID:  … some people that lose [indiscernible] might someone too, you might have to

12   adopt really well. You get the first crack at new member like any time lessons come

13   through and tell some of your people like hey, the club's going hard line on membership.

14   Grab on something. If it doesn't work, sorry but if you could bring in a couple more

15   members it might get Lisa off your back. If you can't fight the system try and work with

16   it. And I want to find out but I don't want to be that guy too. I don't want to be like well

17   is this happening at Camelback and Ocotillo too? 'Cause I know Josh teaches -- Josh is

18   such a fuckin' creep. There's no way he'd ever [indiscernible] lessons if people aren't

19   members.

20   STUART:  Correct.

21   DAVID:  There's no way. Not even people on the teams aren't members. So I'm going

22   to be the guy that goes to Carol and goes well you're making us not teach non-members

23   and Josh does it. How's that …. ? All that would do is

1    STUART:   I don't know how'd we do this but what would be interesting is actually to

2    look at the revenue.   Is to look at -- I don't know if they've even – memberships

3    DAVID:   We used to be able to remember that?

4    STUART:   I know

5    DAVID:   We used to be able to look at all the clubs.   If I'd known that …. [indiscernible

6    due to cross talk]

7    STUART:   And we'd be able to look at the revenue of what guests actually have brought

8    in and what they're going to be bringing in.   Because I guarantee the club's going to lose

9    money.   They have to lose money.

10    DAVID:   They'll lose revenue but they don't care because Lisa now is convinced that

11    those people should join or could join

12    STUART:   They're not going to.   A lot of them are not going to.

13    DAVID:   At first she doesn't – that's where there's no trust right now.   I'm like you have

14    to trust me.   If I think somebody can afford and is going to play on the team and is going

15    to

16    STUART:   Of course.   You're going to get them to join.

17    DAVID:   I'm going to get them to join.   Like when I moved here I got like 25

18    families/people to join.   I'm sorry I don't do that like every month but how are we going

19    to convince more people to join if they never get in front of me.

20    STUART:   And you don't want to do it because what's the use of you teaching a person

21    twice and then I'm sorry, you can't come back next week unless you join.   Well they're

22    not going to do it.

23    DAVID:   Exactly.   It takes some time.   You have to develop the relationship.   You've

24    got to get them used to coming. …. We're having a social …. And eventually you go

1   hey, you know, but I'm not going to win that fight.  I already tried it so.  I'm just trying to

2   make it work until something better pops up.

3   STUART:  I mean I got that group that's filling up in Village doubles.  They'll fill it up.

4   DAVID:  How many are non members?

5   STUART:  Three.  Well you know what?  It's going to stop.  So there's a whole class

6   that hasn't been busy at all.  I'll finally get it full

7   DAVID:  They going to do it twice a month?

8   STUART:  I don't know what they're going to do.  I have to speak to the lady.

9   DAVID:  Some of them they might be ready.  A couple might join.  [indiscernible] sorry

10  it's new, it sucks, poor me.  My problem is I like the club as the club.  Cause if the

11  amenities are there they gotta live around here which means some of them gotta have the

12  money.  And like I said, short and long term if we can convert a couple and show hey

13  okay we're on board, we get it.  It's a member club we changed our attitude.  We'll get

14  off their radar for a while then and see what happens.  'Cause she's not going to want to

15  keep checking every little – and there are you know, there's enough members now too

16  where like we're where we need to be.  There's enough hours here.  And like I said, I

17  respect that you built relationships you don't want to tell somebody but there's enough

18  members and hours to have you teach as much as you want.

19  STUART:  No there is

20  DAVID:  That's where you just have to decide well okay

21  STUART:  Is it worth it

22  DAVID:  No I did, I don't like it, I feel like they're screwing me, they changed the deal

23  but a deal is a deal I'm going to stay here head on and say well it's a member club.  It's

24  busy enough now – when you're growing it too and I still think we're in growth mode.

