## UDALL | SHUMWAY
COUNSELORS AT LAW SINCE 1965

1138 NORTH ALMA SCHOOL ROAD, SUITE 101
MESA, ARIZONA 85201
Telephone: 480.461.5300 | Fax: 480.833.9392

Bradley D. Gardner (SBN: 011211)
bdg@udallshumway.com
*Attorney for Plaintiff*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stuart McNicol,<br><br>Plaintiff,<br><br>v.<br><br>DMB Sports Clubs Limited Partnership,<br><br>Defendants. | Case No.: 2:19-cv-00750-MTL<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Stuart McNicol ("Plaintiff" or "Stuart") hereby responds to Defendant's Motion for Summary Judgment (Dkt 42) and requests that the motion by Defendant DMB Sports Clubs Limited Partnership ("Defendant" or "DMB") be denied as genuine issues of material facts exist requiring a trial on both the Fair Labor Standards Act ("FLSA") retaliation claim and the wrongful termination claim require a trial.

## I.    FACTUAL BACKGROUND

### A.    Stuart Hired

Stuart, a successful professional tennis instructor, was hired in March 2014 as the Head Tennis Professional ("Head Pro") to establish a tennis program and work under Nick Heron ("Heron"), who was the then Tennis Director. (Ex. A [McNicol] depo 16:4-15, 21:13-22:5, 22:13-24) (Dkt 42-1, ex. 3, p. 97-99). Stuart was paid a salary for his administrative duties and an hourly rate (commission) for teaching group or private lessons. (Ex. A depo 24:1-23). Although the club Stuart worked at was a private club, non-members could take lessons there when Stuart was hired. (Ex. A depo 22:8-12)

1    The Tennis Director reports to the General Manager for the club.  (Ex. A depo
2  29:23-30:8).   Heron was the Tennis Director when Stuart was hired and through
3  September 2016, and David Critchley ("Critchley") succeeded Heron in November
4  2016.  (Ex. A depo 25:21-23, 74:12-14, 76:17-21) (Ex. B [Critchley] depo 21:23-22:1,
5  23:25-24:8) Jim Krimbill ("Krimbill") served as the General Manager and he reports to
6  the President.   (Ex. C [Krimbill] depo 9:14-15, 12:15-13:7, 15:3-5, 20:16-18).   The
7  General Manager is aware of all salary and compensation amounts for employees for
8  budgeting purposes and the General Manager's bonus can be affected by whether
9  budget goals are met. (Ex. C depo 15:14-16:24, 41:3-11).

10    **B.    No Change To Stuart's Compensation After January 2016**

11    In January 2016 because of his good work as the Head Pro, Stuart received a
12  salary increase.  (Ex. A depo 24:24-25:10, 25:18-20).   Thereafter, Stuart received no
13  further salary increase and his hourly commission for teaching did not increase while he
14  worked at DMB. (Ex. A depo 24:24-25:17).  Other tennis professionals were later hired
15  to teach group and private lessons, and they were paid more than Stuart.  (Ex. A depo
16  26:8-27:5, 162:18-163:23, 165:23-168:20).   Other tennis pros also received raises
17  (including Critchley for his teaching duties), while Stuart did not. (Ex. B depo 60:22-
18  61:3, 71:1-6).  Critchley told Stuart that he asked Krimbill for a raise for Stuart but
19  Krimbill said he would absolutely not give one to Stuart.  (Ex. A depo 169:1-15).
20  Critchley offered to add fictitious hours to compensate for not getting a raise.  (Ex. A
21  depo 169:11-170:2).  Critchley said he sought several times to get a raise for Stuart but
22  the General Manager always said no.  (Ex. B depo 60:5-16).

23    **C.    No Issue With Stuart's Performance Until He Makes Overtime Claim
       And Efforts To Retaliate**

24    Stuart does not recall Heron ever discussing with him any problems with Stuart's
25  job performance.  (Ex. A depo 57:17-22).  Heron provided positive reviews of Stuart's
26  performance.  (Ex. G, Perf. Reviews).  Stuart was presented in August 2016 with a
27  document entitled Expectations for Success which he discussed with Heron and the
28  General Manager. (Ex. A depo 61:7-62:4 and Ex. 3) (Dkt 42-1, ex. 6, p. 126-128).  It

was not given to him as a criticism of his work performance but just to outline expectations going forward. (Ex. A depo 62:5-63:22, 68:20-69:12) (Ex. C depo 47:12-24, 48:1-49:16). Stuart was already doing the things outlined in the memo and many items did not apply to him. (Ex. A depo 63:23-68:12).

In August 2016 Stuart reported to HR and the General Manager that he had worked overtime and had not been compensated. (Ex. A depo 69:17-70:13, 71:18-72:8 and Errata) (Ex. C depo 36:3-37:18). Stuart was seeking ways to increase his income when he met with them. (Ex. A depo 70:7-21, 71:4-6). Stuart's report resulted in an investigation and DMB acknowledged in September 2016 that it owed $5,964.33 to Stuart for unpaid overtime. (Ex. A depo 73:4-74:1) (Dkt 42-1, p. 135-137). The General Manager was informed at the time of the results and the payment. (Ex. C depo 52:6-14).

In the Fall of 2016 McNicol applied for the open Tennis Director's position but was not even granted an in-person interview by the panel which included the General Manager. (Ex. A depo 75:12-19, 75:22-76:5) (Ex. C depo 42:17-43:18). The General Manager made the decision on whom to hire for Tennis Director. (Ex. C depo 4:19-24).

In October 2016, in an email exchange Stuart responded to the General Manager's raising of issues which were not duties Stuart's job had previously entailed. (Ex. A depo 110:21-111:15, 112:15-113:22, 114:5-12, 114:24-115:14, 158:8-159:12 and ex. 5). Stuart explained that with the duties he was performing already as Head Pro he was effectively making only $7 per hour. (Ex. A depo 114:13-23 and ex. 5) Stuart was already fulfilling his job duties contrary to the insinuation by the General Manager. (Ex. A depo 115:15-20).

Stuart supplemented his income by using his personal equipment for stringing of racquets of members of the club. (Ex. A depo 52:5-13, 52:14-19). Initially stringing of rackets was not run through DMB and members paid Stuart directly. (Ex. A depo 52:20-53:12). Stuart was the only one doing the stringing. (Ex. A depo 116:18-23). In December of 2016, DMB bought a stringer and then stringing was done through the club's POS system. (Ex. A depo 54:10-25, 55:15-24). This was done at the direction of the General Manager. (Ex. A depo 55:1-14). When stringing was run through DMB

Stuart was paid a set rate of $20 per racquet and he still had to provide the materials. (Ex. A depo 55:21-56:16, 60:6-15). Running stringing through DMB cost Stuart about $100 per month on average. (Ex. A depo 116:5-17, 117:7-10 and ex. 5). The General Manager's plan was to replace Stuart with two underage workers. (Ex. H, Emails).

In December 2016 Critchley and the General Manager presented a false and undeserved negative performance evaluation which Stuart told them he disagreed with at the time. (Ex. A depo 118:10-122:3) (Dkt 42-1, ex. 7, p. 129-134). According to coworkers, Stuart was always professional and supportive and helpful contrary to what the General Manager claimed. (Ex. E, Miller declaration – SM 157). Favorable comments were also provided by members. (Ex. I, Emails). Stuart did not write his comments on the evaluation as the General Manager said it would not matter what he wrote. (Ex. A depo 122:4-15).

### D. General Manager Pushes To Fire Stuart And Fails To Reward Stuart For Good Work Recognized By Tennis Director

In a January 2017 meeting between Stuart and Critchley, the Tennis Director, Critchley said that the General Manager wanted Stuart fired because Stuart had cost DMB too much in overtime pay. (Ex. A depo 85:18-86:1, 86:9-15).

In 2017 at the direction of the General Manager there was a push to promote the Junior Academy for group tennis instruction to children. (Ex. A depo 86:12-87:10). Stuart was not allowed to teach private lessons on the open courts during the Junior Academy hours. (Ex. A depo 86:2-4, 226:15-228:23). Other professionals, however, could teach during that time. (Ex. A depo 90:18-91:8) (Ex. L, Texts).

Once Critchley was able to work with Stuart for a prolonged time throughout 2017, he saw that Stuart was a great asset to the club. (Ex. B depo 67:16-21). Many members joined the club because of Stuart and he was the face of the tennis program. (Ex. B depo 67:16-68:22). The 2017 performance evaluation prepared by Critchley gave a positive evaluation of Stuart's performance. (Ex. A depo 148:6-12, 148:19-24 and ex. 7) (Ex. C depo 55:2-24) (Dkt 42-1, ex. 9, p. 138-142). Stuart met only with Critchley to discuss this evaluation. (Ex. A depo 151:6-10). Some of this praise was

1   for the same things Stuart had been doing in 2016. (Ex. A depo 153:9-19, 154:18-
2   155:15, 155:16-156:20). Although Stuart got a positive evaluation from Critchley, the
3   General Manager was still critical of Stuart in discussions with Critchley, Stuart's
4   supervisor. (Ex. B depo 41:15-21, 45:19-21).

### E.   DMB Prevents Stuart From Teaching Non-Members While Critchley Is Allowed To Do So

7   In January 2018 DMB's Director of Membership sent an e-mail notifying Stuart
8   that non-members could no longer receive lessons at the club unless they agreed to join.
9   (Ex. A depo 85:18-86:1, 92:13-22). This caused Stuart to stop teaching non-members at
10  the club. (Ex. A depo 93:4-25, 94:6-9) (Ex. J, McNicol declaration ¶ 4). Critchley,
11  however, continued to teach non-members. (Ex. A depo 94:10-96:17) (Ex. E, Miller
12  declaration) (Ex. J, McNicol declaration ¶ 6) (Ex. T, Emails).

13  When Stuart complained about the new policy being enforced against him,
14  DMB's Director of Membership told Stuart he was free to teach non-members
15  elsewhere while remaining an employee of DMB. (Ex. J, McNicol declaration ¶ 8).
16  This prompted Stuart to seek a part-time opportunity at another club. (Ex. J, McNicol
    declaration ¶ 8).

### F.   Tennis Director Engages In Illegal Activity And Stuart Reports It

19  In December 2016, Stuart was inadvertently copied on an e-mail chain which
20  made it clear that DMB's management and HR agreed to violate club policy and hire
21  underage sixteen and seventeen-year-olds to start providing lessons. (Ex. H, Emails).
22  As stated by DMB President, "If they are both 17, I could live with it but tell them to
23  say they are 18 if anyone asks…which they shouldn't. No 16 year olds", and Critchley's
24  comment "…if we get desperate could be worth the risk!". (Ex. H, Emails).

25  In 2017 and 2018 Tennis Director Critchley illegally hired and paid off the DMB
26  books/payroll a teenager (Max Geiger) and a foreign national (Harry Busby), without
27  the papers to work lawfully, to help teach in the Junior Academy. (Ex. A depo 124:15-
28  125:1, 125:13-126:14, 128:24-129:6, 131:12-132:11, 135:5-17) (Ex. B depo 26:13-16,
    27:16-28:1, 29:24-30:22, 32:9-16, 33:8-21) (Ex. D, PIP). To hide this and to get the

funds to pay them, another Tennis Pro (Warren Race) had his hours inflated.  (Ex. A depo 127:10-21, 129:7-130:25) (Ex. J, McNicol declaration ¶ 15).  Stuart thought this was illegal.  (Ex. A depo 126:16-127:6, 127:22-128:7, 136:22-137:5, 138:4-12) (Ex. J, McNicol declaration ¶ 16).  Because he did not want to be involved in illegal activity, Stuart did not participate in the Junior Academy starting in May 2017.  (Ex. A depo 145:11-146:8).

