**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stuart McNicol,<br><br>　　　　Plaintiff,<br><br>v.<br><br>DMB Sports Clubs LP,<br><br>　　　　Defendant. | No. CV-19-00750-PHX-MTL<br><br>**ORDER** |

Defendant DMB Sports Clubs LP ("DMB") has filed a Motion for Summary Judgment (Doc. 42). The Motion is fully briefed. (Doc. 42); (Doc. 53); (Doc. 56.) The Motion is granted in part and denied in part.[1]

**I.　BACKGROUND**

Plaintiff Stuart McNicol began working for DMB on March 24, 2014, as the Head Tennis Professional at DMB's DC Ranch Village Health Club & Spa ("the Village"). (Doc. 42 at 2); (Doc. 53 at 1); (Doc. 48-1 at 9.) McNicol's job responsibilities included providing tennis instruction for Village members. (Doc. 1-3 at 7, ¶ 22.) He was also permitted to give on-site tennis lessons to non-club members. (*Id.*) DMB allowed McNicol to string racquets from his home, and he was compensated directly by club members for

---

[1] DMB requested oral argument (part of Doc. 42), which the Court granted before the Motion was fully briefed. (Doc. 47.) After reviewing the pleadings, however, the Court determined that oral argument would not have aided the Court's decisional process. *See e.g.*, *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *see also* LRCiv 7.2(f); Fed. R. Civ. P. 78(b). Oral argument was already vacated. (Doc. 57.) DMB's request for oral argument (part of Doc. 42) is denied.

those services. (Doc. 1-3 at 20, ¶ 11); (Doc. 53 at 3); (Doc. 48-1 at 18-19.) In 2014 and 2015 McNicol received favorable year-end employee performance reviews. (Doc. 48-2 at 83-91.)

McNicol reported directly to the Tennis Director, Nick Heron. (Doc. 42-1 at 97-99.) On July 5, 2016, Mr. Heron drafted an "Expectations for Success" memorandum to McNicol, stating that "[i]n order for our group to succeed, the following expectations of each of us must become effective immediately." (Doc. 42-1 at 127-28.) The memorandum listed numerous expectations for the group, including attendance at "member events, networking functions and team functions unless prior approval is received from the Tennis Director or General Manager to be absent." (*Id*.)

On August 1, 2016, Plaintiff met with Mr. Heron and the Village's General Manager, Jim Krimbill, to discuss the Expectations for Success memorandum. (Doc. 48-1 at 25-26); (Doc. 53 at 2); (Doc. 42 at 3.) McNicol maintains that the memorandum was not given to him as a criticism of his work, but as an outline of expectations moving forward. (Doc. 53 at 2-3.) DMB contends that the memorandum identified areas in which McNicol's work needed improvement and reestablished McNicol's specific job duties. (Doc. 42 at 3.) The memorandum was signed by both Mr. Heron and McNicol that day. (Doc. 42-1 at 128); (Doc. 48-1 at 25.)

Sometime in August 2016, McNicol met with Mr. Krimbill and DMB's Chief Human Resources Officer to discuss his compensation.[2] (Doc. 42 at 3); (Doc. 53 at 3); (Doc. 48-1 at 34.) McNicol alleges that during this meeting the Chief Human Resources Officer told him that he could increase his compensation by working overtime. (Doc. 48-1 at 34); (Doc. 42 at 3); (Doc. 53 at 3.) McNicol responded that he was unaware of his eligibility for overtime pay, but that he had been working overtime between March 2014 and August 2015 without compensation. (Doc. 42 at 3-4); (Doc. 53 at 3.) In September 2016, after an investigation into McNicol's unpaid overtime claim, DMB paid McNicol

---

[2] DMB states (Doc. 42 at 3) that the meeting between McNicol, the General Manager, and the Chief Human Resources Officer occurred on August 1, 2016, but the record reflects solely that the meeting occurred sometime in August 2016.

$5,964.33.[3] (Doc. 53 at 3); (Doc. 42 at 4); (Doc. 48-1 at 37.)