1    But when you're growing it you say well listen, I just want the hours when I teach. Now

2    they're [indiscernible] you can replace those numbers with full paying lessons especially

3    now. It seems to be a pretty steady flow of requests coming through and we're struggling

4    to fill them a lot of times which is nuts 'cause Des's fuckin' lazy. Well could they do

5    Monday at 2? I have lesson 3. I'm like I don't know, if they want fuckin' 1 come in at 1

6    and then try and fill your 2 o'clock or take a break. The entitlement of these young pros

7    is unbelievable. I'm like I'm 45 I've done a hundred times more than you and if

8    somebody wants a lesson at a certain time within reason I do it. One day I'm like get me

9    like six ladies. Okay 6. There's like 3. I'm making less than I'm making in private right

10    now. I'm like what the heck's going on.

11    STUART:  For an hour and a half.

12    DAVID:  Whatever. It's going the wrong way for [indiscernible]. Work fewer hours

13    and make more money. But then it's like she's trying so then I don't want to like -- It's

14    like fuck. It's like do you charge people more when people don't show up. It's like well

15    it's not their fault. And then when you do that it's hard to grow things 'cause then people

16    get wary of showing up.

17    STUART:  Well that's how it used to be.

18    DAVID:  And then you just have to look at it and if something's not consistently filling

19    up then you change it and say okay that's not the right time or the right day or the right

20    group till you get some winners.

21    STUART:  What if, what if you could – and I don't know how you do this, so I like the

22    groups right? Where the pro gets a commission on how many people are in his class.

23    DAVID:  But like an hourly based on how many people are in it?

24    STUART:  Or the percentage. The percentage would change.

1    DAVID:   Goes up if you get more people in class? [indiscernible due to cross talk]

2    STUART:   Yeah. Because that way it's up to me. It's up to me to promote all the

3    classes that I do. If I'm only going to have two people in my class well I should only get

4    paid for two people. But if I'm going to have six

5    DAVID:   …. 'cause the argument is like someone like me. If I can convince 16 people

6    to come to the same clinic, one, the club's already making more than if I just teach a

7    private so you're already happy. So that would be another idea and that's definitely a

8    possible way. And then I've already met with Laura too and I've got to make sure some

9    of the things I proposed are not back end accounting nightmares like as far as oh how

10   does that commission get spit out. Some of those things should be as simple as like you

11   know you just have – I think people are going to have different rates. I assume we can

12   also have different commission rates. She would just have to assign it to certain classes

13   like okay. But then if it was like you said, like I don't know if the system can go on

14   Stuart's class gets to six then it gets kicked up again; you know what I mean?

15   STUART:   Yeah

16   DAVID:   I know she could assign okay you get 70% of this class and 60% of this class.

17   I don't know if the system's smart enough to go hey once it hits a certain number the

18   commission's going to … so then they'd have to do it manually which they could but …

19   If you suggest something that's just going to create a lot of work for somebody they're

20   going to fight us so it's better … So I thought the prime time was a good idea potentially

21   on that. You know the other stuff is just a map of like – it's a pretty big jump if you do a

22   [indiscernible] as a private [indiscernible] 110. Now you're taking 65 bucks home

23   instead of 48. You do 10 of those more a week that's like teaching a couple extra lessons

24   and now you're back to like okay I'm making more money per hour. I think long term if

43

1   we both stay or you stay or I stay it's like those are the type of things we're expecting

2   him to all of a sudden see the light and pay more salary.  It's like now we just got to find

3   a way.  The pluses are there's a lot of people here with money that are members that we

4   have access to so we've just got to find ways to maximize our time on the court with

5   them and make the most we can per hour.  So like for you we're trying to see if there's

6   any natural fits like a when do you want to go private.  Say hey what do you think about

7   doing a semi?  The people that you know and if they say no you kind of say fine and you

8   can always use me maybe to do another pay bump.  I'm going to up my hourly to the

9   point where it's like prohibitive ...