Stuart first reported this illegal activity to Critchley on April 4, 2018 and again on May 3.  (Ex. A depo 128:20-23, 138:20-139:9) (Ex. B depo 74:6-75:4).  Critchley believed Stuart when he said what had been done was illegal.  (Ex. B depo 76:2-9).  Critchley, however, expressed to Stuart and others that he was upset about Stuart's report of the illegal activity by Critchley and DMB.  (Ex. J, McNicol declaration ¶ 12) (Ex. M, 5/3/18 Transcript – SM 138:12-21) (Dkt 44-1 p. 12-13).  Previously Stuart had not reported the illegal activity fearing he would be fired as already threatened after he made his overtime claim.  (Ex. A depo 85:18-86:1, 86:9-15, 161:6-24).

Following up, Stuart had his attorney on May 16, 2018 report the illegal activity to the club's president.  (Ex. A depo 141:13-17, 142:10-15) (Dkt 42-1, ex. 17, p. 175-177).  These reports were ultimately borne out as true by an investigation conducted by DMB, although no real discipline was imposed just a directive not to do similar conduct in the future.  (Ex. C depo 29:12-30:16, 31:12-34:2, 34:3-25) (Ex. D, PIP).  During the investigation Critchley admitted to his wrongful conduct.  (Ex. C depo 33:13-34:2).

### G. Tennis Director Begins Retaliating And Stuart Constructively Discharged As Head Pro

Critchley and DMB were aware Stuart had started working at Desert Highlands as of mid-April 2018 and Critchley, the Tennis Director, contacted Desert Highlands rather than simply ask Stuart.  (Ex. K, Email)  DMB's HR Director thought it was underhanded for Critchley to contact Desert Highlands. (Ex. K, Email).

In late April Critchley sought to have Stuart placed on a Performance Improvement Plan ("PIP") for alleged failure to perform duties which was based on false and misleading information.  (Ex. J, McNicol declaration ¶ 13).  A PIP can be the

last step before one is terminated. (Ex. C depo 29:12-30:6). One item dealt with Stuart failing to prepare a poster and writing an article, although those were not in Stuart's duties listed in his Job Description and DMB had a marketing department for those type of tasks. (Ex. A depo 160:12-23) (Ex. J, McNicol declaration ¶ 13A) (Dkt 42-1, ex. 3, p. 97-99). Another item was Stuart's failure to attend the Strategic Planning meeting on April 6, 2018 for which Critchley later admitted Stuart had been excused due to his sick child. (Ex. J, McNicol declaration ¶ 13B) (Ex. O, Text). Another item was Stuart's alleged failure to attend the last four DMB social events, yet Critchley only could name three events in an e-mail and for one of those Critchley was aware Stuart was out of town. (Ex. A depo 207:21-208:15) (Ex. J, McNicol declaration ¶ 13C) (Ex. P, Email). For another event it was moved without Stuart being informed. (Ex. A depo 208:21-209:2). (Ex. J, McNicol declaration ¶ 13C). Critchley admitted for each event, Stuart provided a reason why he could not attend. (Ex. B depo 54:20-55:24). DMB's HR person even had to ask if Stuart was supposed to attend social events as it is not listed in the Job Description. (Ex. Q, Email). Another item was failure to get LinkedIn Learning completed timely by the March 31 deadline for completion, but that was completed timely by Stuart who had to do it on his own time and away from DMB. (Ex. J, McNicol declaration ¶ 13D) (Ex. R, Email) (Ex. S, Report).

At a May 3, 2018 meeting Critchley for the first time raised having new duties for the Head Pro position and discussed with Stuart that if Stuart did not want to perform the new duties envisioned for the Head Pro then Stuart would no longer be the Head Pro, but he could work at the club in another role. (Ex. A depo 193:1-9, 195:12-25). On May 14, Critchley sent to Stuart the duties he wanted the Head Pro to fulfill going forward which would be "in addition, not in place of the current duties listed in the Head Pro Job Description". (Ex. A depo 193:22-194:7 and ex. 9) (Ex. B depo 72:19-73:4) (Dkt 42-1, ex. 16, p. 172-174). The new duties included forcing Stuart back into the Junior Academy with its illegal activity. (Ex. A depo 197:25-198:13, 203:11-20 and ex. 9) (Dkt 42-1, ex. 16, p. 172-174). Effectively in May 2018 Stuart was constructively discharged as Head Pro when his managerial access to the club's tennis system (Spectrum) was denied. (Ex. A depo 196:3-197:13). Such access was

1  necessary to reserve court space for lessons and other duties Stuart had to perform.  (Ex.
2  A depo 197:14-22, 199:14-22, 200:1-201:19).

3      Stuart did not resign from the Head Pro position.  (Ex. A depo 207:21-208:15).
4  Stuart's lawyer on May 16, 2018 notified DMB that he had been constructively
5  discharged from his Head Pro position but was accepting the offer from Critchley to
6  continue to work as a Tennis Pro.  (Ex. A depo 211:2-4) (Dkt 42-1, ex. 17, p. 175-177).
7  Stuart's lesson opportunities declined for Stuart after May 16, 2018 although he said he
8  could and was willing to take them.  (Ex. A depo 211:20-23, 212:3-7) (Dkt 42-1, ex. 18,
9  p. 178-179).  Eventually, the lessons he was teaching continued to decline[1], meaning his
10  income also declined, and so on July 20 Stuart's lawyer notified DMB that he
11  considered himself as constructively discharged from his position as Tennis Pro (which
12  had started as of May 16).  (Ex. F, Paystubs) (Ex. J, McNicol declaration ¶ 17) (Dkt 42-
   1, ex. 17, p. 175-177) (Dkt 42-1, ex. 18, p. 178-179).

13      DMB informed Stuart that he was banned from DMB's property because it was
14  allegedly the policy that all former employees are banned.  (Ex. J, McNicol declaration
15  ¶ 18).  At least five other former employees were not banned, and Stuart apparently is
16  the only one the policy applies.  (Ex. J, McNicol declaration ¶ 19-20).

17      As of October 2019, no one had replaced Stuart as Head Pro and the duties of
18  that position were being done by Critchley and front desk personnel, although some of
19  the duties set forth in May 2018 are simply not being performed.  (Ex. A, depo ex. 9)
20  (Ex. B depo 76:18-82:3) (Dkt 42-1, ex. 16, p. 172-174).

21      **H.    Stuart Works At Desert Highlands**

22      Stuart worked as a part-time Assistant Tennis Pro at the Desert Highlands
23  Association's club starting in February 2018 and he only became the Head Pro at that
24  club on August 29, 2018.  (Ex. A depo 96:18-97:25, 100:9-25, 101:5-9, 104:25-105:24,
25  216:25-217:21 and Errata) (Dkt 42-1, ex. 14-15, p. 156-171)  Stuart only went to work

26

27  [1] It is true that Stuart had declined a few sporadic lesson opportunities, but some were
28  for legitimate reasons and others Stuart does not recall why they were declined.  (Ex. A
   depo 213:24-216:8)

1  at Desert Highlands after he was told he could not teach non-members at DMB's club
2  and he had students who were a member at Desert Highlands so he could teach them
3  there. (Ex. A depo 93:4-25, 104:14-17). Desert Highlands did not require any specific
4  hours for McNicol to work except for the one day a week he was scheduled. (Ex. A
5  depo 101:5-9, 104:25-105:24).

6  ## II.   FLSA RETALIATION CLAIM

7      Under the FLSA, an employer may not "discharge or in any other manner
8  discriminate against any employee because such employee has filed any complaint or
9  instituted or caused to be instituted any proceeding under or related to this chapter, or
10  has testified or is about to testify in any such proceeding, or has served or is about to
11  serve on an industry committee." 29 U.S.C. § 215(a)(3).  The statute "protect[s]
12  persons who report illegal conduct to government agencies or complain about such
13  conduct to their employers, even though they have not yet instituted a formal
14  proceeding." *Perez v. Oak Grove Cinemas, Inc.*, 68 F.Supp.3d 1234, 1247 (D. Or.
15  2014) (*quoting Leonard v. St. Rose Dominican Hosp.*, 310 F.3d 653, 655 (9th Cir.
16  2002)).  The FLSA is interpreted broadly to give effect to the statute's remedial
17  purpose. *Regan v. HDR Engineering, Inc.*, 2019 WL 5895429, * 3 (D. Ida. 11/12/19).
18  It is designed to encourage employees to report alleged violations of the FLSA's
19  substantive provisions without fear of reprisal. *Id.*

20      When evaluating a retaliation claim in the summary judgment context, the
21  plaintiff bears the initial burden to establish a prima facie case of FLSA retaliation by
22  showing: 1) plaintiff engaged in activity protected by the FLSA; 2) defendant took an
23  adverse employment action; and 3) there was a causal link between the protected
24  activity and the adverse action. *Id.* At the summary judgment stage, the degree of proof
25  necessary to establish a prima facie case is minimal and does not even need to rise to the
26  level of a preponderance of the evidence.  *Id.* (*quoting Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005)).

27      The Motion challenged only whether a prima face case could be made by
28  Plaintiff as to elements 2 and 3.  The FLSA requires an employer to pay employees for

9

1  any overtime if they are in non-exempt positions.   Reporting a claim for overtime
2  compensation is protected activity under the FLSA as the Motion admits.[2]  *See*
3  *Rosenfield v. GlobalTranz Ent., Inc.*, 811 F.3d 282, 286 (9th Cir. 2015), *cert. denied*,
4  137 S.Ct. 85 (2016).  The Motion acknowledges this was done in August 2016 and the
5  claim paid in September 2016.  The FLSA also requires record keeping by employers
6  about hours worked and wages paid.  29 U.S.C. §211(c); 29 C.F.R. Part 516.  Thus,
7  Stuart's complaint in April and May of 2018 about the illegal off the book payments
8  also would qualify as protected activity under the FLSA (and Arizona law as well).

9      **A.    Plaintiff Was Subjected To A Series Of Adverse Employment Actions**

10         Defendant first argues that the FLSA claim fails because there was no adverse
11  employment action.  An employment action is adverse if it would dissuade a reasonable
12  worker from engaging in FLSA-protected activity.  *Ray v. Henderson*, 217 F.3d 1234,
13  1235 (9th Cir. 2000) (Title VII case); *Regan v. HDR Engineering, Inc.*, 2019 WL
14  5895429, * 4 (D. Ida. 11/12/19); *see also Burlington N. and Santa Fe Ry. Co. v. White*,
15  548 U.S. 53, 68 (2006) (Under Title VII, "an action is cognizable as an adverse
16  employment action if it is reasonably likely to deter employees from engaging in
17  protected activity."); *McBurnie v. City of Prescott*, 511 Fed. Appx. 624, 625 (9th Cir.
18  2013) (applying the *Burlington* standard to an FLSA retaliation claim).   While this
19  analysis is objective, context matters and an immaterial act in some situations is
20  material in others depending on the circumstances, expectations, and relationships.
21  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).   Adverse
22  employment actions are broadly defined by the Ninth Circuit and are not limited to
23  actions such as discharges, transfers, or demotions. *Hashimoto v. Dalton*, 118 F.3d 671,
24  679 (9th Cir. 1997) (Title VII case).  Instead, adverse employment actions may include
25  lateral transfers, unfavorable job references, and changes in work schedules. *Ray v.*
26  *Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000).  Actions which reduce an employee's
27  pay are also adverse employment actions.  *Id.* at 1243-44.