The Village hired a new Tennis Director, David Critchley, in November 2016. (Doc. 53 at 2); (Doc. 42 at 4.) On December 8, 2016, Mr. Critchley and Mr. Krimbill gave McNicol an unfavorable year-end employee performance evaluation. (Doc. 42-1 at 130-34); (Doc. 42 at 4); (Doc. 53 at 4.) The evaluation alleged that McNicol had a negative attitude toward the Village's policies and procedures, that he failed to follow through with assigned tasks, and that he poorly managed his time. (Doc. 42-1 at 130-34); (Doc. 42 at 4); (Doc. 53 at 4.) McNicol's 2016 year-end review referenced events that purportedly occurred in July and October 2016. (Doc. 42-1 at 131-32.)

In December 2016, DMB purchased equipment that enabled it to offer racquet stringing services on-site at the Village. (Doc. 53 at 3.) Thereafter, McNicol was no longer permitted to string racquets from his home, and his on-the-job responsibilities were not expanded to include on-site racquet stringing services. (*Id.* at 4.) According to McNicol, DMB hired teenagers to do this work. (*Id.*)

McNicol asserts that in January 2017, Mr. Critchley told him that Mr. Krimbill wanted him fired because he had "cost the company too much money in [his] overtime pay." (Doc. 48-1 at 41-42); (Doc. 53 at 4); (Doc. 1-3 at 20, ¶ 8); (*see also* Doc. 48-2 at 176.) DMB denies that any such conversation occurred. (Doc. 9 at 2, ¶ 8.)

On December 6, 2017, McNicol received a positive year-end employee performance review in which Mr. Critchley described him as a "great asset to the club" and the "face of [the] tennis program." (Doc. 42-1 at 139.) McNicol's 2017 evaluation reflected that McNicol had been "very open to the several new responsibilities given to [him] by the director," that he was "quick to help where needed," and that he had been "a huge asset to the director . . . ." (Doc. 53 at 4); (Doc. 42 at 5); (Doc. 42-1 at 139-42.) McNicol did not receive a raise in 2017. (Doc. 1-3 at 21, ¶ 20.)

In January 2018, DMB's Director of Membership told McNicol that non-members could no longer receive tennis lessons at the Village. (Doc. 53 at 5.) The next month,

---
[3] DMB maintains that it paid the $5,964.33 to McNicol even though it could not corroborate his overtime claim. (Doc. 42 at 4.)

allegedly with DMB's consent, McNicol began teaching lessons part-time at a non-DMB tennis club. (Doc. 42 at 6); (Doc. 53 at 5); (Doc. 48-1 at 50.) McNicol alleges that Mr. Critchley continued to personally teach tennis lessons to non-members at the Village, even though McNicol was no longer permitted to do so. (Doc. 53 at 5.) McNicol claims, moreover, that in mid-April 2018, Mr. Critchley called the other club where McNicol provided instruction and inquired about the identities of McNicol's students there. (Doc. 1-3 at 22, ¶ 26); (Doc. 53 at 6.)

Sometime between 2017 and 2018, McNicol asserts that he became aware of what he believed were unlawful employment practices committed by Mr. Critchley within the Juniors Academy at the Village. (Doc. 53 at 5-6); (Doc. 48-1 at 56.) Specifically, McNicol believed that cash payments were made to people "under the table," that an employee's hours were manipulated so that he qualified for insurance benefits, and that DMB was employing a foreign citizen without a proper work visa. (Doc. 1-3 at 21, 27, ¶¶ 16-18, 61-63); (Doc. 53 at 5-6.)