10  STUART:  Well maybe I should

11  DAVID:  I think I'm just going to something stupid like 125 and tell people he doesn't

12  really do privates.  Like if you want privates you get it done with these guys.  If you want

13  to pay somebody $125 for a lesson, sure.  If I want to grandfather a couple people in

14  'cause I think it's good for the [indiscernible], it's none of peoples' business.  But then

15  just say that I'm like currently at 125.  And then for some people like paying $125 it

16  doesn't mean anything.  They go and spend $200 on their massage and they spend $150

17  to get their hair done.  And they spend $140 to get their golf lessons so.

18  STUART:  Okay.  That might be good for me to do that.

19  DAVID:  So think about all those things.  Trying to build ways and then like I said, I like

20  that idea of hiring somebody.  So it would be a bit of a risk on your part so I understand

21  but if the whole position is -- listen, it's your job to fill these clinics.  'Cause Catherine

22  does it when it's convenient to her.  Like some weeks she promotes which is fine, like I

23  never told her to.  Some weeks she promotes the Wednesday clinic and we've had 12

24  people on Wednesday and then last week she looked and saw there were two people so

1   she came so she got like a semi-private and that kind of pissed me off because Nicole told

2   me that that's what she said. She said oh yeah there's only two people so I'm going to

3   get a semi- private. I'm like okay so some weeks she'd send out texts and grow it and

4   then other weeks she decided -- but like I said, I haven't officially made that part of her

5   role but she helped [indiscernible] Monday and see you just either need to identify one

6   person and do that for all the classes and then we just look as a program and say okay this

7   class isn't filled. Let's try a cardio again or let's try whatever.

8   STUART:  I do like that thought.

9   DAVID:  You can convert.

10  STUART:  I mean they're there. They're speaking to everybody that's coming in

11  through the door.

12  DAVID:  And that's where if it was one person then maybe a salaried – then we're going

13  to pay somebody there anyways and we want the overlap now. Then there're be like,

14  we'd have like Rebecca or Trudy basically and so they're there every day 8-4, 9-5 so they

15  get to know the juniors, they can do that.

16  STUART:  That would take a lot off your shoulders.

17  DAVID:  Yeah which we said is the whole point of having the two salaried positions but

18  your deal was different when you took it so I get it. But it's like now that the activity has

19  doubled it's hard.

20  STUART:  Yeah. I mean mine's what $500 bucks a month?

21  DAVID:  And I think you're better on the court. ... your administrating [indiscernible].

22  Going into the nature of tennis is like – if I view you're good enough to be teaching it

23  doesn't really mean you're a good administrator.

24  STUART:  No. No I'm not.

1    DAVID:   There should be like a program person that's going to send emails and texts

2    and knowing peoples' names and oh you should really charge them, or you should do

3    this, have you ever done the evening clinic.  And then the club needs to support us with

4    like texting and Constant Contact and like be able to send out emails and actually push

5    the clinics without the pros having to do it.  That should be the advantage of working for

6    a big club is like the marketing should be streamlined and efficient and they should have

7    whatever the latest way to communicate with your members is we should have it and we

8    should be doing text marketing and emails should just be like targeted.  All the four or

9    five guys, or all the teams.

10   STUART:   Okay.

11   DAVID:   You got the outline so show that thing.  Even if they say yes and stuff like that,

12   I don't know if that's something they only do annually or if they would do it right away, I

13   don't know.  But they went through it recently about three years ago but they changed the

14   commission structure for trainers and so there's three tiers now but the shitty thing is the

15   biggest tier is 55%.  That's the most you can keep as a trainer.  But tennis is a little

16   different animal.  I'm already ahead of that so [indiscernible].  But at least the model's

17   still in place and

18   STUART:   I mean the trainers are inside.  They can work 9, 10 hours 12 hours a day.

19   DAVID:   I think it's more of a -- some people join the club; if they want training they're

20   going to use the trainers at our club.  Tennis is a little more - people are more vagrant.

21   Most people go to places like [indiscernible].  I know there's more value to having good

22   quality pros that will attract and keep the members very happy.  How much Carol sees

23   that I don't know.  I don't know how much Jim likes me, bla, bla, bla but I don't know

24   how much of what he tells me I can trust either.  He says well I went to Carol and asked

1   for this but she said no, Dave knew what he was getting into.  I'm like oh that was the re-

2   negotiation?