28  [2] Arizona law also requires payment of wages by employers, withholding of taxes, and
    record keeping by employers.  A.R.S. § 23-350 et seq.; A.R.S. § 23-361.01.

1   DMB's motion on p. 9 acknowledges six different adverse employment actions

2   citing to ¶ 52 of the Amended Complaint[3]: (1) Stuart did not receive a raise at the end of

3   2016; (2) Stuart received a negative performance review at the end of 2016; (3) Stuart

4   was denied employee benefits; (4) Stuart did not receive a raise at the end of 2017; (5)

5   Stuart had policies selectively applied only to him[4]; and (6) Stuart was constructively

6   discharged.[5]   And while the Motion states "several of the actions of which Plaintiff

7   complains do not constitute adverse employment actions",  but the only one specifically

8   challenged (see fn 7 on p. 9 of the Motion) is item 3 relating to employee benefits and

9   then only because they were allegedly not specified.[6]   The other retaliatory acts all

10  qualify as adverse employment actions.  *See Davis v. Team Elec. Co.*, 520 F.3d 1080,

11  1089 (9th Cir. 2008) (an adverse employment action is one which materially affects the

12  compensation, terms, conditions, or privileges of employment); *Yartzoff v. Thomas*, 809

13  F.2d 1371, 1376 (9th Cir.1987) (transfers of job duties and an allegedly undeserved

14  negative performance rating can constitute adverse employment action for retaliation

15  claim); *Garcia v. Los Banos Unified Sch. Dist.*, 418 F. Supp. 2d 1194, 1224 (E.D. Cal.

16  2006) (series of retaliatory events including a negative performance evaluation, constant

17  negative comments, continuing offensive conduct, and rude and hostile behavior can

18  constitute adverse employment action).

19      DMB's Motion ignores other retaliatory acts by it towards Stuart which were

20  alleged and proven by the evidence.  The Amended Complaint incorporated these other

---

[3] The Amended Complaint was filed by Stuart pro per and is to be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  )

[4] Even after Stuart stopped working for DMB, DMB's lawyers notified him that by policy he like all former employees were banned from being on any DMB property. (Ex. J, McNicol declaration)  However, at least five other former employees have been allowed back to DMB's properties.  (Ex. J, McNicol declaration)  So the unequal treatment continued even after termination.

[5] Below is a list of additional allegations of retaliation which should be included either under the umbrella of constructive discharge or on their own because they were also alleged and incorporated into the FLSA claim in the Amended Counterclaim.

[6] Stuart was denied health benefits expressly because of his overtime claim which was paid by DMB. (Ex. N, 4/4/18 Transcript – SM 076:3-23, SM 0077:1-2) (Dkt 1-3, p. 24, ¶ 43)

1   allegations through ¶ 51 and 53.  (Dkt 1-3, p. 25-26, ¶ 51, 53).  These other adverse

2   employment allegations alleged and proven include: (7) hiring underage teenagers in

3   early 2017 to take over stringing of racquets to reduce Stuart's income (Dkt 1-3, p. 22, ¶

4   26) [Section I(C) supra]; (8) Critchley in April 2018 sought to interfere with Stuart's

5   employment at Desert Highlands (Dkt 1-3, p. 20, ¶ 11) [Section I(G) supra]; (8) forcing

6   Stuart in May 2018 to be involved with the Junior Academy despite the illegal activities

7   going on or forcing Stuart to stop being the Head Pro and serve only as a Tennis

8   Professional (Dkt 1-3, p. 24-25, ¶ 38, 44) [Section I(F)-(G) supra]: (9) adding in May

9   2018 additional duties to the job of Head Pro to force him to get out of that position

10  (Dkt 1-3, p. 24, ¶ 39-40) [Section I(G) supra]; (10) preparing in April and May 2018 a

11  false write up of Stuart (Dkt 1-3, p. 24, ¶ 42-43) [Section I(G) supra]; (11) denial of

12  health benefits to Stuart in April 2018 because he had cost the company money on his

13  overtime claim (Dkt 1-3, p. 24, ¶ 43) [(Ex. N, 4/4/18 Transcript – SM 076:3-23, SM

14  0077:1-2); and (12) removing Stuart's managerial access to DMB's system impeding

15  Stuart's work performance (Dkt 1-3, p. 25, ¶ 48) [Section I(G) supra - (Ex. A depo

16  196:3-197:13)].   These would all fall within the broad definition of an adverse

17  employment action as articulated by the Ninth Circuit and the EEOC.

18       Stuart has identified a slew of adverse employment actions which are cognizable

19  as retaliation because a reasonable employee would likely not pursue a FLSA protected

20  activity considering the various retaliatory acts.

21       **B.    There Are Genuine Issues Of Material Fact As To A Causal Link**

22       The primary attack on the FLSA retaliation claim is the assertion that no causal

23  link between the FLSA protected activity and the alleged adverse employment actions

24  exists.  To show causation, a plaintiff must establish that his or her protected activity

25  was a but-for cause of the alleged adverse action by the employer.  *McBurnie v. City of*

26  *Prescott*, 511 Fed. Appx. 624, 624 (9th Cir. 2013).   When adverse employment

27  decisions closely follow protected activity, retaliatory intent may be inferred.  *Pardi v.*

28  *Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004).   The causal connection can

    also be demonstrated by direct or other circumstantial evidence as well.  Even a single

1   comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary

2   judgment for the employer. *Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027,

3   1039 (9th Cir. 2005).  Direct evidence of a discriminatory animus means a triable issue

4   is created as to the actual motivation of the employer even if the evidence is not

5   substantial. *Id*. at 1038.  The discriminatory statement need not be in the context of the

6   employment decision. *Id.*at 1039-40; *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145,

7   1149 (9th Cir.1997) (holding that an employer's reference to an employee as a "dumb

8   Mexican" "could be proof of discrimination against [plaintiff] despite their reference to

9   another agent and their utterance after the hiring decision").

10      Here DMB's General Manager told Stuart's direct supervisor that the General

11   Manager wanted to fire Stuart because he made a claim for overtime compensation

12   which was paid by DMB.  (Ex. A depo 85:18-86:1, 86:9-15).  The same General

13   Manager is the one who provided the negative 2016 performance evaluation and denied

14   a raise to Stuart in 2016 and 2017 so he would not be paid as much as the other tennis

15   professionals.  (Ex. A depo 24:24-25:17, 118:10-122:3, 169:1-15) (Dkt 42-1, ex. 7, p.

16   129-134).  This happened even when the 2017 performance evaluation was positive.

17   (Ex. A depo 148:6-12, 148:19-24 and ex. 7) (Ex. C depo 55:2-24) (Dkt 42-1, ex. 9, p.

18   138-142).  Other pros received raises while Stuart did not.  (Ex. A depo 26:8-27:5,

19   162:18-163:23, 165:23-168:20) (Ex. B depo 60:22-61:3, 71:1-6).  Additionally, at the

20   April 4, 2018 meeting Critchley told Stuart that DMB was denying Stuart health

21   benefits because Stuart had cost the company money with his overtime claim.  (Ex. N,

22   4/4/18 Transcript – SM 076:3-23, SM 0077:1-2).

23      Contrary to the Motion's assertion, the August 2016 Expectations for Success

24   memo was a generalized memo and not about any alleged work deficiencies.  (Ex. A

25   depo 62:5-63:22, 68:20-69:12) (Ex. C depo 47:12-24, 48:1-49:16) (Dkt 42-1, ex. 6, p.

26   126-128).  The December 2016 performance evaluation was not a true or valid

27   evaluation by the biased General Manager.  (Ex. A depo 118:10-122:15) (Ex. E, Miller

28   declaration) (Ex. I, Emails) (Dkt 42-1, ex. 7, p. 129-134).  It is for the jury to determine

1    if there were legitimate grounds for this evaluation or if it was part of the General

2    Manager's stated intent to fire Stuart.  This evaluation also followed shortly after the

3    protected overtime claim resulting in a September 2016 payment to Stuart.  (Ex. A depo

4    73:4-74:1) (Dkt 42-1, p.  135-137).  Heron did not advise Stuart of any performance

5    issues while he was the Tennis Director.  (Ex. A depo 57:17-22).

6         The Motion asserts there is no temporal proximity for any action which occurred

7    in 2017 or 2018.  "In some cases, temporal proximity can by itself constitute sufficient

8    circumstantial evidence of retaliation for purposes of both the prima facie case and the

9    showing of pretext.".  *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011).  There

10   is no mechanical per se rule that a certain time frame is too long.  *Coszalter v. City of*

11   *Salem*, 320 F.3d 968, 977-78 (9th Cir. 2003).  Depending on the circumstances, three to

12   eight months is easily within a time range that can support an inference of retaliation.

13   *Id*.  An eleven-month gap was found sufficient to support an inference of retaliation in

14   *Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir.2002).  Defendant's argument also

15   ignores that Stuart's April and May 2018 reports of illegal off-the book payments to

16   Critchley and the DMB President are protected activity as well.  (Ex. A depo 128:20-23,

17   138:20-139:9, 141:13-17, 142:10-15) (Ex. B depo 74:6-75:4, 76:2-9) (Ex. M, 5/3/18

18   Transcript) (Ex. N, 4/4/18 Transcript) (Dkt 42-1, ex. 17, p. 175-177).

19        This argument is also unavailing when a plaintiff relies not on a single protected

20   activity and a remote termination, but on a sustained series of negative incidents leading

21   up to the termination.  *Garcia v. Los Banos Unified Sch. Dist.*, 418 F. Supp. 2d 1194,

22   1224 (E.D. Cal. 2006).  Also, retaliation can take the form of a hostile work

23   environment.  *See Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000) (decided

24   under Title VII). The General Manager here engaged in a series of adverse employment

25   actions in retaliation for the successful overtime claim starting in Fall 2016 and

26   continuing through 2018.  Critchley became antagonistic because of Stuart's April and

27   May 2018 reports about illegal activity which violated the FLSA and Arizona law.

28

1       Defendant argues that the positive 2017 performance evaluation dispels any

2   causal link, but the cases cited are distinguishable.[7]  Here, the review in 2017 was done

3   by Critchley, the Tennis Director, not the General Manager and it is the General

4   Manager who was continually retaliating for the FLSA protected activity.  (Dkt 42-1,

5   ex. 9, p. 138-142).   Critchley only joined in 2018 in retaliation which was after the

6   evaluation.