McNicol discussed these matters, as well as his compensation, job duties and job performance with Mr. Critchley in early April, and again on May 3, 2018.[4] (Doc. 48-2 at 103, ¶ 12); (Doc. 53 at 6); (Doc. 56 at 5); (Doc. 48-2 at 117-20, 126, 133-35, 145, 160-62.) During the May 3, 2018 conversation and in a subsequent email sent to McNicol on May 14, 2018, Mr. Critchley outlined what he "envision[ed] from the Head Pro Role moving forward." (Doc. 53 at 7); (Doc. 42 at 7); (Doc. 42-1 at 173); (Doc. 48-2 at 132.) Mr. Critchley also discussed the possibility of McNicol forgoing his salaried position and its accompanying administrative duties in exchange for an hourly and commission-based position that would only require him to teach tennis lessons. (Doc. 48-2 at 135.) McNicol alleges that in the May 14, 2018 email, Mr. Critchley added additional duties to the Head Tennis Professional role, including the requirement that McNicol assist with the Juniors Academy, where he believed the illegal hiring practices were occurring. (Doc. 53 at 7); (Doc. 42 at 7.)

---

[4] McNicol surreptitiously recorded these conversations. Transcripts of the recordings were attached to McNicol's Response. (Doc. 48-2 at 114-192.)

On May 7, 2018, Mr. Critchley asked the Village's human resources department to issue a performance improvement plan for McNicol. (Doc. 48-2 at 197-203.) In response to Mr. Critchley's proposal to present McNicol with a "write up," a human resources employee noted that there were not enough documented incidents to make it "a Final" and that McNicol could not be written up "for incidents where he notified [Mr. Critchley] beforehand . . . ." (Doc. 48-2 at 197.) On May 15, 2018, Mr. Critchley texted McNicol, requesting a meeting with Mr. Krimbill to review a disciplinary write-up. (Doc. 1-3 at 24, ¶ 41.) The performance improvement plan was never given to McNicol. (Doc. 56 at 6.)

On May 16, 2018, through his attorney, McNicol reported the alleged unlawful employment practices to the Village's president. (Doc. 53 at 6.) An internal investigation ensued. Mr. Critchley admitted that he had personally paid a non-Village employee to assist with tennis lessons, and that he had permitted another employee to do the same. (Doc. 48-2 at 12, 54, 55, 57.) Mr. Critchley was disciplined for these infractions. (Doc. 48-2 at 12-13.)

Also on May 16, 2018, McNicol's attorney communicated to Mr. Critchley that McNicol considered himself "constructively discharged" from the Head Tennis Professional position because he was being "forced" to participate in the Juniors Academy. (Doc. 42 at 8); (Doc. 53 at 7-8); (Doc. 42-1 at 176.) McNicol maintains that he thereafter "accept[ed] the offer" to work as a commission-based Tennis Professional at the Village. (Doc. 53 at 8); (Doc. 42 at 8.)

DMB terminated McNicol's managerial access to DMB's internal system on July 16, 2018. (Doc. 1-3 at 25, ¶ 48); (Doc. 56 at 7.) Thereafter, when DMB failed to provide McNicol with what he considered to be meaningful opportunities to teach lessons, he considered himself constructively discharged from the Tennis Professional position, too. (Doc. 53 at 8); (Doc. 42-1 at 179.) DMB maintains that McNicol voluntarily resigned from his employment with DMB on July 20, 2018. (Doc. 42 at 8.)

In this lawsuit, McNicol raises claims of retaliation under the Fair Labor Standards Act ("FLSA") (Count 1) and wrongful termination under the Arizona Employment

Protection Act ("AEPA") (Count 2). (Doc. 1-3 at 19-40.)

## II. LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (internal citations omitted); *see also Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) (court determines whether there is a genuine issue for trial but does not weigh the evidence or determine the truth of matters asserted).

## III. ANALYSIS

### A. FLSA Claim

The FLSA makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]." 29 U.S.C. § 215(a)(3). When evaluating an FLSA retaliation claim in the summary judgment context, the plaintiff must first make a *prima facie* case of retaliation by showing: (1) that he or she engaged in protected activity; (2) that he or she suffered an adverse employment decision; and (3) that there was a causal link between the plaintiff's activity and the adverse employment decision. *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997) (*applying McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If a plaintiff establishes a *prima facie* case, "the burden shifts to the employer to offer a legitimate reason for the [adverse action]." *Conner*, 121 F.3d at 1394. Once the employer offers such a reason, "the burden then shifts back to the plaintiff to show that 'there is a genuine dispute of material fact as to whether the employer's proffered reason for the

challenged action is pretextual.'" *Id.* (internal citations omitted).