3   STUART:  That was it?

4   DAVID:  Yeah.  And I was trying not – you know he's trying to sell me on yeah you

5   want to build your salary so when you go on vacation – but I go yeah, I'd love to build

6   my salary but $3,000 a year, $400 a month, $100 a week you're paying me to teach two

7   lessons I don't teach.  That's why I tried to be respectful because he's like that's the max,

8   I'm like well.  If I was making $30,000 a year than yeah that 10% raise is great so I'm

9   making over six figures, throwing in $3,000 when I know I made you 97 more than you

10  were expecting to?  Like I don't expect a 50/50 split but I was thinking more in the range

11  of like a $10,000 raise or something substantial.  So we'll see.  But yeah I just don't

12  know.  I don't know.  I'd like to see what Will's deal is and Josh's deal and see if they

13  were better negotiators than me when they came in except they're ….

14  STUART:  Well I don't know.  But you gotta remember Will works constantly.

15  DAVID:  I know.  He's nuts.  He makes the most money though of anybody at the clubs.

16  STUART:  Josh, I don't think Josh is still

17  DAVID:  And I guess Carol doesn't like that.  Well Josh can't because they're revenue is

18  tiny every month.  They're in the teens.  We're in like almost the [indiscernible].  And

19  he's got to be doing half of their revenue.

20  STUART:  Yeah.  So who knows what goes on there.

21  DAVID:  Yeah.  [indiscernible] if all their money's going through them, through the

22  channels.  Who's the -- there's a new manager

23  STUART:  Oh gosh I don't even know.

1  DAVID:  So he's going to know he hands it out more than the manager 'cause the

2  managers know.  That'd be interesting.  But see now I'm like what the fuck.  Josh would

3  be like [indiscernible and cross talk]

4  STUART:  Yeah that's the thing.  You don't want to mess it up for anybody else.

5  DAVID:  If he's gotten a better deal then.  But when she started doing this I was just like

6  go away.

7  STUART:  Yeah she's become a tough person.

8  DAVID:  Every time we talk I try and tell her.  I'm like listen, I can't convince, I can't

9  bring in new members if you don't let them come and try.  I'm not going to bring in any

10  members.  I'm here all day.  How are you going to expose people to the club is you

11  severely limit their ability to come try it?  I've always thought once a week and people

12  financially aren't going to commit to paying 200 bucks a month if they're only doing

13  something once a week cause [indiscernible].

14  STUART:  Well exactly.  That's the thing.  They're not going to

15  DAVID:  I can see their side too.  They spent 3 million dollars.  It's a private club

16  [indiscernible] and there are.  I mean you know what a health club's like.  There's

17  probably 500 people that don't average 4 times a month and they're still members.  They

18  just pay their dues because when they feel like going out or when they think about or

19  when it gets hot.  So I can see her side of it too from that.  She's like well somebody that

20  comes every week once a week, that is a member.  And I'm like if I worked in

21  membership I'd probably look at it that way too but then I try and tell her but tennis

22  people are cheap.  They're not going to pay 50 bucks extra for a lesson.  But it's like

23  whatever.  Looks like she's not going to see it then.  I lost that fight.

1   STUART:  No 'cause they're pretty much paying $120 a month anyway to take that

2   lesson once a week.  That's how much they're getting.  So you're losing per person.