7       Policies were applied unevenly to Stuart.   Contrary to the Motion, there is

8   evidence from Stuart and a co-worker that DMB prohibited Stuart from teaching non-

9   members while Critchley was teaching non-members.  (Ex. A depo 94:10-96:17) (Ex. E,

10  Miller declaration).   Also, contrary to the Motion, while there were courts available

11  during the Junior Academy for private lessons they were being assigned for use by other

12  tennis pros.  (Ex. A depo 86:2-4, 90:18-91:8, 226:15-228:23) (Ex. L, Texts).

13      The Motion's analysis of constructive discharge does not properly understand

14  that there were two different discharges:  first in mid-May 2018 Stuart was

15  constructively discharged as the Head Pro and in mid-July 2018 he was discharged from

16  the Tennis Pro non-salaried position he assumed in mid-May.  (Dkt 42-1, ex. 17, p. 176)

17  (Dkt 42-1, ex. 18, p. 179).  Stuart did not ever resign but felt he was discharged.  (Ex. A

18  depo 207:21-208:15) (Dkt 42-1, ex. 17, p. 176) (Dkt 42-1, ex. 18, p. 179).  Critchley

19  intended to terminate Stuart by making Stuart believe he would for the same pay have to

20  do a bunch of new duties.  (Ex. A depo 193:22-194:7 and ex. 9) (Dkt 42-1, ex. 16, p.

21  172-174).  But those duties weren't necessary for the Head Pro to perform as no one

22  even replaced Stuart and many of the duties listed were not performed by anyone and

23

24  [7] The Motion cited *Ghirmai v. Northwest Airlines, Inc.*, 131 Fed. Appx. 609 (9th Cir.

25  2005) for support of this contention, but that decision is not citable under Ninth Circuit
    Rule 36-3 (only unpublished decisions after 1/1/07 can be cited).   In that case the

26  alleged bad actor (Jones) with the defendant was the same person who did the positive
    evaluation.  *Id*. In *Moorehed v. Hi-Health Supermart Corp.*, 2017 WL 131564, * 7 (D.

27  Ariz. 1/13/17) (which improperly relied upon the *Ghirmai* decision), *aff'd* 725 Fed.

28  Appx. 603 (9th Cir. 2018),that case also involved a single alleged bad actor who had
    given multiple positive reviews after the protected activity.

1  those that were performed were handled by Critchley and front desk personnel.  (Ex. B
2  depo 76:18-82:3) (Dkt 42-1, ex. 16, p. 172-174).

3       For the Head Pro position Stuart was being targeted by unequal treatment under
4  the policies, he was threatened with a wrongful write up, and his duties were being
5  expanded exponentially despite not getting a raise since January 2016 while others were
6  given raises.  Stuart had made clear he was making roughly $7 per hour doing the
7  preexisting duties, so adding duties would make the effectively hourly rate impossible
8  to survive – he would become an indentured servant. (Ex. A depo 114:13-23 and ex. 5).
9  Stuart on May 3, 2018 was told he would be terminated as Head Pro unless he agreed to
10 perform the extra duties, which is a type of direct discharge.  (Ex. A depo 193:1-9,
11 195:12-25).  For the Tennis Pro position, the number of lessons given by Stuart quickly
12 died out and so Stuart's lawyer advised that with nothing to teach to earn income, Stuart
13 was terminated.  (Ex. F, Paystubs) (Dkt 42-1, ex. 17, p. 175-177) (Dkt 42-1, ex. 18, p.
14 178-179) (Ex. J, McNicol declaration ¶ 17).

15      This Court should deny the Motion as to the claim of FLSA retaliation.

16 **III.   WRONGFUL TERMINATION CLAIM UNDER ARIZONA LAW**

17      The Motion correctly sets out the elements of a claim under A.R.S. § 23-
18 1501(A)(3)(c)(ii) for retaliation against a whistleblower.[8]  The only argument advanced
19 in the Motion is that there was no termination and a claim of constructive discharge
20 must satisfy A.R.S. § 12-1502 which the Motion claims cannot be met.  However,
21 Stuart was expressly discharged by DMB from the Head Pro position.  Stuart on May 3,
22 2018 was told he would be terminated as Head Pro unless he agreed to perform the extra
23 duties, which is a type of direct discharge.  (Ex. A depo 193:1-9, 195:12-25).  Stuart can
24 also show he was constructively discharged as well.

25 [8] Plaintiff also alleged a violation of subsection (A)(3)(c)(i) of the AEPA which
26 prohibits termination due to: the refusal by the employee to commit an act or omission
   that would violate the Constitution of Arizona or the statutes of this state.  Stuart refused
27 to participate in the illegal use of the teenager and foreign national in the Junior
   Academy and his participation in the Junior Academy was required by DMB's new job
28 duties outlined by Critchley in mid-May 2018.

1    Under Arizona law, constructive discharge can be established by evidence of
2  "objectively difficult or unpleasant working conditions to the extent that a reasonable
3  employee would feel compelled to resign" or evidence of "outrageous conduct by the
4  employer or a managing agent . . . if the conduct would cause a reasonable employee to
5  feel compelled to resign."   A.R.S. § 23-1502(A).   There is sufficient evidence and
6  reasonable inferences to support a finding of constructive discharge here.

7    After the April 4, 2018 and subsequent protected revelations about Critchley and
8  DMB's illegal activity, they began a campaign of harassment intended to and successful
9  in driving Stuart out which included: (1) Critchley in April 2018 sought to interfere with
10 Stuart's employment at Desert Highlands (Dkt 1-3, p. 20, ¶ 11) [Section I(G) supra]; (2)
   requiring and forcing Stuart in May 2018 to be involved with the Junior Academy
11 despite the illegal activities going on or forcing Stuart to stop being the Head Pro and
12 serve only as a Tennis Professional (Dkt 1-3, p. 24-25, ¶ 38, 44) [Section I(F)-(G)
13 supra]: (3) adding in May 2018 additional duties to the job of Head Pro (Dkt 1-3, p. 24,
14 ¶ 39-40) [Section I(G) supra]; (4) preparing in April and May 2018 a false write up of
15 Stuart (Dkt 1-3, p. 24, ¶ 42-43) [Section I(G) supra]; (5) reducing Stuart's lessons and
16 income to an unsustainable level [(Ex. F, Paystubs) (Dkt 42-1, ex. 17, p. 175-177) (Dkt
17 42-1, ex. 18, p. 178-179) (Ex. J, McNicol declaration ¶ 17)]; and (6) removing Stuart's
18 managerial access to DMB's system impeding Stuart's work performance (Dkt 1-3, p.
19 25, ¶ 48) [Section I(G) supra - (Ex. A depo 196:3-197:13)].

20   In compliance with A.R.S. § 23-1502 Stuart's attorney on May 16, 2018 advised
21 DMB of the intolerable condition imposed on Stuart forcing his termination.  (Dkt 42-1,
22 ex. 17, p. 176).  But DMB did nothing to resolve the illegal condition and allowed
   Stuart to remain as a Tennis Professional.  This of course, led to Stuart's second notice
23 about a constructive discharge.  (Dkt 42-1, ex. 18, p. 179).
24
     These individually or collectively constituted objectively difficult or unpleasant
25 working conditions which would compel a reasonable employee to leave their salaried
26 plus position as Head Pro and then the commission only Tennis Professional position.
27 The acts of DMB towards Stuart also constituted outrageous conduct under the Arizona
28

statute justifying a constructive discharge claim without the necessity of offering a reasonable time to correct the situation.

This Court should deny the Motion as to the wrongful termination claim.

DATED:  January 14, 2020.

**UDALL SHUMWAY PLC**

By: _/s/ Bradley D. Gardner_
     Bradley D. Gardner, Esq.
     1138 North Alma School Road, Suite 101
     Mesa, Arizona 85201
     _Attorney for Plaintiff_

**LIST OF PLAINTIFF'S EXHIBITS**

Exhibit A    McNicol deposition excerpts and exhibits

Exhibit B    Critchley deposition excerpts

Exhibit C    Krimbill deposition excerpts

Exhibit D    Performance Improvement Plan – DMB 000522-524

Exhibit E    Miller declaration SM157

Exhibit F    Paystubs SM47-52

Exhibit G    2014-2015 Performance Evaluations DMB 000037-44

Exhibit H    E-mails SM16

Exhibit I    E-mails SM8-10

Exhibit J    McNicol declaration

Exhibit K    E-mail DMB 000094

Exhibit L    Texts SM27-29

Exhibit M    Transcript of 5/3/18 recording SM127-151

Exhibit N    Transcript of 4/4/18 recording SM73-126

Exhibit O    Texts SM35

Exhibit P    E-mail DMB 000205-206

Exhibit Q    E-mail DMB 000197

Exhibit R    E-mail DMB 000082

Exhibit S    E-mail DMB 000454

# EXHIBIT 2

# UDALL|SHUMWAY

COUNSELORS AT LAW SINCE 1965

1138 NORTH ALMA SCHOOL ROAD, SUITE 101
MESA, ARIZONA 85201
Telephone: 480.461.5300 | Fax: 480.833.9392

Bradley D. Gardner (SBN: 011211)
bdg@udallshumway.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Stuart McNicol,

Plaintiff,

v.

DMB Sports Clubs Limited Partnership,

Defendants.

Case No.: 2:19-cv-00750-MTL

**DECLARATION OF COUNSEL**

David R. Schwartz states:

    1.    I state the matters of my own personal knowledge.

    2.    I have been duly and continuously licensed as an attorney in Arizona since 1983 and have been admitted to practice before this federal court at all times since 1984.

    3.    I was assisting lead attorney Bradley D. Gardner and was responsible for drafting the response by our client, Plaintiff Stuart McNicol, to Defendant's Motion for Summary Judgment.

    4.    Plaintiff's response was due January 14, 2020.

    5.    On January 9, 2020 I submitted the initial draft to lead attorney Bradley D. Gardner and to our client. The initial draft included three references to potentially addressing some points in the client's declaration noted as "[?? Client declaration]". Also, because the declaration of Plaintiff had not yet been finalized the draft could not and did not include ¶ numbering for citations to the declaration from Plaintiff which was going to be ex. J to the Response.

6.     I continued to work on the draft and created a new revised (second) version of the response. On Saturday, January 11, I e-mailed the revised draft. A true and accurate copy of the e-mail and attached draft is Exhibit A to this declaration. As my e-mail explained two additional arguments were to be included in this revised version. This was intended to be the final substantive version. In this version there was no references to "[?? Client declaration]". This was the version approved by attorney Bradley D. Gardner for filing, subject to grammar and other minor edits (including inserting the ¶ numbering for citations to Plaintiff's declaration which was ex. J which the client signed on January 12).

7.     On January 14, the legal assistant for Bradley Gardner in preparing to file the response and exhibits created a new document based upon the original draft version of January 9. This was then mistakenly filed by her as Docket 48 in this Court.

8.     The exhibits attached to the filed response were the correct exhibits.

9.     The mistaken filing was discovered by me on Thursday, January 30, when I reviewed the Reply filed by Defendant (Dkt 50) and wondered why they did not respond to some arguments I knew were in the final Response I had drafted. I then viewed what had been filed and saw it was not what was supposed to have been filed.

10.     Plaintiff requests permission to withdraw the mistakenly filed draft response (Dkt 48) and replace it with the intended final response. The proposed replacement response has not been altered in any substantive way and it does not address anything in the Reply (Dkt 50) filed by Defendant.