### 1.     Prima facie showing

#### a.     Protected activity

To engage in protected activity, the plaintiff must make a "complaint." 29 U.S.C. § 215(a)(3).  McNicol argues that he engaged in protected activity under the FLSA when he filed his overtime claim with DMB in August 2016 and again when he reported the illegal "off the book payments" in April and May 2018. (Doc. 53 at 9-10.)  For purposes of this Motion, DMB agrees that McNicol's overtime claim in August 2016 constituted FLSA-protected activity. (Doc. 42 at 9 n.6.)  While DMB challenges the veracity of Plaintiff's theory that "all of the alleged retaliation up to April 2018 was at the behest of Mr. Krimbill, while all of the alleged retaliation after April 2018 was by Mr. Critchley," (Doc. 56 at 5), it does not deny that McNicol's reporting of the "off the book payments" constitutes protected activity. *See also* 29 U.S.C. § 211(c) (FLSA requires employer to keep and preserve records of its employees' wages and hours).

Because 29 U.S.C. § 215(a)(3) broadly encompasses the filing of "*any* complaint," (emphasis added), the Court agrees that McNicol engaged in protected activity when he made his unpaid overtime claim in August 2016 and again when he reported the unlawful payments and hiring practices to Mr. Critchley and the Village president in May 2018. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 9-10 (2011) (holding that the phrase "any complaint" suggests a broad interpretation).

#### b.     Adverse Employment Decision

To meet the second prong of the *prima facie* retaliation test, a court must find that a reasonable employee would have found the challenged action materially adverse. *McBurnie v. City of Prescott*, 511 Fed. App'x. 624, 625 (9th Cir. 2013).  An employer's action is materially adverse if it "might have dissuaded a reasonable worker from making or supporting" an FLSA complaint. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68-69 (2006) (analyzing adverse employment under Title VII's antiretaliation provision); *McBurnie*, 511 Fed. App'x. at 625 (applying the *Burlington* standard to FLSA claims).

Transfers of job duties away from the plaintiff and undeserved performance ratings can constitute adverse employment decisions under the FLSA. *Yartzoff v. Thomas*, 809 F.2d 1371, 1375-76 (9th Cir. 1987). Additional adverse actions can include the denial of a pay raise, *see*, *e.g.*, *Gillis v. Georgia Dept. of Corrections*, 400 F.3d 883, 887 (11th Cir. 2005), a reduction of hours, *Henderson v. City of Grantville, Ga.*, 37 F. Supp. 3d 1278, 1283 (N.D. Ga. 2014), and a termination via a constructive discharge, *Ford v. Alfaro*, 785 F.2d 835, 841 (9th Cir. 1986) (constructive discharge constitutes adverse employment decision under FLSA where an ordinary employee would feel compelled to resign if confronted with the difficult work environment).

Here, the Court finds that McNicol's allegations about the unjustified 2016 year-end performance review, the denial of a raise in 2016 and 2017, the reduction of his income through the alleged disparate application of internal policies about providing tennis lessons to non-members, the alleged constructive discharge from the Head Tennis Professional and Tennis Professional positions, the ultimatum to participate in the Juniors Academy and assume additional duties or resign, and DMB's purported failure to provide him new lesson opportunities after May 16, 2018, (Doc. 1-3 at 24-26, ¶¶ 38-39, 45, 52)—all, if true, fall within the meaning of adverse employment decisions under the FLSA. Each of these actions by DMB, taken individually or in the aggregate, might have dissuaded an ordinary employee from making an FLSA claim. *See Danielson v. Brennan*, 764 Fed. App'x. 622, 623 (9th Cir. 2019) (considering collective actions). Accordingly, McNicol has shown that DMB's actions meet the second prong of the *prima facie* retaliation test.