3   That's what you're losing a month.

4   DAVID:  Who?

5   STUART:  The club.

6   DAVID:  See the club will look at it like you're your thing so they want what you said

7   which is -- they want to make the money off the membership dues 'cause they're going

8   to look at each lesson and they're going we don't make any money off Stuart teaching a

9   lesson 'cause as bad as we think we have it and by the time they pay Laura to put it in the

10  system, the front desk person to ring it up, all those taxes, like if we're saying we only

11  make 25 they're only taking 40%; they're not getting rich off their cut of our lessons

12  either.  So they're looking at it like well I don't want Stuart teaching a non-member, if

13  he's out there teaching them we make the money off of membership and we break even

14  on the lesson; that's their mindset on it so that's the way we got to look at it.  Other than

15  the academy we don't generate much money.  Of the $18,000 a month we do in our

16  lessons and privates.  I mean the average split is probably more than 40 then 'cause Dez

17  is still at 50, Warren's still at 50.  All the younger other pros went at 50%.  All of them

18  teach private maybe one, two Saturdays a month.  But yeah Mike and those guys

19  wouldn't touch a 60/40 split.

20  STUART:  No

21  DAVID:  And some of it's just the nature of the club.   Yeah there are payroll taxes and a

22  lot of this is

23  STUART:  I get it

49

1    DAVID:  if you're teaching in a park there's no payroll taxes.  If you look ahead

2    probably over the summer or going into the Fall [indiscernible] again and then I think

3    that's a good time to also do that and you can use me.  You can say well Dave set the

4    prices.  And you're busy enough.  If you do lose a couple or if you need to grandfather a

5    couple people in

6    STUART:  I'd do the regulars that do a lot.

7    DAVID:  And I would encourage even with the regulars, throw it out and see how they

8    react.

9    STUART:  Yeah.  Well because it's been the same for a long time too.

10   DAVID:  Yeah you know I'd just say listen, the club takes a big chunk and everybody's

11   going up.  I bet at least half of them probably go oh that's no big deal, [indiscernible].

12   STUART:  [indiscernible] not going to make any difference.

13   DAVID:  In the long term 'cause you know it's 5 bucks to them but it's 10, 20 grand a

14   year at the end of the year which as much as the other stuff sucks at least at the end of the

15   ꞌyear you're making more.  Per hour is what you really want to focus on.  It's like how

16   much am I making per hour.  And then like you said it's up to you how much you work

17   but you want to feel like – your average hourly is going up.  How are the groups you

18   have?  It seemed like you have like 5 and 6

19   STUART:  On the Tuesdays?  All those classes in the mornings are 5 or 6 people.

20   DAVID:  Something long term you just got to keep trying to build those.  Put a couple

21   more – more amount of time and maybe in the Fall we try and find a new group or a new

22   whatever because I'll give you first crack at all those type things rather than letting Dez

23   have any.  My plan with those people is to not really let them have their own classes till

50

1   they've been here five years then maybe they're just hourly.  If they don't like it move

2   on.

3   STUART:  Alright

4   DAVID:  Alright some stuff to think about.

5   STUART:  Thank you

6   DAVID:  Sure

7   STUART:  We should do this more often.  (laughing).

8   DAVID:  No way.

9   STUART:  Thank you Dave.

10   DAVID:  Sure

11

12   **End of official recording.**

13

14   DAVID:  I'm not holding my breath.

15   STUART:  We can only try.  That's all.

16

17

18

19                                            Certification

20           I, Marybeth Abodeely, MBA Legal Transcription, Phoenix, Arizona, do hereby

21   swear and/or affirm that the foregoing is an accurate transcript to the best of my ability.

22           I FURTHER CERTIFY that I am in no way related to nor employed by any of the

23   parties hereto, nor am I in any interested in the outcome hereof.

24                                        *Marybeth Abodeely*

25                                        Dated approximately January 1, 2019

51

1

2

McNicol v. DMB

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT O

**Texts (SM35)**

**4:32**





David ›

Text Message

Unfortunatley no, write up about not fulfilling the current description.  You have not attended the last 5 events at the club, even after we spoke.

iMessage



Tue, May 15, 8:41 PM

St. Paddy's Social, Club Mixed Doubles Champs social, The Strategic Plan (excused, I know your daughter was sick) TGen fundraiser clinic, and Cinco De Mayo social

Wed, May 16, 4:25 PM

 

   