11.     I declare under penalty of perjury that the above statements are true and correct.

DATED: January 14, 2020.

David R. Schwartz

5655680.1
117296.1

2

# EXHIBIT 2-A

## David Schwartz

| | |
|---|---|
| **From:** | David Schwartz |
| **Sent:** | Saturday, January 11, 2020 3:52 PM |
| **To:** | Brad Gardner ; Stuart McNicol |
| **Subject:** | mcnicol v dmb - revised Draft of Response to Motion for Summary Judgment for final comments |
| **Attachments:** | 1-11-20 draft Response to MSJ.pdf |

Attached is the revised Response to the Motion for Summary Judgment for final thoughts, comments and pointing out any typos.  I added a couple of new arguments from the previous draft: (1) that reporting the off-the books payments violated the FLSA record keeping requirements(not just taxes) as well as Arizona law, to argue that there was FLSA protected activity in April and May 2018 and (2) that Critchley saying you had to agree to the added duties or find another position was an express termination.

Let me know your thoughts and comments.  This has to be filed Tuesday.


**David R. Schwartz**
Attorney At Law



**480.461.5325** Direct  |  **480.461.5300** Main  |  **480.833.9392** Fax
1138 North Alma School Road, Suite 101 | Mesa, Arizona 85201
das@udallshumway.com  |  www.udallshumway.com


Our offices are conveniently located just south of the Loop 202 (Red Mountain Freeway) between Dobson and Alma School.  You can find our offices by taking either the Dobson or Alma School exits and entering Mesa Riverview at West Bass Pro Drive (please click here for map).

NOTICE - This e-mail contains confidential and privileged material for the sole use of the intended recipient. Any review or distribution to others is strictly prohibited. If you are not the intended recipient, please contact the sender and delete and destroy all copies.

Thank you.



# UDALL|SHUMWAY
### COUNSELORS AT LAW SINCE 1965
1138 NORTH ALMA SCHOOL ROAD, SUITE 101
MESA, ARIZONA 85201
Telephone: 480.461.5300 | Fax: 480.833.9392

Bradley D. Gardner (SBN: 011211)
bdg@udallshumway.com
*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stuart McNicol, | Case No.: 2:19-cv-00750-MTL |
| Plaintiff, | **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DMB Sports Clubs Limited Partnership, | |
| Defendants. | |

Plaintiff Stuart McNicol ("Plaintiff" or "Stuart") and Defendant DMB Sports Clubs Limited Partnership ("Defendant" or "DMB") hereby responds to Defendant's Motion for Summary Judgment (Dkt 42) and requests that such motion be denied as genuine issues of material facts exist requiring a trial on both the Fair Labor Standards Act ("FLSA") retaliation claim and the wrongful termination claim require a trial.

## I.    FACTUAL BACKGROUND

### A.    Stuart Hired
Stuart, a successful professional tennis instructor, was hired in March 2014 as the Head Tennis Professional ("Head Pro") to establish a tennis program and work under Nick Heron, who was the then Tennis Director. (Ex. A [McNicol] depo 16:4-15, 21:13-22:5, 22:13-24) (Dkt 42-1, ex. 3, p. 97-99)   Stuart was paid a salary for his administrative duties and an hourly rate (commission) for teaching group or private lessons. (Ex. A depo 24:1-23) Although the club Stuart worked at was a private club, non-members could take lessons there when Stuart was hired. (Ex. A depo 22:8-12)

The Tennis Director reports to the General Manager for the club. (Ex. A depo 29:23-30:8)  Nick Heron was the Tennis Director when Stuart was hired and through

1   September 2016, and David Critchley succeeded Heron in November 2016.  (Ex. A

2   depo 25:21-23, 74:12-14, 76:17-21) (Ex. B [Critchley] depo 21:23-22:1, 23:25-24:8)

3   Jim Krimbill served as the General Manager and he reports to the President.  (Ex. C

4   [Krimbill] depo 9:14-15, 12:15-13:7, 15:3-5, 20:16-18)  The General Manager is aware

5   of all salary and compensation amounts for employees for budgeting purposes and the

6   General Manager's bonus can be affected by whether budget goals are met.  (Ex. C

7   depo 15:14-16:24, 41:3-11)

8       **B.     No Change To Stuart's Compensation After January 2016**

9          In January 2016 because of his good work as the Head Pro, Stuart received a

10   salary increase.  (Ex. A depo 24:24-25:10, 25:18-20)  Thereafter, Stuart received no

11   further salary increase and his hourly commission for teaching did not increase while he

12   worked at DMB.  (Ex. A depo 24:24-25:17)  Other tennis professionals were later hired

13   to teach group and private lessons, and they were paid more than Stuart.  (Ex. A depo

14   26:8-27:5, 162:18-163:23, 165:23-168:20)   Other tennis pros also received raises

15   (including Critchley for his teaching duties), while Stuart did not. (Ex. B depo 60:22-

16   61:3, 71:1-6)  Critchley told Stuart that he asked Krimbill for a raise for Stuart but

17   Krimbill said he would absolutely not give one to Stuart.   (Ex. A depo 169:1-15)

18   Critchley offered to add fictitious hours to compensate for not getting a raise.  (Ex. A

19   depo 169:11-170:2)  Critchley said he sought several times to get a raise for Stuart but

20   the General Manager always said no.  (Ex. B depo 60:5-16)

21       **C.     No Issue With Stuart's Performance Until He Makes Overtime Claim
                   And Efforts To Retaliate**

22          Stuart does not recall Heron ever discussing with him any problems with Stuart's

23   job performance.  (Ex. A depo 57:17-22)  Heron provided positive reviews of Stuart's

24   performance.  (Ex. G, Perf. Reviews)  Stuart was presented in August 2016 with a

25   document entitled Expectations for Success which he discussed with Heron and the

26   General Manager.  (Ex. A depo 61:7-62:4 and Ex. 3) (Dkt 42-1, ex. 6, p. 126-128)  It

27   was not given to him as a criticism of his work performance but just to outline

28   expectations going forward.  (Ex. A depo 62:5-63:22, 68:20-69:12) (Ex. C depo 47:12-

1  24, 48:1-49:16)  Stuart was already doing the things outlined in the memo and many
2  items did not apply to him.  (Ex. A depo 63:23-68:12)

3       In August 2016 Stuart reported to HR and the General Manager that he had
4  worked overtime and had not been compensated.  (Ex. A depo 69:17-70:13, 71:18-72:8
5  and Errata) (Ex. C depo 36:3-37:18)  Stuart was seeking ways to increase his income
6  when he met with them.  (Ex. A depo 70:7-21, 71:4-6)  Stuart's report resulted in an
7  investigation and DMB acknowledged in September 2016 that it owed $5,964.33 to
8  Stuart for unpaid overtime.  (Ex. A depo 73:4-74:1) (Dkt 42-1, p.  135-137)  The
9  General Manager was informed at the time of the results and the payment.  (Ex. C depo
10  52:6-14)

11       In the Fall of 2016 McNicol applied for the open Tennis Director's position but
12  was not even granted an in-person interview by the panel which included the General
13  Manager.  (Ex. A depo 75:12-19, 75:22-76:5) (Ex. C depo 42:17-43:18)  The General
    Manager made the decision on whom to hire for Tennis Director.  (Ex. C depo 4:19-24)

14       In October 2016, in an email exchange Stuart responded to the General
15  Manager's raising of issues which were not duties Stuart's job had previously entailed.
16  (Ex. A depo 110:21-111:15, 112:15-113:22, 114:5-12, 114:24-115:14, 158:8-159:12
17  and ex. 5)  Stuart explained that with the duties he was performing already as Head Pro
18  he was effectively making only $7 per hour.  (Ex. A depo 114:13-23 and ex. 5)  Stuart
19  was already fulfilling his job duties contrary to the insinuation by the General Manager.
20  (Ex. A depo 115:15-20)

21       Stuart supplemented his income by using his personal equipment for stringing of
22  racquets of members of the club.  (Ex. A depo 52:5-13, 52:14-19)  Initially stringing of
23  rackets was not run through DMB and members paid Stuart directly.  (Ex. A depo
24  52:20-53:12)  Stuart was the only one doing the stringing.  (Ex. A depo 116:18-23)  In
25  December of 2016, DMB bought a stringer and then stringing was done through the
26  club's POS system.  (Ex. A depo 54:10-25, 55:15-24)  This was done at the direction of
27  the General Manager.  (Ex. A depo 55:1-14)  When stringing was run through DMB
28  Stuart was paid a set rate of $20 per racquet and he still had to provide the materials.
    (Ex. A depo 55:21-56:16, 60:6-15)  Running stringing through DMB cost Stuart about

3

1   $100 per month on average.  (Ex. A depo 116:5-17, 117:7-10 and ex. 5)  The General

2   Manager's plan was to replace Stuart with two underage workers.  (Ex. H, Emails)

3         In December 2016 Critchley and the General Manager presented a false and

4   undeserved negative performance evaluation which Stuart told them he disagreed with

5   at the time.  (Ex. A depo 118:10-122:3) (Dkt 42-1, ex. 7, p. 129-134)  According to

6   coworkers, Stuart was always professional and supportive and helpful contrary to what

7   the General Manager claimed.  (Ex. E, Miller declaration – SM 157)  Favorable

8   comments were also provided by members.  (Ex. I, Emails)  Stuart did not write his

9   comments on the evaluation as the General Manager said it would not matter what he

10  wrote.  (Ex. A depo 122:4-15)

11        **D.    General Manager Pushes To Fire Stuart And Fails To Reward Stuart
              For Good Work Recognized By Tennis Director**

12  In a January 2017 meeting between Stuart and Critchley, the Tennis Director,

13  Critchley said that the General Manager wanted Stuart fired because Stuart had cost

14  DMB too much in overtime pay.  (Ex. A depo 85:18-86:1, 86:9-15)

15        In 2017 at the direction of the General Manager there was a push to promote the

16  Junior Academy for group tennis instruction to children.  (Ex. A depo 86:12-87:10)

17  Stuart was not allowed to teach private lessons on the open courts during the Junior

18  Academy hours.  (Ex. A depo 86:2-4, 226:15-228:23)  Other professionals, however,

19  could teach during that time.  (Ex. A depo 90:18-91:8) (Ex. L, Texts)

20        Once Critchley was able to work with Stuart for a prolonged time throughout

21  2017, he saw that Stuart was a great asset to the club.  (Ex. B depo 67:16-21)  Many

22  members joined the club because of Stuart and he was the face of the tennis program.

23  (Ex. B depo 67:16-68:22)  The 2017 performance evaluation prepared by Critchley gave

24  a positive evaluation of Stuart's performance.  (Ex. A depo 148:6-12, 148:19-24 and ex.