### c. Causal Link

To show causation at the *prima facie* stage, McNicol must establish that there is a "causal link" between a protected activity and an adverse employment action, which is much less stringent than the "but-for" causation that a jury must find. *Knickerbocker v. City of Stockton*, 81 F.3d 907, 910-11 (9th Cir. 1996) (applying "but for" standard for causation during trial and on appeal); *Starnes v. Wallace*, 849 F.3d 627, 635 (5th Cir. 2017) (*prima facie* inquiry into causation is the "much less stringent" standard); *Carmack v. Park*

*Cities Healthcare, LLC*, 321 F.Supp.3d 689, 705 (N.D. Tex. 2018) (*prima facie* burden to show causal link is minimal).

Regarding McNicol's August 2016 overtime claim and the allegedly unjustified 2016 year-end performance review—and regarding McNicol's August 2016 overtime claim and the denial of a raise in 2016—the Court finds that McNicol has made a *prima facie* showing of causation. When the facts are viewed in the light most favorable to McNicol, the Court agrees that the four-month proximity of McNicol's overtime complaint and the 2016 year-end performance evaluation and denial of a raise, combined with the alleged retaliatory statement by Mr. Krimbill to Mr. Critchley and the lack of prior discipline to McNicol, all reveal an inference of retaliation sufficient to show a causal link at the *prima facie* stage. *See Knickerbocker*, 81 F.3d at 912 (adverse action closely following protected activity can support inference of retaliation); (Doc. 48-1 at 41-42); (McNicol claiming Mr. Krimbill told Mr. Critchley that he wanted McNicol fired because of McNicol's overtime complaint); (Doc. 48-2 at 176) (Mr. Critchley admitted to McNicol during the recorded conversation on April 4, 2018, that Mr. Krimbill wanted McNicol to "kind of go away".)

While the Court agrees with DMB that McNicol's favorable year-end performance evaluation in 2017 "dispels any inference of retaliation" stemming from the overtime claim he made in August 2016, (Doc. 42 at 11); *see Manatt v. Bank of Am., NA*, 339 F.3d 792, 802 (9th Cir. 2003) (intervening events, such as pay raises and selection for prestigious assignments, break the causal connection), McNicol engaged in additional FLSA-protected activities when he reported the unlawful employment practices and "under the table" payments in April and May 2018. Because the positive year-end performance evaluation in 2017 does not dispel any inference of retaliation for the subsequent FLSA-protected activities, the Court finds that McNicol made a *prima facie* showing of causation with regard to his allegations that he was constructively discharged from both positions (Doc. 1-3 at 26, ¶ 52), that he was forced to participate in the Juniors Academy and assume additional duties or resign, (Doc. 1-3 at 24, ¶¶ 38-39), and that he was not provided

meaningful opportunities for new lessons after May 16, 2018 (Doc. 1-3 at 25, ¶ 45). These alleged adverse employment actions occurred as little as four days after McNicol engaged in the protected activity. (Doc. 48-2 at 200-201.) This temporal proximity alone is sufficient to show a causal link at the *prima facie* stage. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000).

### 2. DMB's proffered reasons

Because McNicol established a *prima facie* case, the burden shifts to DMB to articulate legitimate, nonretaliatory reasons for the alleged retaliatory action taken. *Conner*, 121 F.3d at 1394. DMB states that McNicol's unsatisfactory 2016 evaluation and the corresponding denial of a raise were due to McNicol's "failure to perform the job duties outlined in his job description and the 'Expectations for Success' memorandum, such as organizing and attending events and programs, organizing and developing DMB's racquet-stringing business, and displaying a positive attitude about his job duties . . . ." (Doc. 42 at 10.) DMB claims that Mr. Critchley added new administrative duties to McNicol's position as Head Tennis Professional in May 2018 because DMB's tennis program had expanded, not because DMB was retaliating against McNicol for reporting the instances of unlawful employment practices and payments. (Doc. 42 at 12-13); (Doc. 48-2 at 29-30.) Finally, DMB asserts that McNicol was not constructively discharged from either the Head Tennis Professional or Tennis Professional position, but that McNicol voluntarily "directed his efforts at other employment with more favorable compensation" and "turned down numerous lesson opportunities offered to him by DMB." (Doc. 42 at 13.) The Court finds that DMB has stated legitimate reasons for these adverse employment actions.