SM035

**McNicol v. DMB**

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT P

**E-mail (DMB 000205-206)**

From: Gabrielle Lachapelle <GLachapelle@dmbclubs.com>
Sent: Wednesday, May 9, 2018, 1:03 PM
To: David Critchley <DCritchley@dmbclubs.com>
Subject: RE: Stuart Final PIP
Attachments: Stuart McNicol Written.doc

Hi Dave,
Here is the finished PIP. There is not enough documented incidents to make this a Final so it is a Written.
Please let me know when you and Jim plan to deliver this to Stuart. Bring up all the talking points that
you have shared during the PIP conversation with Stuart, clearly outline what your expectations are of
him going forward. I did send you his job description right? He already has a copy, I gave it to him when
we met.

Then, when he does not meet a clear expectation that you have outlined for him please follow up with
him and ask him why he failed to accomplish the task or expectation. If the answer is unreasonable then
we can move forward with further Performance Improvement Plan progressive discipline. It's very
important to keep a record of when you asked employees to do tasks, when you followed up to address
behaviors and what was said. Most managers keep some sort of log or spreadsheet to track this in an
organized manner.

Let me know if you have any questions.

I'm at DCR if you would like to call me here. I am free until 2:30pm, then in a meeting until @ 4:30pm. If
you don't reach me in the office here, my mobile number is 480-215-5994. I will be back at Gainey
tomorrow and then presenting MEDP training all day on Friday.
Thank you,
**Gabrielle Lachapelle | Human Resources Generalist/Recruitment**
Village Health Clubs & Spas | Life's Better at the Village
P 480-624-9118 F 480.367.7552 W www.villageclubs.com

*Now Hiring Apply @ http://jobs.villageclubs.com/*



From: Gabrielle Lachapelle
Sent: Wednesday, May 09, 2018 11:12 AM
To: David Critchley <DCritchley@dmbclubs.com>
Subject: RE: Stuart Final PIP

I'm at DCR today, you likely called me at Gainey.

I can't write Stuart up for incidents where he notified you beforehand and especially if his child was sick.
I will need to remove these two.

DMB000205

As far as the details you are including, these are important talking points while addressing your issues with him when you deliver the PIP with Jim. We only put facts of incidents onto the PIP documentation.

If a member is willing to share what they overheard Stuart say, but is not willing to be known, then we can't put what they overheard into the PIP. You can use this as a talking point when you have the conversation with him. I would ask him why he is saying these things.

**Gabrielle Lachapelle** | Human Resources Generalist/Recruitment
Village Health Clubs & Spas | Life's Better at the Village
P 480-624-9118 F 480.367.7552 W www.villageclubs.com

*Now Hiring Apply @ http://jobs.villageclubs.com/*



**From:** David Critchley
**Sent:** Wednesday, May 09, 2018 10:58 AM
**To:** Gabrielle Lachapelle <GLachapelle@dmbclubs.com>
**Subject:** RE: Stuart Final PIP

I just tried to call your office number. I think I answered most of questions in my previous email.

For the strategic plan he said his daughter was sick. For the St. Paddy's day social I noted he said he was out of town. The only other reason he gave for not attending or doing any of his duties of head pro. Was: "it is hard to have a good attitude and want to do things when things are constantly taken away from me". I asked him what and he said " he used to keep 100% of stringing and racket sales, now club gets a percentage. He was told when he was hired the salary was to offset the high commission, now he is expected to work for it. Club is taking away "his clients" (Referring to nonmembers he teaches at the club).

He was once again caught complaining about Jim and Carol and the club to another employee. A member overheard the entire conversation, but does not want to get involved and Stuart would know it was that member that told me.


Dave

**From:** Gabrielle Lachapelle
**Sent:** Wednesday, May 09, 2018 9:38 AM
**To:** David Critchley <DCritchley@dmbclubs.com>
**Subject:** RE: Stuart Final PIP


Hi Dave

DMB000206

Let me know once you have had a chance to view the PIP on a computer and then I will finish editing it. Do you know when you and Jim plan to deliver it?