25  7) (Ex. C depo 55:2-24) (Dkt 42-1, ex. 9, p. 138-142)  Stuart met only with Critchley to

26  discuss this evaluation.  (Ex. A depo 151:6-10) Some of this praise was for the same

27  things Stuart had been doing in 2016.  (Ex. A depo 153:9-19, 154:18-155:15, 155:16-

28  156:20)  Although Stuart got a positive evaluation from Critchley, the General Manager

1   was still critical of Stuart in discussions with Critchley, Stuart's supervisor.   (Ex. B
2   depo 41:15-21, 45:19-21)

3     **E.**  **DMB Prevents Stuart From Teaching Non-Members While Critchley**
4        **Is Allowed To Do So**

  In January 2018 DMB's Director of Membership sent an e-mail notifying Stuart
5   that non-members could no longer receive lessons at the club unless they agreed to join.
6   (Ex. A depo 85:18-86:1, 92:13-22)  This caused Stuart to stop teaching non-members at
7   the club.  (Ex. A depo 93:4-25, 94:6-9) (Ex. J, McNicol declaration ¶ 4)  Critchley,
8   however, continued to teach non-members.  (Ex. A depo 94:10-96:17) (Ex. E, Miller
9   declaration) (Ex. J, McNicol declaration ¶ 6)

10     When Stuart complained about the new policy being enforced against him,
11   DMB's Director of Membership told Stuart he was free to teach non-members
12   elsewhere while remaining an employee of DMB.  (Ex. J, McNicol declaration ¶ 8)
13   This prompted Stuart to seek a part-time opportunity at another club.  (Ex. J, McNicol
14   declaration ¶ 8)

15     **F.**  **Tennis Director Engages In Illegal Activity And Stuart Reports It**
16     In December 2016, Stuart was inadvertently copied on an e-mail chain which
17   made it clear that DMB's management and HR agreed to violate club policy and hire
18   underage sixteen and seventeen-year-olds to start providing lessons.  (Ex. H, Emails)
19   As stated by DMB President, "If they are both 17, I could live with it but tell them to
20   say they are 18 if anyone asks…which they shouldn't. No 16 year olds", and Critchley's
21   comment "…if we get desperate could be worth the risk!".  (Ex. H, Emails)

  In 2017 and 2018 Tennis Director Critchley illegally hired and paid off the DMB
22   books/payroll a teenager (Max Geiger) and a foreign national (Harry Busby), without
23   the papers to work lawfully, to help teach in the Junior Academy.  (Ex. A depo 124:15-
24   125:1, 125:13-126:14, 128:24-129:6, 131:12-132:11, 135:5-17) (Ex. B depo 26:13-16,
25   27:16-28:1, 33:8-21, 29:24-30:22, 32:9-16)  (Ex. D, PIP)  To hide this and to get the
26   funds to pay them, another Tennis Pro (Warren Race) had his hours inflated. (Ex. A
27   depo 127:10-21, 129:7-130:25) (Ex. J, McNicol declaration ¶ 15)  Stuart thought this
28   was illegal.  (Ex. A depo 126:16-127:6, 127:22-128:7, 136:22-137:5, 138:4-12) (Ex. J,

1   McNicol declaration ¶ 16)  Because he did not want to be involved in illegal activity,

2   Stuart did not participate in the Junior Academy starting in May 2017.  (Ex. A depo

3   145:11-146:8)

4         Stuart first reported this illegal activity to Critchley on April 4, 2018 and again

5   on May 3.  (Ex. A depo 128:20-23, 138:20-139:9) (Ex. B depo 74:6-75:4)  Critchley

6   believed Stuart when he said what had been done was illegal.  (Ex. B depo 76:2-9).

7   Critchley, however, expressed to Stuart and others that he was upset about Stuart's

8   report of the illegal activity by Critchley and DMB.  (Ex. J, McNicol declaration ¶ 12)

9   (Ex. M, 5/3/18 Transcript – SM 138:12-21) (Dkt 44-1 p. 12-13)  Previously Stuart had

10  not reported the illegal activity fearing he would be fired as already threatened after he

    made his overtime claim.  (Ex. A depo 85:18-86:1, 86:9-15, 161:6-24)

11        Following up, Stuart had his attorney on May 16,2018 report the illegal activity

12  to the club's president.  (Ex. A depo 141:13-17, 142:10-15) (Dkt 42-1, ex. 17, p. 175-

13  177)  These reports were ultimately borne out as true by an investigation conducted by

14  DMB, although no real discipline was imposed just a directive not to do similar conduct

15  in the future.  (Ex. C depo 29:12-30:16, 31:12-34:2, 34:3-25) (Ex. D, PIP)  During the

16  investigation Critchley admitted to his wrongful conduct.  (Ex. C depo 33:13-34:2)

17        **G.    Tennis Director Begins Retaliating And Stuart Constructively**
           **Discharged As Head Pro**
18
    Critchley and DMB were aware Stuart had started working at Desert Highlands
19
    as of mid-April 2018 and Critchley, the Tennis Director, contacted Desert Highlands
20
    rather than simply ask Stuart.  (Ex. K, Email)  DMB's HR Director thought it was
21
    underhanded for Critchley to contact Desert Highlands.  (Ex. K, Email)
22
          In late April Critchley sought to have Stuart placed on a Performance
23
    Improvement Plan ("PIP") for alleged failure to perform duties which was based on false
24
    and misleading information.  (Ex. J, McNicol declaration ¶ 13)  A PIP can be the last
25
    step before one is terminated.  (Ex. C depo 29:12-30:6)  One item dealt with Stuart
26
    failing to prepare a poster and writing an article, although those were not in Stuart's
27
    duties listed in his Job Description and DMB had a marketing department for those type
28
    of tasks.  (Ex. A depo 160:12-23) (Ex. J, McNicol declaration ¶ 13A) (Dkt 42-1, ex. 3,

p. 97-99)  Another item was Stuart's failure to attend the Strategic Planning meeting on April 6, 2018 for which Critchley later admitted Stuart had been excused due to his sick child.  (Ex. J, McNicol declaration ¶ 13B) (Ex. O, Text)   Another item was Stuart's alleged failure to attend the last four DMB social events, yet Critchley only could name three events in an e-mail and for one of those Critchley was aware Stuart was out of town.  (Ex. A depo 207:21-208:15) (Ex. J, McNicol declaration ¶ 13C) (Ex. P, Email)  For another event it was moved without Stuart being told.  (Ex. A depo 208:21-209:2) (Ex. J, McNicol declaration ¶ 13C)  Critchley admitted for each event, Stuart provided a reason why he could not attend.  (Ex. B depo 54:20-55:24)  DMB's HR person even had to ask if Stuart was supposed to attend social events as it is not listed in the Job Description.  (Ex. Q, Email)   Another item was failure to get LinkedIn Learning completed timely by the March 31 deadline for completion, but that was completed timely by Stuart  who had to do it on his own time and away from DMB.  (Ex. J, McNicol declaration ¶ 13D) (Ex. R, Email) (Ex. S, Report)

At a May 3, 2018 meeting Critchley for the first time raised having new duties for the Head Pro position and discussed with Stuart that if Stuart did not want to perform the new duties envisioned for the Head Pro then Stuart would no longer be the Head Pro, but he could work at the club in another role. (Ex. A depo 193:1-9, 195:12-25)  On May 14, Critchley sent to Stuart the duties he wanted the Stuart as the Head Pro to fulfill going forward which would be "in addition, not in place of the current duties listed in the Head Pro Job Description".  (Ex. A depo 193:22-194:7 and ex. 9) (Ex. B depo 72:19-73:4) (Dkt 42-1, ex. 16, p. 172-174)  The new duties included forcing Stuart back into the Junior Academy with its illegal activity.  (Ex. A depo 197:25-198:13, 203:11-20 and ex. 9) (Dkt 42-1, ex. 16, p. 172-174)  Effectively in May 2018 Stuart was constructively discharged as Head Pro when his managerial access to the club's tennis system (Spectrum) was denied.  (Ex. A depo 196:3-197:13)  Such access was necessary to reserve court space for lessons and other duties Stuart had to perform.  (Ex. A depo 197:14-22, 199:14-22, 200:1-201:19)

Stuart did not resign from the Head Pro position.  (Ex. A depo 207:21-208:15)  Stuart's lawyer on May 16, 2018 notified DMB that he had been constructively

1  discharged from his Head Pro position but was accepting the offer from Critchley to

2  continue to work as a Tennis Pro.  (Ex. A depo 211:2-4) (Dkt 42-1, ex. 17, p. 175-177)

3  Stuart's lesson opportunities declined for Stuart after May 16, 2018 although he said he

4  could and was willing to take them.  (Ex. A depo 211:20-23, 212:3-7) (Dkt 42-1, ex. 18,

5  p. 178-179)  Eventually, the lessons he was teaching continued to decline[1], meaning his

6  income also declined, and so on July 20 Stuart's lawyer notified DMB that he

7  considered himself as constructively discharged from his position as Tennis Pro (which

8  had started as of May 16).  (Ex. F, Paystubs) (Dkt 42-1, ex. 17, p. 175-177) (Ex. J,

9  McNicol declaration ¶ 17) (Dkt 42-1, ex. 18, p. 178-179)

10      DMB informed Stuart that he was banned from DMB's property because it was

11  allegedly the policy that all former employees are banned.  (Ex. J, McNicol declaration

12  ¶ 18)  At least five other former employees were not banned, and Stuart apparently is

    the only one the policy applies.  (Ex. J, McNicol declaration ¶ 19-20)

13      As of October 2019, no one had replaced Stuart as Head Pro and the duties of

14  that position were being done by Critchley and front desk personnel, although some of

15  the duties set forth in May 2018 are simply not being performed.  (Ex. A, depo ex. 9)

16  (Ex. B depo 76:18-82:3) (Dkt 42-1, ex. 16, p. 172-174)

17      **H.    Stuart Works At Desert Highlands**

18      Stuart worked as a part-time Assistant Tennis Pro at the Desert Highlands

19  Association's club starting in February 2018 and he only became the Head Pro at that

20  club on August 29, 2018.  (Ex. A depo 96:18-97:25, 100:9-25, 101:5-9, 104:25-105:24,

21  216:25-217:21 and Errata) (Dkt 42-1, ex. 14-15, p. 156-171)  Stuart only went to work

22  at Desert Highlands after he was told he could not teach non-members at DMB's club

23  and he had students who were a member at Desert Highlands so he could teach them

24  there.  (Ex. A depo 93:4-25, 104:14-17)  Desert Highlands did not require any specific

25  hours for McNicol to work except for the one day a week he was scheduled.  (Ex. A

26  depo 101:5-9, 104:25-105:24)

27  ───────────────

    [1] It is true that Stuart had declined a few sporadic lesson opportunities, but some were

28  for legitimate reasons and others Stuart does not recall why they were declined.  (Ex. A

    depo 213:24-216:8)

8

## II.   FLSA RETALIATION CLAIM

Under the FLSA, an employer may not "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). The statute "protect[s] persons who report illegal conduct to government agencies or complain about such conduct to their employers, even though they have not yet instituted a formal proceeding." *Perez v. Oak Grove Cinemas, Inc*., 68 F.Supp.3d 1234, 1247 (D. Or. 2014) (*quoting Leonard v. St. Rose Dominican Hosp.*, 310 F.3d 653, 655 (9th Cir. 2002)). The FLSA is interpreted broadly to give effect to the statute's remedial purpose. *Regan v. HDR Engineering, Inc.*, 2019 WL 5895429, * 3 (D. Ida. 11/12/19). It is designed to encourage employees to report alleged violations of the FLSA's substantive provisions without fear of reprisal. *Id.*

When evaluating a retaliation claim in the summary judgment context, the plaintiff bears the initial burden to establish a prima facie case of FLSA retaliation by showing: 1) plaintiff engaged in activity protected by the FLSA; 2) defendant took an adverse employment action; and 3) there was a causal link between the protected activity and the adverse action. *Id.* At the summary judgment stage, the degree of proof necessary to establish a prima facie case is minimal and does not even need to rise to the level of a preponderance of the evidence. *Id.* (*quoting Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005)).