### 3. Genuine disputes of material fact regarding pretext

Because DMB has offered legitimate reasons for the adverse actions, it is McNicol's burden to show that there is a genuine dispute of material fact as to whether DMB's proffered reasons for the adverse employment actions are pretextual. *Conner*, 121 F.3d at 1394. McNicol argues that the Expectations for Success memorandum was not a critique of his prior job performance, but more of a generalized memorandum. (Doc. 53 at 13.)

Though addressed to McNicol, the memorandum emphasizes "the expectations of each of us" that are necessary for "our group to succeed." (*See* Doc. 42-1 at 127-28.) On its face, the memorandum does not purport to identify past alleged instances of poor job performance by McNicol. The Court therefore finds that there are genuine disputes of material fact about the purpose of the Expectations for Success memorandum and whether DMB identified McNicol's purported job deficiencies prior to his filing of the overtime complaint in August 2016.

Regarding the diminished opportunities for teaching new lessons in June and July 2018, McNicol has presented evidence that DMB may have offered pretextual reasons for its adverse actions. On May 7, 2018, just four days after McNicol reported the "under the table" payments to Mr. Critchley, Mr. Critchley initiated the process to put McNicol on a performance improvement plan, claiming that he had failed to complete tasks as early as January and March of that year. (Doc. 48-2 at 200-201.) Yet in response to Mr. Critchley's plan to present McNicol with a "write up," the Village's human resources representative noted that there were not enough documented incidents to make it "a Final" and that McNicol could not be written up "for incidents where he notified [Mr. Critchley] beforehand." (Doc. 48-2 at 197.) Mr. Critchley and Mr. Krimbill ultimately decided not to present this to McNicol, and immediately thereafter McNicol's opportunities for teaching lessons declined. The timing of these relevant actions and comments raises a genuine dispute of material fact as to "but for" causation.

Finally, McNicol has raised a genuine disputed fact as to whether the adding of job duties to the Head Tennis Professional role in May 2018 was pretextual. DMB claims that the additional job duties were added in response to an expanding tennis program; yet nobody was hired to replace McNicol as the Head Tennis Professional after he left, and the administrative duties were assumed by Mr. Critchley. (Doc. 53 at 15-16); (Doc. 48-2 at 33.)

Because there are material disputed facts about whether DMB's stated reasons for the adverse actions are pretextual, the Court **denies** summary judgment to DMB on Count

1. This claim shall proceed to trial.

### B. AEPA Claim

McNicol alleges that he was wrongfully terminated from the Head Tennis Professional and Tennis Professional positions. A wrongful termination action under the AEPA lies when, in the course of his or her employment, an employee is terminated in retaliation for refusing to violate Arizona law or for reporting violations of Arizona law. *Galati v. America West Airlines, Inc.*, 205 Ariz. 290, 292 (App. 2003) (*citing* A.R.S. § 23-1501(3)(c)(i), (ii)). DMB does not dispute that McNicol reported such violations to DMB's management. (Doc. 42 at 14-18); (Doc. 53 at 16.) The sole argument it advances is that McNicol was not terminated from his employment.[5] (Doc. 42 at 14); (Doc. 56 at 8-11.)