Thanks
Gabrielle Lachapelle | Human Resources Generalist/Recruitment
Village Health Clubs & Spas | Life's Better at the Village
P 480-624-9118 F 480.367.7552 W www.villageclubs.com

*Now Hiring Apply @ http://jobs.villageclubs.com/*



**From:** David Critchley
**Sent:** Tuesday, May 08, 2018 6:15 PM
**To:** Gabrielle Lachapelle <GLachapelle@dmbclubs.com>
**Subject:** Re: Stuart Final PIP

For St. Paddy's day he did inform me he was going to be out of town - did not ask. I actually asked him to run it as it fell on my birthday weekend. I instead cancelled my plans as he was not willing to attend.

For the strategic planning he let me know day of that he would not be attending.

On May 5th was our Cinco De Mayo Tennis social.

I am on my phone and couldn't see any notes, so I will double back when I can get on a computer.

Dave

Dave Critchley
Director of Tennis
DC Ranch Village

On May 8, 2018, at 4:52 PM, Gabrielle Lachapelle <GLachapelle@dmbclubs.com> wrote:

> Dave,
> Here is the PIP. Thank you for getting back to me. This is still in progress. I have added a few comments in the margin that are items that need to be completed to finish this. Please let me know the answers and I will finish it and send it back to you when it is ready to be delivered. Let me know if anything is not accurate or if you have anything else that is concrete that we should add.
>
> Thank you,
> Gabrielle Lachapelle | Human Resources Generalist/Recruitment
> Village Health Clubs & Spas | Life's Better at the Village
> P 480-624-9118 F 480.367.7552 W www.villageclubs.com

DMB000207

*Now Hiring Apply @ http://jobs.villageclubs.com/*

<image001.png>

**From:** David Critchley
**Sent:** Tuesday, May 08, 2018 3:34 PM
**To:** Gabrielle Lachapelle <GLachapelle@dmbclubs.com>
**Subject:** Stuart Final PIP

Gabrielle,

Here are some of the dates. There are several other things on his duties that he is not fulfilling, but here are the specifics I have documented.

On January 9th at 1pm I requested that Stuart create a poster promoting stringing and for him to write an informative article also about stringing. As of May neither has been done and I have followed up with him 4 times verbally. When we have spoken about he said he does promote stringing verbally and did concede he had not done this when we met in person on Wednesday April 4th.

Stuart did not attend the mandatory roll out of the Strategic Plan Rollout Mandatory Manager on April 6th.

Stuart has not attended the last 4 tennis socials: St. Paddy's Day March 17th , Mixed Doubles club Championships on April 21st ,T- Gen fundraiser that we discussed him getting some people to attend and him helping teach it . In a written document presented to Stuart by the former director and Jim it clearly outlines he is expected to attend all tennis social events at the club or ask the director or GM for permission to not attend.

We met in person about his role again on May 3rd and yet did again not attend or communicate that he would not be attending the social on May 5th, 2018.

I had to encourage Stuart to sing up for mandatory Linked in Learning as he did not respond to Diana's several requests to at least sign up. She had to email Jim and myself to get it done.

Here is email from Diana

**From:** Diana Gevelhoff
**Sent:** Thursday, March 15, 2018 4:49 PM
**To:** RJ Heyer <rheyer@dmbclubs.com>; William White <WWhite@DMBClubs.com>; Ryan Sawyer <RSawyer@dmbclubs.com>; Cyndi Van Voorhees <CVanVoorhees@dmbclubs.com>; Stuart McNicol <SMcNicol@DMBClubs.com>; Peter Fantich <PFantich@dmbclubs.com>
**Subject:** LinkedIn Learning

Cyndi, and Stuart,

You haven't signed up for LinkedIn Learning yet. We have made a significant investment to bring this new online learning program to all of our managers. The first mandatory course, Communication Foundations, is due March 31 and is a 2 hour online course. I have sent several emails to you and wonder if you having trouble signing up? If you need help, call me. The invite to sign up will come from Village Health Clubs & Spas via LinkedIn Learning messages-noreply@linkedin.com

Let me know if I can help. Thanks.