The Motion challenged only whether a prima face case could be made by Plaintiff as to elements 2 and 3. The FLSA requires an employer to pay employees for any overtime if they are in non-exempt positions. Reporting a claim for overtime compensation is protected activity under the FLSA as the Motion admits.[2] *See Rosenfield v. GlobalTranz Ent., Inc*., 811 F.3d 282, 286 (9th Cir. 2015), *cert. denied*, 137 S.Ct. 85 (2016). The Motion acknowledges this was done in August 2016 and the

---

[2] Arizona law also requires payment of wages by employers, withholding of taxes, and record keeping by employers. A.R.S. § 23-350 et seq.; A.R.S. § 23-361.01.

9

1   claim paid in September 2016.  The FLSA also requires record keeping by employers
2   about hours worked and wages paid.  29 U.S.C. §211(c); 29 C.F.R. Part 516.  Thus,
3   Stuart's complaint in April and May of 2018 about the illegal off the book payments
4   also would qualify as protected activity under the FLSA (and Arizona law as well).

5      *A.*  ***Plaintiff Was Subjected To A Series Of Adverse Employment Actions***
6      Defendant first argues that the FLSA claim fails because there was no adverse
7   employment action.  An employment action is adverse if it would dissuade a reasonable
8   worker from engaging in FLSA-protected activity.  *Ray v. Henderson*, 217 F.3d 1234,
9   1235 (9th Cir. 2000) (Title VII case); *Regan v. HDR Engineering, Inc.*, 2019 WL
10  5895429, * 4 (D. Ida. 11/12/19); *see also Burlington N. and Santa Fe Ry. Co. v. White*,
11  548 U.S. 53, 68 (2006) (Under Title VII, "an action is cognizable as an adverse
12  employment action if it is reasonably likely to deter employees from engaging in
13  protected activity."); *McBurnie v. City of Prescott*, 511 Fed. Appx. 624, 625 (9th Cir.
14  2013) (applying the *Burlington* standard to an FLSA retaliation claim).   While this
15  analysis is objective, context matters and an immaterial act in some situations is
16  material in others depending on the circumstances, expectations, and relationships.
17  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).   Adverse
18  employment actions are broadly defined by the Ninth Circuit and are not limited to
19  actions such as discharges, transfers, or demotions. *Hashimoto v. Dalton*, 118 F.3d 671,
20  679 (9th Cir. 1997) (Title VII case).  Instead, adverse employment actions may include
21  lateral transfers, unfavorable job references, and changes in work schedules. *Ray v.
22  Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000).  Actions which reduce an employee's
23  pay are also adverse employment actions.  *Id.* at 1243-44.

   DMB's motion on p. 9 acknowledges six different adverse employment actions
24  citing to ¶ 52 of the Amended Complaint[3]: (1) Stuart did not receive a raise at the end of
25  2016; (2) Stuart received a negative performance review at the end of 2016; (3) Stuart
26  was denied employee benefits; (4) Stuart did not receive a raise at the end of 2017; (5)

27  ───────────────
28  [3] The Amended Complaint was filed by Stuart pro per and is to be liberally construed.
*Erickson v. Pardus*, 551 U.S. 89, 94 (2007). )

1   Stuart had policies selectively applied only to him[4]; and (6) Stuart was constructively
2   discharged.[5]  And while the Motion states "several of the actions of which Plaintiff
3   complains do not constitute adverse employment actions",  but the only one specifically
4   challenged (see fn 7 on p. 9 of the Motion) is item 3 relating to employee benefits and
5   then only because they were allegedly not specified.[6]  The other retaliatory acts all
6   qualify as adverse employment actions.  *See Davis v. Team Elec. Co.*, 520 F.3d 1080,
7   1089 (9th Cir. 2008) (an adverse employment action is one which materially affects the
8   compensation, terms, conditions, or privileges of employment); *Yartzoff v. Thomas*, 809
9   F.2d 1371, 1376 (9th Cir.1987) (transfers of job duties and an allegedly undeserved
    negative performance rating can constitute adverse employment action for retaliation
10  claim); *Garcia v. Los Banos Unified Sch. Dist.*, 418 F. Supp. 2d 1194, 1224 (E.D. Cal.
11  2006) (series of retaliatory events including a negative performance evaluation, constant
12  negative comments, continuing offensive conduct, and rude and hostile behavior can
13  constitute adverse employment action).

14       DMB's Motion ignores other retaliatory acts by it towards Stuart which were
15  alleged and proven by the evidence.  The Amended Complaint incorporated these other
16  allegations through ¶ 51 and 53.  (Dkt 1-3, p. 25-26, ¶ 51, 53)  These other adverse
17  employment allegations alleged and proven include: (7) hiring underage teenagers in
18  early 2017 to take over stringing of racquets to reduce Stuart's income (Dkt 1-3, p. 22, ¶
19  26) [Section I(C) supra]; (8) Critchley in April 2018 sought to interfere with Stuart's
20  employment at Desert Highlands (Dkt 1-3, p. 20, ¶ 11) [Section I(G) supra]; (8) forcing
21  Stuart in May 2018 to be involved with the Junior Academy despite the illegal activities

22  [4] Even after Stuart stopped working for DMB, DMB's lawyers notified him that by
23  policy he like all former employees were banned from being on any DMB property.
    (Ex. J, McNicol declaration)  However, at least five other former employees have been
24  allowed back to DMB's properties.  (Ex. J, McNicol declaration)  So the unequal
    treatment continued even after termination.
25  [5] Below is a list of additional allegations of retaliation which should be included either
26  under the umbrella of constructive discharge or on their own because they were also
    alleged and incorporated into the FLSA claim in the Amended Counterclaim.
27  [6] Stuart was denied health benefits expressly because of his overtime claim which was
28  paid by DMB.  (Ex. N, 4/4/18 Transcript – SM 076:3-23, SM 0077:1-2) (Dkt 1-3, p. 24,
    ¶ 43)

11

1   going on or forcing Stuart to stop being the Head Pro and serve only as a Tennis

2   Professional (Dkt 1-3, p. 24-25, ¶ 38, 44) [Section I(F)-(G) supra]: (9) adding in May

3   2018 additional duties to the job of Head Pro to force him to get out of that position

4   (Dkt 1-3, p. 24, ¶ 39-40) [Section I(G) supra]; (10) preparing in April and May 2018 a

5   false write up of Stuart (Dkt 1-3, p. 24, ¶ 42-43) [Section I(G) supra]; (11) denial of

6   health benefits to Stuart in April 2018 because he had cost the company money on his

7   overtime claim (Dkt 1-3, p. 24, ¶ 43) [(Ex. N, 4/4/18 Transcript – SM 076:3-23, SM

8   0077:1-2); and (12) removing Stuart's managerial access to DMB's system impeding

9   Stuart's work performance (Dkt 1-3, p. 25, ¶ 48) [Section I(G) supra - (Ex. A depo

10   196:3-197:13)].   These would all fall within the broad definition of an adverse

    employment action as articulated by the Ninth Circuit and the EEOC.

11       Stuart has identified a slew of adverse employment actions which are cognizable

12   as retaliation because a reasonable employee would likely not pursue a FLSA protected

13   activity considering the various retaliatory acts.

14       **B.   There Are Genuine Issues Of Material Fact As To A Causal Link**

15       The primary attack on the FLSA retaliation claim is the assertion that no causal

16   link between the FLSA protected activity and the alleged adverse employment actions

17   exists.   To show causation, a plaintiff must establish that his or her protected activity

18   was a but-for cause of the alleged adverse action by the employer.   *McBurnie v. City of*

19   *Prescott*, 511 Fed. Appx. 624, 624 (9th Cir. 2013).   When adverse employment

20   decisions closely follow protected activity, retaliatory intent may be inferred.   *Pardi v.*

21   *Kaiser Found. Hosps*., 389 F.3d 840, 850 (9th Cir. 2004).   The causal connection can

22   also be demonstrated by direct or other circumstantial evidence as well.   Even a single

23   comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary

24   judgment for the employer.   *Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027,

25   1039 (9th Cir. 2005).   Direct evidence of a discriminatory animus means a triable issue

26   is created as to the actual motivation of the employer even if the evidence is not

27   substantial.   *Id*. at 1038.   The discriminatory statement need not be in the context of the

28

1    employment decision.  *Id.*at 1039-40; *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145,

2    1149 (9th Cir.1997) (holding that an employer's reference to an employee as a "dumb

3    Mexican" "could be proof of discrimination against [plaintiff] despite their reference to

4    another agent and their utterance after the hiring decision").

5         Here DMB's General Manager told Stuart's direct supervisor that the General

6    Manager wanted to fire Stuart because he made a claim for overtime compensation

7    which was paid by DMB.  (Ex. A depo 85:18-86:1, 86:9-15)   The same General

8    Manager is the one who provided the negative 2016 performance evaluation and denied

9    a raise to Stuart in 2016 and 2017 so he would not be paid as much as the other tennis

10   professionals.  (Ex. A depo 24:24-25:17, 118:10-122:3, 169:1-15) (Dkt 42-1, ex. 7, p.

11   129-134)   This happened even when the 2017 performance evaluation was positive.

12   (Ex. A depo 148:6-12, 148:19-24 and ex. 7) (Ex. C depo 55:2-24) (Dkt 42-1, ex. 9, p.

13   138-142)   Other pros received raises while Stuart did not.   (Ex. A depo 26:8-27:5,

14   162:18-163:23, 165:23-168:20) (Ex. B depo 60:22-61:3, 71:1-6)   Additionally, at the

15   April 4, 2018 meeting Critchley told Stuart that DMB was denying Stuart health

16   benefits because Stuart had cost the company money with his overtime claim.  (Ex. N,

17   4/4/18 Transcript – SM 076:3-23, SM 0077:1-2)

18        Contrary to the Motion's assertion, the August 2016 Expectations for Success

19   memo was a generalized memo and not about any alleged work deficiencies.  (Ex. A

20   depo 62:5-63:22, 68:20-69:12) (Ex. C depo 47:12-24, 48:1-49:16) (Dkt 42-1, ex. 6, p.

21   126-128)   The December 2016 performance evaluation was not a true or valid

22   evaluation by the biased General Manager.  (Ex. A depo 118:10-122:15) (Ex. E, Miller

23   declaration) (Ex. I, Emails) (Dkt 42-1, ex. 7, p. 129-134) It is for the jury to determine

24   if there were legitimate grounds for this evaluation or if it was part of the General

25   Manager's stated intent to fire Stuart.   This evaluation also followed shortly after the

26   protected overtime claim resulting in a September 2016 payment to Stuart.  (Ex. A depo

27   73:4-74:1) (Dkt 42-1, p.  135-137)  Heron did not advise Stuart of any performance

28   issues while he was the Tennis Director.  (Ex. A depo 57:17-22)

1    The Motion asserts there is no temporal proximity for any action which occurred

2  in 2017 or 2018. "In some cases, temporal proximity can by itself constitute sufficient

3  circumstantial evidence of retaliation for purposes of both the prima facie case and the

4  showing of pretext.". *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011). There

5  is no mechanical per se rule that a certain time frame is too long. *Coszalter v. City of

6  Salem*, 320 F.3d 968, 977-78 (9th Cir. 2003). Depending on the circumstances, three to

7  eight months is easily within a time range that can support an inference of retaliation.