Termination of the employment relationship is required for a wrongful termination claim under the AEPA. A.R.S. § 23-1501(3)(c)(i), (ii). Termination may be express or constructive. *Peterson v. City of Surprise*, 244 Ariz. 247, 250 (App. 2018). Constructive discharge transforms a resignation into a discharge, which satisfies the termination element of a wrongful termination claim under the AEPA. *Id.* In any action under the statutes of Arizona, including the AEPA, constructive discharge may only be established by: (1) evidence of an employer's failure to remedy "objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign," A.R.S. § 23-1502(A)(1); or (2) evidence of "outrageous conduct" by the employer, A.R.S. § 23-1502(A)(2). To preserve the right to bring a constructive discharge claim for "objectively difficult or unpleasant working conditions," the employee must first give the employer "at least fifteen days' notice . . . that the employee intends to resign because of [the] conditions." A.R.S. § 23-1502(A)(1). This notice requirement encourages the employee to communicate to the employer whenever he or she believes working conditions may

---

[5] DMB does not challenge causation under McNicol's AEPA claim. The Court, therefore, does not decide what framework applies or whether there are material disputed facts as to causation on Count 2. *Cf. Whitmore v. Wal-Mart Stores Incorporated*, 359 F. Supp. 761, 799-800 n.29 (D. Ariz. 2019) (applying *McDonnell Douglas* burden-shifting framework to plaintiff's AEPA claim); *Revit v. First Advantage Tax Consulting Services, LLC*, No. CV10-1653-PHX-DGC, 2012 WL 1230841, at *4-5 (D. Ariz. Apr. 12, 2012) (adopting First Amendment retaliation approach to AEPA claims instead of *McDonnell Douglas* test).

become intolerable, and it gives the employer the opportunity to respond to the employee's concerns. A.R.S. § 23-1502(A)(1), (E)(2). An employer is deemed to have waived the right to notice of an employee's intent to resign, however, if the employer failed to provide prior written notice to its employees of the requirements for bringing a constructive discharge claim against the employer. *See* A.R.S. § 23-1502(E), (E)(2) (providing required language and posting requirements for the employers' notice to employees). An employee is not required to give prior notice to the employer if the employee is resigning because of the employer's "outrageous conduct." A.R.S. § 23-1501(A)(2), (F).

McNicol contends that he was expressly terminated and constructively discharged from the Head Tennis Professional position, and that he was constructively discharged from the Tennis Professional position. (Doc. 53 at 16.) DMB argues that McNicol was never expressly terminated, (Doc. 56 at 9), and that he cannot meet the statutory elements of constructive discharge because [i] there was no outrageous employer conduct, [ii] he did not provide DMB 15 days' notice of his intent to resign, and [iii] because there were no objectively difficult or unpleasant working conditions. (Doc. 42 at 16); (Doc. 56 at 9.) Neither party identifies whether DMB provided its employees with the statutorily required employment notice in A.R.S. § 23-1502(E)(2).

Preliminarily, the Court agrees with DMB that McNicol was not expressly terminated by DMB from either position. McNicol has consistently argued only that he was constructively discharged from both positions. (Doc. 1-3 at 28, ¶¶ 66-69.) And the evidence he submitted was in furtherance of the same. The Court therefore **grants** partial summary judgment in favor of DMB on Count 2 with respect to McNicol's claim that he was expressly terminated by DMB.

The Court also agrees with DMB that there is no evidence of outrageous employer conduct. While the statute defining outrageous employer conduct does not provide an exhaustive list, it names sexual assault, threats of violence, and a continuous pattern of discriminatory harassment as examples. A.R.S. § 23-1502(F). Requiring McNicol to participate in the Juniors Academy, calling the other club to inquire about McNicol's

students, adding additional duties to the job of Head Tennis Professional, engaging in a "systematic and sustained effort to deprive him of almost all lesson income," and removing his managerial access to DMB's internal system do not rise to the level of "outrageous conduct" contemplated by the statute. A.R.S. § 23-1502(A)(2); (Doc. 1-3 at 28, ¶ 66); (Doc. 53 at 17.) It is therefore ordered **granting** partial summary judgment in favor of DMB on Count 2 with respect to McNicol's claim that he was constructively discharged by outrageous employer conduct.