**Diana Gevelhoff | Executive Assistant**
Village Health Clubs & Spas |People|Places|Programs
**P** 480.609.6979 **W www.villageclubs.com**

<Stuart McNicol.doc>

**McNicol v. DMB**

2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT Q

**E-mail (DMB 000197)**

From: Gabrielle Lachapelle <GLachapelle@dmbclubs.com>
Sent: Monday, May 7, 2018, 8:48 AM
To: David Critchley <DCritchley@dmbclubs.com>
Subject: RE: Stuart

I did start it but can't do anything without the additional info. Thanks for working on it. Yes, we do need the dates that you verbally asked him about stringing. If you can try to nail down one that would be good.

We should also include the recent events that you mention. Did you tell him that he was required to attend? I don't see in his job descript that he is required to attend but assume you told him he is. Let me know, thanks.

Have you directly asked him why he is booking courts under his name? When you did, what did he say? If he does it again you need to ask him about it and should follow up to see what he is doing/charging for that time slot.

**Gabrielle Lachapelle** | Human Resources Generalist/Recruitment
Village Health Clubs & Spas | Life's Better at the Village
P 480-624-9118 F 480.367.7552 W www.villageclubs.com

*Now Hiring Apply @ http://jobs.villageclubs.com/*



**From:** David Critchley
**Sent:** Monday, May 07, 2018 8:29 AM
**To:** Gabrielle Lachapelle <GLachapelle@dmbclubs.com>
**Subject:** Re: Stuart

You said you would start working on it so I didn't realize you were waiting for me.

I will send you the specific dates I have for some of the communications today. I addressed all the points again in another conversation last week.

He said he didn't attend the TGen because I didn't specifically ask him to help. He did concede hat I had asked him to help promote it and work when we created the event.

He did not give a reason for why he did not attend the socials. He did not attend the social this past Saturday either.

I will get dates to you today for specific conversations that I have. If I don't have it documented do we have to leave it out? For example, I followed up verbally 3-4 times about stringing marketing, but did not document those dates?

DMB000197

# McNicol v. DMB

## 2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT R

**E-mail (DMB 000082)**

**From:** Diana Gevelhoff
**Sent:** Thursday, March 15, 2018 4:49 PM
**To:** RJ Heyer <rheyer@dmbclubs.com>; William White <WWhite@DMBClubs.com>; Ryan Sawyer <RSawyer@dmbclubs.com>; Cyndi Van Voorhees <CVanVoorhees@dmbclubs.com>; Stuart McNicol <SMcNicol@DMBClubs.com>; Peter Fantich <PFantich@dmbclubs.com>
**Subject:** LinkedIn Learning

Cyndi, and Stuart,
You haven't signed up for LinkedIn Learning yet. We have made a significant investment to bring this new online learning program to all of our managers. The first mandatory course, Communication Foundations, is due March 31 and is a 2 hour online course. I have sent several emails to you and wonder if you having trouble signing up? If you need help, call me. The invite to sign up will come from Village Health Clubs & Spas via LinkedIn Learning messages-noreply@linkedin.com

Let me know if I can help. Thanks.

**Diana Gevelhoff | Executive Assistant**
Village Health Clubs & Spas |People|Places|Programs
**P** 480.609.6979 **W** www.villageclubs.com

2

DMB000082

# McNicol v. DMB

## 2:19-cv-00750

**Plaintiff's Exhibits to Response to Defendant's Motion for Summary Judgment**

# EXHIBIT S

**E-mail (DMB 000454)**

| Name | Email | Course | Hours Viewed | Percent Completed | Started | Last Viewed | Completed | Course Language | Course ID | Groups | Number of Assessments Completed | Total Assessments | Unique User ID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stuart McNicol | smcnicol@dmbclubs.com | Communication Foundations (2013) | 2.1625 | 100% | 3/25/18, 9:00 AM | 3/25/18, 11:30 AM | 3/25/18, 11:30 AM | English | 141501 | DC Ranch Village | 0 | 0 | |

DMB000454