8  *Id.* An eleven-month gap was found sufficient to support an inference of retaliation in

9  *Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir.2002). Defendant's argument also

10  ignores that Stuart's April and May 2018 reports of illegal off-the book payments to

11  Critchfield and the DMB President are protected activity as well. (Ex. A depo 128:20-

12  23, 138:20-139:9, 141:13-17, 142:10-15) (Ex. B depo 74:6-75:4, 76:2-9) (Ex. M, 5/3/18

13  Transcript) (Ex. N, 4/4/18 Transcript) (Dkt 42-1, ex. 17, p. 175-177)

14    This argument is also unavailing when a plaintiff relies not on a single protected

15  activity and a remote termination, but on a sustained series of negative incidents leading

16  up to the termination. *Garcia v. Los Banos Unified Sch. Dist.*, 418 F. Supp. 2d 1194,

17  1224 (E.D. Cal. 2006). Also, retaliation can take the form of a hostile work

18  environment. *See Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000) (decided

19  under Title VII). The General Manager here engaged in a series of adverse employment

20  actions in retaliation for the successful overtime claim starting in Fall 2016 and

21  continuing through 2018. Critchley became antagonistic because of Stuart's April and

22  May 2018 reports about illegal activity which violated the FLSA and Arizona law.

23    Defendant argues that the positive 2017 performance evaluation dispels any

24  causal link, but the cases cited are distinguishable.[7] Here, the review in 2017 was done

25

26  [7] The Motion cited *Ghirmai v. Northwest Airlines, Inc.*, 131 Fed. Appx. 609 (9th Cir.
2005) for support of this contention, but that decision is not citable under Ninth Circuit

27  Rule 36-3 (only unpublished decisions after 1/1/07 can be cited). In that case the
alleged bad actor (Jones) with the defendant was the same person who did the positive

28  evaluation. *Id.* In *Moorehed v. Hi-Health Supermart Corp.*, 2017 WL 131564, * 7 (D.

1    by Critchley, the Tennis Director, not the General Manager and it is the General

2    Manager who was continually retaliating for the FLSA protected activity.  (Dkt 42-1,

3    ex. 9, p. 138-142)  Critchley only joined in 2018 in retaliation which was after the

4    evaluation.

5        Policies were applied unevenly to Stuart.  Contrary to the Motion, there is

6    evidence from Stuart and a co-worker that DMB prohibited Stuart from teaching non-

7    members while Critchley was teaching non-members. (Ex. A depo 94:10-96:17) (Ex. E,

8    Miller declaration)  Also, contrary to the Motion, while there were courts available

9    during the Junior Academy for private lessons they were being assigned for use by other

10   tennis pros. (Ex. A depo 86:2-4, 90:18-91:8, 226:15-228:23) (Ex. L, Texts)

11       The Motion's analysis of constructive discharge does not properly understand

12   that there were two different discharges: first in mid-May 2018 Stuart was

13   constructively discharged as the Head Pro and in mid-July 2018 he was discharged from

14   the Tennis Pro non-salaried position he assumed in mid-May.  (Dkt 42-1, ex. 17, p. 176)

15   (Dkt 42-1, ex. 18,  p. 179)  Stuart did not ever resign but felt he was discharged.  (Ex. A

16   depo 207:21-208:15) (Dkt 42-1, ex. 17, p. 176) (Dkt 42-1, ex. 18,  p. 179)  Critchley

17   intended to terminate Stuart by making Stuart believe he would for the same pay have to

18   do a bunch of new duties.  (Ex. A depo 193:22-194:7 and ex. 9) (Dkt 42-1, ex. 16, p.

19   172-174)  But those duties weren't necessary for the Head Pro to perform as no one

20   even replaced Stuart and many of the duties listed were not performed by anyone and

21   those that were performed were handled by Critchley and front desk personnel.  (Ex. B

22   depo 76:18-82:3) (Dkt 42-1, ex. 16, p. 172-174)

23       For the Head Pro position Stuart was being targeted by unequal treatment under

24   the policies, he was threatened with a wrongful write up, and his duties were being

25   expanded exponentially despite not getting a raise since January 2016 while others were

26

27   Ariz. 1/13/17) (which improperly relied upon the *Ghirmai* decision), *aff'd* 725 Fed.

28   Appx. 603 (9th Cir. 2018),that case also involved a single alleged bad actor who had
     given multiple positive reviews after the protected activity.

1   given raises.   Stuart had made clear he was making roughly $7 per hour doing the

2   preexisting duties, so adding duties would make the effectively hourly rate impossible

3   to survive – he would become an indentured servant. (Ex. A depo 114:13-23 and ex. 5)

4   Stuart on May 3, 2018 was told he would be terminated as Head Pro unless he agreed to

5   perform the extra duties, which is a type of direct discharge.   (Ex. A depo 193:1-9,

6   195:12-25)   For the Tennis Pro position, the number of lessons given by Stuart quickly

7   died out and so Stuart's lawyer advised that with nothing to teach to earn income, Stuart

8   was terminated.   (Ex. F, Paystubs) (Dkt 42-1, ex. 17, p. 175-177) (Dkt 42-1, ex. 18, p.

9   178-179) (Ex. J, McNicol declaration ¶ 17)

10       This Court should deny the Motion as to the claim of FLSA retaliation.

11   **III.   WRONGFUL TERMINATION CLAIM UNDER ARIZONA LAW**

         The Motion correctly sets out the elements of a claim under A.R.S. § 23-

12
13   1501(A)(3)(c)(ii) for retaliation against a whistleblower.[8]   The only argument advanced

     in the Motion is that there was no termination and a claim of constructive discharge
14
     must satisfy A.R.S. § 12-1502 which the Motion claims cannot be met.   However,
15
     Stuart was expressly discharged by DMB from the Head Pro position.   Stuart on May 3,
16
     2018 was told he would be terminated as Head Pro unless he agreed to perform the extra
17
     duties, which is a type of direct discharge. (Ex. A depo 193:1-9, 195:12-25) Stuart can
18
     also show he was constructively discharged as well.

19       Under Arizona law, constructive discharge can be established by evidence of

20   "objectively difficult or unpleasant working conditions to the extent that a reasonable

21   employee would feel compelled to resign" or evidence of "outrageous conduct by the

22   employer or a managing agent . . . if the conduct would cause a reasonable employee to

23   feel compelled to resign."   A.R.S. § 23-1502(A).   There is sufficient evidence and

24   reasonable inferences to support a finding of constructive discharge here.

25   _____

26   [8] Plaintiff also alleged a violation of subsection (A)(3)(c)(i) of the AEPA which
     prohibits termination due to: the refusal by the employee to commit an act or omission
27   that would violate the Constitution of Arizona or the statutes of this state.   Stuart refused
     to participate in the illegal use of the teenager and foreign national in the Junior
28   Academy and his participation in the Junior Academy was required by DMB's new job
     duties outlined by Critchley in mid-May 2018.

After the April 4, 2018 and subsequent protected revelations about Critchley and DMB's illegal activity, they began a campaign of harassment intended to and successful in driving Stuart out which included: (1) Critchley in April 2018 sought to interfere with Stuart's employment at Desert Highlands (Dkt 1-3, p. 20, ¶ 11) [Section I(G) supra]; (2) requiring and forcing Stuart in May 2018 to be involved with the Junior Academy despite the illegal activities going on or forcing Stuart to stop being the Head Pro and serve only as a Tennis Professional (Dkt 1-3, p. 24-25, ¶ 38, 44) [Section I(F)-(G) supra]; (3) adding in May 2018 additional duties to the job of Head Pro (Dkt 1-3, p. 24, ¶ 39-40) [Section I(G) supra]; (4) preparing in April and May 2018 a false write up of Stuart (Dkt 1-3, p. 24, ¶ 42-43) [Section I(G) supra]; (5) reducing Stuart's lessons and income to an unsustainable level [(Ex. F, Paystubs) (Dkt 42-1, ex. 17, p. 175-177) (Dkt 42-1, ex. 18, p. 178-179) (Ex. J, McNicol declaration ¶ 17)]; and (6) removing Stuart's managerial access to DMB's system impeding Stuart's work performance (Dkt 1-3, p. 25, ¶ 48) [Section I(G) supra - (Ex. A depo 196:3-197:13)].

In compliance with A.R.S. § 23-1502 Stuart's attorney on May 16, 2018 advised DMB of the intolerable condition imposed on Stuart forcing his termination. (Dkt 42-1, ex. 17, p. 176) But DMB did nothing to resolve the illegal condition and allowed Stuart to remain as a Tennis Professional. This of course, led to Stuart's second notice about a constructive discharge. (Dkt 42-1, ex. 18, p. 179)

These individually or collectively constituted objectively difficult or unpleasant working conditions which would compel a reasonable employee to leave their salaried plus position as Head Pro and then the commission only Tennis Professional position. The acts of DMB towards Stuart also constituted outrageous conduct under the Arizona statute justifying a constructive discharge claim without the necessity of offering a reasonable time to correct the situation.

This Court should deny the Motion as to the wrongful termination claim.

DATED: January 11, 2020.

**UDALL SHUMWAY PLC**

By: */s/ Bradley D. Gardner*
    Bradley D. Gardner, Esq.
    1138 North Alma School Road, Suite 101
    Mesa, Arizona 85201
    *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2020, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on the following counsel of record via the Court's CM/ECF system to:

Leah S. Freed
Justin B. Caresia
Ogletree, Deakins, Nash, Smoak & Stewart, P.C., SBN 00504800
2415 East Camelback Road, Suite 800
Phoenix, Arizona 85016
*Attorneys for Defendant*

By: */s/ Alyssa Quijano*

5638315.2/117296.1

18

1

**LIST OF PLAINTIFF'S EXHIBITS**

2

| Exhibit A | McNicol deposition excerpts and exhibits |
| Exhibit B | Critchley deposition excerpts |
| Exhibit C | Krimbill deposition excerpts |
| Exhibit D | Performance Improvement Plan – DMB 000522-524 |
| Exhibit E | Miller declaration SM157 |
| Exhibit F | Paystubs SM47-52 |
| Exhibit G | 2014-2015 Performance Evaluations DMB 000037-44 |
| Exhibit H | E-mails SM16 |
| Exhibit I | E-mails SM8-10 |
| Exhibit J | McNicol declaration |
| Exhibit K | E-mail DMB 000094 |
| Exhibit L | Texts SM27-29 |
| Exhibit M | Transcript of 5/3/18 recording SM127-151 |
| Exhibit N | Transcript of 4/4/18 recording SM73-126 |
| Exhibit O | Texts SM35 |
| Exhibit P | E-mail DMB 000205-206 |
| Exhibit Q | E-mail DMB 000197 |
| Exhibit R | E-mail DMB 000082 |
| Exhibit S | E-mail DMB 000454 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28