Next, because DMB disregarded § 23-1502(E) in its Motion, the Court assumes that DMB did not comply with its own notice obligations. *See Cook v. Scottsdale Ins. Co.*, No. CV-110938-PHX-DGC, 2012 WL 6089039, at *5 (D. Ariz. Dec. 6, 2012) (assuming by defendant's disregard of § 23-1502 that they either did not give the employment notice required by § 23-1502(E), or they gave the notice and plaintiff complied with the 15-days' notice requirement). Without some showing that DMB complied with § 23-1502(E) by giving its employees the required employment notice, the Court cannot find as a matter of law that McNicol was required to give DMB 15 days' notice of the alleged "difficult or unpleasant working conditions" prior to resigning. *See* A.R.S. § 23-1502(A)(1), (E) (establishing waiver of an employer's right to notice under subsection A, paragraph 1). Accordingly, in ruling on summary judgment under § 23-1502(A)(1), the Court will consider only whether McNicol presented evidence to show "objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign," and not whether he gave DMB the 15 days' notice that would otherwise be required by statute.

To show difficult or unpleasant working conditions, McNicol focuses on events that occurred after he reported the alleged unlawful employment practices to Mr. Critchley in April 2018. (Doc. 53 at 17.) He claims that he was compelled to resign from the Head Tennis Professional position because: Mr. Critchley called the other club to see which students McNicol was teaching there, DMB management was intent on giving him a "false write up"; DMB added additional duties to his job description; and DMB required him to

be part of the Juniors Academy, where McNicol believed the unlawful employment practices were occurring. (*Id*.) He asserts that he was compelled to resign from the Tennis Professional position because DMB reduced his income to an unsustainable level by depriving him of meaningful opportunities to teach lessons. (*Id*.) DMB argues that McNicol's claims of constructive discharge are not credible because he agreed to remain employed at DMB as a Tennis Professional and because lesson income is generally lower in the summer months. (Doc. 42 at 16); (Doc. 56 at 10.)

Whether working conditions are so intolerable as to justify a reasonable employee's decision to resign is generally a fact question for the jury. *See West v. Salt River Agr. Imp. and Power Dist.*, 179 Ariz. 619, 625 (App. 1994). The Court construes the inferences in favor of McNicol and does not weigh the evidence or assess its credibility at the summary judgment stage. *Jessinger*, 24 F.3d at 1131. Accordingly, the Court concludes that requiring McNicol to teach lessons in the Juniors Academy after he reported unlawful hiring practices within it, threatening a disciplinary write up that was drafted but never substantiated, and adding additional duties to the Head Tennis Professional position without an increase in compensation are sufficient to create a question of fact on whether McNicol was subjected to "objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign" from the Head Tennis Professional position. A.R.S. § 23-1502(A)(1). The Court further finds that depriving McNicol of opportunities to teach lessons as a commission-based employee creates a question of fact on whether a reasonable employee would feel compelled to resign from the Tennis Professional position. Partial summary judgment is **denied** to DMB on Count 2 with respect to McNicol's claim that he was constructively discharged by evidence of objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign. Count 2 shall proceed to trial.

## IV. CONCLUSION

**IT IS ORDERED denying** summary judgment (part of Doc. 42) to Defendant on Count 1.

**IT IS FURTHER ORDERED granting** partial summary judgment (part of Doc. 42) to Defendant on Plaintiff's claim in Count 2 that he was expressly terminated (part of Count 2).

**IT IS FURTHER ORDERED granting** partial summary judgment (part of Doc. 42) to Defendant on Plaintiff's claim in Count 2 that he was constructively discharged under A.R.S. § 23-1502(A)(2) (part of Count 2).

**IT IS FURTHER ORDERED denying** partial summary judgment (part of Doc. 42) to Defendant on the remaining portions of Count 2.

**IT IS FURTHER ORDERED** denying DMB's request for oral argument (part of Doc. 42).

**IT IS FINALLY ORDERED** affirming the Final Pretrial Conference on June 8, 2020, and the Jury Trial for June 16, 2020 to June 19, 2020.

Dated this 20th day of March, 2020.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge